ORIGINAL

FILED
JUN 3 0 2005
U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SCOTT TIMBER CO., Plaintiff, v. THE UNITED STATES, Defendant. | ) | No. 05-708C |

**COMPLAINT**

**ALLEGATIONS COMMON TO ALL COUNTS**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491 and 41 U.S.C. § 609.

2. Plaintiff is Scott Timber Co. ("Scott").

3. Defendant is the United States of America acting through the United States Forest Service, Department of Agriculture (the "Forest Service").

4. This action arises out of the Forest Service's denial of Scott's claims under the Contract Disputes Act, 41 U.S.C. § 601, et. seq. (the "CDA"), for breach of the Forest Service's Whitebird timber sale contract no. 087475 (hereinafter also referenced as the "Whitebird" contract), Jigsaw

timber sale contract no. 087467 (hereinafter also referenced as the "Jigsaw" contract) and Pigout timber sale contract no. 087459 (hereinafter also referenced as the "Pigout" contract).

5. The Whitebird, Jigsaw and Pigout contracts were awarded by the Forest Service to Scott on July 8, 1999. All of the contracts involve the sale and harvest of certain timber located in the Umpqua National Forest in Oregon.

6. The Whitebird, Jigsaw, and Pigout contracts contain Clause CT6.01, Interruption Or Delay of Operations (10/96), which provides the government with limited authority to suspend timber sale operations.

7. The Whitebird, Jigsaw, and Pigout contracts contain Clause CT 6.25 Protection of Habitat of Threatened, Endangered and Sensitive Species. Clause CT6.25 reads as follows

> CT6.25# – PROTECTION OF HABIT OF ENDANGERED SPECIES. (10/78) Location of areas needing special measures for protection of plants or animals listed as threatened or endangered under the Endangered Species Act of 1973, as amended, or as sensitive by the Regional Forester under authority of FSM 2670, are shown on Sale Area Map and identified on the ground. Measures needed to protect such areas have been included elsewhere in this contract or are as follows:
>
> None
>
> If protection measures prove inadequate, if other such areas are discovered, or if new species are listed, Forest Service may either cancel under CT8.2 or unilaterally modify this contract to provide additional protection regardless of when such facts become known. Discovery of such areas by either party shall be promptly reported to the other party.
>
> In the event of contract modification under this Subsection, Purchaser shall be reimbursed for any additional protection required by the modification, provided that any work or extra protection required shall be subject to prior approval by

Forest Service. Amount of reimbursement shall be determined by Forest Service using standard Forest Service rate redetermination methods in effect at time of agreed change and shall be in the form of a reduction in Current Contract Rates unless agreed otherwise in writing. However, in no event my Current Contract Rates be reduced below Base Rates.

8. By indicating "none" in Clause CT6.25 in the Whitebird, Jigsaw and Pigout timber sale contracts, the Forest Service represented that it had already taken specified adequate measures to protect Threatened, Endangered and Sensitive Species when it designed the sale and put it out for bid. Scott relied on these representations when it purchased these sales.

9. Scott was relying on the timber from the Whitebird, Jigsaw and Pigout sales to meet its obligations to supply wood to the mills owned and operated by its parent company and long-standing exclusive domestic log processing subcontractor, Roseburg Forest Products ("RFP").

10. Scott relies on RFP to fulfill the domestic processing requirement of its Forest Service and BLM timber sale contracts and RFP relies on Scott to supply timber to its mills.

11. When Scott was awarded the Whitebird, Jigsaw and Pigout contracts, Scott and the Forest Service anticipated that some of the timber from those sales would also be sold on the open market.

12. Before Scott could begin harvesting on these sales, on August 2, 1999, the U.S. District Court for the Western District of Washington, issued an opinion on the parties' cross-motions for

summary judgment in an action styled Oregon Natural Resources Council Action v. U.S. Forest Service, 59 F. Supp. 1085, No. C98-942WD ("ONRC Action"), in which the court found that the Forest Service, arbitrarily and capriciously violated the President's Northwest Forest Plan and various National Forest Land Management Plans by failing to perform certain plant and wildlife surveys before awarding certain timber sale contracts. Based on this finding, the court granted summary judgment against the Forest Service and entered an injunction that immediately suspended the timber sale contracts identified in the ONRC Action amended complaint.

13. On August 26, 1999, the court expanded its previously entered injunction to another 25 timber sale contracts, including the Whitebird, Pigout and Jigsaw timber sale contracts.

14. On August 31, 1999, the Forest Service advised Scott that the Forest Service would not approve any plan of operations for the Whitebird, Pigout and Jigsaw sales while the injunction remained in force, which prevented Scott from starting its harvesting operations as Scott expected.

15. Although Scott had already invested significant amounts of time and money in anticipation of being able to begin harvesting, Scott reluctantly complied with the Forest Service's direction and suspension, and did not begin harvesting on the Whitebird, Pigout and Jigsaw sales.

16. In late 1999, the environmental activist plaintiffs, the Forest Service and the BLM[1] filed a stipulation and proposed order for dismissal in ONRC Action, under which the Forest Service agreed, among other things, to continue the suspension of operations on the Whitebird, Pigout and Jigsaw timber sales until certain survey requirements (which the Forest Service had failed to fulfill prior to awarding the Whitebird, Pigout and Jigsaw timber sale contracts) were satisfied. The Forest Service also gave the environmental activist plaintiffs the right to review any completed surveys and to object to their sufficiency before operations on these sales could resume.

17. As a result of the above-mentioned agreement between the environmental plaintiffs, the Forest Service and the BLM, the ONRC Action lawsuit was dismissed, and the injunction dissolved.

18. However, pursuant to the above-mentioned agreement, the Forest Service continued to refuse to permit any operations on the Whitebird, Pigout and Jigsaw sales until all of the surveys required for that sale under the agreement had been completed. The surveys were not completed on the Pigout sale until on or about June 11, 2002. The surveys were not completed on the Whitebird and Jigsaw sales until on or about June 9, 2003.

---

[1]The BLM was a defendant in ONRC Action. However, no BLM timber sales are at issue in this action.

19. The Pigout contract remained suspended for approximately three years, from August 31, 1999 to June 11, 2002, when the Forest Service notified Scott that this suspension was lifted.

20. The Whitebird and Jigsaw contracts remained suspended for approximately four years, from August 31, 1999, until June 9, 2003, when the Forest Service finally notified Scott that these suspensions were lifted.

21. Because of the Forest Service's suspension of operations, Scott was unable to remove any timber from the Whitebird, Jigsaw and Pigout sales at the time that Scott planned to harvest it and Scott incurred various damages and was unable to fully meet its obligations to RFP. RFP, in turn, was forced to run certain of its plywood plants at reduced levels and/or to produce a different product mix. RFP consequently incurred damages for which Scott is liable, and Scott is entitled to recover these damages in this action.

22. On November 9, 2004, Scott submitted three properly certified claim letters regarding the Whitebird, Jigsaw and Pigout contracts to the contracting officer pursuant to the CDA, seeking damages and requesting a final decision on these claims within 60 days.

23. On April 29, 2005, the Contracting Officer, Brenda L. Woodard, issued three final decisions granting in part, and denying in part Scott's claims associated with the Whitebird, Jigsaw and Pigout contracts.

**COUNT I**
**WHITEBIRD**

24. Scott incorporates and realleges paragraphs 1-23 above.

25. The Whitebird contract was awarded by the Forest Service to Scott on July 8, 1999.

26. The Whitebird contract was for the sale and harvest of approximately 4,125 MBF.

27. The original termination date on the Whitebird contract was October 31, 2002, a term of over 39 months. The termination of the contract has been extended by the Forest Service to August 31, 2008.

28. The Whitebird contract remained suspended for approximately four years, from August 31, 1999, until June 9, 2003, when the Forest Service finally notified Scott that the suspension was lifted. Even then, operations were still not allowed on one unit of the contract (Payment Unit 40) because a red tree vole nest had been located in that unit. Through an agreement with Scott dated June 8, 2004, the Forest Service removed approximately 79.3 MBF from this unit.

29. The Forest Service's suspension of Scott's performance under the Whitebird contract constitutes a material breach of the Forest Service's implied duties under the contract to cooperate and not hinder Scott's performance.

30. In the alternative, even assuming that the Forest Service had authority to suspend Scott's operations under clause CT6.01, the Forest Service retained an obligation to implement any such suspension reasonably. The Forest Service's suspension of Scott's operations under the Whitebird timber sale contract lasted approximately four years (from August 1999 into June 2003, with the exception of Unit 40). The length of this suspension was unreasonable in duration, and the Forest Service failed to undertake reasonable efforts to complete the required surveys in a timely manner in order to permit Scott to operate. The unreasonable duration of the Forest Service's suspension of the Whitebird timber sale contract constitutes a further material breach of that contract.

31. The Forest Service's failure to perform the required plant and wildlife surveys and subsequent suspension of the Whitebird contract in order to do so after award to determine whether the additional measures were necessary to protect plant and wildlife habitat constitutes a material breach of the Forest Service's express warranty in clause CT6.25.

32. In the alternative, assuming that the Forest Service's suspension of the Whitebird contract is not a breach, the Forest Service breached the contract by wrongfully failing and refusing to pay Scott certain out-of-pocket costs within the scope of contract clause CT6.01, including interest on deposits and Scott's cost of preparing its CDA claim.

33. As a result of the Forest Service's improper suspension and breach of the Whitebird contract, Scott was precluded from meeting its obligation to supply timber to the mills owned

and operated by RFP. Additionally, Scott expected to sell some of the timber from the sale on the open market. As a result of being denied the timber from the Whitebird sale at the time that Scott planned to harvest it, Scott incurred damages.

34. As a result of the Forest Service's improper suspension and breach of the Whitebird contract, Scott was precluded from providing a sufficient volume of quality timber to RFP to produce certain high value products resulting in lost profits to RFP in the amount of $2,028,290. Scott is liable to RFP for these lost profits and therefore Scott is entitled to recover these damages in this action.

35. As a result of the Forest Service's improper suspension and breach of the Whitebird contract, Scott was precluded from selling a volume of logs on the open market, resulting in lost profits in the amount of $28,544. Scott is entitled to recover these damages.

36. At the time of the suspension, Scott had deposits on the sale totaling $146,200. On January 25, 2000, this amount was reduced to $2,294. Interest on these sums through June 9, 2003, when the suspension was lifted, totals $6,225. The Contracting Officer's final decision acknowledged that Scott is entitled to these costs, but only awarded interest on deposits in the amount of $4,654.65. Scott is entitled to recover the difference ($1,570.35), plus any additional interest on the deposits as well as any CDA interest.

37. At the time of the suspension and thereafter, RFP had debt on which it was making payments at various interest rates. Had RFP been able to obtain the profit of $2,056,834 which it anticipated in a timely manner, it would have reduced its outstanding debt and avoided paying additional interest costs in the amount of $328,536. This interest cost continues to increase. Scott is liable to RFP for this cost and is entitled to recover this cost in this action.

38. Scott incurred $4,078 in having its personnel assist in the preparation of the Whitebird claim. Scott is entitled to recover this cost.

39. Scott incurred a benefit of $105,849 by purchasing and harvesting timber to replace some of the timber which had been suspended under the Whitebird sale. This amount is reflected as a credit in Scott's damage claim.

40. Scott's total damages incurred as a result of the Forest Service's wrongful suspension and breach of the Whitebird contract are $2,285,169, plus CDA interest.

**COUNT II**
**JIGSAW**

41. Scott incorporates and realleges paragraphs 1-23 above.

42. The Jigsaw contract was awarded by the Forest Service to Scott on July 8, 1999.

43. The Jigsaw contract was for the sale and harvest of approximately 7,272 MBF.

44. The original termination date on the Jigsaw contract was September 30, 2003, a term of over 50 months. The termination of the contract has been extended by the Forest Service to July 31, 2009.

45. The Jigsaw contract remained suspended for approximately four years, from August 31, 1999, until June 9, 2003, when the Forest Service finally notified Scott that the suspension was lifted.

46. The Forest Service's suspension of Scott's performance under the Jigsaw contract constitutes a material breach of the Forest Service's implied duties under the contract to cooperate and not hinder Scott's performance.

47. In the alternative, even assuming that the Forest Service had some authority to suspend Scott's operations under clause CT6.01, the Forest Service retained an obligation to implement any such suspension reasonably. The Forest Service's suspension of Scott's operations under the Jigsaw timber sale contract lasted approximately four years (from August 1999 into June 2003). The length of this suspension was unreasonable in duration, and the Forest Service failed to undertake reasonable efforts to complete the required surveys in a timely manner in order to permit Scott to operate. The unreasonable duration of the Forest Service's suspension of the Jigsaw timber sale contract constitutes a further material breach of that contract.

48. The Forest Service's failure to perform the required plant and wildlife surveys and subsequent suspension of the Jigsaw contract in order to do so after award to determine whether the additional measures were necessary to protect plant and wildlife habitat constitutes a material breach of the Forest Service's express warranty in clause CT6.25.

49. In the alternative, assuming that the Forest Service's suspension of the Jigsaw contract is not a breach, the Forest Service breached the contract by wrongfully failing and refusing to pay Scott certain out-of-pocket costs within the scope of contract clause CT6.01, including interest on deposits and Scott's cost of preparing its CDA claim.

50. As a result of the Forest Service's improper suspension and breach of the Jigsaw contract, Scott was precluded from meeting its obligation to supply timber to the mills owned and operated RFP. Additionally, Scott expected to sell some of the timber from the sale on the open market. As a result of being denied the timber from the Jigsaw sale at the time that Scott planned to harvest it, Scott incurred damages.

51. As a result of the Forest Service's improper suspension and breach of the Jigsaw contract, Scott was precluded from providing a sufficient volume of quality timber to RFP to produce certain high value products resulting in lost profits to RFP in the amount of $3,211,250. Scott is liable to RFP for these lost profits and therefore is entitled to recover these damages in this action.

52. As a result of the Forest Service's improper suspension and breach of the Jigsaw contract, Scott was precluded from selling a volume of logs on the open market, resulting in lost profits in the amount of $45,888. Scott is entitled to recover these damages.

53. At the time of the suspension, Scott had deposits on the sale totaling $334,200. On January 25, 2000, this amount was reduced to $6,684. Interest on these sums through June 9, 2003, when the suspension was lifted, totals $14,296. The Contracting Officer's final decision acknowledged that Scott is entitled to these costs, but only awarded interest on deposits in the amount of $10,640.12. Scott is entitled to recover the difference ($3,655.88), plus any additional interest on the deposits as well as any CDA interest.

54. At the time of the suspension and thereafter, RFP had debt on which it was making payments at various interest rates. Had RFP been able to obtain the profit of $3,257,138 which it anticipated in a timely manner, it would have reduced its outstanding debt and avoided paying additional interest costs in the amount of $362,329. This interest cost continues to increase. Scott is liable to RFP for this cost and is entitled to recover this cost in this action.

55. Scott incurred $4,078 in having its personnel assist in the preparation of the Jigsaw claim. Scott is entitled to recover this cost.

56. Scott incurred a benefit of $226,648 by purchasing and harvesting timber to replace some of the timber which had been suspended under the Jigsaw sale. This amount is reflected as a credit in Scott's damage claim.

57. Scott's total damages incurred as a result of the Forest Service's wrongful suspension and breach of the Jigsaw contract are $3,400,552.88, plus CDA interest.

**COUNT III**
**PIGOUT**

58. Scott incorporates and realleges paragraphs 1-23 above.

59. The Pigout contract was awarded by the Forest Service to Scott on July 8, 1999.

60. The Pigout contract was for the sale and harvest of approximately 3,497 MBF.

61. The original termination date on the Pigout contract was October 31, 2001, a term of over 27 months. The termination of the contract has been extended by the Forest Service to August 31, 2006.

62. The Pigout contract remained suspended for approximately three years, from August 31, 1999, until June 11, 2002, when the Forest Service finally notified Scott that the suspension was lifted.

63. The Forest Service's suspension of Scott's performance under the Pigout contract constitutes a material breach of the Forest Service's implied duties under the contract to cooperate and not hinder Scott's performance.

64. In the alternative, even assuming that the Forest Service had some authority to suspend Scott's operations under clause CT6.01, the Forest Service retained an obligation to implement any such suspension reasonably. The Forest Service's suspension of Scott's operations under the Pigout timber sale contract lasted approximately three years (from August 1999 into June 2002). The length of this suspension was unreasonable in duration, and the Forest Service failed to undertake reasonable efforts to complete the required surveys in a timely manner in order to permit Scott to operate. The unreasonable duration of the Forest Service's suspension of the Pigout timber sale contract constitutes a further material breach of that contract.

65. The Forest Service's failure to perform the required plant and wildlife surveys and subsequent suspension of the Pigout contract in order to do so after award to determine whether the additional measures were necessary to protect plant and wildlife habitat constitutes a material breach of the Forest Service's express warranty in clause CT6.25.

66. In the alternative, assuming that the Forest Service's suspension of the Pigout contract is not a breach, the Forest Service breached the contract by wrongfully failing and refusing to pay Scott certain out-of-pocket costs within the scope of contract clause CT6.01, including interest on deposits and Scott's cost of preparing its CDA claim.

67. As a result of the Forest Service's improper suspension and breach of the Pigout contract, Scott was precluded from meeting its obligation to supply timber to mills owned and operated by RFP. Additionally, Scott expected to sell some of the timber from the sale on the open market. As a result of being denied the timber from the Pigout sale at the time that Scott planned to harvest it, Scott incurred damages.

68. As a result of the Forest Service's improper suspension and breach of the Pigout contract, Scott was precluded from providing a sufficient volume of quality timber to RFP to produce certain high value products resulting in lost profits to RFP in the amount of $1,300,491. Scott is liable to RFP for these lost profits, and Scott is entitled to recover these damages in this action.

69. As a result of the Forest Service's improper suspension and breach of the Pigout contract, Scott was precluded from selling a volume of logs on the open market, resulting in lost profits in the amount of $69,477. Scott is entitled to recover these damages.

70. At the time of the suspension, Scott had deposits on the sale totaling $100,700. On January 25, 2000, this amount was reduced to $2,014. Interest on these sums through June 11, 2002, when the suspension was lifted, totals $4,198. The Contracting Officer's final decision acknowledged that Scott is entitled to these costs, but only awarded interest on deposits in the amount of $3,110.57. Scott is entitled to recover the difference ($1,087.43), plus any additional interest on the deposits as well as any CDA interest.

71. At the time of the suspension and thereafter, RFP had debt on which it was making payments at various interest rates. Had RFP been able to obtain the profit of $1,369,968 which it anticipated in a timely manner, it would have reduced its outstanding debt and avoided paying additional interest costs in the amount of $218,824. This interest cost continues to increase. Scott is liable to RFP for this cost and is entitled to recover this cost in this action.

72. Scott incurred $4,078 in having its personnel assist in the preparation of the Pigout claim. Scott is entitled to recover this cost.

73. Scott incurred a benefit of $151,951 by purchasing and harvesting timber to replace some of the timber which had been suspended under the Jigsaw sale. This amount is reflected as a credit in Scott's damage claim.

74. Scott's total damages incurred as a result of the Forest Service's wrongful suspension and breach of the Pigout contract are $1,442,006.43, plus CDA interest.

WHEREFORE, plaintiff respectfully requests that this Court:

(a) rule that the Forest Service breached the Whitebird, Jigsaw and Pigout timber sale contracts;

(b) overturn the Contracting Officer's denial of plaintiff's claims;

(c) award plaintiff all the damages it has suffered as a result of the Forest Service's wrongful suspension and breach of the Whitebird timber sale as alleged in Count I, plus applicable interest in accordance with the Contract Disputes Act;

(d) award plaintiff all the damages it has suffered as a result of the Forest Service's wrongful suspension and breach of the Jigsaw timber sale as alleged in Count II, plus applicable interest in accordance with the Contract Disputes Act;

(e) award plaintiff all the damages it has suffered as a result of the Forest Service's wrongful suspension and breach of the Pigout timber sale as alleged in Count III, plus applicable interest in accordance with the Contract Disputes Act;

(f) award plaintiff its costs and attorneys' fees incurred in pursuing this action; and

(g) grant plaintiff such further relief as this Court deems just and proper.

Respectfully submitted,

Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Alan I. Saltman
William M. Jack
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: June 30, 2005