**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SCOTT TIMBER COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 05-708C<br>(Judge Lettow) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

# PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: May 7, 2008

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ........ iv

Table of Acronyms ........ x

INTRODUCTION ........ 1

QUESTIONS PRESENTED ........ 1

BACKGROUND ........ 2

The Northwest Forest Plan And Survey Program ........ 2

The Administrative Structure Of The Northwest Forest Plan ........ 4

Creation Of The Issue Resolution Team And Development Of The Interpretation "NEPA Decision Equals Implementation" And The Red Tree Vole Directive ........ 5

Events Subsequent To The Issuance Of The Agency Memoranda Adopting The Interpretation "NEPA Decision Equals Implementation" And The Red Tree Vole Directive ........ 8

ARGUMENTS TO BE PRESENTED AT TRIAL ........ 10

I. As The Drafter Of The Contracts, The Forest Service Assumed The Risk Of Liability To Scott When It Awarded The Timber Sale Contracts Without The Required Category 2 Surveys And Then Had To Suspend Scott's Timber Sale Operations In Order To Perform Those Surveys And Failed To Include Any Exculpatory Provisions Or Disclaimers In The Contracts Or Require Scott To Execute Any Waivers Of Liability ........ 10

II. The Forest Service Breached Its Implied Warranty Of Specifications ........ 17

A. The Law Of Implied Warranty Of Specifications ........ 17

B. Timber Sale Contracts Are Contracts Of Adhesion That Contain Detailed Timber Harvesting Specifications Which The Contractor Must Follow ....19

C. The Forest Service Is Obligated To Design Timber Sale Contracts In Conformity With Federal Environmental Law ....20

D. Where Delay Is Caused By Defective Specifications, That Delay Is Presumed To Be Unreasonable ....23

III. The Forest Service Breached The Contracts Because It Failed To Disclose To Scott That Its Timber Sales Were On ONRC Action's "At-Risk" Lists And That The Forest Service Had Secret Agreements With ONRC Action Regarding The Award Of The Contracts And Because The Forest Service Misled Scott Into Believing That The Sales Were Not Threatened By The ONRC Action Litigation ....24

IV. The Forest Service Breached Its Implied Duties To Cooperate And Not To Hinder Scott's Operations ....27

A. The District Court Holding In ONRC Action That The Forest Service's Interpretation "NEPA Decision Equals Implementation" And The Red Tree Vole Directive Are Arbitrary, Capricious And Contrary To Law Establishes That The Forest Service Unreasonably Caused The Suspensions Of Scott's Sales ....28

B. The Forest Service Was Unreasonable In Causing The Suspension Of Scott's Sales Because It Awarded The Contracts Without Conducting Category 2 Surveys Despite Having Been Put On Notice Repeatedly Prior To Award That Its Legal Rationale For Not Conducting The Surveys Was Deficient ....36

1. The Issue Resolution Team's Concerns And The Development Of "NEPA Decision Equals Implementation" And The Red Tree Vole Directive ....37

2. Warnings To The Forest Service In Public Comments, Administrative Appeals And In The ONRC Action Lawsuit ....39

3. Warnings To The Forest Service From The Department Of Justice And The Forest Service Regional Attorney After ONRC Action Was Filed ....41

4. The Forest Service Awarded Scott's Contracts Despite Its Secret Knowledge That If Scott's Sales Were Operated They Would Trigger Motions For Injunctive Relief....................................................43

CONCLUSION....................................................44

# TABLE OF AUTHORITIES

**CASES** **PAGE**

Al Johnson Constr. Co. v. United States,
854 F.2d 467 (Fed. Cir. 1988)....................18

Beauchamp Constr. Co., Inc. v. United States,
14 Cl. Ct. 430 (1988)....................23

Castle Constr. Co.,
ASBCA No. 28509, 84-1 BCA ¶ 17,045 (1984)....................18

Cedar Lumber, Inc. v. United States,
5 Cl. Ct. 539 (1984)....................11

Chaney and James Constr. Co. v. United States,
421 F.2d 728 (Ct. Cl. 1970)....................23

C.J. Betters Corp. v. United States,
25 Cl. Ct. 674 (1992)....................15, 16

Dep't of Natural Res. and Conservation of Montana v. United States,
1 Cl. Ct. 727 (1983)....................11, 16

Everett Plywood Corp. v. United States,
651 F.2d 723 (Ct. Cl. 1981)....................14, 21, 22

GAF Corp. v. United States,
932 F.2d 947 (Fed. Cir. 1991), cert. denied, 502 U.S. 1071 (1992)....................24

George A. Fuller Co. v. United States,
69 F. Supp. 409 (Ct. Cl. 1947)....................16

Heartwood, Inc. v. United States Forest Service,
73 F. Supp. 2d 962 (S.D. Ill. 1999)....................32

Helene Curtis Industries, Inc. v. United States,
312 F.2d 774 (Ct. Cl. 1963)....................24, 25

Hercules, Inc. v. United States,
516 U.S. 417 (1996)....................17

H.N. Wood Products, Inc. v. United States,
59 Fed. Cl. 479 (2003) ....................15, 28, 35

Huber, Hunt & Nichols, Inc.,
GSBCA No. GS-09B-C-7004-SF, 75-2 BCA ¶ 11,457 (1975) ....................18

In re Gartside,
203 F.3d 1305 (Fed. Cir. 2000)....................29

J.A. Jones Constr. Co. v. United States,
390 F.2d 886 (Ct. Cl. 1968) ....................25

J.L. Simmons Co. v. United States,
412 F.2d 1360 (Ct. Cl. 1969) ....................18

John E. Gallno,
AGBCA No. 97-146-1, 98-1 BCA ¶ 29,616 (1998) ....................19

John Woods Trucking,
AGBCA No. 97-1-158, 98-1 BCA ¶ 29,644 (1998) ....................19

Laburnum Constr. Co. v. United States,
325 F.2d 451 (Ct. Cl. 1963) ....................18, 23

Louisiana Pacific Corp. v. United States,
656 F.2d 650 (Ct. Cl. 1981) ....................19

Luria Bros. & Co., Inc. v. United States,
369 F.2d 701 (Ct. Cl. 1966) ....................19, 23

Miller Elevator Co. v. United States,
30 Fed. Cl. 662 (1994) ....................27

Munn v. Secretary of Dept. of Health and Human Services,
970 F.2d 863 (Fed. Cir. 1992)....................29

Northcoast Environmental Center v. Glickman,
136 F.3d 660 (9th Cir. 1998) ....................29

Oregon Natural Resources Council Action v. United States Forest Service,
59 F. Supp. 2d 1085 (W.D. Wash. 1999).................... *passim*

Ozark Dam Constructors v. United States,
127 F. Supp. 187 (Ct. Cl. 1955)....................14, 15

Pacific Rivers Council v. Thomas,
30 F.3d 1050 (9th Cir. 1994) ....................................................................................34, 35

Petrochem Services, Inc. v. United States,
837 F.2d 1076 (Fed. Cir. 1998)............................................................................................25

Poston Logging,
AGBCA No. 97-168-1, 99-1 BCA ¶ 30,188 (1998), recons. denied,
AGBCA No. 99-143-R, 00-1 BCA ¶ 30,829 (2000) ..........................................................19

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) ........................................................................................... *passim*

Precision Pine & Timber, Inc.,
AGBCA No. 99-160-1, 00-2 BCA ¶ 30,942 (2000)..........................................................19

Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of Navy,
898 F.2d 1410 (9th Cir. 1990) .............................................................................................29

Seaboard Lumber Co. v. United States,
41 Fed. Cl. 401 (1998)..........................................................................................................14

Sergent Mechanical Systems, Inc. v. United States,
34 Fed. Cl. 505 (1995)..........................................................................................................23

Shawn Montee, Inc. dba Shawn Montee Timber Company,
AGBCA Nos. 2003-132-1 through 2003-136-1,
04-1 BCA ¶ 32,564 (2004) ...................................................................................................16

Silver v. Babbitt,
924 F. Supp. 976 (D.Ariz. 1995) ..........................................................................................34

Southern California Edison v. United States,
58 Fed. Cl. 313 (2003)..........................................................................................................24

Spearin v. United States,
248 U.S. 132 (1918)....................................................................................................17, 18, 22

Superior Timber Co., Inc.,
IBCA No. 3459, 97-1 BCA ¶ 28,736 (1996).........................................................................34

Tamarack Mills, LLC,
AGBCA Nos. 2003-115-1 and 2003-116-1, 04-1 BCA ¶ 32,591 (2004)....................15, 35

Trinity River Lumber Co. v. United States,
66 Fed. Cl. 98 (2005) ....................15, 28, 28, 35

United States v. Seckinger,
397 U.S. 203 (1970) ....................11, 16

**STATUTES AND REGULATIONS**

5 U.S.C. § 706(2)(A) ....................29

16 U.S.C. § 472a ....................23

16 U.S.C. § 472a(a) ....................20

16 U.S.C. § 472a(e)(2) ....................12

16 U.S.C. § 475 ....................20

16 U.S.C. § 528 ....................20

16 U.S.C. § 1600 et seq. .................... *passim*

42 U.S.C. § 4321 et seq. .................... *passim*

23 C.F.R. § 771.117 ....................6

36 C.F.R. Part 223 ....................23

36 C.F.R. § 223.1 ....................20

36 C.F.R. § 223.88 ....................12

36 C.F.R. § 223.100 ....................12

**MISCELLANEOUS**

2 Childress and Davis, STANDARDS OF REVIEW (1986) ....................29

J. Cibinic, R. Nash, J. Nagle, ADMINISTRATION OF GOVERNMENT CONTRACTS
(4th ed. 1995) ....................18

M. Davis, A BASIC GUIDE TO STANDARDS OF JUDICIAL REVIEW,
33 S.D.L.Rev. 469 (1988) ....................................................................................29

# TABLE OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| DN | Decision Notice |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FONSI | Finding of No Significant Impact |
| FS | Forest Service |
| FWS | Fish & Wildlife Service |
| FY | Fiscal Year |
| IMG | Intermediate Management Group |
| IRT | Issue Resolution Team |
| LRMP | Land Resource Management Plan |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NFP | Northwest Forest Plan |
| REO | Regional Ecosystem Office |
| RIEC | Regional Interagency Executive Committee |
| ROD | Record of Decision |
| RTV Directive | Red Tree Vole Directive |
| S&M | Survey and Manage |

## INTRODUCTION

Plaintiff Scott Timber Company ("Scott") alleges that the Forest Service ("FS") breached three of its timber sale contracts, Pigout, Whitebird and Jigsaw. Sections I-III of this memorandum are premised on legal theories that require proof of the FS's erroneous acts or omissions but do not require inquiry by this Court into whether these acts or omissions were unreasonable. In Section IV Scott contends that the FS breached the contracts by violating its implied duties to cooperate and not to hinder. This legal theory, as articulated in Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35 (2001), and the cases which have followed, involves a determination that the FS failed to act reasonably. Each of the arguments in Sections I-IV constitutes an independent ground for ruling in favor of Scott on the issue of liability. In addition, all four arguments may be considered together as another basis for ruling on liability in favor of Scott.

## QUESTIONS PRESENTED

1. Is the FS liable because as the drafter of the contracts it assumed the risk of liability to Scott when it awarded the timber sale contracts without Category 2 surveys and then had to suspend Scott's timber sales to perform those surveys but failed to include any valid exculpatory provisions or disclaimers in the contracts or require Scott to execute any waivers of liability excusing FS fault?

2. Is the FS liable because it breached its implied warranty of specifications when it had to suspend Scott's operations in order to reevaluate whether the original specifications

governing timber harvesting, road building and other ground-disturbing activities were adequate to protect Category 2 species?

3. Is the FS liable because it breached its obligation to Scott to disclose its superior knowledge that (a) the timber sales were on ONRC Action's "at-risk" lists and (b) the FS had secret agreements with ONRC Action regarding the award of Scott's contracts, and because the FS misrepresented to Scott that the sales were not threatened by the ONRC Action litigation?

4. Is the FS liable because it breached its duties to cooperate and not to hinder by suspending Scott's sales because it failed to conduct Category 2 surveys on those sales prior to contract award?

## BACKGROUND

### The Northwest Forest Plan And Survey Program

In April 1994, the Secretary of the United States Department of Agriculture on behalf of the FS and the Secretary of the United States Department of the Interior on behalf of the Bureau of Land Management ("BLM") issued a Record of Decision ("ROD") for "amendments to [FS] and [BLM] planning documents within the range of the Northern Spotted Owl." This document amended the Land and Resource Management Plans ("LRMPs") governing the operation of the National Forests and BLM lands in Washington, Oregon and northern California where it was believed that populations of Northern spotted owls existed. This amendment became known as the Northwest Forest Plan ("NFP"). The Umpqua National Forest in Oregon on which Scott's Pigout, Whitebird, and Jigsaw sales were located was included within the area governed by the NFP.

The fundamental purpose of the NFP was to permit a predictable and sustainable level of timber sales and use of non-timber resources that would not degrade or destroy the environment or endanger the viability of a variety of species of plants and animals present on NFP forests. As part of the NFP ROD, Survey and Manage ("S&M") Standards and Guidelines were developed as mitigation measures for over 400 old-growth-related species where there was a concern for the continued persistence of these species across the landscape but where little knowledge existed of the species themselves.

The NFP identified four survey strategies for the S&M species: (1) manage known sites; (2) survey prior to ground-disturbing activities; (3) conduct extensive surveys to find high priority sites for management; and (4) conduct general regional surveys to acquire additional information to determine necessary levels of protection. S&M species fall into one or more of these categories, also sometimes called "components" or "strategies."

The Oregon red tree vole, five species of salamanders, and the Canada lynx were initially designated as Category 2 species. Prior to the award of the Pigout, Whitebird, and Jigsaw timber sale contracts to Scott, the Canada lynx was removed from the Category 2 species by the Regional Interagency Executive Committee ("RIEC") under a provision of the NFP which allowed for such a modification. Surveys for the red tree vole and the five salamanders in Category 2 were required for certain timber sales beginning October 1, 1996, the start of fiscal year ("FY") 1997. Approximately 71 invertebrate species, including certain bryophytes, lichens, fungi, mollusks, and vascular plants, were also designated as Category 2 species. Surveys for these species were required for certain timber sales beginning October 1, 1998, the start of FY

1999. Pigout, Whitebird, and Jigsaw were among the sales on which Category 2 surveys were required pursuant to the NFP.

The Category 2 surveys required by the NFP were important to the environmental evaluation of the sales. The Category 2 surveys were the most restrictive of the NFP S&M surveys in terms of the potential impact on federal lands, including from FS timber sales. Category 2 surveys were designed for species at a high risk of extirpation and for which survey protocols existed or could be developed reasonably soon. For Category 2 species, it was necessary that surveys be conducted prior to ground-disturbing activities that could result in the destruction or impairment of habitat necessary for those species' survival. It was important to have survey information before the issuance of a decision document approving the sales as being in compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and to comply with the substantive requirements of the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 et seq. For this reason, one of the important objectives of the NFP was to develop as soon as possible the protocols necessary for the Category 2 "prior to ground-disturbing activities" surveys.

**The Administrative Structure Of The Northwest Forest Plan**

Under the NFP there were several government groups with various levels of authority for recommending and determining the intent and meaning of the NFP S&M requirements. There existed a "Survey and Manage Working Group" composed of representatives from the FS, the BLM and other agencies. Among other things, the purpose of the Survey and Manage Working Group was to coordinate the implementation of NFP wildlife and plant surveys.

Immediately above the Survey and Manage Working Group in the NFP administrative hierarchy was the Intermediate Management Group ("IMG"). The IMG included representatives of the FS and BLM. One purpose of the IMG was to act on and approve recommendations with regard to definitions, directions and interpretations of the survey requirements under the NFP when, in the view of the IMG members, such decisions could be made without referring the matter to the next higher level of authority, the Regional Interagency Executive Committee ("RIEC").

The RIEC represented the highest level of agency authority at the regional level within the NFP administrative hierarchy. The RIEC included the Regional Foresters of Regions 5 (California) and 6 (Oregon and Washington) of the FS and the Director of the Oregon State Office of the BLM or their designated representatives.

Finally, there existed a Regional Ecosystem Office ("REO") under the direction of Donald Knowles, Executive Director, which functioned as the staff of the RIEC, coordinating certain agency actions and reporting thereon to the RIEC.

**Creation Of The Issue Resolution Team And Development Of The Interpretation "NEPA Decision Equals Implementation" And The Red Tree Vole Directive**

By at least January 1996, the Issue Resolution Team ("IRT") was a part of the NFP administrative structure. The IRT was charged with, among other things, developing and recommending interpretations of the NFP Category 2 survey requirements, including the interpretation of when Category 2 surveys were required to be performed. The IRT members principally involved in developing that interpretation and memoranda recommending the REIC adopt that interpretation were Tom Hussey (FS) and Larry Larsen (BLM). Randy Hickenbottom (FS) also played a role in this effort with Messrs. Hussey and Larsen.

In the summer and fall of 1996, Messrs. Hussey, Larsen and Hickenbottom collaborated in an effort which ultimately led to a recommendation to the RIEC that it officially adopt the interpretation, "NEPA decision equals implementation." By this it was meant that the NFP ROD was interpreted such that Category 2 surveys would not be required for FS timber sales where NEPA decision documents signifying approval of the environmental analyses preparatory to offering the sales to the public were signed by either the October 1, 1996 or October 1, 1998 trigger date.[1]

As early as 1996, the FS was aware there were serious legal risks involved in awarding timber sale contracts without Category 2 surveys based upon the interpretation "NEPA decision equals implementation." Members of the IRT considered this legal risk for several months while they developed the interpretation "NEPA decision equals implementation." Field personnel of the FS and BLM also expressed concern that adopting the interpretation "NEPA decision equals implementation" could result in a substantial number of contracts being awarded without Category 2 surveys and therefore increased both the risk of a legal challenge and biological risk to the species. There was so much concern about the possible adverse consequences of exempting timber sales from Category 2 surveys that the REO inquired into whether it was

[1]NEPA requires the FS to prepare a decision document approving the environmental analyses before offering timber for sale to the public. A decision document can be either a Decision Notice ("DN") or a ROD. A DN is the decision document issued as part of the NEPA process where only an Environmental Assessment ("EA") is required. (An EA is the form of environmental analysis prepared for most FS timber sales.) A ROD is the decision document issued as part of the NEPA process where an Environmental Impact Statement ("EIS") is required. (An EIS is a more extensive undertaking than an EA.) Oregon Natural Resources Council Action v. United States Forest Service ("ONRC Action"), 59 F. Supp. 2d 1085, 1092 n.4 (W.D. Wash. 1999). In this case, the FS's decision documents that authorized the sale of Whitebird, Jigsaw, and certain units of Pigout were DNs. One unit of Pigout was authorized under a categorical exclusion, which is an action that does not affect the environment and therefore does not require any NEPA documentation. 23 C.F.R. § 771.117.

possible to do an assessment of the potential impact of the different implementation dates for surveys required under the NFP. The response was that there was no way of knowing whether delaying the Category 2 surveys would or would not cause the extirpation of a species.

In the face of these concerns, the RIEC adopted the interpretation "NEPA decision equals implementation" and the RTV Directive effective October 1, 1996 and subsequently readopted them on September 11, 1998, effective October 1, 1998. This meant that if NEPA decision documents for planned timber sales were signed prior to the trigger dates, Category 2 surveys would not have to be performed even if those sales were offered to the public and awarded months or even years after the decision documents were signed. The effect of this interpretation was to exempt numerous FS and BLM timber sales from Category 2 surveys. ONRC Action, 59 F. Supp. 2d at 1093.

Randy Hickenbottom of the FS and others were involved in developing the November 4, 1996 "Interim Guidance for Survey and Manage Component 2 Species: Red Tree Vole" (the "RTV Directive"). The RTV Directive was an interpretation of the Category 2 survey requirements that employed various parameters that resulted in exempting approximately 90% of the red tree vole habitat, including all of the red tree vole habitat in California, from the survey requirements. The rationale for this interpretation was the FS's belief that red tree vole surveys were not necessary where red tree vole habitat was abundant. Id. at 1094. The RTV Directive was in direct conflict with the specific direction in the NFP ROD that red tree vole surveys must be conducted "within the species' 'known or suspected ranges and within the habitat types or vegetation communities associated with it.'" Id. at 1095.

In April 1998, the FS and BLM approached the RIEC with a request to consider a one-year delay of survey implementation for several Category 2 species from FY 1999 (October 1, 1998) to FY 2000 (October 1, 1999). A procedure for such changes was authorized in the NFP ROD, but a change of this type required compilation of an EA or EIS before the ROD could be amended. The FS and BLM could have used, but chose not to use, this procedure to delay any or all of the 71 invertebrate Category 2 surveys rather than adopt the interpretation "NEPA decision equals implementation" without environmental analysis.

**Events Subsequent To The Issuance Of The Agency Memoranda Adopting The Interpretation "NEPA Decision Equals Implementation" And The Red Tree Vole Directive**

Various environmental groups and members of the public began filing comments and administrative appeals of the FS and BLM decision documents that did not include Category 2 surveys based upon the interpretation "NEPA decision equals implementation" and the RTV Directive. Such comments and administrative appeals were filed for Pigout, Whitebird, and Jigsaw. The ONRC Action lawsuit was filed on July 8, 1998, challenging, among other things, the FS's adoption of the interpretation "NEPA decision equals implementation" and the RTV Directive. The allegations of the complaint directed to both of these points were spelled out in further detail in a September 25, 1998 letter from ONRC Action to the Department of Justice.

Edward (Ted) Boling, the chief trial lawyer for the government in ONRC Action, was initially leery of the FS's rationale for these two Category 2 survey interpretations. On or about November 24, 1998, Mr. Boling briefed his superior, Assistant Attorney General for the Environment and Natural Resources Lois Schiffer, and her immediate deputy, Peter Coppleman, on the ONRC Action allegations regarding "NEPA decision equals implementation." Both Ms.

Schiffer and Mr. Coppleman had strong concerns over the defensibility of the "NEPA decision equals implementation" interpretation. Ms. Schiffer was concerned that the FS may have rushed to sign decision documents in order to have timber sales offered to the public without Category 2 surveys. Ms. Schiffer indicated that she would need to have further discussions with high level agency officials before deciding whether the Department of Justice would defend the "NEPA decision equals implementation" interpretation in court. Ms. Schiffer's and Mr. Coppleman's concerns were communicated to agency attorneys and upper level management personnel for the FS in November and December of 1998.

After the filing of ONRC Action, ONRC Action provided the government with several lists of "at-risk" or "problem sales" (which included sales not mentioned in the ONRC Action complaint). The purpose of these lists was to put the FS on notice that if it awarded any of the listed sales, ONRC Action would seek a temporary restraining order or a preliminary injunction. Later, the FS secretly agreed with ONRC Action that certain of the at-risk or problem sales could be awarded without the immediate threat of an injunction but that ONRC Action reserved the right to file a motion for a temporary restraining order or preliminary injunction if any ground-disturbing operations occurred on those sales. These secret lists, agreements and negotiations were not revealed to the public and in particular not to Scott. When the FS awarded Pigout, Whitebird, and Jigsaw on July 8, 1999, it represented implicitly to Scott that the sales were not under threat of injunction in the ONRC Action litigation, when in fact they were under explicit threat of injunction if any ground-disturbing operations took place after contract award.

The district court's decision granting summary judgment to ONRC Action and enjoining the FS from allowing operations on nine specified timber sales was issued on August 2, 1999.

By order dated August 26, 1999, the district court expanded the injunction to preclude the FS from allowing operations on other timber sales, including Pigout, Whitebird, and Jigsaw. The FS suspended sale operations on Pigout, Whitebird, and Jigsaw on or about August 31, 1999.

Edward Boling recommended that the government not appeal ONRC Action because the agency rationale for the interpretation "NEPA decision equals implementation" was weak and the RTV Directive was in obvious tension with the explicit direction in the ROD. In December 1999, the government settled the ONRC Action lawsuit. Pursuant to this settlement agreement, the complaint was dismissed and the injunction dissolved; however, the FS agreed to continue its suspensions of all affected timber sales, including Pigout, Whitebird, and Jigsaw, until applicable Category 2 surveys had been completed and ONRC Action had been given an opportunity to review and object to Supplemental Information Reports on those surveys. The government also agreed as part of that settlement to pay ONRC Action's attorneys' fees in accordance with the Equal Access to Justice Act.

Scott timely filed claims under the Contract Disputes Act for the damages it incurred as a result of the FS's suspensions of Pigout, Whitebird, and Jigsaw.

## ARGUMENTS TO BE PRESENTED AT TRIAL

### I. As The Drafter Of The Contracts, The Forest Service Assumed The Risk Of Liability To Scott When It Awarded The Timber Sale Contracts Without The Required Category 2 Surveys And Then Had To Suspend Scott's Timber Sale Operations In Order To Perform Those Surveys And Failed To Include Any Exculpatory Provisions Or Disclaimers In The Contracts Or Require Scott To Execute Any Waivers Of Liability

The FS had a fundamental obligation under each of Scott's contracts to make the timber available to Scott to harvest in a timely manner. The FS breached each of Scott's contracts because it failed to fulfill this basic obligation and was not excused from doing so by any valid

exculpatory clause or disclaimer or by any other provision in the contracts, including standard FS contract clause CT6.01.

When the government is the drafter of a contract the courts will strictly construe that contract against the government and in favor of the contractor. See United States v. Seckinger, 397 U.S. 203, 210 (1970) (stating that contracts are "construed most strongly against the drafter"). This is particularly appropriate where the contractor has been damaged by delay or cost increases resulting from events within the government's control, and the government, as the drafter of the contract, has failed to protect itself with a valid exculpatory provision or effective disclaimer language in the contract. Dep't of Natural Res. and Conservation of Montana v. United States, 1 Cl. Ct. 727, 734 (1983); see Cedar Lumber, Inc. v. United States, 5 Cl. Ct. 539, 552 (1984). That is precisely the situation in the instant case.

Years before making contract award, the FS was on notice that awarding timber sale contracts without Category 2 surveys entailed a significant risk of FS liability to the purchasers of those contracts. Government personnel involved in developing the interpretation "NEPA decision equals implementation" understood that there were serious risks of legal challenges and potential liability to purchasers of timber sales that were not surveyed if the FS and BLM adopted that interpretation. After the filing of the ONRC Action lawsuit on July 8, 1998, this risk of liability became very specific. In light of the concerns expressed by the government's chief trial counsel in ONRC Action and the Assistant Attorney General for the Environment and Natural Resources, among others, it should have been apparent to the FS at least by December 1998 that if it awarded timber sale contracts without Category 2 surveys the FS must include explicit exculpatory language to protect itself against liability in the event of suspensions.

On July 29, 1998, Robert Simmons, the Regional Attorney for Region 5 (California) of the FS, advised the Regional Foresters for Region 5 and Region 6 (which includes the Umpqua National Forest and the Pigout, Whitebird, and Jigsaw timber sales) that if certain timber sales threatened by the ONRC Action lawsuit were to be offered to the public, the FS should (1) notify all purchasers prior to the opening of the bids[2] that ONRC Action had identified the sale as one where the FS has violated the NFP in preparing the sale, (2) include appropriate language in the contract limiting the government's liability in case of cancellation to holding costs, and notify the bidders of the inclusion of that language and instruct them to withdraw their bids at that time if the language was unacceptable, and (3) give all bidders the opportunity to withdraw their bids simply because of the litigation.

For the contracts at issue in this action no direction was given regarding FS liability for suspensions. Nothing in the prospectuses or instructions to bidders for each contract mentioned possible suspensions or language being included in the contracts to limit the FS's liability in the event of suspension. No "appropriate language" was included in these contracts.

Following the filing of the ONRC Action litigation and before contract award, Scott's Pigout, Whitebird, and Jigsaw timber sales were named on lists of "at-risk" sales provided by ONRC Action to the government. The FS kept the identity of the sales on these lists secret from the public, including Scott. By providing these lists of "at-risk" sales to the government, ONRC Action was putting the FS on notice that if it allowed harvesting or any other kind of ground-disturbing activities to proceed on these sales ONRC Action would immediately seek injunctive

---

[2] Award of FS timber sale contracts follows the opening of sealed bids and often an oral auction conducted by the FS to determine the high bidder. See 16 U.S.C. § 472a(e)(2); 36 C.F.R. §§ 223.88 and 223.100.

relief. Brenda Woodard, the FS contracting officer for Pigout, Whitebird, and Jigsaw understood when these contracts were awarded that harvesting or ground-disturbing operations would likely prompt a motion for a temporary restraining order or a preliminary injunction. Despite this knowledge, the FS did not include clear and direct disclaimer or exculpatory language in the contracts to protect itself from liability in the event that Scott's sales were suspended because of the FS's failure to perform Category 2 surveys.

In addition, the FS knew that it faced serious liability to purchasers if it awarded timber sale contracts that later had to be suspended for the completion of Category 2 surveys. For example, the FS Litigation Coordinator for Region 6, Sue Zike, warned that awarding such contracts could create monetary liability to the government if it lost ONRC Action because the FS had no provision in its timber sale contracts that allowed for suspensions for surveys and/or the discovery of S & M species.

The FS awarded Pigout, Whitebird, and Jigsaw on July 8, 1999 – the one-year anniversary of the filing of ONRC Action and after the FS knew of the Department of Justice's serious doubts about the legal defensibility of the FS's Category 2 survey interpretations. Nevertheless, these contracts do not contain any language referencing the ONRC Action litigation or language clearly and directly disclaiming FS liability for suspensions resulting from the FS's failure to conduct Category 2 surveys. The award letters for these contracts also do not reference the ONRC Action lawsuit, and the FS did not impose as a condition of Scott's receipt of award any requirement that Scott waive any rights to damages in the event that its timber sales were suspended due to the FS's failure to conduct Category 2 surveys.

Timber sale contracts are contracts of adhesion. E.g., Everett Plywood Corp. v. United States, 651 F.2d 723, 720 (Ct. Cl. 1981); Precision Pine, 50 Fed. Cl. at 66; Seaboard Lumber Co. v. United States, 41 Fed. Cl. 401, 408 (1998). The FS as the drafter of the Pigout, Whitebird, and Jigsaw timber sale contracts could have at least attempted to require that Scott execute an explicit release and waiver of all claims as a condition of receiving contract award. When the FS as the drafter of the contract fails to include explicit language necessary to insulate itself from liability for an event which it clearly foresaw and which it initially caused (i.e., the pre-award failure to survey), the FS is liable to the purchaser under the governing law of the Federal Circuit. See Ozark Dam Constructors v. United States, 127 F. Supp. 187, 191 (Ct. Cl. 1955).

In the absence of any clear and direct exculpatory language in the contract itself or at a minimum, clear and direct language requiring Scott to waive any potential damages claim as a condition of its receipt of contract award, the FS assumed the risk of liability if Scott's timber sales were suspended because the FS elected not to perform Category 2 surveys before making contract award.

Standard timber sale contract clause CT6.01 does not permit the FS to suspend sale operations with limited liability to the purchaser where, as here, FS fault caused the suspension.[3]

---

[3]The Pigout, Whitebird, and Jigsaw contracts contain clause CT6.01 which provides:

CT6.01 – Interruption or Delay of Operations. (10/96) Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:

(a) To prevent serious environmental degradation or resource damage that may require contract modification under CT8.3 or termination pursuant to CT8.2;

(b) To comply with a court order, issued by a court of competent jurisdiction; or

"[T]he efficacy of a limitation of liability clause does not extend to those situations where the breach arises out of events within the Government's control." C.J. Betters Corp. v. United States, 25 Cl. Ct. 674, 677 (1992) (citing Ozark Dam, 127 F. Supp. at 187). As articulated by the court in Precision Pine:

> If the Forest Service sought to exculpate itself from delays . . . caused by conduct within the Government's own control, there would need to be a clear expression of that intent in [clause CT6.01]. "It is not only reasonable, but it is required that where the government intends to exculpate itself from liability for its breach of contract, it must manifest that intent in direct and express language." Dept. of Natural Resources and Conservation of Mont. v. U.S, 1 Cl. Ct. 727, 734 (1983); see also Cedar Lumber, Inc. v. United States, 5 Cl. Ct. 539, 552 (1984) ("when the government intends to disclaim liability for breach of contract, it must employ clear and express language to effectuate its intent"). However, nowhere in [clause CT6.01] is such language to be found.

Precision Pine, 50 Fed. Cl. at 58. Precision Pine and all the cases subsequently dealing with allegations that the FS breached its implied duties to cooperate and not to hinder by suspending timber sales under clause CT6.01 to satisfy pre-award environmental obligations have held that this clause is not a valid exculpatory clause. Trinity River Lumber Co. v. United States, 66 Fed. Cl. 98, 108 (2005); H.N. Wood Products, Inc. v. United States, 59 Fed. Cl. 479, 487 (2003); Precision Pine, 50 Fed. Cl. at 59, 64; Tamarack Mills, LLC, AGBCA Nos. 2003-115-1 and 2003-

---

> (c) Upon determination of the appropriate Regional Forester, Forest Service, that conditions existing on this sale are the same as, or nearly the same as, conditions existing on sale(s) named in such an order as described in (b).
>
> Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be (i) Contract Term Adjustment pursuant to BT8.21, or (ii) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to BT8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, attorney's fees, replacement cost of timber, or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify and verify actual expenditures.

116-1, 04-1 BCA ¶ 32,591 (2004), at 161,228; Shawn Montee, Inc. dba Shawn Montee Timber Company, AGBCA Nos. 2003-132-1 through 2003-136-1, 04-1 BCA ¶ 32,564 (2004), at 161,073-74.

Even assuming that the government could draft a valid exculpatory clause, such a clause would fundamentally alter the relationship between the parties, and therefore the government could do so only clearly, expressly and directly. Seckinger, 397 U.S. at 212 ("[I]f the United States expects to shift the ultimate responsibility for its negligence to its various contractors, the mutual intentions of the parties to this effect should appear with clarity from the face of the contract"); see George A. Fuller Co. v. United States, 69 F. Supp. 409, 412 (Ct. Cl. 1947) ("Indeed, so far as we have been able to find, it has never been doubted that the government is liable for delays caused by it, in the absence of a clause in the contract explicitly exempting it from liability therefor") (citations omitted) (emphasis added); C.J. Betters Corp. v. United States, 25 Cl. Ct. at 677 ("cases of inadequate or incomplete performance fall outside of the exculpatory reach of a limitation of liability provision"); Dep't of Natural Res. and Conservation of Montana, 1 Cl. Ct. at 734 ("it is required that where the government intends to exculpate itself from liability for its breach of contract, it must manifest that intent in clear, direct and express language"). There is no such clear and direct exculpatory language in Scott's contracts, and therefore the FS may not use clause CT6.01 to limit its liability for the damages Scott suffered as a direct result of the suspensions of Pigout, Whitebird, and Jigsaw.

Years before awarding Scott's timber sale contracts, the FS was on notice that awarding timber sale contracts without Category 2 surveys entailed a significant risk of FS liability to the purchasers of those contracts. It should have been apparent to the FS at least by December 1998

that if it awarded timber sale contracts without Category 2 surveys the FS must include explicit exculpatory language to protect itself against liability in the event of suspensions. It did not do so, and it elected to award Scott's contracts months later without Category 2 surveys. For these reasons, the FS assumed the risk of liability to Scott.

## II. The Forest Service Breached Its Implied Warranty Of Specifications

When the government specifies the manner in which a contract must be performed, the government impliedly warrants to the contractor that it will be able to complete the contract satisfactorily by following those specifications. Spearin v. United States, 248 U.S. 132 (1918). In this case, the Pigout, Whitebird, and Jigsaw timber sale contracts contained many detailed specifications governing the manner in which the timber must be harvested and roads built and maintained in order to protect natural resources, including wildlife and plant species. After award, the FS was forced to re-examine the detailed specifications it drafted in order to determine whether they provided adequate protection for Category 2 wildlife and plant species that had not been surveyed prior to award. The FS suspended sale operations for substantial periods of time while these surveys were performed so that if Category 2 species were discovered the contract specifications could be revised, if necessary. Such suspensions fall directly within the ambit of the Spearin doctrine.

### A. The Law Of Implied Warranty Of Specifications

"When the Government provides specifications directing how a contract is to be performed, the Government warrants that the contractor will be able to perform the contract satisfactorily if it follows the specifications." Hercules, Inc. v. United States, 516 U.S. 417, 425 (1996). This black letter rule of law has its origin in the Spearin case and has become known as

the "Spearin rule" or "Spearin doctrine." Over the ensuing decades the Spearin doctrine has been regularly applied and expanded in the Federal Circuit. Al Johnson Constr. Co. v. United States, 854 F.2d 467, 468 (Fed. Cir. 1988) ("The Spearin doctrine is much alive today, and we have recently had occasion to extend and apply it in a case other than a construction contract dispute").

The "Spearin rule is not dependent on a finding of independent fault or negligence. The Spearin rule originates and is inherent in the Government's undertaking to prepare adequate plans and specifications." J.L. Simmons Co. v. United States, 412 F.2d 1360, 1383 (Ct. Cl. 1969) (internal quotations omitted). The government's inclusion of a contract specification that runs afoul of laws and regulations is a breach of the implied warranty of specifications. Huber, Hunt & Nichols, Inc., GSBCA No. GS-09B-C-7004-SF, 75-2 BCA ¶ 11,457 (1975), at 54,572 (contractor awarded damages incurred as a result of complying with more costly municipal Department of Water and Power requirements which conflicted with contract specifications prepared by the government); Castle Constr. Co., ASBCA No. 28509, 84-1 BCA ¶ 17,045 (1984), at 84,859 (government's preparation of specifications that did not comply with national plumbing standards breached the implied warranty of specifications and entitled contractor to damages); accord J. Cibinic, R. Nash, J. Nagle, ADMINISTRATION OF GOVERNMENT CONTRACTS at 279-80, 282 (4th ed. 1995) ("The government also assumes the risk if its detailed specifications require performance contradictory to local codes or ordinances. . . .")

The case law also establishes that where the government's defective specifications cause a delay in a contractor's performance, the contractor is entitled to recover the costs it has incurred as a result of that delay. Laburnum Constr. Co. v. United States, 325 F.2d 451, 457 (Ct.

Cl. 1963) ("If faulty specifications prevent or delay completion of the contract, the contractor is entitled to recover damages for the defendant's breach of its implied warranty. . . " (citations omitted)); Luria Bros. & Co., Inc. v. United States, 369 F.2d 701, 707-08 (Ct. Cl. 1966) ("When, as here, defective specifications delay completion of the contract, the contractor is entitled to recover damages for defendant's breach of this implied warranty. . . " (citations omitted)).

### B. Timber Sale Contracts Are Contracts Of Adhesion That Contain Detailed Timber Harvesting Specifications Which The Contractor Must Follow

Tribunals have consistently recognized that FS timber sale specifications cover all aspects of the contractor's operations under the contract. Louisiana Pacific Corp. v. United States, 656 F.2d 650, 654 (Ct. Cl. 1981). See John Woods Trucking, AGBCA No. 97-1-158, 98-1 BCA ¶ 29,644 (1998), at 146,887, where the Board referred to all three divisions of the standard FS timber sale contract (Division A – Specific Conditions, Division B – Standard Provisions and Division C – Special Provisions) as "specifications." Accord Precision Pine & Timber Inc., AGBCA No. 99-160-1, 00-2 BCA ¶ 30,942 (2000), at 152,726 (contract "specifies" normal operating season); Poston Logging, AGBCA No. 97-168-1, 99-1 BCA ¶ 30,188 (1998), at 149,374, recons. denied, AGBCA No. 99-143-R, 00-1 ¶ BCA 30,829 (2000) ("[i]ncluded timber was defined in the [contract] specifications"); John E. Gallno, AGBCA No. 97-146-1, 98-1 BCA ¶ 29,616 (1998), at 146,762 (contract specified the number of trees per acre to be left and the spacing between those trees). FS timber sale contracts are offered on a "take it or leave it basis" with only the price term being open to the bidder to specify. E.g., Precision Pine, 50 Fed Cl. at 66. The three timber sale contracts at issue in this action are of this same type and contain similarly detailed specifications.

### C. The Forest Service Is Obligated To Design Timber Sale Contracts In Conformity With Federal Environmental Law

Like many government contracts, FS timber sale contracts are designed to achieve management goals in keeping with the agency's statutory mission. Much as the specifications for the construction of a nuclear submarine are designed to advance the Navy's role in meeting the needs of national defense, a FS timber sale contract is part of a statutorily mandated program developed over more than a century to improve timber stand productivity across the National Forest System, manage fire, conserve fish and wildlife habitat, develop a road system (with its attendant increase in access to the forest for recreational and other purposes), regulate water flows and improve other resources. See Organic Administration Act, 16 U.S.C. § 475; Multiple-Use Sustained-Yield Act, 16 U.S.C. § 528; NFMA, 16 U.S.C. § 472a(a); 36 C.F.R. § 223.1.

The process by which a timber sale comes into being starts with planning and the preparation of a preliminary document, i.e., a timber sale project plan, in which the feasibility of proceeding with the project which may contain one or more sales is verified. The plan must present appropriate data needed by the responsible FS official to determine whether or not to proceed with the environmental analysis and project design. Such data is to include current surveys, current aerial photos, and inventories plus on-the-ground reviews of the project areas to verify existing data.

The next step is for the FS to conduct an intensive field investigation within and adjacent to the proposed project area, the purpose of which is to develop an environmentally sound and cost-efficient project under NEPA and to develop a design for field lay out of the project. As part of this step, the FS is to perform its statutory obligations under NEPA – complete the appropriate environmental analysis (typically either an EIS or an EA); prepare alternatives,

including a no-action alternative; decide which alternative to select; and document the decision in a decision document, either a DN and finding of no significant impact ("FONSI") or a ROD.[4] At the conclusion of this phase of the process, a responsible FS line officer must execute a certification as to what has been done. The FS Manual makes clear that it is the duty of the Forest Supervisor to ensure that sale planners consider the environmental effects both in the environmental and sale preparation processes.

The FS's process of planning and preparing timber sales should result in harvest specifications prepared in accordance with the procedural requirements of NEPA and the substantive requirements of NFMA, and which would permit operations under the resulting contract both to proceed and to be accomplished in a timely manner. Contract specifications of this type include: prescribing helicopter logging rather than tractor logging for certain parts of a sale area, the specification of limited operating periods to protect certain species, and specifying which trees to cut or not to cut in the sale area.

With regard to the sales here in issue, the district court in ONRC Action found that the FS had not conducted certain pre-award Category 2 species surveys which were designed to ensure the viability of the species. 59 F. Supp. 2d at 1092. Without these surveys, the FS could not know if its specifications were adequate. Ultimately, therefore, it was doubt about the efficacy of the FS's contract specifications prepared without the guidance provided by Category 2 surveys that was the primary cause of the suspensions of performance, not any court order.

In Everett Plywood, a case analogous to the one at bar, the FS terminated a timber sale contract when it was discovered after award that "road construction and logging planned for

[4]See supra note 1.

units 3 and 4 would result in massive mantle failures with resulting soil and watershed damage, thereby making difficult the re-establishment of the timber stand." 651 F.2d at 726. The FS and the purchaser in that case were unable to agree upon a modification of the contract specifications. There was no termination for convenience clause in that case (and none in the instant case), and therefore the FS, believing that the adverse environmental consequences of road construction under the specifications as awarded would be in conflict with the FS's statutory environmental obligations, unilaterally cancelled the contract.

The trial court initially ruled in favor of the government in Everett Plywood, finding that because the FS had certain environmental objectives in connection with the timber sale contract but not stated in the contract, the FS could cancel the contract with no liability to the purchaser based upon the common law doctrine of frustration of purpose. Id. at 727. On appeal, the Court of Claims rejected this theory, holding that the government had assumed the risk that its specifications might be defective or inadequate to accomplish their environmental purposes because the FS as "owner of the tracts to be harvested would be presumed to be the party informed as to soil conditions, and geologic structure that might indicate that logging would endanger the environment." Id. at 730-31.

The Court of Claims found it unnecessary to decide whether the Spearin doctrine should be applied directly in Everett Plywood but ruled that "the fact that the government did design the specified roads is relevant for purposes of allocating the risk of environmental damages caused by the construction of these roads." Id. at 731. The Court of Claims concluded that "the contract allocated the risk to the government." Id. This same reasoning applies with respect to the FS's defective plans and specifications in Pigout, Whitebird, and Jigsaw.

**D. Where Delay Is Caused By Defective Specifications, That Delay Is Presumed To Be Unreasonable**

Where a delay is caused by deficient specifications that delay is per se unreasonable for purposes of the standard suspension of work clause.[5] Sergent Mechanical Systems, Inc. v. United States, 34 Fed. Cl. 505, 526 (1995) ("The case law has held that any delay is per se unreasonable for the purpose of applying the standard suspension clause if the delay is caused by a deficient specification in the contract" (citing Chaney and James Constr. Co. v. United States, 421 F.2d 728, 731 (Ct. Cl. 1970)); Luria Bros., 369 F.2d at 707-08; Laburnum Constr., 325 F.2d at 453-54; see Beauchamp Constr. Co., Inc. v. United States, 14 Cl. Ct. 430, 438 (1988). This case, where a court concluded that the FS could not continue performance of the contract because the specifications it had prepared could detrimentally affect Category 2 species habitat and therefore were deficient, is not substantively different from the more common situation where the specifications which the government has provided a contractor are functionally defective and unperformable. In both instances, governmental failure to do that which was needed before putting the contract out for bid resulted in defective specifications and a contract that could not be performed.

[5]General principles of federal government contract law are routinely applied to timber sale contract disputes even though the FS enters into timber sale contracts pursuant to NFMA, 16 U.S.C. § 472a, and its implementing regulations, 36 C.F.R. Part 223, rather than pursuant to the federal procurement statutes and regulations.

**III. The Forest Service Breached The Contracts Because It Failed To Disclose To Scott That Its Timber Sales Were On ONRC Action's "At-Risk" Lists And That The Forest Service Had Secret Agreements With ONRC Action Regarding The Award Of The Contracts And Because The Forest Service Misled Scott Into Believing That The Sales Were Not Threatened By The ONRC Action Litigation**

The FS breached its implied affirmative duty "to disclose superior knowledge that is required for the performance of a contract to which it is a party" by failing to disclose to Scott the vital knowledge it possessed that its sales were explicit targets of the pending ONRC Action litigation and misleading Scott to the contrary. Southern California Edison v. United States, 58 Fed. Cl. 313, 325 (2003). Specifically, the FS awarded the subject timber sale contracts to Scott without informing it that the FS knew that these sales were named targets of ONRC Action and that the commencement of operations was virtually certain to provoke applications for temporary restraining orders or other injunctive relief by ONRC Action which the Forest Service believed were likely to be successful. The FS also failed to inform Scott that before deciding to make contract award it had weighed the risk of likely injunctive action against these sales by ONRC Action and evaluated the strength of the government's case on the merits as to each.

A government agency cannot remain silent where, as here, it has a duty to share information. See Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 778 (Ct. Cl. 1963). To show a breach under the superior knowledge doctrine, a contractor must prove that it (1) undertook the contract without vital knowledge of a fact that affects performance costs or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information. GAF Corp. v. United States, 932 F.2d 947, 949 (Fed. Cir. 1991), cert. denied, 502 U.S. 1071

(1992) (internal citations omitted); see, e.g., Petrochem Services, Inc. v. United States, 837 F.2d 1076, 1078-79 (Fed. Cir. 1988); J.A. Jones Constr. Co. v. United States, 390 F.2d 886 (Ct. Cl. 1968); Helene Curtis, 312 F.2d at 774.

In this case, the standard is easily met. As Scott will prove at trial, (1) when Scott accepted award of the subject timber sale contracts, it did not have the vital knowledge that the sales were explicit targets in the ONRC Action litigation, (2) the FS knew that Scott had no knowledge that its sales were explicit targets of ONRC Action or on "at-risk" lists and no reason to seek that information because the FS actively pursued a strategy of keeping the information secret from Scott, (3) by entering into the standard timber sale contracts it had drafted without informing Scott of the virtual certainty that the sales would be challenged after award, the FS supplied Scott with contract specifications that misled Scott or did not put Scott on notice to inquire about whether the sales likely would be challenged, and (4) the FS failed to provide the secret information it possessed and actively hid that information from Scott for its own purposes so that Scott would be placed "squarely at the table" to Scott's detriment and the government's assumed benefit.

The FS never disclosed to Scott the FS's secret internal communications, assessments of the risk of going forward with contract award, and communications with counsel for ONRC Action about Pigout, Whitebird, and Jigsaw subsequent to bid opening and the oral auction. Additionally, on October 26, 1998, shortly after the oral auction for Pigout, Edward Boling and John Watts, trial attorneys for the government in the ONRC Action litigation, agreed with ONRC Action not to award certain FS timber sales which were on ONRC Action's at-risk list until after November 23, 1998.

In a memorandum dated December 9, 1998 from Sue Zike, Regional Litigation Coordinator, to Bob Williams, Regional Forester for Region 6 of the FS, and BLM State Director Elaine Zielinski, Ms. Zike analyzed the pros and cons of awarding sales ONRC Action named as examples of sales violating the NFP survey requirements. One of the "pro" considerations she identified in favor of awarding such sales was that doing so would strengthen the Forest Service's arguments against an injunction because purchasers and their employees would be harmed. One of the "cons" identified by Ms. Zike was that it may subject the government to liability for contract damages if the FS were to award the contracts only to have them enjoined. These "pros" and "cons" were never communicated to Scott.

Further, by letter dated July 6, 1999, counsel for ONRC Action notified the government that Pigout, Whitebird, and Jigsaw remained "at-risk." Despite this information, the FS awarded the contracts to Scott on July 8, 1999. The award letters made no mention of the status of the timber sales in relation to ONRC Action or the virtual certainty that ONRC Action would seek a temporary restraining order or a preliminary injunction against any harvesting on the sales and the FS did not otherwise inform Scott of this fact.

Not only did the FS conceal vital knowledge regarding the three sales from Scott, the FS implicitly represented to Scott that the sales were not involved in any lawsuit at the time they were awarded. The FS awarded Pigout, Whitebird, and Jigsaw to Scott on July 8, 1999. In the award letters, Contracting Officer Brenda Woodard explained that award had been delayed pending resolution of a lawsuit. The clear implication of the award letters is that Pigout, Whitebird, and Jigsaw were no longer involved in the lawsuit that had delayed award. Of

course, as the FS knew and Scott did not, the sales remained directly at risk, and the risk became a virtual certainty once the FS decided to make contract award.

Scott could not have known that the subject sales were on the secret "at-risk" lists by the FS's pre-bid opening statement that award (as opposed to performance after award) of the contracts might be delayed. Scott relied on the FS's conduct in making contract award to them without giving them any indication that the sales were still at risk of being delayed as a result of ONRC Action, and by its silence on the subject effectively representing to Scott that the sales were not at risk.

Scott relied on the FS's silence and its letters and suffered injury as a result of the FS's failure to disclose. Scott accepted contract award at the prices it bid with the expectation that its operations would not be suspended based on the ONRC Action lawsuit. Because the suspension based on the ONRC Action lawsuit resulted in significant increased costs, lost profits and the need for Scott to acquire, if commercially available, replacement timber for the suspended volume in these sales and these damages were incurred without prior knowledge of the cause thereof, the nondisclosure by the FS resulted in direct injury to the Scott. See Miller Elevator Co. v. United States, 30 Fed. Cl. 662, 674-75 (1994).

## IV. The Forest Service Breached Its Implied Duties To Cooperate And Not To Hinder Scott's Operations

Under the legal standard articulated in Precision Pine and the board of contract appeals and federal court cases which have followed Precision Pine, the FS breached its implied duties to cooperate and not to hinder Scott's performance of its timber sale contracts. In Trinity River, the court succinctly summarized the key holdings of the cases following Precision Pine:

> These cases demonstrate that a breach of the implied duties to cooperate and not to hinder may be found where the government causes delay by unreasonably prolonging timber contract suspensions or by unreasonably provoking the suspension of a contract. If such a breach causes harm to purchasers, the government may be found liable for damages.

66 Fed. Cl. at 111. For Trinity River and other cases following Precision Pine, the key question in determining whether the FS acted unreasonably was whether the FS knew or should have known that the environmental analyses supporting the sale were inadequate when it awarded the contract. H.N. Wood Products, 59 Fed. Cl. at 491; Trinity River, 66 Fed. Cl. at 112. In the context of the instant case, the question is whether the FS knew or should have known that its environmental analyses were inadequate at the time of contract award because of its decision not to perform Category 2 surveys on Scott's sales.

As Scott will prove at trial, from the beginning of the development of the interpretation "NEPA decision equals implementation" and the RTV Directive through the award of Scott's contracts and the ONRC Action decision, the FS was repeatedly placed on notice that awarding contracts without Category 2 surveys would likely be successfully challenged after award by environmentalists, resulting in suspensions causing damages to the purchasers. Indeed, Pigout, Whitebird, and Jigsaw were specifically named on lists of sales given to the FS by ONRC Action that were "at-risk" of prompting an injunction if they were awarded.

### A. The District Court Holding In ONRC Action That The Forest Service's Interpretation "NEPA Decision Equals Implementation" And The Red Tree Vole Directive Are Arbitrary, Capricious and Contrary To Law Establishes That The Forest Service Unreasonably Caused The Suspensions Of Scott's Sales

In ONRC Action, the district court carefully considered the government's and ONRC Action's arguments in the context of the plain language of the NFP Category 2 survey

requirements and the undisputed basic purpose of those surveys and firmly concluded that the agency interpretation "NEPA decision equals implemented [or implementation]" and the RTV Directive were "arbitrary and contrary to the plain language of the ROD." 59 F. Supp. 2d at 1093. The court found the interpretation "NEPA decision equals implementation" and the RTV Directive arbitrary, capricious and contrary to law under the Administrative Procedure Act ("APA") standard of review, 5 U.S.C. § 706(2)(A). Id. at 1093-95.

The arbitrary and capricious "test is a standard well understood to be the most deferential possible." Munn v. Secretary of Dept. of Health and Human Services, 970 F.2d 863 (Fed. Cir. 1992) (citing M. Davis, A BASIC GUIDE TO STANDARDS OF JUDICIAL REVIEW, 33 S.D.L.Rev. 469, 476 (1988); 2 Childress and Davis, STANDARDS OF REVIEW § 15.7 (1986)); accord In re Gartside, 203 F.3d 1305, 1312 (Fed. Cir. 2000). An agency decision can be overturned under the APA standard of review only if that decision is not just unreasonable but irrational. E.g., In re Gartside, 203 F.3d at 1312 ("the reviewing court analyzes only whether a rational connection exists between the agency's fact findings and its ultimate action"). This rule is the same in the Ninth Circuit, under whose law ONRC Action was decided. E.g., Northcoast Environmental Center v. Glickman, 136 F.3d 660, 666 (9th Cir. 1998) ("Under the arbitrary and capricious standard, . . . the question is whether the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choice made'"); Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of Navy, 898 F.2d 1410, 1414 (9th Cir. 1990). Moreover, the Ninth Circuit expressly recognizes that when a court reviews an agency action for reasonableness, the court is less deferential than when it applies the arbitrary and capricious test. Northcoast Environmental Center, 136 F.3d at 666-67. When the district court found that the FS was

arbitrary and capricious for adopting the "NEPA decision equals implementation" interpretation and the RTV Directive in ONRC Action, the court ipso jure concluded that the FS had no rational basis for its actions. Had the court analyzed the "NEPA decision equals implementation" interpretation and the RTV Directive under a reasonableness standard, it would have been even more likely to find that the FS had unreasonably failed to comply with the requirements of the NFP. The district court's holding in ONRC Action and the supporting findings by District Court Judge Dwyer, who had previously adjudicated challenges to FS actions under the NFP and was familiar with the basic intent and purpose of the NFP, prove that the FS acted unreasonably in awarding Scott's contracts without Category 2 surveys.

The FS and BLM developed the interpretation "NEPA decision equals implementation" purportedly because of a conflict in the NFP language. The agencies perceived a conflict between language on page C-5 of the NFP Standards & Guidelines which states that "Surveys [for Component 2 species] must precede the design of all ground-disturbing activities that will be implemented in [FY] 1997 or later" and language in the NFP ROD itself at page 36 which states "surveys [must be] conducted prior to ground-disturbing activities." The FS and BLM chose to adopt what they allegedly saw as the meaning of the language on page C-5 of the Standards & Guidelines, i.e., that the FS and BLM were authorized to treat the signing of NEPA decision documents for planned timber sales as the commencement of ground-disturbing activities. In adopting this highly strained interpretation, the FS and BLM "exempt[ed] numerous proposed sales from the survey requirements." ONRC Action, 59 F. Supp. 2d at 1092.

In ONRC Action, the court found the "NEPA decision equals implementation" interpretation arbitrary and irrational because it was obvious that in both the ROD and the

Standards & Guidelines "'implemented' refers to ground-disturbing activities."[6] Id. at 1093. The court observed that even "the title of the category two survey requirements is 'Survey prior to ground-disturbing activities.'" Id. at 1093 (emphasis in original). In addition, "there is no mention of NEPA decisions" in either the Standards & Guidelines or the ROD itself. Id. Further, as the FS well knew, EISs, EAs and NEPA decision documents "often precede ground-breaking activities by a number of years. To equate a NEPA decision with the implementation of ground-disturbing activities would arbitrarily exempt a large number of timber sales from the plan's survey requirements" and "create an incentive to rush NEPA decisions to avoid conducting surveys." Id.

The clear intent of the Category 2 surveys was to gather vital information on species for which there was little information and a serious concern about their persistence before timber harvesting and other ground-disturbing activities took place. From this basic intent, it follows that the NFP did not contemplate exempting numerous timber sales from Category 2 survey requirements merely because NEPA decision documents had been rushed to completion in order to beat the October 1, 1996 or, in the case of Scott's sales, the October 1, 1998 trigger dates.

The key emphasis in both the ROD at page 36 and the Standards & Guidelines at page C-5 is on the implementation date of ground-disturbing activities. The district court recognized this

---

[6]In a footnote reciting the nine federal timber sales authorized under the "NEPA decision equals implementation" interpretation which were specifically challenged in ONRC Action, the court noted that the Department of the Interior Board of Land Appeals upheld BLM's decision to offer the North Murphy timber sale in an administrative agency appeal that challenged BLM's failure to conduct Category 2 surveys on the sale. 59 F. Supp. 2d at 1092 n.5. Had the North Murphy administrative decision been appealed, the challenge would have been prosecuted before the same court that decided ONRC Action. The summary judgment decision in ONRC Action struck down the FS's and BLM's use of the interpretation "NEPA decision equals implementation" and in effect disposed of the North Murphy administrative determination by the Board of Land Appeals.

when ruling that "in both instances, 'implemented' refers to ground-disturbing activities." Id. In other words, the main focus was on whether the FS intended ground-disturbing activities on planned timber sales to take place after October 1, 1996 or after October 1, 1998. For any planned timber sales in this category, surveys were clearly required as part of the environmental analyses necessary for a NEPA decision document to issue. The correct approach, which the FS intentionally did not follow, would have been to treat ongoing environmental analyses for such timber sales as incomplete until Category 2 surveys had been performed. Only then would it have been appropriate to issue NEPA decision documents and thereafter to offer the sales and award the contracts.

The Pigout NEPA decision documents were two DNs that were signed without Category 2 surveys on June 23, 1997 and February 24, 1998.[7] The NEPA decision document for Whitebird and Jigsaw was a DN that was signed without Category 2 surveys on September 21, 1998. Category 2 surveys should have been performed for each of these timber sales prior to the issuance of the NEPA decision documents because ground-disturbing activities were planned by the FS to take place on these sales after October 1, 1998.

"The [NFP] ROD's Category Two survey requirements are clear, plain and unmistakable." 59 F. Supp. 2d at 1094. Because it was arbitrary, capricious, contrary to law, contrary to the plain language of the ROD and therefore irrational action, the district court struck down the FS's interpretation "NEPA decision equals implementation." The FS's adoption of the

[7]Cutting Unit 28 of Pigout was authorized under a CE decision memorandum dated September 17, 1998. See supra note 1. In Heartwood, Inc. v. United States Forest Service, 73 F. Supp. 2d 962, 974-77 (S.D. Ill. 1999), the district court found that the FS was arbitrary and capricious in adopting the CE under which this unit was authorized.

"NEPA decision equals implementation" interpretation was unreasonable and the suspensions of Scott's timber sales that resulted from that interpretation were likewise unreasonable.

The holding in ONRC Action that the RTV Directive was arbitrary, capricious and contrary to law is equally well-supported. The November 4, 1996 RTV Directive unreasonably and without the necessary further NEPA analysis reversed the explicit NFP ROD direction for Category 2 surveys for the red tree vole. ONRC Action, id. at 1094-95. Under the RTV Directive, no red tree vole surveys were required where it was believed that there was a substantial amount of red tree vole habitat. This interpretation was ostensibly based upon the agencies' belief that field surveys were not needed in these areas.

As the district court observed, the clear direction in the NFP ROD is that surveys must be conducted "within the species' 'known or suspected ranges and within the habitat types or vegetation communities associated with' it." Id. at 1095 (emphasis in original). The court reasoned, "The plan's requirement that surveys be conducted cannot be dropped simply by the issuance of memoranda concluding that 'field surveys were not needed.'" Id. Any such change in the ROD requirements for red tree vole surveys would have required an amendment to the NFP and associated NEPA analysis. See id. at 1088, 1094. The FS did not follow this NEPA process even though the RTV Directive exempted "about ninety percent of the red tree voles' habitat, including all of its California habitat, from the survey requirements." Id. at 1094. The district court held that the RTV Directive was arbitrary, capricious and contrary to law. Id. at 1096-97. The implementation of this arbitrary and capricious directive exempting Pigout, Whitebird, and Jigsaw from surveys was unreasonable and consequently the FS suspended these sales in order to perform the required surveys for the RTV and other Category 2 species.

In Precision Pine, the court granted the plaintiff summary judgment on liability where the FS unreasonably failed to submit LRMPs for formal consultation to the Fish & Wildlife Service ("FWS") in the face of the Ninth Circuit's "clear ruling" in Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1051-52 (9th Cir. 1994), that the FS was required to do so under the Endangered Species Act ("ESA"). 50 Fed. Cl. at 68-69.[8] The FS had tried to avoid these consultation requirements by issuing numerous amendments to its LRMPs and submitting the amendments, but not the underlying LRMPs, for consultation. An environmental organization sued to enforce the ESA's consultation requirements and, citing Pacific Rivers, the district court found that the FS's actions were "contrary to the ESA and clear Ninth Circuit law." Silver v. Babbitt, 924 F. Supp. 976, 985 (D.Ariz. 1995).

The Arizona district court issued an injunction that caused the FS to suspend Precision Pine's timber sales until the required consultations were completed. 50 Fed. Cl. at 38. Precision Pine then filed suit in this court alleging that the FS's suspensions breached the government's implied duties to cooperate and not to hinder. The court in Precision Pine found that for some of the suspensions prior to Pacific Rivers, there was a reasonable legal argument for not submitting LRMPs for consultation because there was "an open . . . legal question" on the matter up to that point, but afterwards the FS was unreasonable for trying "to avoid the clear mandate of Pacific Rivers." Id. at 68, 70.

---

[8]In Superior Timber Co. Inc., IBCA No. 3459, 97-1 BCA ¶ 28,736 (1996), the Interior Board of Contract Appeals likewise found that the government had breached its implied duties to cooperate and not to hinder by suspending BLM timber sales in order to perform environmental analyses after award that should have been conducted by the government prior to award. The Precision Pine court found Superior Timber "remarkably similar" to the case before it. 50 Fed. Cl. at 65.

In the instant case, there was no need for a Pacific Rivers-type court decision because the intent and direction of the NFP Category 2 surveys was "clear, plain and unmistakable." ONRC Action, 59 F. Supp. 2d at 1094. There was never any genuine "open legal question" before the FS regarding the unreasonableness of the "NEPA decision equals implementation" interpretation or the RTV Directive. Moreover, in this case, as in Precision Pine, there is uncontroverted evidence that the Department of Justice expressed deep concerns to the FS about the legal defensibility of its proposed actions. See Precision Pine, 50 Fed Cl. at 45, 68-69.

The theory of liability on which Precision Pine prevailed was that the FS breached its duty to cooperate and not to hinder. 50 Fed. Cl. at 70, 72. Since the Precision Pine decision, other tribunals agreed with Precision Pine that the FS's unreasonable failure to comply with critical underlying environmental requirements prior to contract award may well constitute a breach of the government's duty to cooperate and not to hinder. E.g., Trinity River, 66 Fed. Cl. at 112; H.N. Wood Products, 59 Fed. Cl. at 490-91; Tamarack Mills, 04-1 BCA at 161,228; Shawn Montee, 04-1 BCA at 161,077. The facts that Scott will present at trial are stronger and more comprehensive than those in Precision Pine or in those timber sale suspension cases before this court and the Department of Agriculture Board of Contract Appeals which followed Precision Pine.

The holding and finding of ONRC Action establish that it was not reasonable the FS to have concluded that the "NEPA decision equals implementation" interpretation and RTV Directive were lawful.[9] By ignoring the NFP's clear requirements and promulgating the "NEPA

[9]The government has recognized the soundness of the ONRC Action court's opinion. Rather than taking an appeal, the government decided to settle the matter. In recommending settlement to his superiors, Edward Boling, lead trial counsel for the government in ONRC

decision equals implementation" interpretation and the RTV Directive, the FS acted irrationally and unreasonably and is therefore liable for damages caused by the suspension of Scott's sale operations. See Precision Pine, 50 Fed. Cl. at 68-69, 70.

**B. The Forest Service Was Unreasonable In Causing The Suspension Of Scott's Sales Because It Awarded The Contracts Without Conducting Category 2 Surveys Despite Having Been Put On Notice Repeatedly Prior To Award That Its Legal Rationale For Not Conducting The Surveys Was Deficient**

The basic purpose of the NFP Category 2 surveys and the plain language of the NFP plus ONRC Action's allegations were enough in themselves to put the FS on notice that awarding Pigout, Whitebird, and Jigsaw to Scott without first performing Category 2 surveys was unreasonable. Additionally, for years before award of the contracts, the FS was repeatedly put on notice that its interpretation "NEPA decision equals implementation" and the RTV Directive were without any reasonable legal basis. Warnings piled upon warnings from FS and other agency personnel and government attorneys and high level personnel within the Department of Justice were repeatedly ignored by FS management which proceeded to award Pigout, Whitebird, and Jigsaw without Category 2 surveys. As the evidence at trial will show, the FS either knew or should have known that it was not reasonable to award Pigout, Whitebird, and Jigsaw to Scott without Category 2 surveys.

---

Action, stated that "success on appeal is not great because the agencies' interpretations are clearly in tension with the text of the ROD and the common meaning of the words 'implemented' and 'survey.'" Even more pointedly, Mr. Boling told his superiors that the RTV Directive was "not clearly allowed" by and "inconsistent with the ROD requirement to survey 'all' ground-disturbing activities 'within the known or suspected ranges and within the habitat types or vegetation communities associated with the species.' ROD C-5." Ultimately, as part of a joint stipulation dismissing the case, the government agreed to conduct the required Category 2 species surveys on specified timber sales, including Pigout, Whitebird and Jigsaw, and to pay ONRC Action their attorneys' fees in accordance with the Equal Access to Justice Act.

### 1. The Issue Resolution Team's Concerns And The Development Of "NEPA Decision Equals Implementation" And The Red Tree Vole Directive

The Issue Resolution Team ("IRT") was a part of the NFP administrative structure charged with, among other things, developing and recommending interpretations of the NFP Category 2 survey requirements. Typically, recommendations from the IRT would be provided to the IMG and/or to the RIEC for adoption as official direction to field personnel for both the FS and BLM employees. Tom Hussey (FS) and Larry Larsen (BLM) were members of the IRT and Randy Hickenbottom (FS) worked with the IRT on developing interpretations of the NFP requirements for Category 2 surveys.

As early as 1996, an IRT representative advanced the position that a project is implemented for purposes of requiring Category 2 surveys when the FS has committed to a project to the point where it would be unreasonable (cost or resource wise) to delay or cancel the project. They went on to say that when the FS has entered into a legal contractual agreement, the project is considered implemented.[10] Had the FS adopted this definition of implement, all applicable Category 2 surveys would have been performed on Pigout, Whitebird, and Jigsaw prior to contract award and there would have been no basis for ONRC Action's contention that the FS sought to rush NEPA decision documents to execution before the survey trigger dates in order to exempt timber sales from the Category 2 surveys. Had the FS adopted this definition, the FS would not have had to suspend Scott's sales, and the instant lawsuit would not have occurred. Thus, more than three years before the award of Pigout, Whitebird, and Jigsaw, the FS was aware of a reasonable and logically defensible definition of implementation that would have

[10] When Mr. Hussey was on the IRT, he believed that the term "implementation" referred to physical activity on the ground and not the signing of a NEPA decision document.

effectively obviated the challenges by ONRC Action to "NEPA decision equals implementation" and avoided the unilateral suspensions of Scott's timber sales. Unfortunately, the FS did not adopt this rational definition.

Instead, the FS ignored the concerns raised by IRT representatives and others over the "NEPA decision equals implementation" interpretation. From the beginning of the IRT's efforts to define when ground-disturbing activities implemented on a project or timber sale for purposes of determining when Category 2 surveys are required, IRT documents recognized that adoption of the interpretation "NEPA decision equals implementation" would mean offering and approving timber sales that contemplated ground-disturbing activities on or after October 1, 1996 or October 1, 1998 without Category 2 surveys. IRT documents acknowledged that adopting this interpretation had the advantage of allowing the FS and BLM to move ahead with timber sales for which a decision has already been made, but would not begin operations until after the trigger date. In addition, although it was characterized as a "last resort," IRT documents also acknowledged that where timber sales need to have a NEPA decision made prior to the time that surveys could be conducted, then the decision document could be signed but the project could not commence operations until the surveys was conducted and the project design adjusted to include S&M species considerations as appropriate. This "last resort" option was responding to the concern that timber sales should not be exempted automatically from Category 2 surveys when there was time to perform the surveys prior to award just because a NEPA decision document had been executed.

In the summer of 1996, IRT documents reflect concerns that adopting the interpretation "NEPA decision equals implementation" could result in timber sales being operated on in FYs

1997, 1998, and even 1999 without surveys having been done. Moreover, the IRT knew that it was unable to determine how many timber sales this might include, nor estimate the possible resource damage that could occur. There was so much concern about the possible adverse consequences of exempting many timber sales from Category 2 surveys that the director of the REO, Donald Knowles, inquired into whether it was possible to do an assessment of the potential impact of the different implementation dates for surveys required under the NFP. The response Mr. Knowles received was that there was no way of knowing whether delaying the Category 2 surveys would or would not cause the extirpation of a species.

The IRT also understood that there was strong concern on the part of many FS, BLM and FWS personnel that allowing major activities such as timber sale or road building operations to proceed in FY 1997 without surveys was unacceptable because it did not meet the commonly accepted understanding of when implementation occurs. Had the FS heeded the concerns voiced by its own field personnel and others raised long before awarding Scott's contracts without surveys, the ONRC Action lawsuit and the instant action for damages would not have occurred.

### 2. Warnings To The Forest Service In Public Comments, Administrative Appeals And In The ONRC Action Lawsuit

The ONRC Action lawsuit directly challenged the FS's interpretation "NEPA decision equals implementation" on the same grounds that the IRT and other government personnel had raised years earlier. 59 F. Supp. 2d at 1092-93. This lawsuit also raised the argument that the RTV Directive was erroneous and contrary to the NFP survey requirements because it exempted 90% of the red tree vole habitat in the NFP forests from surveys without any basis for such an exclusion in the NFP. Id. at 1094-95.

Two and a half months after the filing of the ONRC Action complaint, at the express request of Department of Justice counsel, ONRC Action provided the government with a detailed written description, including examples, of how ONRC Action believed the NFP was being improperly implemented with respect to Category 2 surveys. This letter spelled out in detail ONRC Action's allegation that the interpretation "NEPA decision equals implementation" was a violation of the NFP ROD and would allow the FS and BLM to quickly "implement" timber sales before surveys are required by simply signing the NEPA documents. The letter also raised the argument that the RTV Directive wrongly exempted most of the habitat of the red tree vole and drew an arbitrary line excluding all red tree vole habitat in the California national forests from such surveys. Months before Scott's contracts were awarded, the FS was put directly on detailed notice of the serious deficiencies of these two Category 2 survey interpretations. Nevertheless, the FS pushed forward, awarding Scott's sales without Category 2 surveys.

On March 24, 1998, Umpqua Watersheds, an ONRC Action plaintiff, filed an administrative appeal of the EA and NEPA decision documents for the Pigout timber sale challenging the FS's failure to comply with the NFP S&M requirements. Umpqua Watersheds also filed an administrative appeal of the FS's T-Line Salvage CE, on November 1, 1998, which included unit 28 of the Pigout timber sale. This appeal directly challenged the "NEPA decision equals implementation" interpretation, stating that the interpretation was causing Category 2 surveys to be delayed inappropriately. These same issues were raised in the administrative appeals of the Warm Springs EA and NEPA decision documents, which had authorized the Whitebird and Jigsaw timber sales, filed by Umpqua Watersheds on November 3, 1998 and ONRC Action on November 12, 1998. Even earlier, during the public comment period on the

Warm Springs EA, the FS received comments objecting to the failure of the FS to survey for red tree voles and stating that Category 2 surveys were required prior to completion of the NEPA documentation because the timber sales authorized by the EA would involve ground-disturbing activities implemented in FY 1999 or later.

As the evidence at trial will show, both before and after the ONRC Action litigation, the FS was repeatedly put on notice that its interpretation "NEPA decision equals implementation" and its RTV Directive were fatally defective. Still, the FS pressed ahead with its decision to award Pigout, Whitebird, and Jigsaw.

### 3. Warnings To The Forest Service From The Department Of Justice And The Forest Service Regional Attorney After ONRC Action Was Filed

After the ONRC Action lawsuit was filed on July 8, 1998, the FS was repeatedly warned by government officials that its rationale for the interpretation "NEPA decision equals implementation" was of dubious validity and that the FS should take special measures to protect itself if it insisted on awarding timber sale contracts without Category 2 surveys based upon that interpretation. These warnings came from, among others, the chief trial counsel for the government in ONRC Action, Edward (Ted) Boling; the FS's Regional Attorney for Region 5, Robert Simmons; and the Assistant Attorney General for the Environment and Natural Resources, Lois Schiffer. Mr. Simmons advised the Regional Foresters for Regions 5 and 6 that if timber sales threatened by the ONRC Action lawsuit were to be offered to the public, the FS should, among other things, take action to make sure that appropriate language is in the contract to protect the FS from liability to the purchasers. Mr. Simmons gave this advice to the FS several months prior to the award of Pigout, Whitebird, and Jigsaw.

During the period leading up to October 1, 1998, the trigger date for requiring Category 2 surveys for the 71 invertebrate Category 2 species, and in the midst of ONRC Action's allegations that the FS was rushing through the signing of NEPA decision documents in order to avoid performing Category 2 surveys, Robert Devlin, the Director of Natural Resources for Region 6, specifically advised Forest Supervisors in the NFP planning area that they should push through the signing of NEPA decision documents for timber sales prior to October 1, 1998, even if certain items were missing because by doing so these timber sales could be exempted from Category 2 surveys. Mr. Devlin acknowledged that rushing the sales through was a risk, but believed it was a reasonable one to take.

Mr. Devlin's direction is exactly what ONRC Action feared the FS would do. At least as early as February 17, 1999, ONRC Action notified the government of their knowledge of the Devlin direction. The FS's knowledge that Mr. Devlin's message had become known to the environmental activists should have been another serious warning to the FS not to proceed with the awards of Pigout, Whitebird, and Jigsaw without Category 2 surveys or, at a minimum, without waiting until it had obtained a dispositive decision in ONRC Action. Despite all of these warning signs, the FS remained steadfastly on its path to award Pigout, Whitebird, and Jigsaw without Category 2 surveys and to do so prior to the resolution of the pending ONRC Action litigation. This course of action was unreasonable and the suspensions of Scott's sales were unreasonably caused by the FS.

### 4. The Forest Service Awarded Scott's Contracts Despite Its Secret Knowledge That If Scott's Sales Were Operated They Would Trigger Motions For Injunctive Relief

As blunt warnings continued to flow from FS attorneys and the Department of Justice during the pendency of the ONRC Action litigation, the government engaged in secret negotiations with the ONRC Action plaintiffs to at first delay award and then to allow the award of certain timber sale contracts on ONRC Action's "at-risk" or "problem" sale lists. These lists included Pigout, Whitebird, and Jigsaw. ONRC Action provided these lists to the government to put the FS on notice that it would likely file for a temporary restraining order or a preliminary injunction if these sales were operated. The FS kept the identity of the sales on these lists a secret and did not disclose this information to Scott. Scott also was not notified when secret agreements were reached between the government and ONRC Action to allow Scott's contracts to be awarded with the understanding that ONRC Action would likely seek a temporary restraining order or a preliminary injunction if these sales were actually operated.

Despite the FS's secret knowledge that Pigout, Whitebird, and Jigsaw were explicit targets of ONRC Action, the FS awarded the contracts and deliberately did not inform Scott of their precarious status. Also, notwithstanding Mr. Simmons' advice given months earlier to include "appropriate language" limiting the government's liability and warning bidders of the ONRC Action lawsuit, no valid exculpatory or disclaimer provisions were included in the Pigout, Whitebird, or Jigsaw contracts; and there were no references in the FS's prospectuses or instructions to bidders for any of these contracts about a threat of suspensions due to ONRC Action or language being included in the contracts to limit the FS's liability in the event of such suspensions. In short, no "appropriate language" was included in the contracts.

The awards of Pigout, Whitebird, and Jigsaw on July 8, 1999 all occurred during the briefing of cross-motions for summary judgment in the ONRC Action lawsuit. The district court issued its summary judgment decision on August 2, 1999. 59 F. Supp. 2d at 1096-97. Under these circumstances the FS's decision to award Pigout, Whitebird, and Jigsaw without Category 2 surveys before the court's summary judgment decision in the ONRC Action lawsuit was unreasonable. By unreasonably provoking the suspension of the Pigout, Whitebird and Jigsaw contracts, the FS breached its implied duties to cooperate and not to hinder Scott's operations.

**CONCLUSION**

Scott will prove at trial that the FS breached the Pigout, Whitebird, and Jigsaw timber sale contracts and that the Court should rule in favor of Scott on the issue of liability.

Respectfully submitted,

s/Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:
Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: May 7, 2008