# Attachment #2

24557
JB



UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, vs. THE UNITED STATES, Defendant. | No. 01-570C (Judge Williams) |
| TIMBER PRODUCTS COMPANY, Plaintiff, vs. THE UNITED STATES, Defendant. | No. 01-627C (Judge Williams) |
| CLR TIMBER HOLDINGS, INC., Plaintiff, vs. THE UNITED STATES, Defendant. | No. 04-501C (Judge Williams) |

DEPOSITION OF EDWARD BOLING

Washington, DC

Friday, August 24, 2007

REPORTED BY: JULIE BAKER

EXHIBIT
Plaintiff's Trial Exhibit No. 176

**Designated Excerpts from the Edward Boling Deposition Transcript in Blue Lake, August 24, 2007:**

Page/Line
22: 4 – 22:13
33:2 – 34: 21
35: 18 – 36: 3
37: 9 – 37: 19
38: 9 – 39: 16
41: 21 – 42: 5
50: 7 – 57: 5
57: 12 – 61: 3
65: 1 – 68: 4
68: 9 – 73: 8
73:20 – 75: 8
76: 12 – 81: 15
82: 6 – 84: 21
86: 15 – 89: 16
90: 3 – 90:17
91: 15 – 93: 2
98: 4 – 101: 1

24557
JB



to the Regional Interagency Executive Committee, sometimes called the RIEC?

A Yes, RIECs, PIECs, all that.

Q When did you first learn about -- the NEPA decision equals implementation definition? Just do it the best you can for me.

A It would probably be on or about July 27th of 1998 at 12:27 p.m. is the date and time of this fax.

Q And that's Exhibit 21?

A That's Exhibit 21, yes. That's my recollection of probably about the time of my first contact with the case.

Q Exhibit 21, in the comments section on the fax cover sheet, refers to a meeting. Do you recall attending a meeting like this?

A I don't have any specific recollection, but it certainly is not surprising.

Q At this meeting, when I believe you were first made aware of the NEPA decision equals implementation definition, did you have a discussion with others about whether that definition was

BY MR. STEVENS:

Q You were aware, were you not, in your discussions with all these various individuals we've been talking about concerning that definition, that as a result of that definition, a substantial number of timber sales were approved and many awarded without surveys; right?

A I don't recall the exact number, but that --

Q Pretty sizable number?

A Yes, that the agency did authorize -- it doesn't apply to authorization -- did offer and indeed awarded timber sales based on that interpretation.

Q At that time it was the practice of the Forest Service to complete the NEPA work and issue a decision notice on the timber sale often months or years before there would be any ground disturbing activities. You were aware of that?

A Yes.

Q Were those facts of any concern to you or anyone else that we've been talking about, in light

24557
JB



of the definition that was used here? It seems to me that we're talking about a substantial number of timber sales and a huge amount of habitat that wasn't being surveyed when there were months or years left within which to do it.

A I don't want to quibble with your term "substantial number of timber sales."

Q Fair enough.

A And I have, in preparation for this, seen e-mail where we were, in fact, asking for the Forest Service and BLM to provide us information as to just how many timber sales would be subject to this peril, and that was part of the litigation risk analysis that we were looking at, as well as also, the agency's concerns with regard to getting the survey and manage program up and running as well as also meeting the commitments of the Northwest Forest Plan to provide timbers, get the timber program back up and running from a standing stop.

In answer to your question, yes, I do recall there being some concern.

Q Was it the view of all these individuals

24557
JB



and yourself at the time that it was reasonable to grandfather in all of these timber sales in terms of your understanding of the purpose and intent of the surveys?

MS. LYNCH: I object to the form of the question. It's assuming a lot of facts that haven't been presented here.

THE WITNESS: I can't speak for other individuals.

BY MR. STEVENS:

Q To the extent they expressed such views to you. You can't tell me what's in their mind, but you can tell me what they said in your presence.

MS. LYNCH: In particular, just relating to grandfathering in a number of species, that's an assumption that I don't think has been brought up here.

THE WITNESS: Certainly there was a finite number of timber sales that had been authorized prior to the deadline for surveys and would be implemented after the deadline, and that there was some litigation risk associated with those

24557
JB



decisions. And that's in part why you have a substantial record of efforts to explore settlement with the plaintiffs.

And there was support for exploring that to a limit, but ultimately, the agency believed in its interpretation of its record of decision, and the decision was made to abandon settlement discussions and proceed expeditiously with cross motions for summary judgment to seek judicial resolution of the issue.

BY MR. STEVENS:

Q Did Dinah Bear ever indicate to you that they thought the definition that we're talking about was in conflict with the basic purpose of the surveys under the Northwest Forest Plan?

A I have no recollection of that.

Q You don't know one way or the other, or you know for a fact she never did?

A I don't know for a fact that she never did, but I don't believe she did.

Q Why?

A Because the whole purpose in providing

24557
JB



additional time to get the survey and manage program up and running, is so it could have an orderly transition. If the plaintiff's interpretation which was never adopted by the government was adopted, then timber sales would be subject to an endless accretion of new survey requirements as survey protocols were revised or new survey requirements came on line.

You had to have some point at which you've authorized. You've done your environmental analysis, you've authorized the timber sale, and you don't look back, especially given the fact that we're not talking about a survey for threatened or endangered species for which there are other label requirements, that this was a requirement that the agency had voluntarily undertaken as part of the record of decision and therefore, had some latitude in terms of structuring the development and implementation of the survey management group.

Q So why not just interpret the survey requirements as requiring surveys prior to offering the sales to the public?

A I think you could probably slice the process of the development of timber sales and their offer, their award, their implementation at many points at which you could have a deadline at which you would survey.

But the point of environmental analysis and a decision based on that environmental analysis was the most logical point to pick.

Q The surveys were done because they produced information that was important to an environmental evaluation of the sales; right?

A Exactly, which is why you'd want to have the survey done prior to the authorization, so you know what you're authorizing.

Q You want to have it done prior to the completion of a decision notice?

A Yes.

Q So why not hold off on completing the decision notice until you've finished the surveys?

A That was the agency's interpretation. Ultimately, it didn't make any sense to continue to require surveys on timber sales that had already

24557
JB



received a decision notice.

Q Why did that not make any sense?

A Well, because you would be making decisions based on a mistake of fact, if you will. For example, if you had a timber sale in Oregon red tree vole habitat that had not been surveyed for Oregon red tree voles, had NEPA documentation done for it but that potentially very important piece of information hadn't been collected, authorized the timber sale, then at some point later, possibly during the contracting process, you go out and survey and end up finding red tree vole nests hither yither and yon, and you effectively, you know, substantially reduced the scope of the timber sale, and you've made an authorization based on information that was fundamentally flawed.

Q What I'm trying to focus on is the fact that while the decision notices were being worked on, for all of the timber sales, including the ones in this case that were the subject of the ONRC action litigation, the people who were working on those decision notices knew that there were survey

24557
JB



Northwest Forest Plan.

MR. STEVENS: Relating to attorney-client privilege and work product immunity with respect to documents relating to defendant's interpretation of the Northwest plan, NEPA equals implementation, that's exactly the definition I'm talking about right now.

One way of defining it is to say you can complete a decision notice without doing the surveys and just ignore the fact that that's something the Northwest Forest Plan prescribes, or you could hold off on finishing the decision notice until you've done the surveys. I think I'm inquiring about a reasonable area.

THE WITNESS: Can I answer subject to that reservation and objection?

MR. STEVENS: Sure, I understand your objection.

THE WITNESS: Your point is well taken. It's my recollection that was done on some circumstances on some sales. In fact, part of the reason why we engaged in the settlement discussions

with the plaintiffs was to try to separate the wheat from the chaff, figure out what timber sales they really cared about so we could move forward on other ones, as well as try to negotiate down some of the scope of the survey requirements.

BY MR. STEVENS:

Q I'd like to have you look at two exhibits now, Exhibit 124 and Exhibit 123.

A I have 124 A and a -- no, I'm sorry.

Q These exhibits are new. They're not in your binder.

A Okay. I'm being handed it.

Q 123 and 124. Let me explain why I want to talk about these documents and you can take as much time as you want to look at them.

Just to focus on my question while you look at it, 124 is a letter written by Michael Axline, lead counsel for ONRC action. On the first page here in the paragraph beginning "First, plaintiffs ask," he's writing to the various regional executives here, including the Forest Service, asking if they inform potential purchasers

24557
JB



A No general recollection either.

Q Would you take a look at Plaintiff's Exhibit 30. I believe that's in your binder.

A I have a 30 A and apparently no 30 B.

Q Okay. I will ~~land~~ hand you 30 -- let me hold off on that document for a moment.

Do you have a 24 A in your binder?

A Yes.

Q Let's go to that for a moment and we'll get back to 30 in a minute. You recognize this letter, I assume?

A I don't have a specific recollection of the letter. I recognize my signature, my style of writing. I don't dispute this is an accurate copy of my letter.

Q It has a number of requests for interpretation characterized by you as requests for expedited information. Would you look on page 2 of this exhibit, paragraph 3. Did you get an answer to that?

A I don't recall. "Have the viability assessments for any of the strategy 2 species been

24557
JB



reevaluated since FSEIS appendix J 2 was issued? If so, describe." I don't recall any -- what the response of the agencies was on this.

Q Why did you ask for that information?

A Well, I suppose the reason I asked is the viability assessments for the strategy 2 species helped determine what survey requirements would apply to them, whether they would be on one category of surveys or another.

In essence, what I'm asking for there is is there new improved information on the viability as in the biological peril, if you will, of these critters, given that we're talking about survey requirements that were adopted over four years before based on best viable information at that time.

Q How about request number 4 on this page, did you get a response to that?

A I don't recall. Same with regard to number 5.

Q And the same with regard to number 6?

A Yep. I don't recall.

24557
JB



Q Why were you asking for the information requested in paragraph number 4?

A I have no specific recollection. I suppose that the reason I was asking this and many of these other questions is I was trying to obtain further information that would help me gauge the strength of our case, having been recently assigned the case.

Q Do you remember what the acronym IAC stands for?

A I believe it was interagency advisory council, IAC, interagency advisory council. I don't know specifically.

Q Why did you want to know if a draft had been provided to that entity?

A That would be a vehicle whereby the agencies would obtain the comments of other expert agencies such as the Fish and Wildlife Service, which the Fish and Wildlife Service and the National Marine Fisheries Service, not so much with regard to this program, but they had equities in the implementation of the Northwest Forest Plan and

24557
JB



certainly expertise with regard to the survey and manage program.

Q What about that next sentence in paragraph 4, what are your plans for addressing the 9/30/98 expiration of this memo? Does that refresh your recollection at all about advising them regarding what the agencies should do at the expiration of the memo?

A I'm afraid it does. It's a logical question when you see the expiration date coming up.

Q And you don't have a recollection of whether you received information in response to these paragraphs, 3, 4, 5 and 6 or not; right?

A I don't have any specific recollection.

Q And no general recollection?

A No.

Q Would it have been customary at the time when you made a request like this to Sue Zike and Owen Schmidt and the others shown in the cc's down there that they would respond with something in writing?

A Well, it's an ambitious list of questions,

24557
JB



and they may have provided a mix of documents that could have been responsive -- they're available documents, as well as also just gotten on the phone with John Watts and myself and given us -- or put other people on the phone who are more knowledgeable to help answer the questions.

Q In paragraph 5, you ask was any public notice and opportunity to comment provided before the November 4, 1996 interim guidance cited in paragraph 3 was issued?

A 33.

Q 33, excuse me, right. That November 4, 1996 references to the red tree vole memorandum?

A I believe you're correct, that that's a reference to the red tree vole memorandum.

Q Why were you interested in public notice and opportunity to comment on it?

A I had no specific recollection. I can only speculate that I was interested in seeing if there's an argument maybe that the plaintiffs knew of this interpretation for quite some time and that there might be a latches argument out there or some

24557
JB



sort of equities that we could bring to play in our defense.

Q Would public notice and opportunity to comment have been a necessary part of a development in adoption of that definition if it actually amended the Northwest Forest Plan record of decision?

A Well, that calls for a legal conclusion.

Q You are eminently qualified to answer the question.

A As of that time, I don't recall having reached that conclusion or any conclusion there. I will say that this sort of interpretive guidance has greater legal stature if you go through public notice and comment under the APA, but it's not required.

Q Why did you ask -- what environmental analysis, if any, was done for this decision?

MS. LYNCH: Objection. We're going far into the realm of the work product here, and I do not believe that's been covered by the waiver.

MR. STEVENS: I disagree, but if you'll go

24557
JB



ahead and answer.

THE WITNESS: Subject to that objection, I'll answer, I was -- I think that's consistent with my request at number 3 about viability assessments and just what environmental information would I obtain regarding the practical implications of this interpretation.

BY MR. STEVENS:

Q Why was that important?

A It would be important to the defense of the case to explain to Judge Dwyer as to the real world significance of this interpretation versus the plaintiff's interpretation.

Q And then why did you next ask in what way is the description of this decision in paragraph 34 inaccurate or accurate?

A In that question, I'm more or less trying to get a jump on the standard operating procedure for the Forest Service and BLM, which would be to produce a litigation report, and they do sort of annotated draft answer responding paragraph by paragraph.

And I wanted information faster than that standard operating procedure. I was particularly interested in paragraphs 33 and 34 of the complaint, so I was sort of getting a jump on that, asking them to focus on that.

MR. STEVENS: Why don't we take about a 10-minute break here, and we'll pick up again.

(Recess.)

THE WITNESS: Do you want me to read the entire document?

BY MR. STEVENS:

Q I don't think you need to. I'm not going to ask you about a lot of it. I want to you focus, for purposes of a few questions here, on the first 22 pages of the document, which is your Fax cover sheet and then an attached letter from Mr. Axline. I believe it's about 22 pages, if you could turn to it and see. That is your cover sheet?

A I've got 25 pages.

Q 25, yes, that's probably right.

That is your cover sheet. It's addressed to Ms. Schiffer and Coppelman. At that time what

24557
JB



was Lois Schiffer's position?

A She was the assistant attorney general for the Environment and Natural Resources Division at the Department of Justice.

Q And Mr. Coppelman's position?

A I believe he was principal assistant deputy attorney general of the same.

Q You were reporting to in your capacity as the lead attorney for government in the ONRC action?

A At that time I was a senior trial attorney in the general litigation section.

Q After your fax cover sheet, there's a letter from Mr. Axline in which he is detailing some of the allegations that the plaintiffs are raising. Would you turn to page 5 of his letter at the bottom of the paragraph.

A "Examples of How Sales Violate the ROD"?

Q Actually, below that, where it says "To make matters worse," do you see that?

A My version is not tracking yours. Let's see. This is what I've got -- oh, I'm sorry, his page 5, not fax page 6. I got you.

24557
JB



Q Fax page 6, his page 5.

A Okay.

Q At the very bottom, where it says "To make matters worse, projects are being rushed out before the end of FY 98, with statements from the agencies that this rush is specifically designed to avoid doing the FY 99 surveys." Then he gives an example with a quotation. "'So a ROD can be signed by September 30' so as to avoid 'possible lengthy delays' resulting from the survey requirements kicking in on October 1, 1998."

He says "See attached copy." That copy is not attached to this, I don't think, but I have a version of it which you'll find as PX 1.

MS. LYNCH: It doesn't appear that this is in this volume.

MR. STEVENS: You don't have a 19a?

MS. LYNCH: No.

MR. STEVENS: We'll get it for you. It also pops up elsewhere, but we'll use this one.

THE WITNESS: Can you explain to me how we know that this document I'm holding, Plaintiff's

Exhibit 19a, is what's referenced here as see attached copy on page 6 of his letter? I don't see any -- in fact, his letter has fax cover line on it, western and environmental law, and that's not on this copy, so I don't see how this was faxed to me or attached.

BY MR. STEVENS:

Q I'll represent to you I do believe it to be the attachment. Let's hold on 19a for a minute and go back to 30. Did you investigate that particular allegation made by Mr. Axline at the bottom of his page 5 going up to page 6, that a ROD was signed by September 30 so as to avoid possible lengthy delays resulting from survey requirements kicking in on October 1?

A With regard to the white pass ski area expansion final EIS?

Q With regard to that example.

A I don't recall a specific investigation with regard to that. I do recall the concern. That was an implication of the agency's interpretation, that for those actions that they authorized prior to

24557
JB



deadline, that they would have some hurry up get it done before the deadline kind of activity. That could happen with whatever the deadline was.

Q Look back at 19a with me for a minute.

A Plaintiff's Exhibit 19a?

Q Right. This is an e-mail from Bob Devlin. Do you remember Mr. Devlin?

A I vaguely recall the name.

Q He's been deposed in this litigation and another litigation.

A It's also plaintiff's Exhibit 39A.

Q In a different case.

MS. LYNCH: I just want to state a general objection for the record with regard to this document. We don't know who it's to, no idea of the date of the document. It's just all very unclear.

MR. STEVENS: Mr. Devlin testified out in Portland a few days ago this was his e-mail sent out to the National Forest within region 6 that were subject of the Northwest Forest Plan.

THE WITNESS: You're testifying as to testimony I don't have an opportunity to review.

24557
JB



Q When did settlement negotiations begin between the government and the ONRC action plaintiffs?

A I think your Plaintiff's Exhibit 30 is probably the best evidence of that. It references a response to a letter of September 3rd that I sent to Michael Axline on its first page asking him to follow through on his August 7 commitment to identify timber sales that do not comply with the Northwest Forest Plan.

So we had some discussion with him on August 7th, and I believe -- that right there is the earliest I've seen of that. It would be probably sometime between July 27th, Plaintiff's Exhibit 21. It doesn't look like I had any discussions with him at that point, and August 7th.

Q Did there come a time after that when it became apparent to the government there was not going to be a settlement of the case?

A Yes.

Q Did that occur sometime in December of 1998?

A That's my recollection. It was sometime in November, December of 1998. That was the first attempt at settlement. Of course, you have to distinguish that from ultimately the settlement occurred subsequent after Judge Dwyer's order.

Q Exactly. Exactly.

Did you ask the Forest Service not to award any timber sales that appeared on the ONRC action plaintiffs' list of problem sales or at-risk sales while these settlement negotiations were going on?

A I don't recall if I asked the Forest Service to hold off on the award of timber sales. I do recall that some action was suspended on some timber sales that had been identified by the plaintiffs to facilitate the settlement discussions, September through November of 1998.

Q Did the Justice Department have an agreement with the plaintiffs that it would not award -- the government would not award certain sales?

A I don't recall any specific agreement. I

24557
JB



think it was -- I think it was more based on a recognition by Justice Department and agency counsel that it was worth exploring possible settlement opportunities rather than to fight the preliminary injunction battles that would occasion action on those timber sales.

Q Did the ONRC action plaintiffs indicate that if a sale was awarded by the Forest Service, it was identified as one of the problem sales or at-risk sales that they would file for a restraining order or preliminary injunction with respect to that sale?

A I am actually paging through Exhibit 30 to see if they did that in this document. I think that's certainly an implication behind their -- actually, I think it's fairly well stated in their letter to the regional foresters and state directors in Plaintiff's Exhibit 124. The paragraph on the first page, "Second, although plaintiffs tend to seek injunctive relief," they're "willing to first attempt to reach an interim agreement with" "respective agencies on what's required by the ROD

and how those requirements may be met. Such an agreement might make it unnecessary to seek injunctive relief."

So that's a fairly clear threat.

MS. LYNCH: Can we go off the record for just a second?

(Discussion off the record.)

BY MR. STEVENS:

Q Take a look at Plaintiff's Exhibit 45. This is a fax cover sheet and some materials from Owen Schmidt to you, but it also has Sue down at the bottom, and Ms. Zike has testified that's her handwriting.

A Actually, it's a fax from Sue Zike to me and Owen Schmidt.

Q Ah, that's right. Thank you. My question goes to the page that's identified in the lower right-hand corner as 92216. That was an attachment to this fax, and that's the same Devlin --

A Oh, there it is.

Q -- the same Devlin e-mail that we looked at before. Does that do anything to refresh your

24557
JB



recollection that you have seen this prior to today?

A Well, I'd say it appears I received this -- I don't know if you got this out of DOJ files, but I assume that I -- I wouldn't dispute that I had received this fax, so -- on February, or rather November 12th of 1998.

Q It would have been my thought when you got this, you would have followed up by talking to Mr. Devlin or getting some more information about this particular issue?

A This particular issue was one stated quite clearly in Mr. Axline's letter of August 7. So as of November 12, 1998, this is fairly old news. It's also about a month past that deadline. What activity would have occurred in that time frame would have occurred.

I don't know that I would have followed up directly with Mr. Devlin about this.

Q You don't have any further recollection of looking at it in this context?

A I'm looking at Sue's fax here. I don't have any specific recollection.

Q No recollection of having discussions with Owen Schmidt about it, for example?

A I don't have any specific recollection. Certainly, easily as of our receipt of this letter, the September 25, 1998 where he talks about -- he being Michael Axline, talks about this phenomenon of people rushing to meet the deadline. Certainly I would have had conversation with Owen Schmidt about that and certainly the appearances created by that.

But as of November 12, 1998, I think at that point, it was fairly old news. This is an e-mail that is out in public as of that point. ONRC seems to have attached it to their press release.

Q You do recall from time to time during the settlement negotiations, the ONRC action plaintiffs provided you with lists of sales which they characterize as problem sales or at-risk sales?

A I do recall that.

Q And you passed these lists along to the Forest Service through Sue Zike?

A Yes.

Q Did you give any instructions or guidance

24557
JB



to the Forest Service as to whether the information contained in those lists should be disclosed to anyone outside the Forest Service or the Department of Justice?

A I don't recall. However, I note that on page 1 of Michael Axline's September 25th, 1998 letter, which is part of Plaintiff's Exhibit 30, that Mr. Axline asserts in the first paragraph "Because this letter is submitted in furtherance of settlement discussions, it is subject to Federal Rule of Evidence," section --

Q What page is that on?

A If you look on page 2 of plaintiff's Exhibit 30, this would be the first page of WELC's September 25, 1998 letter bottom of the first paragraph it says "Because this letter is submitted in furtherance of settlement discussions, it is subject to Federal Rule of Evidence 408."

Q Meaning that it can't be introduced into evidence?

A Meaning that it can't be introduced in evidence. I think I probably asked them to -- well,

24557
JB



no. Now that I think about that, no, I don't have any specific recollection as to how to treat this information. Certainly I asked them for information about these timber sales. They're identifying problem sales, and so I think it's likely almost certain -- I don't have the document in front of me, but I recall having seen things like this -- where we asked for okay, tell me the status of the timber sale. What are the issues here? Part of the reason for that, we were trying to maintain a common understanding with the plaintiffs over what we were fighting over.

There's a fair amount of -- we had a long list of timber sales, a fair amount of bad information out there about the status of these timber sales, and it was in everyone's interest to inform the settlement discussions, avoid, perhaps, an unnecessary TRO battle, to have a clear sense of just what's where.

I recall an unfortunate circumstance faced by another attorney in that section at about the same time where he had made representations about

24557
JB



what was happening on a timber sale and then they found later it had actually been operated, cut, and he was called to account for that. We wanted to have some clear basis for discussion as to both the scope of what they were asking for in injunctive relief or what they would likely ask for in the injunctive relief, as well as opportunities for settlement.

Q Did you tell the Forest Service not to reveal these lists to potential purchasers?

A I don't recall doing that.

Q Did the Forest Service ever ask you if it was all right with you if they reveal these lists to potential purchasers?

A I don't recall.

Q Did the Forest Service ever indicate to you that they would prefer not to reveal these lists to potential purchasers?

A I don't recall ever hearing that.

Q Am I correct that your testimony today is that you don't recall giving any advice to the Forest Service as to how to handle these lists in

24557
JB



terms of making them available to other parties or other individuals?

A I don't recall any advice to them as to how to handle the lists, other than the list itself -- or this document was exchanged in settlement negotiations, and its first page there, page 2 of Exhibit 30 says "Privileged and Confidential."

That does not necessarily mean that every aspect of this document was treated as privileged and confidential. Your question is whether purchasers or potential purchasers of the timber sale identified in this document, whether they were informed or not.

I see that I circled the names of timber sales and projects here, and it's quite a range of them.

Q You mean on the exhibit you're looking at?

A On the exhibit I looked at.

Q Which is Exhibit 30?

A Exhibit 30. I don't recall giving my specific recollection as to how to treat the fact

24557
JB



that these particular projects had been identified by WELC should be treated.

Certainly I would not expect the Forest Service to take this privileged and confidential letter and put it on the fax machine hither and yon to all potential purchasers of a timber sale, but I don't know what they did with the fact of that information.

Q What about letting potential purchasers know that certain sales were on the list?

A Again, Plaintiff's Exhibit 124, WELC had asked the Forest Service to provide that information to potential purchasers. As I said, I don't know what the Forest Service did in that regard. This is a more specific iteration of the communication on July 8th of 1998 as described in Plaintiff's Exhibit 124.

Q Do you have an Exhibit 59 in your book in front of you? If you do, would you turn to it?

A This Exhibit 59 appears to be a printout of a Sue Zike e-mail from December 4, 1998. There's a distribution list down at the bottom, I guess --

24557
JB



well, no.

Q That's page 169. And then page 170 is part of a related e-mail. Would you turn to page 171?

A This does not appear to be related. You've got ASCII text printout of an e-mail here with a page break there, different title, different date actually preceding the December 4, 1998 e-mail to the December 2, 1998 e-mail. And you've got after that -- the document you're going to ask me about is the December 4th letter.

Q That's right. Pages 171 and 172 of Exhibit 59. This is your letter. You've written it to Sue Zike and Allen Wood. At the bottom of the first paragraph you say "The Forest Service and BLM are free award pursuant to applicable law in the exercise of sound discretion."

It sounds like to me up that at least until this letter you had been instructing the Forest Service and BLM not to award any sales that they wanted to. Would I be right about that?

A That's the implication there. It says --

24557
JB



to make clear, our request -- it says "As of today, we have no agreement with plaintiffs to hold on to the award of any timber sales." I'll grant you the implication was at some point prior to December 4, 1998 there was some agreement with plaintiffs to hold on to the award of timber sales.

Q Your previous testimony, and I believe you, is that you have no recollection?

A Yes -- I can't say you're refreshing my recollection because it's not like I'm having an "aha" moment here.

Q But you don't dispute what's in the letter?

A I don't dispute this is an accurate copy of my letter of December 4, 1998. By we have no agreement, it may have been the Forest Service and BLM, they may have undertaken to agree to hold on to the award of some timber sales. I don't recall. I also don't recall how many timber sales that applies to.

Q I take it you're telling me also, although you recognize this letter as yours, you don't have

24557
JB



any further recollection as to this letter, as to why it was sent out or if you ever received any input from Mr. Schmidt or Mr. Nesbitt, who are cc'd at the bottom, or from Ms. Zike or Mr. Wood?

A No. The letter goes on to say -- the purpose of the letter is, I think, stated in its second paragraph, it's essential to the defense of this matter that the Department of Justice be kept informed of pending timber sale awards, particularly the date on which the agency is going to award. And we ask for very specific information there about having reviewed the issues coming to administrative appeal and the ONRC action suit with agency counsel, Owen Schmidt and Roger Nesbitt. In other words, is there a live issue there they haven't failed to exhaust their administrative remedy such that they could bring to the court.

Communicate to us its judgment that the award of the sales were at the risk, that the sale would ~~by~~ be used ~~by~~ by the plaintiffs -- that the award of the sale is worth the risk, that the sale will be used by plaintiffs as an example in an emergency

24557
JB



motion to enjoin all sales in the area of the Northwest Forest Plan, compile the essential elements of the administrative record that we will need to defend against such a motion, e.g., EA/FONSI and appeal records where they can be copied and sent to DOJ on a one-day notice and for completed all contracting prerequisites.

In essence, what I'm doing in this letter is we've moved from settlement discussions to the point where we're going to be proceeding with our cross motions for summary judgment, proceeding with the case-in-chief, and I want to be prepared to run into court with the facts on particular timber sales if they're going to use the administrative action, the award of a timber sale as a basis for an emergency motion before Judge Dwyer, which would be important from a defense standpoint because Judge Dwyer's impressions of the case could be materially colored by that early emergency action, and we want to be able to walk into court not scrambling for the facts but ready with our defense.

Q Was it your understanding that with

24557
JB



respect to the Forest Service timber sales, Owen Schmidt would communicate to you his judgment that the award of the sale was worth the risk that the sale would be used by the plaintiffs as an example in an emergency motion?

A That would be the ordinary course of business.

Q How would you expect him to go about making that kind of risk assessment?

A I would expect that he would review the record, review the facts, make sure that the environmental assessment didn't have any significant flaws to it, that it presented the agency's case as to the environmental significance or nonsignificance of that particular timber sale and that we're in a reasonably good posture to use this as an example, which any one of these could become sort of the bellwether example for the entire survey and manage program.

Q Do you expect Mr. Schmidt or anyone else in the Forest Service to explain to you why it was necessary to go forward with the award of the

24557
JB



particular sale prior to a final decision on the merits by Judge Dwyer?

MS. LYNCH: I object. It calls for speculation and looking into another person's thought process.

THE WITNESS: Let me also ask you, the way you stated the question, you threw me when you said prior to a decision by Judge Dwyer. That would be the purpose of the exercise as before, we're briefing the TRO before Judge Dwyer to explain that we've got some opportunity to talk about the action, the timber sale that we're called upon to defend.

So that would necessarily -- part of that would be Owen's expertise, his judgment about the strength of our case.

BY MR. STEVENS:

Q Weren't you really asking the Forest Service to tell you if it had a good reason for awarding that sale rather than just wanting to award it in the ordinary course? You wanted some special rationale for proceeding now rather than waiting until Judge Dwyer ruled?

24557
JB



MS. LYNCH: Object to the form of that question.

THE WITNESS: Subject to that objection, you want to restate the question.

BY MR. STEVENS:

Q What I'm trying to get at here is what you understood the Forest Service was doing in terms of making a decision about awarding sales prior to the conclusion of the ONRC action lawsuit. What I'm asking you more specifically is, did you expect that the Forest Service would give you some specific reasons for awarding this sale or that sale in order to justify going forward with award prior to the lawsuit? Did they have to give you some resource protection or reason or something like that?

A I think it's stated pretty well on Bates number 0171, it's number 2, that they would communicate to us its judgment, that would be the agency judgment, that the award of the sale is worth the risk that the sale will be used by plaintiffs in an example in an emergency motion to enjoin all sales in the area of the Northwest Forest Plan.

24557
JB



They would provide us some sort of discussion of the total litigation risk, I mean the balance of harms and why is this one running that risk. The fundamental purpose of the Northwest Forest Plan was to get the timber program up and running again. So that's entirely a legitimate aspect of that balance of harms.

Q That would be true of every single sale?

A Yes, certainly --

Q So you wouldn't need to know that?

A Not necessarily. Some timber sales -- they all have a different volume associated with them. They're all different. They all have different characteristics to them, both in terms of their environmental issues as well as their other resource benefits, and one of the benefits was the provision of volume from particular areas.

A timber sale in areas of land designated by the Northwest Forest Plan for timber production, known as the matrix, is different from a timber sale from an area of land that's designated for production of timber with more specific significant

restrictions associated with it.

Q Once you got Mr. Schmidt's judgment, did you or Mr. Watts do your own risk analysis?

A First, it's a fairly hypothetical question. What I'm doing in this letter is --

Q I think it calls for a yes or no answer. It didn't seem hypothetical to me.

A I don't recall having done that risk analysis with any particular sale. This is a going forward operating instructions question. Your question was with regard to how would you have behaved on your side, I think, in response to the agency response to this letter.

That said, that sort of goes without saying, it's necessarily we're consulting with them. We have that sort of dialogue with Owen Schmidt and Roger Nesbitt about it.

Q So you did a risk assessment as well?

A We would engage with them on their risk assessment, explain our perspective. That said, I don't recall ever having disagreed with them.

Q Never had a disagreement with them?

A I don't recall at what point -- certainly, I informed them, as your Exhibit 30 shows, that we were in discussions and indeed, Exhibit 30 indicates that we would be having a conversation with Michael Axline at 1:30 on the date of that fax. But I don't recall specifically when I informed them we were engaged in these discussions.

Q Do you recall that you provided Ms. Schiffer and Mr. Coppelman with a briefing on the ONRC action litigation on or about November 24, 1988?

A I probably did about that time. That would have been towards the conclusion of our attempts at settlement.

Q Would you take a look at Plaintiff's Exhibit 53.

A I've got a gap here between 52 and 54.

Q I'm going to hand you 53.

A This is a November 25th, 1998 memo from Nancy Graybeal.

Q That's right. The reason I hand it to you is to refresh your recollection. If you come down

24557
JB



under issues, paragraph number 1, do you see the reference to a briefing there?

A Yep.

Q Paragraph number 7 further down has the results of a briefing?

A That Ms. "Shiffer," misspelled, "and Coppelman want to confer with Ag and Interior Depts regarding: key issues and cost assessment of reaching settlement."

Q What do you recall was the basic purpose of this briefing?

A Well, as the name implies, to brief them on the status of the negotiation and as it says on number 1, that I advised them that cost of settlement of the key issues was too great for the agencies.

Q That is based upon what the agencies told you?

A I was advising them on what the agencies had concluded, so -- yes, that's the implication.

Q At this briefing, did you have occasion to discuss with Ms. Schiffer and Mr. Coppelman the

24557
JB



definition NEPA decision equals implementation?
A I would say yes, probably. I don't have any direct recollection of it, but I'm looking at page 2 of your Exhibit 53, and I see that is the first issue identified in this table, "ISSUES ADDRESSED IN SETTLEMENT NEGOTIATIONS. It says in the first column "RESOLUTION? Not Likely, so that would be probably issue number 1 for that discussion.
Q At this meeting, did Ms. Schiffer tell you that that definition didn't make any sense to her?
A I don't recall that.
Q Did she indicate at this meeting in any way that she thought that the definition was unreasonable?
A I think she had concerns about it. As you pointed out, the fact of the deadline allowed the agency to authorize some timber sales without having conducted surveys because the survey requirement hadn't attached yet, but that's just necessarily a part of it.
That was the focus of Mr. Axline's

24557
JB



allegation in his September 25, 1998 letter, so that certainly would be part of our discussion. I think the prospect of going before Judge Dwyer to explain that this is a logical and reasonable explanation -- reasonable interpretation of the requirement to get these surveys up and running was somewhat -- it was not as clean and simple in retrospect as one would like.

It had the problem of this allegation that the agencies were rushing to get timber sales out the door to avoid the requirement. That's fairly obvious, and I expect that she -- I believe she had some concerns about that. That's sort of the nature of litigation risk.

Q Did Mr. Coppelman have the same concerns?

A I believe he shared them.

Q Did Ms. Schiffer at this meeting indicate to you that she thought that definition was so weak, that she wasn't prepared to make a decision to defend it in court until she had a chance to talk with the assistant secretary of agriculture, Mr. Lyons?

24557
JB



A He's the undersecretary.

Q Excuse me.

A Well, your Exhibit 53 says that "Shiffer and Coppelman want to confer with Ag and Interior Depts," and I assume that meant, amongst other people, Mr. Lyons "re: The key issues and cost assessment of reaching settlement." In other words, they wanted to make sure that the client at a fairly high level of leadership was aware that this was the choice being made.

There was an offer on the table that the agencies had assessed it as being too high a cost, and she wanted to confer, or they wanted to confer, with Ag and Interior departments to ensure that the leadership at those departments was aware that that judgment had been made before proceeding with litigation.

MR. STEVENS: Could you read my question back.

(The reporter read the record as requested.)

BY MR. STEVENS:

Q Can you answer that yes or no?

A No, I don't have a specific recollection. My answer was based on a -- based on my general recollection of these negotiations and discussions within the Department of Justice and your -- Plaintiff's Exhibit 53, which references this. So I'm filling in there. I don't have a specific recollection of what Lois Schiffer said to me at that briefing.

Q Do you recall reporting to Sue Zike what Ms. Schiffer said to you?

A I don't recall it in preparation for this deposition. I did see an e-mail that Sue Zike -- a text, recounting the discussion.

Q And?

A Turning you to your Exhibit 30A, your Plaintiff's Exhibit 30A, I don't know who this is to, but it's a fragment of an e-mail. It appears to be the text of a fragment of an e-mail, "Nancy and others: Ted Boling just called to answer my Qs about what were Shiffer's," again, misspelled, "and Coppelman's concerns about this case. He answered agency definition of implement 'was nonsense.'" And

24557
JB



it goes on. I assume that's what you're getting at.

Q That's part of what I'm getting at. You don't have a recollection?

A I don't recall that conversation. I don't recall if that's an accurate characterization of what I had told her.

Q Would you have any reason to doubt Ms. Zike if she said that is what you told her?

A Only in that I would be surprised that Sue Zike had a clearer recollection than I do of that conversation.

Q Did you take any notes of that conversation?

A I don't know. This is her characterization of what I said.

Q Do you have Plaintiff's Exhibit 52 in the book in front of you?

A Yes.

Q Ms. Zike testified in her deposition last week that these were her notes during a telephone conversation with you when you told her what happened at that meeting.

A Okay. Well, that comports with her e-mail.

Q Yes, it does. Are you aware of anything in writing that would contradict Ms. Zike?

A Yes.

Q What's that?

A The government's briefs in the ONRC action.

Q And you believe that would contradict Ms. Zike as to what Ms. Schiffer told you on this date?

MS. LYNCH: I'd object -- withdrawn. Sorry.

THE WITNESS: I don't know if that word "nonsense" is accurate or not in Ms. Zike's notes of my conversation with her. I don't know if that was the word that Ms. Schiffer used in conversation with me or that was my hyperbole, my characterization. We've got several steps of filter.

I would say that all of us recognized that we did not have a clear-cut issue of interpretation here and that our initial take on this issue was

24557
JB



A But I think you are. I think if they're -- if they had some issue drafts, they're looking at the implications of alternative interpretations or something like that. But, you know, be that as it may, the letter was my attempt, as I had stated earlier to sort of jump start the standard operating procedure in providing us with a litigation report that would get into those sorts of issues.

Q Wouldn't those earlier drafts and discussion papers be important to you in assessing the correctness of the definition? Wouldn't you want to see what other people had said?

A Possibly, not necessarily. It depends on what's in the drafts. As I said, I think my letter was trying to get to the heart of those issues.

Q I'd like you to look at Exhibit 126. I'll have to give you a copy of it. This is a fax cover sheet from you to Dinah Bear, and if I'm reading the fax line at the top, it went out on November 25, 1988, which would be the day after your briefing of Ms. Schiffer and Mr. Coppelman.

The handwriting in the upper right-hand

corner, is that your handwriting on the first page?
A No.
Q Do you recognize the handwriting?
A No.
Q If you turn over to page 3, I believe that's the attachment that's referenced in the first paragraph on page 1. Is that your analysis?
A I don't believe so.
Q Whose analysis is it?
A Well, I don't know whose this is. "Attached is a discussion of the issue." I don't know where the attachment came from.
Q Do you remember the occasion for you sending this to Ms. Bear?
A It appears that I was requested, possibly by Ms. Bear, to identify what I describe as heavy hitter issues looming on the Northwest horizon. It describes the ONRC action case, another case, Siskiyou Regional Education Project, an ongoing action with regard to the Interior Columbia Ecosystem Management Project and budget issues.
On this I'm advising her that I see the

need for regular Northwest group staff by assistant secretary level designees. In other words, I'm advising her of the need for some agency leadership and attention to the ONRC action survey and manage issues as well as other issues.

Q Do you recognize page 3 as something in the style that Mr. Watts would write in?

A Actually, Mr. Watts or myself or possibly shared in that regard. The phrase on the beginning of the paragraph, the second paragraph on page 4, "The agencies' interpretation finds its best support in the logic of the NEPA decision process," I think that's something I already said in this deposition. That's kind of my style.

Q Part of this you recognize this as being yours. Part of it may be Mr. Watts or may not be?

A We were office mates, and we collaborated quite closely on all aspects of this litigation.

Q It is from the Department of Justice, though?

A I believe so, just because this does not look like something that would have come from the

agencies.
Q Did you get any response back from Ms. Bear?
A I don't recall.
Q I'd like you to look at one more exhibit here, Exhibit 127.
A Another fax to Dinah Bear.
Q Another fax to Dinah Bear, this one signed by you.
A February 5th of 1999.
Q What's funny?
A Just the beginning, "how to read this document. First, ignore everything after the heading beginning 'Reasons for Finding...' none of those are reasons!"
Q You recognize that's Mr. Schmidt's style?
A That would be Mr. Schmidt's style, yes.
Q Do you recall why Mr. Schmidt made these comments on NEPA documents available to you?
A What we have here, on page 3 of Exhibit 127, a finding of no significant impact for changes to the implementation of certain aspects of the