# Attachment #3

Orig S Zielke
cc K Burns

# Western Environmental Law Center

DEFENDING THE WEST

Northwest Office
1216 Lincoln Street
Eugene, OR 97401
541/485-2471
541/485-2457 (fax)
westernlaw@igc.org

Executive Director
Michael Axline*

Attorneys
John E. Bonine*
Marianne Dugan*
Elizabeth Mitchell*+
Carrie Stilwell*
Charles Tebbutt*†
* admitted in Oregon
† admitted in New York
+ admitted in Colorado

Scientist
Michael Wach*

Development Director
Deborah Mailander, J.D.

Office Manager
Kathy Cannon

Development Assistant
Kari Kytola

Legal Assistant
Rachel Thiesmeyer

Administrative Assistant
Marilyn Kemp

Southwest Office
P.O. Box 1507
Taos, NM 87571
505/751-0351
505/751-1775 (fax)
taoslaw@laplaza.org

Director, SW Office
Grove Burnett‡

Attorneys
David Gomez‡
Vickie L. Minor‡**
‡ admitted in New Mexico
** admitted in Texas

Office Manager
Linda Velarde

Legal Assistant
Linda Gomez

July 8, 1998

Robert W. Williams
Regional Forester
United States Forest Service
Region 6
PO Box 3623
Portland, OR 97208-3623

G. Lynn Sprague
Regional Forester
United States Forest Service
Region 5
630 Sansome Street
San Francisco, CA 94111

Elaine Y. Zielinski
State Director
Oregon/Washington
United States Bureau of Land Management
PO Box 2965
Portland, OR 97208

Ed Hastey
State Director
California
United States Bureau of Land Management
2135 Butano Drive
Sacramento, CA 95825

Dear Mr. Williams, Ms. Sprague, Ms. Zielinski and Mr. Hastey:

This office represents thirteen organizations that have today filed suit in federal court seeking to enforce the provisions of the Record of Decision (ROD) on Management of Habitat for Late-Successional and Old-Growth Forest Related Species within the Range of the Northern Spotted Owl. I write for two reasons.

First, plaintiffs ask that you inform potential purchasers of sales offered subsequent to the filing of the complaint, within the area covered by the ROD, that such sales may be the subject of a request for injunctive relief for noncompliance with the ROD. This is particularly true for sales within the range and habitat type of "Strategy 2" species for which the survey and management requirements of the ROD have not been performed. Such a notice to potential purchasers will provide protection for the federal government should those sales be enjoined, and insure that purchasers are fully informed of the pending lawsuit and its potential effect on noncomplying sales.

Second, although plaintiffs intend to seek injunctive relief, they are willing to first attempt to reach an interim agreement with your respective agencies on what is required by the ROD and how those requirements may

A-322

PLAINTIFF'S EXHIBIT 124 8-24-07 JB

unbleached · 100% postconsumer waste · soy ink

EXHIBIT Plaintiff's Trial Exhibit No. 49

S-13

100485

be met. Such an agreement might make it unnecessary to seek injunctive relief. We therefore suggest a meeting to discuss whether an agreement might be reached that would obviate the need for injunctive relief while the merits of the suit are being determined.

I look forward to your response.

Sincerely,

Michael Axline
Counsel for Plaintiffs

cc: Oregon Natural Resources Council Action
Pilchuck Audubon Society
Klamath Forest Alliance
California Wilderness Coalition
American Lands Alliance
Umpqua Watersheds, Inc.
Northcoast Environmental Center
Portland Audubon Society
Citizens for Better Forestry
Gifford Pinchot Task Force
Northwest Ecosystem Alliance
Headwaters
U.S. Attorney Kate Pflaumer

U.S. Department of Justice

Environment and Natural Resources Division

EAB
90-1-4-09179

*General Litigation Section*
*P.O. Box 663*
*Washington, DC 20044-0663*

*Telephone (202) 305-0504*
*Facsimile (202) 305-0506*

July 29, 1998

Michael Gippert
Deputy Assistant General Counsel
U.S. Department of Agriculture
South Building, Room 4624
12th & Independence Ave, S.W.
Washington, DC

Renee Stone
Associate Solicitor
U.S. Department of the Interior
1849 C Street, NW, Room 6410
Washington, DC 20240

Re: Oregon Natural Resources Council Action v. U.S. Forest Service and BLM, Civ. No. C98-942 (W.D. Wash.)

Dear Mike and Renee:

This is a request for expedited information regarding the allegations in the above-captioned matter. As you know, thirteen environmental groups filed this action on July 8 and served the Department of Justice on July 17, 1998. The case has been assigned to Judge Dwyer, who has ordered the parties to confer regarding the potential for settlement of this matter and to report to the court by September 8, 1998. Pursuant to this order, plaintiffs' counsel has requested a meeting to discuss settlement during the week of August 17 and that the Forest Service and BLM delay action on 32 timber sales pending settlement discussions. We have already requested information on these timber sales. This request seeks information necessary for our evaluation of the strength of the complaint and the potential for settlement.

Please have your clients respond to each allegation in the complaint, with special attention to the following matters:

1) Paragraphs 25 and 26 allege that FS and BLM have not developed management standards to manage habitat for "survey and manage" species where they are located.

A) What management standards apply to sites where surveys find a) the red tree vole, b) Del Norte, Larch Mountain, Shasta, Siskiyou Mountains or Van Dyke's salamanders, or c) any of the species that will be surveyed prior to ground-

EXHIBIT
Plaintiff's Trial Exhibit No. 51

A-333

PLAINTIFF'S EXHIBIT
242
5-10-07

Released Pursuant to Court of Federal Claims Order of 3/29/07

disturbing activities implemented in FY 1999 or later?
B) Are there management standards for known sites of species identified under Survey Strategy 1 (ROD at C-4)?
C) Are there any draft management standards in preparation?

2) Annual reports (paragraphs 26-27): Have any Forests or BLM Districts produced reports on their "survey and manage" programs? If so, how often and reported to whom? What system exists for reporting information collected by surveys? What has been done as a substitute for annual reports?

3) Have the viability assessments for any of the Strategy 2 species been reevaluated since FSEIS Appendix J-2 was issued? If so, describe.

4) Was any public notice and opportunity to comment provided before the November 1, 1996, directive cited in paragraph 31 was issued? Was a draft provided to the IAC? What are your plans for addressing the 9/30/98 expiration of this memo?

5) Was any public notice and opportunity to comment provided before the November 4, 1996, interim guidance cited in paragraph 33 was issued? Was a draft provided to the IAC? What environmental analysis, if any, was done for this decision? In what way is the description of this decision in paragraph 34 inaccurate or accurate? Is this guidance still "interim" or has it been changed or finalized?

6) What surveys and protocols exist for the Del Norte, Larch Mountain, Shasta, Siskiyou Mountains or Van Dyke's salamanders? When were they implemented? Do these surveys exclude part of the range of these species? Have the Forest Service or BLM ever not conducted these surveys or not followed these protocols since they were adopted? If so, why and for how long?

7) What surveys have been or are being conducted for Strategy 3 and 4 species? When were they initiated?

8) Is the 8/7/97 Effectiveness Monitoring report the final description of the effectiveness monitoring program? How extensively has this program been implemented? (e.g., pilot project basis) What data is being collected for use by the effectiveness monitoring program?

9) How has the Forest Service or BLM evaluated the significance of the new information identified in paragraphs 54, 55, 58 and 59?

10) Please provide the 1997 REO memo described in paragraph 63. Was any public notice and opportunity to comment provided before this memo was adopted? Was a draft provided to the IAC? What environmental analysis, if any, was done for this decision?



Released Pursuant to
Court of Federal Claims
Order of 3/29/07

In what way is the description of this decision in paragraph 63 inaccurate or accurate? How was this REO memo adopted and incorporated into plans or project planning by Forest Service or BLM?

Finally, if you have not already done so, please identify the Forest Service and BLM personnel who a responsible for answering these questions and who will serve as points of contact for this type of factual information. This information is needed as soon as possible, and as it becomes available, because soon we will be responding to plaintiffs' settlement overtures, and possibly a preliminary injunction motion. In any event, please see that we receive a complete response to these questions by Tuesday, August 11. Please call Ted Boling at 202-305-9609 or John Watts at 202-305-0495 if you need clarification or further information.

As always, your assistance is greatly appreciated.

Sincerely,

Edward A. Boling
John Watts
Trial Attorneys

cc: Owen Schmidt
Sue Zike
Karen Mouritsen
Roger Nesbit



Released Pursuant to
Court of Federal Claims
Order of 3/29/07

United States Department of Agriculture — Forest Service

**FAX TRANSMITTAL COVER SHEET**

DATE: 8/8/98  TIME: 2:10 pm

TO: Mike Kapp/Brenda Woodard - UMP

FAX NO.: Herb Wick - WIL

TELEPHONE NO.: Fred Dom - GIP

TOTAL NO. PAGES: 14 (Including Transmittal Sheet)

FROM: ONRC Action v. USFS

U.S. FOREST SERVICE
PACIFIC NORTHWEST REGION
PLANNING & ENVIRONMENTAL AFFAIRS

SUSAN M. ZIKE
ATTORNEY
FOIA & LITIGATION

ROBERT DUNCAN PLAZA
333 SW FIRST AVENUE
PORTLAND, OR 97208-3623

P.O. BOX 3623
TEL: (503) 808-2257
FAX: (503) 808-2255

TELEPHONE NO.:

MESSAGE:

Attached is draft DOJ ltr to plaintiff's atty. Note last sentence of 1st ¶ on 2nd page. Are you willing to notify the bidders before you open bids? WIL . Need to hear from GIP. There is no reason -YET- to plan on delaying award of the USFS sales. We'll know more after the 8/17 meeting between DOJ & ONRC attys.

If you do not receive all pages, please call back as soon as possible

Let me know - FRED! 503-808-2257

Sue

PS OGC memo is attached that DOJ based its sentence on. RO-NR sent this out late last week.

EXHIBIT
Plaintiff's Trial Exhibit No. 53

PLAINTIFF'S EXHIBIT
35A
1-4-07 Zike

U.S. Department of Justice

Environment and Natural Resources Division

EAB
90-1-4-09179
General Litigation Section
P.O. Box 663
Washington, DC 20044-0663

Telephone (202) 305-0594
Facsimile (202) 305-0506

Draft

July 31, 1998

Michael Axline
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401

Via Fax: 541-485-2457

Re: ONRC v. Forest Service, Civ. No. C98-942WD

Dear Michael:

This is in response to your letters of July 27 and 28, 1998, which identified 32 timber sales that your clients believe do not comply with the Northwest Forest Plan and are scheduled for auction before a settlement meeting can be arranged. There appears to be a significant discrepancy between the timber sale information that you provided and the agency information. In the interest of settlement, and subject to Rule 408 of the Federal Rules of Evidence, we are providing the following information. Further, we propose a meeting during the week of August 17, 1998 to discuss your complaint, your concerns regarding these timber sales and your clients' settlement proposal.

Of the seven BLM timber sales identified, it appears that three BLM timber sales have been auctioned but not yet awarded. (See timber sale list attached) Two of these sales, North Murphy and West Botkin, have been appealed and the award withheld pending resolution of the appeal. There was no appeal of Slippery Moose and the award is pending. The four remaining timber sales will not reach an auction date until after the week of August 17, allowing time to reconsider that auction in light of a meeting. We have no information indicating that your clients have appealed any of these BLM timber sales. Nevertheless, in the interest of facilitating settlement discussions, the BLM is prepared to postpone the award of the identified timber sales through the week of August 17, 1998. Further, BLM will notify bidders on the three timber sales scheduled for auction in August that these timber sales have been identified in connection with this lawsuit.

Of the 25 Forest Service timber sales identified, three are scheduled for auction in late August and only Lois is scheduled for auction during the week of August 17. However, timber sales

that you refer to as "L. Horse Peak" and "Yaka Guard" may refer to sales that have been auctioned or awarded. The remaining sales should not interfere with a meeting during the week of August 17 either because no final decision has been made, any advertisement or auction would occur later, or the Forest Service has no plans to offer the timber for sale. In the interest of facilitating settlement discussions, the Forest Service is prepared to notify bidders on the three timber sales scheduled for auction in August that these timber sales have been identified in connection with this lawsuit.

Please confirm that we have identified the relevant timber sales and an appropriate week for settlement discussions. In order for us to have a productive meeting, we request that you provide us with a settlement offer by August 10, 1998. This will allow the Forest Service and BLM sufficient time to provide a carefully considered response.

Sincerely,

Edward A. Boling
John Watts
Trial Attorneys

cc: Owen Schmidt
Roger Nesbit

pre-rod sales

**Bureau of Land Management**

| Sale | District | Status |
|---|---|---|
| Deer Mom | Medford | In 15 day protest period beginning with advertisement on 7/29/98. If no protest, auction on 8/27/98. |
| Bummer Swamp 1 | Salem | In 15 day protest period beginning with advertisement on 7/31/98. If no protest, auction on 8/26/98. |
| Jones 25 | Coos Bay | Advertisement on 8/6/98 will begin 15 day protest period. If no protest, auction on 8/28/98. |
| Remote Control | Coos Bay | Advertisement on 8/6/98 will begin 15 day protest period. If no protest, auction on 8/28/98. |
| North Murphy | Medford | Sold, award withheld pending resolution of IBLA appeal. |
| Slippery Moose | Salem | Sold 7/29/98, award pending. |
| West Botkin | Salem | Sold 7/29/98, award withheld pending resolution of IBLA appeal. |

**Forest Service**

| Sale | Forest | Status |
|---|---|---|
| Lois Timber Sale | Willamette | Auction scheduled for 8/19/98, award 30 to 60 days after auction. |
| Lost Creek Thin | Umpqua | Auction scheduled for 8/26/98, award 5 days after auction. |
| Heli-Tower | G.Pinchot | Advertised 7/31/98 for auction 8/31/98. |
| Little River Demo | Umpqua | In NMFS consultation, no decision or advertisement date. |
| Jefferson Heli | Klamath | In NEPA review, no decision has been made. |
| Upper South Fork Salmon | Klamath | Advertisement 9/7/98 for auction 10/7/98 and award up to 30 days after auction. |
| Collins Hazard | Klamath | Decision due on 9/10/98, advertise on 9/14/98 for auction 9/29/98 and award up to 30 days after auction. |
| Jolt Heli Salvage | Klamath | Decision due on 9/10/98, advertise on 9/14/98 for auction 9/29/98 and award up to 30 days after auction. |
| Jack Heli | Klamath | In appeal period. If no appeal by ?/?/98, advertise on 8/25/98 for auction on 9/22/98 and award up to |

AUG-03-1998 14:29 USDA FOREST SERVICE

| | | |
|---|---|---|
| | | 30 days after auction. |
| Little Horse Research | Klamath | Awarded 6/15/98. |
| Blue Canyon YG Thin | Klamath | Advertisement planned for 2/99. auction 3/99, award 4/99. |
| Bars ~~[illegible]~~ | Mt. Hood | 3/13/98 decision, appeal denied ?/?/98? No advertisement date. |
| Batwing | Mt. Hood | 3/[illegible]/98 decision, appeal denied ?/?/98? No advertisement date. |
| Bear Cub | Mt. Hood | 3/16/98 decision, appeal denied ?/?/98? No advertisement date. |
| Burnt Granite | Mt. Hood | 7/[illegible]/93 decision, no plans to advertise. |
| Misc. Salvage | Mt. Hood | No such sale. This has been removed from 6 month list. |
| Bonanza II | Mt. Hood | 5/24/93 decision, no plans to advertise. |
| Break | Mt. Hood | 12/23/93 decision, no plans to advertise. |
| Mt. Defiance | Mt. Hood | 7/20/98 decision, still in appeal period. No advertisement date. |
| Ringo | Mt. Hood | 6/27/96 decision. No advertisement date. |
| Solo | Mt. Hood | In NEPA comment period, no decision has been made. |
| Tarzan | Mt. Hood | In NEPA comment period, no decision has been made. |
| Abbott Salmon | Mt. Hood | No such timber sale. Plaintiffs may mean Abbott Road or Salmon Curves: |
| Abbott Road | Mt. Hood | Advertised 7/27/98 for auction 9/11/98. |
| Salmon Curves | Mt. Hood | No advertisement date. |
| Yaka Guard | Mt. Hood | No such timber sale. Plaintiffs may mean Yaka or Yaka 22/23: |
| Yaka | Mt. Hood | Awarded 5/15/98. |
| Yaka 22/23 | Mt. Hood | Auctioned 7/17/98, award pending. |
| Cowpoke | Mt. Hood | No advertisement date. |



A-340

SCOTTII00029

USDA

United States Department of Agriculture
Office of the General Counsel
Pacific Region
San Francisco Office

33 New Montgomery, 17th Floor
San Francisco, CA 94105-4511
415-744-3162; FAX 415-744-3170
internet: robert.simmons@usda.gov

July 29, 1998

SENT VIA FAX ONLY

TO: G. Lynn Sprague (415) 705-1109
Regional Forester
Pacific Southwest Region

Robert W. Williams (503) 808-2210
Regional Forester
Pacific Northwest Region

FROM: Robert M. Simmons
Regional Attorney

SUBJECT: *Oregon Natural Resources Coalition v. Forest Service*
Civil No. C98-942WD

Attached is a copy of two notices we have received from the Western Environmental Law Center. The notices identify sales on the Klamath and Mt. Hood NFs that are sales of concern to the plaintiffs in terms of their belief that the forests have not complied with the Northwest Forest Plan in preparing those sales. As I understand it, plaintiffs contend that the Forest Service has not complied with the survey and manage requirement of the Northwest Forest Plan.

The Department of Justice has asked several questions regarding these sales. The questions are: (1) what is the decision status of the sales; (2) what surveys and NEPA work has been done on the sales: (3) what is the agency response with regard to these sales, and are there any special factors (salvage) that need to be considered in regard to these sales; and (4) did any of the 13 plaintiffs in the lawsuit participate in the NEPA process for these sales or in an administrative appeal of these sales. For the initial list of five sales, DOJ asked for the information by Thursday, July 30. We have a conference call with DOJ scheduled for tomorrow, and hope to get a revised date for all of these sales at that time. However, you should start to prepare the answers, as I am sure DOJ will want the information by early next week at the latest.

Should you proceed with the auction of these sales, you should notify all purchasers prior to the opening of the bids that the plaintiffs in this lawsuit have identified the sale and have contended that the Forest Service has violated the Northwest Forest Plan in preparing the sale. You should also notify the bidders that you will be including language in the contract limiting the government's liability in case of cancellation to the holding costs, and that, if this is not acceptable to the bidders, they should withdraw their bid at that time. All bidders should be given the opportunity to withdraw their bid simply because of the litigation. Finally, you should take action to make sure that the appropriate language is in the contract.

As indicated in the new case memo from Kathryn Toffenetti, Owen Schmidt is the lead attorney for OGC. Owen has been working with Sue Zike with regard to the sales in Region 6. To facilitate communication with OGC and with DOJ, and help assure a consistent approach to the litigation, it would be helpful if there were a single point of contact for the Forest Service for activities in both regions. Please let me know if this approach is acceptable. If it isn't, please designate a contact for Region 5.

cc: Mike Lee, Klamath National Forest (530) 842-6327
Roberta Moltzen, Mt. Hood National Forest (503) 668-1423
Owen Schmidt (503) 326-3807
Kathryn Toffenetti (202) 690-2730
Sue Zike (503) 808-2255

**UNITED STATES DEPARTMENT OF JUSTICE**
**ENVIRONMENT and NATURAL RESOURCES DIVISION**
**GENERAL LITIGATION SECTION**

U.S POSTAL MAILING ADDRESS
P. O. Box 663
Washington, D.C. 20044-0663

FED EX/HAND DELIVERIES
601 Pennsylvania Ave., N. W.
Suite 854
Washington, D.C. 20004

IMPORTANT: This facsimile is intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If you have received this transmission in error, please notify us by telephone.

FAX NO. (202) 305-0506 OR (202) 305-0267
VOICE NO. (202) 305-0504

DATE: 7/31, 1998

TO: Mike Gippert — FAX NO. 690-2730
Sue Zike — 503-808-2255
Owen Schmidt — 503-326-3807
Karen Mouritsen — 219-1792

FROM: [illegible]

NUMBER OF PAGES SENT (INCLUDING COVER PAGE): 3

SPECIAL INSTRUCTIONS: More title info — more info needed

JUL-29-1998 05:52

A-343

SCOTTII00032

# Western Environmental Law Center

DEFENDING THE WEST

Northwest Office
1216 Lincoln Street
Eugene, OR 97401
541/485-2471
541/485-2457 (Fax)
westernlaw@igc.org

Executive Director
Michael Axline*

Attorneys
John E. Bonine*
Marianne Dugan*
Elizabeth Mitchell*
Carrie Stilwell*
Charles Tebbutt†
*admitted in Oregon
†admitted in New York
admitted in Colorado

Scientist
Michael Wach*

Development Director
Deborah Mallender, J.D.

Office Manager
Kathy Cannon

Development Assistant
Kari [illegible]

Legal Assistant
Rachel Thiemeyer

Administrative Assistant
Marilyn Kamp

Southwest Office
P.O. Box 1507
Taos, NM 87571
505/751-0351
505/751-1775 (Fax)
[illegible]@laplaza.org

Director SW Office
Grove Burnett

Attorneys
David Gomez
Michael L. Ahner
admitted in New Mexico
admitted in Texas

Office Manager
Linda Velarde

Legal Assistant
Linda Gomez

July 28, 1998

Ted Boling
United States Department of Justice
Environment and Natural Resources Division
General Litigation Section
Washington, D.C. 20044-0663

Via FAX (202) 305-3609

Re: ONRC v. Forest Service, Civ. No. C98-942WD

Dear Ted:

Plaintiffs have continued working to determine the auction dates of sales that have problems with Northwest Forest Plan compliance.

In addition to the list I sent you yesterday, we now know that the following problem sales are scheduled to be auctioned before a settlement meeting can be arranged:

| Sale | Forest or BLM District | Auction date |
|---|---|---|
| Jones 25 | Coos Bay BLM | 7/31/98 |
| Remote Control | Coos Bay BLM | 8/28/98 |
| North Murphy | Medford BLM | any day |
| Little River Demo | Umpqua NF | any day |
| Slippery Moose | Salem BLM | 7/29/98 |
| West Bottom | Salem BLM | 7/29/98 |
| Jefferson TS | Klamath NF | 9/01/98 |
| Upper South Fork | Klamath NF | 8/01/98 |
| Collins Hazard | Klamath NF | 8/01/98 |
| Jolt Heli | Klamath NF | 8/01/98 |
| Jack TS | Klamath NF | 8/30/98 |
| L. Horse Peak | Klamath NF | pending |
| Blue Canyon | Klamath NF | pending |
| Barn | Mt. Hood NF | August 98 |
| Bathing | Mt. Hood NF | August 98 |
| Bear Cub | Mt. Hood NF | August 98 |
| Burnt Granite | Mt. Hood NF | August 98 |

unbleached - 100% postconsumer waste - soy ink

07/28/98 TUE 15:28 FAX

Ted Bolling
July 28, 1998
Page 2

| Sale | Forest or BLM District | Auction date |
|---|---|---|
| Misc. Salvage | Mt. Hood NF | August 98 |
| Bonanza II | Mt. Hood NF | August 98 |
| Break | Mt. Hood NF | August 98 |
| Mt. Defiance | Mt. Hood NF | September 98 |
| Ringo | Mt. Hood NF | 8/04/98 |
| Solo | Mt. Hood NF | August 98 |
| Tarzan | Mt. Hood NF | August 98 |
| Abbott Salmon | Mt. Hood NF | 9/1/98 |
| Yaka Guard | Mt. Hood NF | August 98 |
| Cowpoke | Mt. Hood NF | August 98 |

As with the previous list I sent you, this information is being provided subject to the provisions of Federal Rule of Evidence 408. Although there may be a few additional sales, I believe the list is now relatively complete.

Sincerely,

Michael Axline
Counsel for Plaintiffs

TOTAL P.04

26

U.S. DEPARTMENT OF AGRICULTURE
OFFICE OF THE GENERAL COUNSEL
NATURAL RESOURCES DIVISION

*Providing and coordinating legal services to the Department of Agriculture, Forest Service, and Natural Resources Conservation Service*

1400 Independence Avenue, SW - Room 4625
Washington, D.C. 20250-1412

July 28, 1998

KATHRYN TOFFENETTI

(202) 720-2651
FAX: (202) 690-2730

Subject: ONRC Action

To

Owen Schmidt

Bob Simmons

Al Ferlo

Susan Yonts-Shepard

cc: Gippert, Mulach

MESSAGE:

Attached is the expected letter from Michael Axline to Ted Boling. Note that there are only 5 sales listed - so far.

There is no explanation stating the connection of the sales to the lawsuit (i.e., no statement of what allegations in the suit apply to any of the sales).

Please note the information that Ted Boling wants by COB Thursday at the latest. In addition to the information Ted asks for, we should find out whether any of the plaintiffs administratively appealed any of these sales.

**IMPORTANT:** This facsimile is intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this transmission or it's contents is strictly prohibited. If you have received this transmission in error, please notify us by telephoning and return the original transmission to us at the address given below.

**FROM:** Department of Justice
Environment and Natural Resources Division
General Litigation
601 Pa. Ave., NW
Washington, DC 20004

Fax No.
Voice No.

**SENT BY:** Ted Boling

**TO:** USDA- Mike Gippert

DOI - Karen Mouritsen

**FAX No.** 690-2730, 219-1792

**NUMBER OF PAGES SENT (INCLUDING COVER PAGE):** 3

**SPECIAL INSTRUCTIONS:** Axline's timber sales (5) - Please let us know ASAP (no later than COB Thursday) at least: 1) decision status of the sales (offered, bids opened, etc.), 2) what surveys and NEPA documentation has been done for the sale decision, and 3) agency response.

# Western Environmental Law Center

DEFENDING THE WEST

Northwest Office
1216 Lincoln Street
Eugene, OR 97401
541/485-2471
541/485-2457 (fax)
[illegible]@igc.org

Executive Director
Michael [illegible]

Attorneys
John E. Bonine
[illegible]
[illegible]
[illegible]
Charles Tebbutt
[illegible]

Scientist
Michael [illegible]

Development Director
Deborah [illegible], J.D.

Office Manager
Kathy [illegible]

Development Assistant
[illegible]

Legal Assistant
Rachel [illegible]

Administrative Assistant
[illegible]

Southwest Office
P.O. Box 1507
Taos, NM 87571
505/751-0351
505/751-1775 (fax)
[illegible]

Director SW Office
[illegible]

Attorneys
[illegible]
[illegible]

Office Manager
Linda Velarde

Legal Assistant
Linda [illegible]

7/27/98

Ted Hadling
United States Department of Justice
Environment and Natural Resources Division
General Litigation Section
Washington, D.C. 20044-0663

Via FAX (202) 305-9609

Re: ONRC v. Forest Service, Civ. No. C98-942WD

Dear Ted:

At your request and pursuant to the July 16, 1998, order of the Court, I am sending the following list of sales scheduled to be auctioned before the end of August that plaintiffs believe were not prepared in compliance with the terms of the Northwest Forest Plan. This information is being provided subject to the provisions of Federal Rule of Evidence 408.

| Sale | Forest or BLM District | Auction date |
|---|---|---|
| Lois Timber Sale | Willamette N. F. | August 19, 1998 |
| Loss Creek Thin | Umpqua N. F. | August 20, 1998 |
| Dear Mom | Medford District | August 27, 1998 |
| Butcher Swamp 1 | Salem BLM | August 26, 1998 |
| Hall-Tower | Gifford Pinchot N.F | Late August |

Please note that this is merely a preliminary list of sales scheduled for auction before a meeting can be arranged to discuss settlement.

Postponement of these sales, at least until a settlement meeting can be scheduled, would be necessary to avoid a request by plaintiffs for injunctive relief. Additionally, we do not have complete information about auction dates, and may have to add to this list if we discover that other sales of concern are to be auctioned before we can meet to discuss settlement.

[illegible]

07/27/98 MON 20:16 [TX/RX NO 7086]

JUL-28-1998 07:25 202 [illegible]

A-348

SCOTTII00037

P.06/06

Ted Bolling
Page 2

Please call as soon as you have received this fax, so that we can determine whether agreement on an interim arrangement is possible.

Sincerely,

Michael Axline
Counsel for Plaintiffs

07/27/98 MON 20:15 [TX/RX NO 7088]

TOTAL P.14

9/4/98

Subject: Re: ONRC Action v. USFS.BLM: URGENT!
Sender: Jerry Jensen /r5
Attached Date: 09/04/98 08:42
Priority: normal
Sensitivity: normal
Importance: normal

Part 1

TO: Susan Zike / r6pnw
bstone

Part 2

> I need to remind you that the list of sales I sent out to you is PRIVILEGED INFO
> and NOT AVAILABLE TO THE PUBLIC., asis the chart. They are privileged because
> we are in settlement negotiation. Please do not provide to anyone outside the
> Forest SErvice. If you have a request for it, send the request to the RO and
> we'll process. Thanks!!

%%%%%%%%%%%%%%%%%%%%%%%%%%%%%

Susan, We have Brian Stone back in the loop, taking care of this information. I forwarded the note to him, and he will be responding with the completed data table and answering our forest questions.

/s/---------**
Jerry Jensen

Telephone: 415 705 2617
IBM: jjensen/r5
Internet: Jerry.Jensen/r5@fs.fed.us

*************

18 905

9/4/98 Zike

EXHIBIT
tabbies
Plaintiff's Trial Exhibit No. 59

PLAINTIFF'S EXHIBIT
tabbies
35
1-4-07 Zike

DEPARTMENT OF JUSTICE
Environment & Natural Resources Division

IMPORTANT: This facsimile is intended only for the use of the individual or entity to which it is addressed. It contains information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this transmission or it's contents is strictly prohibited. If you have received this transmission in error, please notify us by telephoning and return the original transmission to us at the address given below.

**FROM:** 202-305-0506

**SENT BY:** Ted Boling (202-305-9609)

**TO:** Lois Schiffer & Peter Coppelman

**FAX No.** 4-0557

**NUMBER OF PAGES SENT (INCLUDING COVER PAGE):** 22

**SPECIAL INSTRUCTIONS:**

This is Michael Axline's response to my letter of September 3 asking him to follow through on his August 7 commitment to identify timber sales that do not comply with the Northwest Forest Plan ROD and the ways in which they do not comply. This is the most specific information that we have received from the ONRC plaintiffs since their complaint. Most significantly, for the first time it identifies upcoming FY99 Survey and Manage compliance as an issue. There is substantial overlap between the lists, but it looks like they may be asking for a 3 month delay on as many as 300 timber sales and other projects to allow time for settlement discussions. Agency counsel and I will talk to Michael at 1:30 (EDT) today about our immediate reaction, next steps for this discussion, and attempt to narrow down the scope of his clients' concerns and their settlement proposal.

A-372

EXHIBIT
tabbies
Plaintiff's Trial Exhibit NO. 65

PLAINTIFF'S EXHIBIT
tabbies
30
8-24-07 JB

Released Pursuant to Court of Federal Claims Order of 3/29/07

# Western Environmental Law Center

DEFENDING THE WEST

Northwest Office
1216 Lincoln Street
Eugene, OR 97401
541/485-2471
541/485-2457 (fax)
westernlaw@igc.org

Executive Director
Michael Axline*

Attorneys
John E. Bonine*
Marianne Dugan*
Elizabeth Mitchell*•
Carrie Stilwell*
Charles Tebbutt*†
* admitted in Oregon
† admitted in New York
• admitted in Colorado

Scientist
Michael Wach*

Development Director
Deborah Mallander, J.D.

Office Manager
Kathy Cannon

Development Assistant
Kari Kytola

Legal Assistant
Rachel Thiesmeyer

Administrative Assistant
Marilyn Kemp

Southwest Office
P.O. Box 1507
Taos, NM 87571
505/751-0351
505/751-1775 (fax)
taoslaw@laplaza.org

Director SW Office
Grove Burnett ‡

Attorneys
David Gomez ‡
Vickie L. Minor ‡**
‡ admitted in New Mexico
** admitted in Texas

Office Manager
Linda Velarde

Legal Assistant
Linda Gomez

September 25, 1998

Edward A. Boling
John Watts
U.S. Department of Justice
Environment and Natural Resources Section
General Litigation Section
601 Pennsylvania Ave. NW, Suite 854
Washington, D.C. 20004

Via Federal Express (w/attachments) and FAX (w/o attachments) to (202) 305-0506

Privileged and Confidential

Dear Ted and John:

You have asked us to provide examples of how the Northwest Forest Plan is being improperly implemented in each of the categories identified in our complaint. We do that below, and in addition we suggest actions that might be taken to programmatically address each category. In categories where the problem is illustrated by regional level documents, we attach those documents. Because this letter is submitted in furtherance of settlement discussions, it is subject to Federal Rule of Evidence 408.

I. FAILURE TO SURVEY FOR FY 97 "STRATEGY 2" VERTEBRATES

As you know, the ROD required that the Forest Service and BLM immediately [in 1994] start design of survey protocols and implement surveys for "Strategy 2" species, which include the red tree vole and a number of rare salamanders (the "FY 97 survey species"). There are over 70 other rare species (the "FY 99 survey species") (discussed below) that are also subject to survey and manage requirements.

Surveys for the vole and salamanders "must precede the design of all ground disturbing activities that will be implemented in [Fiscal Year] 1997 [Oct. 1, 1996] or later." ROD at C-5. These surveys are required "[w]ithin the known or suspected ranges and within the habitat types or vegetation communities associated with the species." Id.

A-373



Released Pursuant to
Court of Federal Claims
Order of 3/29/07

Edward A. Boling, John Watts
Page 2
September 25, 1998

Very generous time delays were built into Strategy 2 of the Survey and Manage standards and guidelines, requiring the government to survey potential habitat areas for only six of the species prior to ground-disturbing activities implemented in FY 1997 or later -- red tree vole, Del Norte salamander, Shasta salamander, Van Dykes salamander, Larch Mountain salamander, and Siskiyou Mountains salamander. Surveys for the other 71 species are required only for ground-disturbing activities implemented in FY 1999 or later.

The government is, however, proceeding with timber sales without conducting any of the required surveys for the FY 99 species, and in many cases, without surveying for the FY 97 species. The following directives from the Regional Offices have prevented and continue to prevent proper implementation of the Strategy 2 survey requirement.

A. "Implement" Directive

A November 1, 1996, memo from regional offices of the BLM and Forest Service addressing survey protocols for FY 97 Strategy 2 survey and manage species defines the word "implement" in the ROD to mean the point at which NEPA decisions are signed, even if ground disturbing activities are months or even years away. See attached copy. This directive allows the Forest Service and BLM to quickly "implement" projects before survey requirements kick in, by simply signing NEPA documents.

The directive was not accompanied by any NEPA document, and was not circulated for public review or comment.

B. Red Tree Vole Directive

On November 4, 1996, Region 6 and the Oregon BLM Director's office issued "interim guidance" amending the ROD's red tree vole survey requirement. See attached copy. Citing the need to cut costs, the directive states that site-specific surveys need not be conducted in most of the habitat types or vegetation communities associated with the red tree vole. For example, the Willamette, Umpqua, and Siskiyou National Forests, and the Salem, Eugene, and Roseburg BLM, informed our clients that the directive exempted them entirely from the need to conduct red tree vole surveys.

The directive also arbitrarily draws a line at the California border, excluding all activities in California from the survey requirement, even though the red tree vole is found in California.

The directive was not accompanied by any NEPA document, and

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

Edward A. Boling, John Watts
Page 3
September 25, 1998

was not circulated for public review or comment.

C. Examples of How the Directives Violate the ROD

A large number of sales were "grandfathered" out of the survey requirement due to the "implement" memo. Because those sales were sold prior to our lawsuit, they are not included on our lists of sales. These sales nonetheless were sold without the surveys required by the ROD, and contribute significantly to changes in the circumstances assumed by the ROD. Sales on our list that exemplify the continuing problems caused by the "implement" memo are discussed below.

A sale that illustrates the problems caused by the red tree vole memo is the Christy Basin sale on the Middle Fork District of the Willamette National Forest. The Christy Basin sale involves 69.5 mmbf of harvest on 5,123 acres, with 7.2 miles of new road construction and 21 miles of road reconstruction. The sale includes 356 acres of "regeneration" harvest in stands that are 110-170 years old. Douglas-fir (which provides habitat for the red tree vole) dominates the forest types in the sale area. The sale is within the known range of the red tree vole. The ROD was signed September 3, 1998, and published September 17, 1998. The DEIS (at 83) and FEIS (at 89) both cite the regional protocol to support the decision not to do surveys for the red tree vole. As discussed below in Part II, this sale also exemplifies the failure to survey for FY 99 species due to the "implement" memo.

A second example is the "Young'n" sale on the Middle Fork Ranger District, Willamette National Forest. This sale involves 20.7 mmbf of timber harvest on 796 acres, with 3.8 miles of road construction and 25 miles of road reconstruction. The project includes 580 acres of old-growth "regeneration" harvest within the known or suspected range and within the habitat types and plant communities associated with red tree voles. While plaintiffs have not yet seen the FEIS/ROD, we understand that the ROD was signed September 21, 1998, and that the FEIS relies on the 40% habitat threshold in the 11/4/96 regional memo to decide that no red tree vole surveys are required.

Another example is the Diamondback Regeneration Harvest, Roseburg BLM, Swiftwater Resource Area. This sale will log almost six million board feet of old-growth on 97 acres, and has some of the largest trees left on the district - over eight feet dbh. Yet red tree vole surveys were only completed for three of the five units (it is unknown whether the protocol was followed in those units, e.g. 100 meters of transect per acre). Red tree voles were located "in and around" all three of those units, yet no surveys were done on the other units. Fortunately, this particular sale was held up by both the IBLA and by Judge

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

Rothstein's order in the Umpqua cutthroat litigation against NMFS. A new EA was issued, however, on August 14, and a new decision is expected shortly.

D. <u>Proposed Solution</u>

Our proposal for solving the problems created by the directives is to withdraw the directives and issue new regional directives that instruct forests and districts to survey for red tree voles and salamanders <u>prior to the design of all ground disturbing activities that are currently</u> uncommitted to third parties, <u>within the known or suspected range</u> and within the habitat types and plant communities associated with red tree voles.

For sales that are currently <u>sold but unawarded</u>, or where the NEPA decision has been made, conduct transect surveys as described in the regional survey protocol. If potential red tree vole nests are found, assume them to be red tree vole nests until tree climbing proves otherwise. <u>Where nests are located</u>, prepare a supplemental NEPA analysis, including at least one alternative that avoids impacts to red tree voles. Where surveys reveal no red tree voles (or potential red tree vole) nests, the project may be implemented, assuming no other Option 9 problems, as described below, are present.

II. <u>FAILURE TO SURVEY FOR FY 99 STRATEGY 2 INVERTEBRATES</u>

The ROD directs the Forest Service and BLM to immediately [in 1994] begin developing survey protocols for the 71 other "Strategy 2" species, and to survey for these species "prior to ground disturbing activities that will be implemented in F.Y. 1999 [Oct. 1, 1998] or later." ROD at C-5.

This requirement has not been followed for projects on our list where ground disturbing activities will begin in FY 1999, because, as described above, the regional directive interpreting the word "implement" treats projects as "implemented" when NEPA decision documents are signed. Not only does this interpretation violate the ROD, as explained above; the regional memo does not even address the FY 99 species, but is being cited by the agencies in reference to the FY 99 species.

A. <u>Example of How Sales Violate the ROD</u>

The Christy Basin sale, discussed in Part I above, also exemplifies the FY 99 survey violation. The project is within the known range of several Strategy 2 survey and manage species, including mollusks and vascular plants. The decision was signed September 3, 1998, and published September 17, 1998. The auction



Released Pursuant to
Court of Federal Claims
Order of 3/29/07

has not been noticed, nor has the appeal period even run. The auction, award and "ground-disturbing" will thus obviously occur in FY 99 or later. Yet no surveys were done for the FY 99 survey species. That is because, under the definition of "implement" in the November 1996 memo, the Forest Service considers the sale "implemented" prior to FY 1999. The FEIS (at 89) cites the regional definition of "implemented" to support the decision to not do surveys for Strategy 2 survey and manage species. The FEIS admits that "[t]he timber harvest would occur over a five year period with a total of approximately thirteen timber sales." FEIS Abstract, August 1998 (emphasis added). The regional directive is thus being used to exempt from the surveying requirement logging that will not occur until the year 2003.

Another example of a project that would be subject to the 1999 survey requirements but for the regional directive is the Moose Subwatershed FEIS/ROD on the Sweet Home District of the Willamette National Forest. This sale involves 1.9 miles of new road construction and 22.5 mmbf of timber harvest on 900 acres (including 200 acres of regeneration harvest) in stands regenerated naturally after an 1856 wildfire. 401 acres of thinning will occur within the inventoried Moose Lake Roadless Area, and 1456 acres of roadless area will be "directly or indirectly" modified. Over 900 acres of spotted owl habitat will be "degraded, downgraded, or removed." The Forest Service admits that four Strategy 2 mollusk species and at least one Strategy 2 plant species are likely to occur in the planning area, and one plant and one lichen are known to occur. The Forest Service states, however, that it does not need to do surveys because the Moose project will be "implemented" in FY 98. The decision was signed July 29, 1998, and published August 14. The appeal is due September 28, 1998, and auction, award, and ground-disturbing activity will thus occur well into FY 1999. Furthermore, the FEIS for the sale states that the Moose ROD will result in timber sales that "will be sold over the course of at least two fiscal years." FEIS at 73. The regional directive is grandfathering sales from this project that will not even be sold until the year 2000.

Two examples from Washington state are the Kirk and Lock timber sales, both on the Gifford Pinchot National Forest. These sales have decision documents signed August 1998, with the appeals due in September and October. No FY 99 surveys were conducted for these sales, although they are each within the range of Strategy 2 species. As with the sales listed above, clearly these will be auctioned and awarded in FY 99 or later.

To make matters worse, projects are being rushed out before the end of FY 98, with statements from the agencies that this rush is specifically designed to avoid doing the FY 99 surveys.



Released Pursuant to
Court of Federal Claims
Order of 3/29/07

Edward A. Boling, John Watts
Page 6
September 25, 1998

For example, the September 4, 1998, Federal Register included a notice of availability of the White Pass Ski Area Expansion FEIS and identified a comment deadline of October 5, 1998. Ten days later, the Gifford Pinchot and Wenatchee National Forests issued a letter asserting that the comment period is not a "required step" and that the comments would actually be due by September 25, "so a ROD can be signed by September 30," so as to avoid "possible lengthy delays" resulting from the survey requirements kicking in on Oct. 1, 1998. See attached copy.

Similarly, the EA for the Blands timber sale in the Mendocino National Forest announces that the Forest Service plans to sign the decision before the end of the fiscal year, so no FY 99 surveys will be required, despite the fact that the comments are not even due until September 8. The series of ponds, wetlands, seeps, serpentine soils, and other unusual features of this area are sure to contain some of the rare Strategy 2 survey species; at least one of the ponds contains Water Howellia, a plant listed under the Endangered Species Act.

B. Proposed Solution

Our proposal for solving the problem with FY 1999 sales is, as with the FY 1997 sales, to withdraw the "implement" directive and issue a new directive that instructs Forests and Districts to complete surveys for the 71 FY 99 Strategy 2 species prior to the design of all ground disturbing activities (that are currently uncommitted to third parties) within the known or suspected range and within the habitat types and plant communities associated with the species. This requirement was, after all, developed so that information from the surveys could be used in designing the projects. All as-yet uncommitted ground-disturbing activities will be "implemented" in FY 99 or later.

Conduct surveys prior to the development of NEPA alternatives and include at least one alternative that avoids impacts to survey and manage species. For sales that fit the above definition that currently have decision documents, withdraw the decisions, conduct the surveys (according to regional protocols) within the range and habitat types of all Strategy 2 species, and prepare supplemental NEPA documents. For species whose survey protocols and management standards are incomplete, projects must be withdrawn if they are within the known or suspected range and within the habitat type and plant communities of the Strategy 2 species.

III. COMMERCIAL HARVEST IN RESERVES

The Late-Successional Reserves (LSRs) were established to "serve as habitat for late-successional and old-growth related

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

Edward A. Boling, John Watts
Page 7
September 25, 1998

species including the northern spotted owl" and to "protect and enhance conditions of late-successional and old-growth forest ecosystems." ROD at 6, C-9. The Riparian Reserves (RR's) were established as areas where "the conservation of aquatic and riparian-dependent terrestrial species receive primary emphasis." ROD at 7. RRs also provide for dispersal needs of owls and the survey and manage species. With limited exceptions, timber harvest is prohibited in these Reserves, and Reserve acres are not to be included in calculations of the timber base under any circumstances. ROD at C-12-16, C-31.

In FY 1997, the Forest Service alone sold over 143 million board feet of timber from Reserves. This figure represents over 20% of the total Forest Service volume sold from the area covered by the ROD in FY 97. In five of the National Forests within the ROD area, the volume of timber sales in Reserves was greater than the volume outside Reserves during FY 97. In two of those Forests, over 90% of the timber cut on the Forest came from Reserves.

There are two problems with the way the ROD is being implemented in Reserves; the "programming" problem and the problem of failing to comply with the ROD's restrictions for many sales in Reserve areas.

A. <u>The Programming Problem</u>

Some forests and district are treating timber from Reserves as "targets" and <u>de facto</u> programming them into their cut projections. We attach two documents that illustrate this problem. The first was obtained from the Olympic National Forest and is entitled <u>XSO Summary Analysis</u>. The second is from the BLM's Oregon/Washington office, and is entitled <u>FY 1998 Preliminary Annual Work Plan</u>. The problem is also illustrated by a BLM response to a timber sale appeal, in which the BLM stated:

> In the process of 'ramping-up' to offering the full amount of ASQ sales and additional volume from non-ASQ sales (the full timber sale production level), BLM set increasing larger annual targets from FYs 1995-1997 which permitted a minor amount of non-ASQ volume to be offered from non-ASQ LUAs. In FY 1998, the policy of allowing non-ASQ sales to count towards the annual targets continued, although the total target did not increase. BLM did not refer to each year's target as an "ASQ target." Instead, the targets were referred to as the annual timber sale program. The intent in including non-ASQ sales towards the annual targets was to encourage a balanced implementation of NFP objectives as soon as possible, i.e., attainment of the aforementioned full timber sale production level comprised of the full ASQ

A-379

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

and a significant quantity of non-ASQ sales.

B. <u>Examples of Problems with Implementation</u>

The ROD requires that thinning and other silvicultural activities in LSR's be submitted to the Regional Ecosystem Office for review. ROD at 8. <u>A memorandum from the Regional Ecosystem Office dated July 9, 1996, however, exempts certain commercial thinning projects in LSR's from such review.</u> <u>See</u> attached copy. <u>This change in the ROD</u> was not accompanied by any NEPA document. Lax oversight by the REO has contributed to a number of problems in LSR's and RR's, as illustrated by the following examples.

The Santiam LSR Restoration Project (DN signed April 9, 1998) on the Sisters Ranger District of the Deschutes National Forest allows 10 million board feet of commercial timber harvest on 2474 acres <u>within an LSR</u>. All the commercial harvest prescriptions allow harvest of green trees within the LSR. Many live and dead trees that contribute to late successional habitat will be cut and removed. This violates the ROD requirement that harvest be limited to treatments beneficial to the creation of late successional habitat. Between the draft EA and the decision notice, 15 <u>LSR units</u> totaling 880 acres had their prescription <u>changed from "remove dead only"</u> to include green tree removal. This decision was based upon "the potential to improve commercial <u>timber sale viability</u>" (DN-2), and to "provide for a more simple implementation by reducing the need to protect all the green trees interspersed within the areas of dead-tree removal." DN-13.

The Santiam LSR project on the Sisters District of the Deschutes National Forest also violates the LSR standards and guidelines. The project is supposedly an attempt to reduce fire risk by treating the entire landscape. This is contrary to the intent of the ROD, which states that LSRs are to be "retained in their natural condition with natural processes, such as fire, allowed to function to the extent possible." ROD at B-4. The "Fire Suppression and Prevention" section of the LSR standards and guidelines requires that "fuels management" in <u>LSRs must utilize "minimum impact"</u> methods. <u>Id.</u> at C-17.

The Siskiyou timber sale, in the Smith River National Recreation Area of the Six Rivers National Forest, proposes to commercially log <u>mature native forests</u> older than 80 years of age <u>in the Siskiyou LSR.</u> In addition to commercial thinning in these mature forests, the logging prescriptions will create some clearcuts. Additionally, the sale will construct 1.06 miles of new road. The DN for the Siskiyou timber sale justifies LSR logging and Key Watershed road construction by stating that the "project will manipulate early and mid mature seral stage forest stands . . . to accelerate the development of late-successional



Released Pursuant to
Court of Federal Claims
Order of 3/29/07

(old-growth) forest characteristics." The EA provides no data, references, or studies demonstrating that acceleration of old-growth conditions is possible, or supporting the conclusion that logging will accelerate the development of old-growth characteristics.

An example of violations of Riparian Reserve restrictions is the Lower Iron timber sale on the Gifford Pinchot, which includes logging and yarding with ground-based equipment within thirty to sixty feet of a stream containing spawning grounds for coho, steelhead and chinook. This type of entrance into the Riparian Reserves has occurred in many other sales as well.

C. Proposed Solution

Our proposal for solving this problem is to issue a regional directive prohibiting timber taken from Reserves from counting towards meeting PSQ or other harvest "goals," and prohibiting "projections" of future cuts anticipated from Reserves. Of course, a halt to setting "targets" for harvest from Reserves should not lead to an increase in logging outside the Reserves. We do not believe this would pose problems, given the current requests by Region 6 foresters to reduce the PSQ. Furthermore, the REO should review any proposals for cutting in Reserves.

## IV. EXCLUSION OF ADJACENT UNSTABLE AND POTENTIALLY UNSTABLE LANDS AND WETLANDS LESS THAN 1 ACRE FROM PROTECTION OF RIPARIAN RESERVES

The ROD includes the following requirement:

> Riparian Reserves . . . are specified for five categories of streams or waterbodies as follows:
>
> * * *
>
> *Seasonally flowing or intermittent streams, wetlands less than 1 acre, and unstable and potentially unstable areas* - This category applies to features with high variability in size and site-specific characteristics. At a minimum, the Riparian Reserves must include:
>
> The extent of unstable and potentially unstable areas (including earthflows), [and]
>
> * * *
>
> The stream channel or wetland and the area from the edges of the stream channel or wetland to the outer edges of the riparian vegetation.

A-381

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

ROD at C-31 (emphasis added). The Reserve boundary is to be set at "a distance equal to the height of one site-potential tree, or 100 feet slope distance, whichever is greatest." Id. Riparian areas designated pursuant to the ROD have not included small wetlands and unstable, much less potentially unstable, slopes.

A. Examples of How Exclusion of Unstable Lands Violates the ROD

In the Broken Buck timber sale on the Roseburg BLM, logging is proposed on steep slopes, even though the forest soil scientists recommended deferral because of unstable conditions. On page 10 of the soils report, dated April 18, 1996, BLM soil scientist Dan Cressy states, "Landslides were common in the general vicinity of this sale during large scale logging operations and road building." BLM soil classification for these unstable soils is FGNW, which is:

> Forest land which is fragile and can not be suitably mitigated: Limitations due to steep slope gradients where high potentials exist for shallow, debris type landslides even when best management practices are applied.

Instead of including these unstable slopes in the Riparian Reserves, the BLM is offering the Broken Buck sale and proposing to "mitigate" by concentrating the required six to eight "leave trees" per acre in these unstable areas, in hopes that they will prevent landslides. But even if such "mitigation" were allowed under the ROD instead of Riparian Reserve designation, Cressy states: "The validity of using retention trees for slope protection is largely unproven. Blowdown can eliminate the intended protection and may even trigger a slide." Soils Report at 16. Such a failure "could trigger a debris avalanche which would enter a perennial stream which flows into Brush Creek."

The Blands timber sale in the Mendocino National Forest is planned in a watershed with an extensive series of landslides (the canyon of the Middle Fork of the Eel River). Soil classifications for the sale sites indicate unstable soils, and the sale area is adjacent to the Riparian Reserve designated for the Eel River. The sale area includes a series of ponds, wetlands, and seeps. Because adjacent unstable slopes were not included in Riparian Reserves as required by the ROD however, the Blands sale plans to log on these slopes.

The Nevergales sale on the Middle Fork Ranger District, Willamette National Forest, is another example of this problem. The Nevergales sale involves 13.5 mmbf of timber harvest, including 224 acres of "regeneration" harvest and 385 acres of thinning. The sale includes 123 acres of regeneration harvest



Released Pursuant to
Court of Federal Claims
Order of 3/29/07

units on steep slopes with shallow soils (category III). These are generally considered to be unstable. The "unit ranking" memo in the administrative record indicates that there are several units with severe slope stability problems. The Forest Service's own hydrologist rated several units as "six" on a scale of one to three. The watershed report states that mass soil movement has increased since forest management began in the watershed. The 3/2/98 BE Fish Supplement also admits that several Aquatic Conservation Strategy objectives will be "degraded" if the proposed activity does result in mass soil movement. This supplement also inaccurately states that "timber sale activities will avoid unstable areas." The unit ranking memo clearly contradicts this assumption.

The Young'n timber sale on the Middle Fork Ranger District in the Willamette National Forest includes 20.7 mmbf of timber harvest on 796 acres and 3.8 miles of road construction and 25 miles of road reconstruction. The sale includes 580 acres of old-growth regeneration harvest. The DEIS states that under the preferred alternative, "[a] total of 245 acres would be harvested on category III soils with steep, shallow, rocky soils moderately susceptible to producing debris torrents. A total of 92 acres would be harvested on category IV soils, shallow, rocky soils with variable slopes, capable of producing short-run-out debris torrents." DEIS at IV-22.

The Lower Iron timber sale on the Gifford Pinchot also includes extensive logging on unstable slopes.

B. <u>Examples of How Exclusion of Small Wetlands Violates the ROD</u>

The Berlin Mummer Timber Sale on the Grants Pass Resource Area of the Medford BLM District fails to protect numerous small wetlands. For example, the map for unit 3-1 indicates that some small areas adjacent to streams will be protected as wetlands, but other adjacent wetland areas which are just as deserving will not. There is no discussion in the EA about any wetland protection. The only mention of Unit 3-1 in the entire EA, in Table 1, indicates an incorrect designation (in code, with no key), but no information concerning wetlands or riparian areas. Other maps for this sale indicate unprotected riparian reserves and associated wetlands.

The Katalo West EA, Bend Fort Rock Ranger District, Deschutes National Forest, decided July 27, 1998, is near known sites of the Strategy 2 liverwort *Tritomeria exsectiforma*, which is associated with rotten logs near small, shady, forested wetlands. The Forest Service did not look for potential habitat (i.e. wetlands), but states in the EA that if suitable wetland habitat

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

is found, the Forest Service should "exclude the areas from activity." EA App. C-6. But the EA clearly does not take the precaution required by the ROD -- the establishment of Riparian Reserves around small wetland habitats should they be found.

The Straw Devil Planning Area DN, signed June 16, 1998, on the Middle Fork Ranger District, Willamette National Forest, includes small wetlands in or near units 1, 8, 14, 17, 18, 21, 23, and 29. The January 7, 1998, botanical/special habitat report lists several seeps and wetlands that are protected by only a 50-foot no-cut buffer. This is borne out by the EA, which states on page 41 that a 50-foot no-harvest buffer will be maintained around wetlands. But the site potential tree height in this area is well over fifty feet, and larger buffers are therefore called for by the ROD.

C. Proposed Solution

Riparian Reserve designations must include adjacent unstable and potentially unstable slopes and small wetlands, with buffers the width of a site-potential tree height (100 feet minimum), as specified in the ROD, if the goals of the Riparian Reserve system are to be achieved. Riparian Reserve designations should be based not only on water body classification but also on classification of soils in adjacent areas (to determine whether slopes are "potentially unstable") and of vegetation on adjacent areas (to determine whether areas constitute small "wetlands.")

Areas adjacent to Riparian Reserves that contain category III and IV and "FGNW" soils, as described above, should be included in the Reserves. Some category I soils, particularly those that involve clayey soils that are prone to slow creeping earth movements, should be included. The unstable slope sections of Riparian Reserves should be protected to the extent of one site-potential tree length (100 feet minimum), just as Reserves based on water bodies are buffered.

As for wetlands, vegetation guidelines for determining wetlands status have been established on a national level by the federal government and should be applied in designating Riparian Reserve boundaries. These wetlands Reserves should be protected to the extent of one site potential tree (100 feet minimum), just as Reserves based on other water bodies are buffered.

V. FAILURE TO PROTECT OLD-GROWTH IN WATERSHEDS WHERE LITTLE REMAINS

The ROD requires the Forest Service and BLM to "[p]rovide for retention of old-growth fragments in watersheds where little remains." ROD at C-44. In an October 1997 memo the REO, in

A-384

Released Pursuant to Court of Federal Claims Order of 3/29/07

response to an inquiry from the Forest Service and BLM, issued a memo regarding this requirement. See attached copy. The REO stated that the __intent__ of the 15% standard & guideline is to protect __old-growth__ where little remains. However, the REO deferred to the Forest Service's and BLM's decisions that LSR stands

> of a variety of ages may possess the characteristics necessary to meet the stated intent, and age alone is generally not a sufficient criteria for stand retention selection. In this light, it was affirmed that the second paragraph of the subject S&G on C-44 expressly provides agency decision makers with the discretion to select appropriate stands, 80 years or older, to meet the intent of the first paragraph. . . . Old-growth stands will be retained to meet the S&G in most instances. However, as a result of [watershed and other site-specific] analyses . . . younger (e.g., 80 year old) stands could be retained while older stands could be harvested.

This interpretation allows the logging of old-growth in watersheds where less than 15% remains, as long as the "middle-aged" trees are retained.

The FWS Biological Opinion for the Roseburg BLM states that under the REO interpretation of the 15% rule, "[i]t is unlikely that mature forests protected under this interpretation would contain the species richness and retain the complex ecological interactions that old forests possess." __See__ attached copy. The BO goes on to discuss the problems with this in detail and concludes, "The Service is concerned about the protection of these remnant stands."

The scientists who wrote Appendix J-2 of the ROD clearly contemplated that the 15% standard and guideline was going to protect __old-growth__, not just mature stands.

> Isolated remnant old-growth patches are ecologically significant in functioning as refugia for a host of old-growth associated species, particularly those with limited dispersal capabilities that are not able to migrate across large landscapes of younger stands. . . . Isolated patches will function as refugia where old-growth associated species are able to persist until conditions become suitable for their dispersal into adjacent stands. Loss of these old-growth stands may result in local extirpation of an array of species. It is prudent to retain what little remains of this age class within landscape areas where it is currently very limited. This will ensure future options for management and enhancement of the diversity within adjacent



Released Pursuant to
Court of Federal Claims
Order of 3/29/07

Edward A. Boling, John Watts
Page 14
September 25, 1998

developing stands.

ROD at J2-18.

The use of the term "late-successional" in the second paragraph of the standard and guideline (ROD at C-44) does not overshadow the stated intent of the S & G. The second paragraph merely provides direction on how this S & G would apply in a particular situation.

A. Examples of How the Directive Violates the ROD

The Lower Hayfork Creek timber sale on the Shasta-Trinity National Forest will log approximately 445 acres of late-successional and old-growth forest. The Lower Hayfork Creek Watershed Analysis states that less than one percent of the fifth-field watershed is old-growth forest habitat, and only 10 percent is late seral. Watershed Analysis at 60. But the Biological Assessment for the sale only considered the subwatersheds in which the sale is located in its evaluation of the 15% requirement, and determined that in these small areas, the 15% requirement would be met. This is in direct violation of the ROD, which requires that the 15% standard be met at the fifth-field watershed level.

The Bonnie and Slyde timber sale on BLM's Glendale RA is in the Umpqua Drainage, a watershed that has been heavily logged over the years, and which contains endangered Umpqua Cutthroat Trout. Most of the logging is regeneration/overstory removal. Instead of looking at how much old-growth was left in the watershed, the BLM determined that 20% of the federal lands in the watershed were at least eighty years old and that the 15% requirement therefore does not apply.

For the Berlin Mummer sale on the Grants Pass RA (discussed above), the BLM similarly looked only at trees 80 years and older. BLM determined that 19.5% of the federal lands in the watershed were at least that old, and that the 15% requirement therefore does not apply.

C. Proposed Solution

It is critical that the 15% S&G be interpreted as stringently as possible in order to ensure that old-growth is preserved. It is just as important that those watersheds that do not meet the 15% S&G ensure that recruitment of old growth be accomplished as soon as possible. In order to meet these two goals, we propose that the REO withdraw its directive and issue a new directive that applies the S&G as intended by the scientists who developed it. Our understanding of the intent of the S&G is



Released Pursuant to Court of Federal Claims Order of 3/29/07

as follows:

Each Forest and District must demonstrate retention of old-growth (age 180-200 years or older) at levels equal to at least 15% of all federal lands within the fifth field watershed. Of first priority is retention of the oldest, highest quality old-growth stands and then all stands in descending old-growth "rank" until the 15% is met.[1] Thus:

1. If old-growth makes up less than 15% of the federal lands within the watershed, the BLM and Forest Service must demonstrate retention of: 1) all old-growth and 2) mature seral stands (aged 80-100 to 180-200 years, see FEMAT at IX-20) in sufficient quantities that the sum of the retained old-growth and mature stands equals at least 15% of the federal lands within the watershed.

2. If the sum of old-growth and mature stands is less than 15% of the federal lands within the watershed, then the BLM and Forest Service must demonstrate retention of: 1) all old-growth, 2) all mature stands, and 3) late seral stands (age 40 to 80-100, see FEMAT at IX-31) in sufficient quantities that the 15% retention level will be attained within the least amount of time.

3. If the sum of old-growth, mature stands and late seral stands (age 46+) is less than 15% of the federal lands within the watershed, then the BLM and Forest Service must demonstrate retention of: 1) all old-growth, 2) all mature stands, 3) all late seral stands, and 4) mid-seral stands (age 15 to 40, see FEMAT at IX-31) in sufficient quantities that the 15% retention level will be attained within the least amount of time.

The areas that the BLM and Forest Service intend to use to meet the 15% S&G for old growth retention should be mapped, tabulated and provided to the public before any additional sales are planned in these areas.

---

[1] In addition to age (see ROD at F-4, FEMAT at IX-24), old-growth is further defined in the ROD, at B-5, to include: 1) multi-species and multilayered assemblages of trees; 2) moderate to high accumulations of large logs and snags; 3) moderate to high canopy closure; 4) moderate to high numbers of trees with physical imperfections such as cavities, broken tops and large deformed limbs; and 5) moderate to high accumulations of fungi, lichens and bryophytes. The "Mature" class has the same characteristics but is 81 to 199 years old.



Released Pursuant to Court of Federal Claims Order of 3/29/07

## VI. FAILURE TO DEVELOP REGIONAL MANAGEMENT STANDARDS FOR SURVEY AND MANAGE SPECIES

The ROD requires that "[m]anagement standards will be developed to manage habitat for the [survey] species on the sites where they are located." ROD at C-5. These management standards are to be "incorporated into interagency conservation strategies developed as part of ongoing planning efforts coordinated by the Regional Ecosystem Office." Id.

Instead of this coordinated, regional process, the "manage" part of the survey and manage standard and guideline has occurred in a chaotic, site-by-site manner. This is particularly egregious for Category 1 species, where sites are already known and providing protection for those sites was to receive the "highest priority" under the ROD. ROD at C-4. As explained below, one of the results of this regional violation has been a failure to manage the located species "on the sites where they are located."

### A. Examples of How the Failure to Develop Regional Management Standards Violates the ROD

As noted above, the Diamondback Regeneration Harvest on the Roseburg BLM's Swiftwater Resource Area will log almost six million board feet of old-growth on 97 acres, and has some of the largest trees left on the district. Although red tree voles were located during surveys "in and around" all three units surveyed, no particular "management" standards were applied to protect those habitat sites. Instead, "the design features of the project will use the retention trees to manage the species." The BLM's rationale was that this particular watershed had enough other red tree vole habitat, so that the existence of that other habitat was "management" enough. When our client visited the sale on the ground, they found one tree marked as retention with "RTV" painted on the tree. No other retention trees were grouped around that single tree.

Another example is the Class of '98 regeneration harvest on the Roseburg BLM's South River Resource Area. This 7 mmbf sale will log low-elevation old-growth on 204 acres, part of it only one mile outside the city limits of Myrtle Creek. A Strategy 1 ("known sites") survey and manage mollusk, the Papillose tail-dropper (*Prophysaon dubium*), was present in unit B. This rare mollusk will be managed with only a 160' radius buffer (one site tree height). This is twenty feet less then the radius BLM determined was required for a similar mollusk species in other sales, such as the Cobble Creek sale, where mollusks are being given a 180' radius buffer. BLM has not justified how the Myrtle Creek mollusks can survive with over 21,000 square feet less



Released Pursuant to
Court of Federal Claims
Order of 3/29/07

habitat per site. Since no management protocol has been developed, BLM is basing protection for this upland mollusk on site tree heights developed for aquatic species protection.

B. Proposed Solution

Develop and apply consistent and science-based regional management standards for all species on the survey and manage list in the ROD. Management standards for Strategy 1 and 2 species must be completed prior to the development of NEPA alternatives for projects affecting the habitat and plan communities within the known or suspected range of the species. Management standards for Strategy 3 and 4 species (discussed below) should be completed by October 1, 1999. For proactive management unrelated to sales or development projects (i.e., administrative designation of research natural areas), standards should be developed and applied by January 1, 1999.

The FS and the BLM should never "manage" by pointing to the existence of sites or suitable habitat outside the project. The ROD specifically requires that the habitat be managed on sites where the species is found during surveys. For the Strategy 2 species, that means management of sites located within the project area.

VII. OTHER PROGRAMMATIC PROBLEMS

As noted in our complaint, a number of other ROD requirements have not been implemented. These violations are not susceptible to illustration by site specific example, but rather affect all forests and district governed by the ROD. These include:

- Failure to develop survey protocols;
- Failure to prepare annual status reports on the survey and manage program;
- Failure to have "underway" by FY 1996 surveys for Strategy 3 species;
- Failure to "initiate" Strategy 4 surveys by FY 1996; and
- Failure to conduct monitoring to determine whether the ROD is being implemented and whether it is "effective."

A. Failure to Prepare Survey Protocols, and Proposed Solution

Survey protocols have not been completed for many of the



Released Pursuant to
Court of Federal Claims
Order of 3/29/07

Edward A. Boling, John Watts
Page 18
September 25, 1998

Survey and Manage species. We propose that the Forest Service and BLM agree to develop survey protocols for Strategy 2, 3, and 4 species by April 1, 1999. Strategy 3 and 4 survey protocols are already three years late, because the surveys themselves should have begun in 1996. Protocols for Strategy 2 species must be completed prior to the development of NEPA alternatives for any further habitat altering projects within the range or habitat of those species. For projects that have been decided and those that are sold but unawarded, the government must not commit to third parties or allow ground disturbing activities until Strategy 2 survey protocols are developed, the surveys are completed, and supplemental NEPA analysis is prepared (if necessary), as described above under the Proposed Solution for the FY 97 survey violations.

B. Failure to Prepare Annual Status Reports, and Proposed Solution

The ROD requires annual status reports on the Survey and Manage standards and guidelines. ROD at C-6. Those reports were supposed to be submitted to the REO for review "beginning at the end of F.Y. 1995." Id. Reports have not been prepared. The reports are extremely important, as they were to form the basis for any changes to the program (such as changes in survey schedules and moving species from one survey Strategy to another). Id.

Our proposed solution is that the Forest Service and BLM immediately prepare a FY 98 report on the survey and manage program and continue to prepare these reports at the end of each fiscal year. The FY 98 report should cover the entire survey and manage program since the ROD was issued.

C. Failure to Have Underway by 1996 Surveys for Strategy 3 Species, and Proposed Solution

"Strategy 3" of the survey and manage standard and guideline is entitled "Extensive Surveys," and requires that, for the 284 "Strategy 3" species, the government must "conduct extensive surveys for the species to find high-priority sites for species management." ROD at C-5. The ROD required that these surveys "must be underway by 1996." Id. at C-6. They are not underway (to the degree intended) even today. In fact, as we discuss above, many of the Strategy 3 species do not even have survey protocols.

Our proposed solution is that no further projects in the range and habitat of the Strategy 3 species occur, until the surveys are completed and the results are incorporated into project designs. For proactive management unrelated to sales or

A-390

Released Pursuant to Court of Federal Claims Order of 3/29/07

development projects (i.e., administrative designation of research natural areas), protocols should be developed and application should begin by January 1, 1999.

D. Failure to "Initiate" Strategy 4 Surveys, and Proposed Solution

"Strategy 4" of the survey and manage standard and guidelines requires is entitled "General Regional Surveys" and requires that for the 73 "Strategy 4" species, the government must

> survey for the species to acquire additional information and to determine necessary levels of protection. . . . These groups of species are particularly poorly known . . . . These surveys are expected to be both extensive and expensive, but the information from them is critical to successful implementation of ecosystem management.

ROD at C-6. These surveys were to be "initiated no later than F.Y. 1996 and are to be completed within ten years." They have not been initiated, and in fact, as discussed above, the survey protocols have in many cases not even been developed.

Our proposed solution is that no further projects in the range and habitat of the Strategy 4 species occur, until the surveys are "initiated."

E. Failure to Conduct Monitoring

The ROD states, "Monitoring is an essential component of the selected alternative. It ensures that management actions meet the prescribed standards and guidelines and that they comply with applicable laws and policies." ROD at 57. The ROD also promises that "[m]onitoring will be conducted at multiple levels and scales." ROD at E-1. In upholding the final version of the ROD, Judge Dwyer specifically noted that without the monitoring required by the ROD the plan would not be legal. He stated, "Monitoring is central to the plan's validity. If it is not funded, or not done for any reason, the plan will have to be reconsidered." With regard to the Aquatic Conservation Strategy (ACS), Judge Dwyer was even more adamant, stating:

> The effectiveness of the ACS is still subject to debate among scientists. If the plan as implemented is to remain lawful the monitoring, watershed analysis, and mitigating steps called for by the ROD will have to be faithfully carried out, and adjustments made if necessary.

The Forest Service and BLM have failed to conduct the monitoring

A-391

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

required by the ROD.

"Implementation monitoring" was supposed to "determine if the standards and guidelines of the Plan are being followed." This type of monitoring was supposed to "focus[] on areas broader than specific project sites." ROD at E-5. But the government's FY 96 implementation monitoring addressed only whether the ROD was followed on forty sample timber sales and, in FY 97, on a few sample timber sales, roads, and restoration projects. No monitoring has been done to determine whether and how well the ROD is being implemented on the regional level, the Forest/District level, or the Province level, as required by monitoring protocol developed by the REO. Had such monitoring occurred, it would have revealed that the projects included in the list we previously provided to you do not comply with the ROD.

The second prong of the ROD's monitoring requirement is "effectiveness monitoring." ROD at 57. The object is to determine whether the management actions prescribed by the ROD are achieving their desired results. Id. For example, effectiveness monitoring would determine whether implementation of the LSR standards and guidelines actually maintains and restores habitat for late-successional associated species. ROD at E-6. This type of monitoring is obviously crucial, because if it indicates that ROD is not protecting species and habitat as it was designed to do, the Forest Service and BLM must revise the ROD in order to comply with their duties under NFMA, FLPMA, and the ESA.

In the more than four years since the ROD was issued, the government has failed to bring effectiveness monitoring for Survey and Manage species past the stage of "initial discussions." In that time period, the government has also failed to move monitoring for Riparian/Aquatic areas past the stage of "conceptual framework." See attached copy. The rationale for this delay is lack of funding.

Our proposed solution regarding Implementation Monitoring is that the Forest Service and BLM's FY 98 monitoring should look at whether and how well the ROD has been implemented at the regional, Forest/District, and Province levels. In addition, if sampling is used rather than review of all projects, all types of projects should be reviewed. Finally, as the REO monitoring protocol required, the monitoring should look at at least twenty projects that affect each Land Use Allocation (LSR, Matrix, AMAs, Key Watersheds, Riparian Reserves).

Our proposed solution regarding Effectiveness Monitoring is that such monitoring begin immediately and be expanded as



Released Pursuant to
Court of Federal Claims
Order of 3/29/07

protocols and surveys come on line.

VIII. FAILURE TO FOLLOW PROTOCOLS IN SALAMANDER SURVEYS

This problem involves a failure by the Forest Service to follow protocols for the Strategy 2 salamander species that were not grandfathered out by the "implement" definition. Although many of these sales have now been sold, the sale documents promised to complete the surveys, and that has not been done. We explained this situation in more detail in our last letter to you. Examples of this problem include the Skeeter/Two Peaks Timber Sale on the Mt. St. Helens National Volcanic Monument and the Power Timber Sale on the Randle RD of the Gifford Pinchot National Forest.

A survey protocol titled "Draft Survey Protocols for Component/Strategy 2 Amphibian Species" was prepared and released for use on March 12, 1996, by the regional office of the Forest Service. The protocol identifies the range, habitat types, and vegetation communities for the salamanders, and describes procedures for surveying areas directly impacted by ground disturbing activities *plus* an adjacent 180 meter "influence area." As explained in the examples below, however, suitable habitat and the 180 meter "influence area" have not been surveyed according to the regional protocol.

In addition to that violation, the Gifford Pinchot has now adopted an "abbreviated protocol" for salamander surveys, which is not supported by the Deanna H. Olson, Lead Biologist for the REO Survey and Manage Amphibian Subgroup; the Acting Supervisor of the North Pacific Coast Ecoregion of the U.S. Fish and Wildlife Service; the Threatened, Endangered, and Sensitive Species Program Manager at the Regional Office of the Forest Service; nor by Charlie Crissafulli, the lead biologist and author of the sections of the protocol for Van Dykes and Larch Mountain salamanders.

On February 10, 1998, Olson wrote to the Core Team, complaining of survey problems with Larch Mountain and Van Dykes salamanders (both Washington state species). She reported that "[s]urveys are not being conducted in all proposed activity areas with Larch Mountain salamander habitat," because the Gifford Pinchot National Forest was "prioritizing" habitat. She noted that "[t]here are insufficient data to prioritize habitats." She also reported that surveys were not being conducted for Van Dykes salamanders on upslope forests and riparian reserves directly adjacent to timber sales. She wrote:

In summary: 1) I am concerned that survey decisions are

A-393

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

Edward A. Boling, John Watts
Page 22
September 25, 1998

being made that are not supported by the species-experts; 2) I am concerned that unsupported decisions may be vulnerable to potential appeals that species protection measures are not being followed; 3) there appears to be a difference of opinion as to which parts of survey protocols may be "required" and which parts are recommended or flexible in their application.

See attached copy.

The U.S. Fish and Wildlife Service on January 20, 1998, wrote to Ted Stubblefield, the Gifford Pinchot NF supervisor, protesting the modifications to the protocols. The FWS noted that the GP had met with FWS and agreed to submit "the modified protocol and a justification for the modifications (including a summary of last year's results)" to the REO for approval, but as of December the REO had not received this. FWS had three concerns with the modifications, and asked the GP to consider the concerns before submitting the modifications to the REO. First, the FWS noted that the modifications may lead to surveys not being conducted in all areas containing S&M species, prior to ground-disturbing activities. FWS gives an examples of where this happened during training. Second, "[t]he modifications were developed without the participation of recognized amphibian experts. Charlie Crissafulli, a primary author of the approved survey protocol, does not support the modifications." Third, the FWS was concerned that "low levels of coarse woody debris and talus" would be misdefined, leading to under-surveying. "Additionally, several populations have been detected on sites which contain no talus." FWS recommended that the modified protocol should not be used until the REO approves it, and that the GP should consult species experts and support a research project that is "designed to develop a habitat-based model for Larch Mountain salamanders. The results of this project may eliminate the need to survey certain habitat types and provide a scientific basis for some of the dichotomies in the flow chart." See attached copy.

As noted below, the survey protocols for the California Strategy 2 salamander species are also not being followed consistently.

A. Example of How Sales Violate the ROD

The Skeeter, Two Peaks and Tower sales are within the known range and within the habitat types and vegetation communities associated with the Larch Mountain and Van Dykes salamanders, yet units within suitable habitat and within the 180 meter "influence area" were not surveyed according to the regional protocol. The Skeeter timber sale contains a number of classic old-growth units

A-394

Released Pursuant to Court of Federal Claims Order of 3/29/07

Edward A. Boling, John Watts
Page 23
September 25, 1998

that were not surveyed to protocol. Gage and Tile are in the same category.

Of the unawarded sales with NEPA complete (through the appeals process), Lower Iron and Iron Horse sales contain late-successional habitat that was not surveyed. These sales include units that enter 1000-acre roadless areas.

Of the unawarded sales still within the NEPA comment period or appeal periods, the Lock and Swell timber sales contain classic old-growth forest, and there is evidence that survey requirements have not been met.

Despite the objections of the leading government salamander biologists, the Gifford Pinchot has used the "abbreviated protocol" on at least 29 timber sales since the beginning of FY 97.

In addition to these problems with the Larch Mountain and Van Dykes salamanders, surveys for the Del Norte salamander in Northern California have not been carried out properly. The problem was recognized in the Region 5 decision reversing in part the Klamath forest supervisors decision on the Upper South Fork sale in the Klamath National Forest, for not complying with survey protocols for the Del Norte salamander.

B. Proposed Solution

Our proposal for solving the problems created by the failure to follow protocol on these sales is to do proper surveys and prepare supplemental NEPA analysis as with the red tree vole solution described above.



Released Pursuant to
Court of Federal Claims
Order of 3/29/07

Edward A. Boling, John Watts
Page 24
September 25, 1998

**CONCLUSION**

The problems with ROD implementation outlined and illustrated above show a disturbing pattern of ignoring or internally changing ROD requirements that limit timber harvest or require funding beyond what has been budgeted. This letter sets forth proposed solutions for each of the problems we have identified. Obviously, some of the solutions will require additional funding, others may require reductions in timber volume harvested. Nevertheless, the proposed solutions merely implementing the ROD as written, and not anything that goes outside the ROD or even requires amending the ROD. We look forward to your reply.

Sincerely,

Marianne Dugan

(for) Michael Axline
Marianne Dugan
Counsel for Plaintiffs

encl
cc: California Wilderness Coalition
Citizens for Better Forestry
Oregon Natural Resource Council
Pilchuck Audubon Society
Klamath Forest Alliance
Klamath Siskiyou Wildlands Center
American Lands Alliance
Umpqua Watersheds
Northcoast Environmental Center
Portland Audubon Society
Gifford Pinchot Task Force
Northwest Ecosystem Alliance
Headwaters



Released Pursuant to
Court of Federal Claims
Order of 3/29/07

# MEMORANDUM

: ONRC Action coordinators

From: Sue Zike, Litigation coordinator

Date: Oct 28, 1998 Attachment sent via FAX 10/28/98

**Subject: ONRC Action: government counter-offer**

---

Attached is the gov't's Oct 26, 1998 counter-offer in the ONRC Action v. USFS (Survey/manage) lawsuit. This correspondence is protected from further distribution by the rules of civil procedure in the federal courts. PLEASE DO NOT DISTRIBUTE OUTSIDE OF THE FOREST SERVICE AND BLM!!

This offer does not technically obligate the government nor any of the Forests at this time. However, as you will note the DOJ has promised certain sales will not be awarded until after Nov. 23, 1998. This list of USFS sales is the same sale list (with a few, but important, changes re: ATV sales and sales not appealed by any of the plaintiffs) that we offered ONRC Action on Sept. 30. However, because some other sales named by the plaintifs have run through their advertisement and are on the auction block and could be awarded before Nov. 23, I need to remind you of Bob Devlin's message to the Forest Supervisors Oct 16, asking that you not award any of the listed sales until I can get an OK from DOJ. I've inserted Bob's message below. I think the MTH, WIL, GP, SIS and UMP have sales in this situation or have already been delaying the award (SIS and GP). I will be sending the updated MTH and ROR charts out for verification tomorrow. I expect the WIL and GP's verified charts by the end of the week.

·ase note that the DOJ is likely to encourage us to delay the upcoming awards of any sale on the chart, unless ..e can show good reasons (resource reasons) why the sale needs to be awarded within the next month. We have been successful in getting DOJ agreement on ATV sales, salvage, 2-year limited completion sales (hopefully, right GP?), and sales with strong community support (like Carberry Ck on the ROR with Applegate support and ONRC the lone appellant). DOJ is aware that the timber market in the Portland area is not strong, so we have a bit of an uphill struggle to move ahead. BUT... try we will! And we do have some good reasons for many of these sales. .

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

0102

EXHIBIT
tabbies
Plaintiff's Trial
Exhibit No. 75

A-434

PLAINTIFF'S
EXHIBIT
tabbies
35
8-20-07 SKK

MESSAGE
Subject: NW Plan Lawsuit
Sender: Robert J. Devlin / r6pnw
PHONE-1=(503) 808-2955;

Dated: 10/16/98 at 09:35
Contents: 2

Message Id: H00001330361f032
Priority: Normal Importance: Normal Sensitivity: Company Confidential
Submission Date: 10/16/98 09:35:26
Delivery Date: 10/16/98 09:35:37
Message Properties:
Conversion Prohibited NO
Alternate Recipient Allowed NO
Contents returned on Non-Delivery YES
Auto-Forward Allowed YES
Auto-Reply Allowed YES
Distribution List Expansion Allowed YES
Disclose Envelope Recipients NO
Conversion with Loss Prohibited NO
Recipient Reassignment Prohibited NO
Original Information Types
TEXT (IA5)

Part 1

TO: DISTRIBUTION (Title: Distribution list)

Part 2

We are still working with DOJ and OGC lawyers on settlement discussions with the plaintiffs on the NW Plan lawsuit. You have reported the status of your sales that are named in the lawsuit and past messages from Sue Zike about holding off award of these sales has been presented to both our lawyers and the plaintiffs. Until we know where these discussions are headed, do not award any of these sales. If you have specific questions on any of the sales on the list, call Sue Zike for advice. If Sue is unavailable, either Peggy Kain or I can help you. If you have bid openings before we decide to award these sales, make your standard announcement before the bid opening that tells prospective bidders that the sale is currently under litigation and award may be delayed.

BOB DEVLIN-DIRECTOR NATURAL RESOURCES
R-6, PACIFIC NORTHWEST REGION
503-808-2955, FAX 503-808-2469
email: rdevlin/r6pnw@fs.fed.us

**Released Pursuant to Court of Federal Claims Order of 3/29/07**

**0103**

230

**MEMORANDUM**

To: ONRC Action coordinators

From: Sue Zike, Litigation coordinator

Date: Oct 28, 1998 Attachment sent via FAX 10/28/98

**Subject: ONRC Action: government counter-offer**

---

Attached is the gov't's Oct 26, 1998 counter-offer in the ONRC Action v. USFS (Survey/manage) lawsuit. This correspondence is protected from further distribution by the rules of civil procedure in the federal courts. PLEASE DO NOT DISTRIBUTE OUTSIDE OF THE FOREST SERVICE AND BLM!!

This offer does not technically obligate the government nor any of the Forests at this time. However, as you will note the DOJ has promised certain sales will not be awarded until after Nov. 23, 1998. This list of USFS sales is the same sale list (with a few, but important, changes re: ATV sales and sales not appealed by any of the plaintiffs) that we offered ONRC Action on Sept. 30. However, because some other sales named by the plaintifs have run through their advertisement and are on the auction block and could be awarded before Nov. 23, I need to remind you of Bob Devlin's message to the Forest Supervisors Oct 16, asking that you not award any of the listed sales until I can get an OK from DOJ. I've inserted Bob's message below. I think the MTH, WIL, GP, SIS and UMP have sales in this situation or have already been delaying the award (SIS and GP). I will be sending the updated MTH and ROR charts out for verification tomorrow. I expect the WIL and GP's verified charts by the end of the week.

Please note that the DOJ is likely to encourage us to delay the upcoming awards of any sale on the chart, unless we can show good reasons (resource reasons) why the sale needs to be awarded within the next month. We have been successful in getting DOJ agreement on ATV sales, salvage, 2-year limited completion sales (hopefully, right GP?), and sales with strong community support (like Carberry Ck on the ROR with Applegate support and ONRC the lone appellant). DOJ is aware that the timber market in the Portland area is not strong, so we have a bit of an uphill struggle to move ahead. BUT... try we will! And we do have some good reasons for many of these sales. .

TAB92939

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

PLAINTIFF'S EXHIBIT
38
8-20-07 SKK

****************** -COMM. JOURNAL- ******************** DATE OCT-29-1998 ***** TIME 13:17 *** P.01

MODE = MEMORY TRANSMISSION START=OCT-29 12:09 END=OCT-29 13:17

FILE NO.= 050

| STN NO. | COM | ABBR NO. | STATION NAME/TEL.NO. | PAGES | DURATION |
|---|---|---|---|---|---|
| 001 | OK | <01> | Deschutes NF | 009/009 | 00:04'08" |
| 002 | OK | <03> | GiffordPinchot | 009/009 | 00:02'50" |
| 003 | OK | <05> | Mt Bak-Snoq. NF | 009/009 | 00:04'38" |
| 004 | BUSY | <08> | Okanogan NF | 000/009 | 00:00'00" |
| 005 | OK | <09> | Olympic NF | 009/009 | 00:03'33" |
| 006 | OK | <10> | Rogue River NF | 009/009 | 00:02'51" |
| 007 | OK | <11> | Siskiyou NF | 009/009 | 00:03'45" |
| 008 | OK | <12> | Siuslaw NF | 009/009 | 00:04'29" |
| 009 | OK | <17> | Wenatchee NF | 009/009 | 00:02'35" |
| 010 | OK | <18> | Willamette NF | 009/009 | 00:03'44" |
| 011 | OK | <20> | Winema NF | 009/009 | 00:04'14" |
| 012 | OK | * | 96681413 | 009/009 | 00:03'45" |
| 013 | OK | * | 915419573495 | 009/009 | 00:04'26" |

-USDA FOREST SERVICE -

******************************************** -R6 STRATEGIC PLG- ***** - 503 808 2255- **********

9 pages

TO: Susan L. Carter / r6pnw, wenatchee
Jan Flatten / r6pnw, okanogan
Jamia R. HansenMurray / r6pnw, mbs
Ward Hoffman / r6pnw, olympic
Fred Dorn / r6pnw, gp
Mike Redmond / r6pnw, mthood 668-1443
Thomas L. Ortman / r6pnw, mthood
Neal Forrester / r6pnw, willamette
Herb Wick / r6pnw, willamette
Lynn Sullivan / r6pnw, willamette
Tom Link ~~Mike Dunn~~ / r6pnw, siskiyou
~~James T. Gladen~~ / r6pnw, rogueriver
Michael D. Hupp / r6pnw, umpqua
Gery Ferguson / r6pnw, deschutes
ematthews / r5, klamath
Ken Grigsby
Linda West / r5, klamath
Sue Danner / r5
oschmidt / internet (oschmidt@att.net)
jerry jensen / r5
Rodney D. Johnson / R6pnw, winema
Craig Snider / r6pnw, siuslaw
brian stone / r5
john fertig / r6pnw, rogueriver
tom link / r6pnw, siskiyou
cynthia m. henchell / r6pnw, gp
kenneth o. grigsby / r6pnw, rogueriver
Robert J. Devlin / r6pnw

CC: Susan Zike / r6pnw
Lisa E. Freedman / r6pnw

TAB92940

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

1210 10/29

TO: Susan L. Carter / r6pnw, wenatchee
Jan Flatten / r6pnw, okanogan
Jamia R. HansenMurray / r6pnw, mbs
? — Ward Hoffman / r6pnw, olympic
Fred Dorn / r6pnw, gp
Mike Redmond / r6pnw, mthood (668-1443)
Thomas L. Ortman / r6pnw, mthood
Neal Forrester / r6pnw, willamette
Herb Wick / r6pnw, willamette
Lynn Sullivan / r6pnw, willamette
Tom Link — ~~Mike Lunn~~ / r6pnw, siskiyou
~~James T. Gladen~~ / r6pnw, rogueriver 541-957-3495
Michael D. Hupp / r6pnw, umpqua
Gery Ferguson / r6pnw, deschutes
ematthews / r5, klamath
Ken Grigsby — Linda West / r5, klamath 9-1-916-842-6327
Sue Danner / r5
oschmidt / internet (oschmidt@att.net)
jerry jensen / r5
Rodney D. Johnson / R6pnw, winema
Craig Snider / r6pnw, siuslaw
brian stone / r5
john fertig / r6pnw, rogueriver
tom link / r6pnw, siskiyou
cynthia m. henchell / r6pnw, gp
kenneth o. grigsby / r6pnw, rogueriver
Robert J. Devlin / r6pnw

CC: Susan Zike / r6pnw
Lisa E. Freedman / r6pnw

TAB92941

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

From: Susan Zike
To: Susan L Carter /r6pnw,wenatchee
To: Jan Flatten /r6pnw,okanogan
To: Jamia R. HansenMurray /r6pnw,mbs
To: Ward Hoffman /r6pnw,olympic
To: Fred Dorn /r6pnw,gp

ONRC Action: R6 sales delayed til 11/23 and desire to award after 11/23

attached is my memo to DOJ/OGC, reviewed by Devlin and Kain, in which I list the sales that some of the forests would like to award after the 11/23/98 delay period (from our 10/26/98 counter-offer) expires. I included a short briefing by Diana Bus, WIL on her sale needs and encourage the rest of you to review the sales in the sideways chart I sent out yesterday to see if you want to make a concerted effort to discuss the award likelihood with DOJ/OGC. UMP: I did not bring to DOJ's attention the sales like Whitebird, Jigsaw, or Praire Thin, that came under a "project name". Some of them have Nov auction dates, so let me know what you'd like to do.

Susan M. Zike
R6 Litigation Coordinator
503-808-2257
503-808-2255 FAX
DG szike/r6pnw:fs
email szike/r6pnw@fs.fed.us

This message
- Distribution list (1819 bytes)
- Message_Body (803 bytes)
- 9-17_listall_11-23delay_transDOJ.aw (20824 bytes)

0 1843

EXHIBIT
Plaintiff's Trial Exhibit No. 82

PLAINTIFF'S EXHIBIT
42
8-20-07 SKK

Released Pursuant to
Court of Federal Claims
Order of 3/29/07

Part 1

TO: DISTRIBUTION (Title: Distribution list)

Part 2

attached is my memo to DOJ/OGC, reviewed by Devlin and Kain, in which I list the sales that some of the forests would like to award after the 11/23/98 delay period (from our 10/26/98 counter-offer) expires. I included a short briefing by Diana Bus, WIL, on her sale needs and encourage the rest of you to review the sales in the sideways chart I sent out yesterday to see if you want to make a concerted effort to discuss the award likelihood with DOJ/OGC. UMP: I did not bring to DOJ's attention the sales like Whitebird, Jigsaw, or Praire Thin, that came under a "project name". Some of them have Nov auction dates, so let me know what you'd like to do.

*****
Susan M. Zike
R6 Litigation Coordinator
503-808-2257
503-808-2255 FAX
DG szike/r6pnw:fs
email szike/r6pnw@fs.fed.us
**********

Part 3

This item is of type Applix Words and cannot be displayed as TEXT

0 1844

Released Pursuant to
Court of Federal Claims
Order of 3/29/07