# Attachment #1

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SCOTT TIMBER CO., | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 05-708C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | ORIGINAL |

DEPOSITION OF

SUE ZIKE

Taken in behalf of Plaintiff

* * *

January 4, 2007

333 S.W. First Avenue

Portland, Oregon

EXHIBIT
Plaintiff's Trial Exhibit No. 173

Teresa L. Dunn, CSR, RPR

Court Reporter

400 Columbia, Suite 140
Vancouver, WA 98660
(360) 695-5554
Fax (360) 695-1737

Schmitt & Lehmann, Inc.
COURT REPORTERS

121 SW Morrison St., Suite 850
Portland, OR 97204
(503) 223-4040
slinc@qwest.net

**Designated Excerpts from the Sue Zike Deposition Transcript in Scott, January 4, 2007:**

Page/Line
6: 9 – 13
6: 19 – 7:6
8: 14 – 14: 8
43: 21 – 45: 22
45: 23 – 47: 20
49: 14 – 50: 11
50: 16 – 52: 10

questions fully and completely even if your counsel objects.

As you know, I think she will be objecting for the record and if she instructs you not to answer, then you have a right not to answer, but otherwise you should give me as full and complete an answer you can.

Is that okay?

A. Okay.

Q. Sketch for me briefly your education since high school.

A. I have a Bachelor of Science degree in landscape architecture in 1974 and a Juris Doctorate from Northwestern School of Law in 1990.

Q. So you celebrated graduation from law school by testifying in a deposition?

A. Something like that.

Q. No other formal education?

A. No.

Q. Okay. And let's go over your job history just a little bit beginning with your present position with the Forest Service.

What are you doing right now?

A. I'm the regional litigation coordinator and Freedom of Information Act coordinator. I have held that position since 1991.

Q. Okay. What were you doing before that?

A. Prior to that I was forest planner and landscape architect with Custer National Forest in Billings, Montana, and Lewis and Clark National Forest out of Great Falls, and I did those jobs for nine years.

Q. Okay. That's enough. Did you have any involvement in the Northwest Forest Plan?

A. In what part of the Northwest Forest Plan?

Q. Well, did you have any involvement in developing the EIS and the version of the plan that became -- was issued in 1994?

A. I did not.

Q. Did you ever participate in any entity called the Survey and Manage Work Group?

A. I did not.

Q. Or the Survey and Manage Core Group?

A. I did not.

Q. Or the Issue Resolution Team?

A. I did not.

Q. Did you have any dealings with any of those organizations?

A. I did not.

Q. And the Regional Interagency Executive Committee, did you have any dealings with that

organization?

A. The RIEC?

Q. Yes, ma'am, that's the acronym.

A. They met probably monthly for a while and I would from time to time be invited to give litigation updates to that group.

Q. And the Region Ecosystem Office, did you have any dealings with that?

A. I did have some dealings with REO primarily when the ONRC Action was filed in 1998 we needed to assemble portions of the record and the folks in the REO group had access to those records so I guided them and helped them prepare records for that lawsuit.

Q. Let's look at what was previously marked plaintiff's Exhibit 35. This is an electronic message. Some parts are inscrutable to me, but it appears to me there are two messages here.

Am I right about that?

A. There are two messages.

Q. What are the two messages so I can sort it out later? What's the first message?

A. It appears to me in time the first message would be, Susan, We have Brian Stone back in the loop taking care of this information. I think that would be. Let me read this other one.

Q. That's Mr. Jensen's electronic message to you?
A. Yes. Let me see, well, I will change that then. It looks to me like my note would say, I need to remind you that the list of sales I sent out to you is privileged.
That would be from me and then Jerry responds to that -- responds to me and B. Stone who is Brian Stone in California that we have Brian back in the loop taking care of this, and I forwarded the note to him.
Q. Okay. At the top left-hand corner on this message it says, Attached Date.
Do you know what that means, Attached Date? Does it mean date sent, for example?
A. I think what it meant back with this e-mail system was that if you forwarded a message instead of reply, that what you forwarded got -- that the content of what you got forwarded was considered attached.
Q. I see.
A. So what would have been attached to this would be my note. I need to remind you that the list of sales, that would have been attached to Jerry's message starting with Susan.
Q. I notice in the upper right-hand corner there's 9-4-98 written on this document and then on the right-hand side towards the bottom it looks like

9-4-98. I want to make sure I have this straight.

Mr. Jensen's electronic message to you was September 4, 1998, and your earlier message to him was what date, can you tell?

A. I can't tell from this.

Q. Prior to 9-4-98?

A. Right, that would be my assumption.

Q. And would I be correct it would be after the filing of the ONRC Action lawsuit in July of 1998?

A. Correct.

Q. There's a reference in your message to the list of sales I sent you. Do you see that?

A. Yes.

Q. Would that be the list of sales at risk being challenged in the ONRC Action lawsuit?

A. The at-risk sales is what you are asking me?

Q. Yes. What would be this list?

A. Sometimes they were called problem sales. I don't think those were the at-risk.

Q. Okay. What was this list of sales?

A. What I would recall is that plaintiffs sent to us lists of sales that they wanted us to negotiate on. And when plaintiffs sent us those lists, they sent it under a settlement banner citing I think Federal Rules of Evidence 408.

So I would have needed to ask my forest people what are the status of those sales so I would have forwarded plaintiff's list out to them.

Q. When you say plaintiffs, you are talking about the ONRC Action plaintiffs?

A. That's correct.

Q. And you said they were negotiating with you with this list of sales meaning that they were trying to negotiate a settlement to the lawsuit?

A. Yes.

Q. Was it your understanding these were sales they meant to challenge?

A. Well, challenge in the context of the issues raised in this particular lawsuit?

Q. Yes.

A. Yes, they were sales that they wanted to negotiate with us whether or not they would be awarded and allowed to operate.

Q. Were these a list of sales that were not awarded?

A. I don't recall that because plaintiff's list, they didn't know. I mean, we could not rely on plaintiff's list of sales as being accurate as far as their status so that's why I had to go to my forest people.

Q. You did that?
A. I did.
Q. You found out something about them?
A. Well, we had these charts that we refer to here that had status on it and what issues had been raised.
Q. That's the as-is chart?
A. As is the chart, meaning privileged.
Q. Okay. Let's look at plaintiff's Exhibit 35A. The first page is a fax cover sheet and it looks like would I be correct a fax you sent?
A. It is.
Q. That's your business card that you photocopied?
A. It is.
Q. And you sent it to Mike Hupp and Brenda Woodard on the Umpqua National Forest?
A. Correct.
Q. What were their positions at the time do you recall?
A. Mike Hupp was the forest planner I believe and Brenda Woodard was the contracting officer. They were also sent to Herb Wick on the Willamette and Fred Dorn on the Gifford Pinchot and those are both contracting officers on those forests.

Q. I took it Ms. Woodard was the contracting officer on some of the sales on plaintiff's list?
A. I don't know. I don't know where the plaintiff's list -- Attached is a draft letter.
Q. We will go through this and reconsider that question later.
A. Okay.
Q. That's your handwriting on the first page?
A. It is.
Q. And you ask, Are you willing to notify the bidders before you open bids?
A. Correct.
Q. Notify them of what?
A. That there was a pending lawsuit.
Q. What was the answer?
A. I don't recall. I don't know what they decided to do about at bid opening. We felt it would be prudent to notify the bidders.
Q. Who is "we"?
A. It would be who I was conferring with was Jerry Hofer, regional contract officer, and Devlin, Bob Devlin.
Q. What was Mr. Devlin's position at the time?
A. He was director of timber.
Q. For Region 6?

A. Correct.
Q. What was the other gentleman's name?
A. Jerry Hofer.
Q. H-O-L-F-E-R?
A. H-O-F-E-R.
Q. All right. So you, Devlin, and Hofer thought it would be prudent to advise them?
A. Correct.
Q. Okay. Further down in your handwritten statement staying there you say, There is no reason yet to plan on delaying award of the USFS sales.
Why not?
A. Because we hadn't made any agreement with plaintiffs to delay award of sales.
Q. Okay. The next two pages are the draft letter you refer to in your fax sheet?
A. Uh-huh.
Q. Did you draft the letter?
A. No. Department of Justice doesn't let us have their letterhead.
Q. On page two of the draft there's a statement in the letter that says, In the interest of facilitating settlement discussions the Forest Service is prepared to notify bidders on the three timber sales scheduled for auction in August that these timber sales

Q. Okay.

A. So given the earlier e-mail in March we agreed to a briefing schedule that would make sense that the briefing schedule would run through June.

Q. So this document which judging by the handwritten notation in the upper right-hand corner 4-5-99 was an attempt to among other things scrutinize the sales that the Forest Service intended to award by mid-June so it wouldn't interfere with the briefing schedule?

A. I would characterize it differently.

Q. How would you characterize it?

A. I would characterize it as we wanted to know if any sales were going to be awarded during the briefing schedule because we had reason to believe that ONRC would not hesitate to file for a TRO or PI in the middle of our summary judgment briefing schedule and that buggers up -- it just messes up the briefing schedule when you are interrupted with injunctive requests.

Q. Okay. Take a look at 41B. Now, if am I reading this right if I look at the fax line at the very top of this document, that means it was faxed to Region 6?

A. The 808-2255 number is my fax which is here in

the Regional Office.

Q. So in the ONRC Action the plaintiffs faxed this to you?

A. I would not think so. I would have gotten it from Ted Boling.

Q. Okay. Well, he writes here, We have been using, and this is the very bottom paragraph on the first page, We have been using June 11, 1999, as a cut-off date for determining whether to include sales in the at-risk category, but of course that is simply when summary judgment will be fully briefed and not when summary judgment will be decided.

What's he talking about, the at-risk category?

A. Well, you would have to ask plaintiffs. When you read the paragraph above it says the sales are not -- not all sales are equally at risk and I believe Mr. Axline -- we're missing a page here.

Q. Yes, we are. Sorry.

A. I'm sorry, it is from Axline.

Q. It is not that I have it and you don't. It is not in my copy either.

A. They believe awarding the sales put them at risk, that it put old growth at risk and it put the earth at risk.

Q. So it was not too veiled a threat, they might

sue and try to get a temporary restraining order?

A. Correct. They had already sued. They would be asking for injunctive relief during the summary judgment briefing schedule.

Q. Okay.

A. See, the second paragraph says that, And some of the sales seem unlikely to be awarded and operated prior to completing summary judgment motions. Because we believe in Murphy's law, however, we think they might be awarded and might be operated during our summary judgment schedule.

Q. Well, the control number on here, 338 followed by 339 indicates that this was the way we got it from the government. I agree with you it looks like at least the signature page is missing?

A. Yes.

Q. Sales at Risk Pre-June 11 and so the Forest Service sales on that list are sales at least as of the date of this letter, April 12, 1999, the ONRC Action plaintiffs were threatening to challenge with TROs if they were awarded?

A. Correct.

Q. We're going to look at 41D next. In this letter from you to Brenda Woodard you say, I forwarded your April 19, 1999, letter to the Department of

Justice in which you relay your intent to award, and various sales are listed there, on or before May 5.

Did you receive that letter, the April 19, 1999, letter? I assume you did.

A. I would have seen it.

Q. Do you know why Ms. Woodard was sending this letter to the Department of Justice?

A. She didn't send it to the Department of Justice. I forwarded her letter to me to the Department of Justice, like we had looked at Diana Bus's letter earlier, this was Brenda's answer to that inquiry.

Q. Okay. All right. Then you say to her you understood these sales were not at-risk sales that ONRC had identified, but the next paragraph you add a qualification based on your discussions with Mr. Boling.

In the last sentence of the paragraph you say, In other words, the at-risk list does not replace the April 5 sales identified by ONRC Action as sales they are to receive prior notice of award according to the Stipulation to Establish a Briefing Schedule filed in this case.

A. That's a confusing sentence.

Q. What were you trying to tell us?

A. In other words, the at-risk list does not replace the April 5 sales identified as sales they were to receive the ten-day notice.

So in our Stipulation to Establish the Briefing Schedule we would have represented that these sales on the Umpqua were -- that we would give notice to plaintiffs of either awarding or approving the plan of operations with a ten-day notice.

Q. So you are reminding her the ten-day notice applies to sales listed here?

A. Yes, under the stipulation and whether or not ONRC considered them at risk or not did not matter because we had made this representation to the court about the sales we were going to give notice on.

Q. In the last short paragraph you say, As you know we have a hearing on June 11. That's the summary judgment hearing?

A. That would be the summary judgment hearing.

Q. In the ONRC Action?

A. Correct.

Q. So when you sent this to Ms. Woodard what did she do with respect to these sales?

A. I don't know what she did.

Q. Did you ever find out?

A. No.

telling us, number one, the stipulation has expired, therefore, delta, no more notice due. And whoever took these notes my read is writing down what Ted is telling us.

Q. Okay.

A. So he must have mentioned Prairie Thin and Pigout and that Ted would be talking to Axline on Tuesday.

Q. Okay.

A. That would be my read of it, but I don't recognize the handwriting or the topic.

Q. And you don't have independent recollection?

A. I don't.

Q. Okay. Plaintiff's Exhibit 44, was a copy of this letter from the ONRC Action plaintiffs made available to you?

A. Well, I would assume that I received it. I was the keeper of the sale list so I would assume that Ted would have got it to me.

Q. By that you mean you were the keeper of the various sale lists provided by the ONRC Action plaintiffs to the government?

A. Correct.

Q. So if anybody needed to know what was on that list or which list, you were the authoritative source

to call?
A. I had files.
Q. And you could read them what was on the document?
A. I could.
Q. Okay. And if I'm reading, just to summarize, the first page of this document correctly, Mr. Axline has attached a revised list in some respects?
A. Yes, they believed that they have more sales at risk of being awarded or operated because Judge Dwyer had not yet ruled.
Q. Okay. This letter is dated July 6th, 1999. Do you know if any of these sales were, in fact, awarded in July, 1999?
A. I don't know.
Q. This is plaintiff's Exhibit 45. Take a look at that for me, please. Do you recognize this chart of sales?
A. I do.
Q. Can you identify it then for the record?
A. It put into chart form what plaintiffs were characterizing as at-risk timber sales.
Q. As of July 6th?
A. As of that -- it was their July 6th letter which I believe we just looked at.

Q. Okay. Did you prepare this chart?
A. I think someone on my staff prepared it.
Q. Okay. What was the purpose in preparing it?
A. The purpose to prepare it was to assess whether or not plaintiffs knew what they were talking about as to award date and to status.
Q. So the information contained under each column here is the best information that the Forest Service could provide according to each status point?
A. On July 7th, right, that appears to be when we printed this off.
Q. And you can tell that from the date on the lower left?
A. Yes.
Q. Was this chart used in any decision-making process that you are aware of?
A. Not that I'm aware of. It would have been provided to Bob Devlin and the forest staffs and Ted Boling, trial counsel, so that we could get an idea of the threat from ONRC Action for an injunction.
Q. Okay. Under the Status column I notice for several of the sales it says, Award delayed until after ONRC hearing 7-1-99.
What hearing is that a reference to?
A. Well, we would have to check the docket for

this case.

Q. When it says "Award Delayed," does it mean the Forest Service agreed to delay of this sale until that hearing? Is that what that means?

A. That would be my interpretation of it.

Q. Now, was this chart or the information on this chart made available to your knowledge to anyone outside the Forest Service other than the Justice Department?

A. Not to my knowledge.

Q. Was it made available to Mr. Axline?

A. I do not know. We did not have, you know, the Forest Service did not have direct communications with opposing counsel.

Q. Okay. Take a look at plaintiff's Exhibit 46, please. Can you identify the first page of that document for me?

A. Well, it looks to me like it is an e-mail again from me out to my forest contacts.

Q. Who would be on that -- is that your distribution list you are talking about?

A. Yes.

Q. Who would be on that list?

A. It would be my case coordinators on these west-side national forests.

THE UNITED STATES COURT OF FEDERAL CLAIMS

BLUE LAKE FOREST PRODUCTS, INC., Plaintiff, v. THE UNITED STATES, Defendant. ) No. 01-570C (Judge Williams)

ORIGINAL

TIMBER PRODUCTS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. ) No. 01-627C (Judge Williams)

CLR TIMBER HOLDINGS, INC., Plaintiff, v. THE UNITED STATES, Defendant. ) No. 04-501C

DEPOSITION OF

SUSAN M. ZIKE

Taken in behalf of Plaintiffs

* * *

August 20, 2007

United States Forest Service, Region 6

333 S.W. First, Suite 717

Portland, Oregon

Shannon K. Krska, CSR

Court Reporter

EXHIBIT Plaintiffs Trial Exhibit No. 174

400 Columbia, Suite 140
Vancouver, WA 98660
(360) 695-5554
Fax (360) 695-1737

Schmitt & Lehmann, Inc.
COURT REPORTERS
www.slreporting.com

121 SW Morrison St., Suite 850
Portland, OR 97204
(503) 223-4040
slinc@qwest.net

**Designated Excerpts from the Sue Zike Deposition Transcript in Blue Lake, August 20, 2007:**

Page/Line
14: 20 – 15:9
54: 24 – 58: 16
16: 59 – 62: 2
63: 2 – 66:5
67: 3 – 68: 3
96: 8 – 99:3

he shared what his observations were, then that led to my follow-up inquiry.

Q. What did Mr. Boling tell you his observations were about the definition of implement?

A. I don't recall his personal impressions of it, but what I think speaks to it is that they defended it. So our -- our rationale, the forest service, and BLM's rationale for why that letter was needed and came to be, it seems to me if they stayed on this, if the department of justice believed it was nondefendable, something changed their mind and they -- and they defended it so --

Q. Did you subsequently learn what had changed their mind, if anything?

A. No, no. Higher levels than me.

Q. Did Mr. Boling ever give you any legal advice on -- relating to the -- this definition of implement?

A. Ask that again.

Q. Well, the definition of implement meaning NEPA equals implement --

A. Correct.

Q. -- did Mr. Boling ever give you any legal advice or express any legal advice in your presence regarding that definition?

A. I don't know if what he shared was legal advice or not.

Q. Okay.

A. But he certainly talked with us about our risks in defending and losing the -- as our justice attorneys do, whether or not we -- he thought we had a good chance or not in being able to win on this. And I think we all knew that there was some risk in -- in defending it.

Q. Okay.

A. But we thought we had enough defense from the record of decision that said that executives could modify these things so -- so we went forward with it.

Q. What's your best recollection of Mr. Boling's assessment of the litigation risk with regard to that definition?

A. You know, I really think he thought we could win it. I think he thought we would come up because he -- as most of our justice attorneys do, they're bright and they can do legal arguments. And the amount of effort that he and John Watt put into defending this case, you know, I didn't feel at think point that he thought it was a sure looser.

Q. Did he ever give you an assessment of the litigation risk on this point?

trial counsel were pretty comfortable with letting us move ahead because they felt they had an argument that there was no standing.

Q. Now, you said the implement issue or the red tree vole --

A. Red tree vole memo issue, yes.

Q. Referring to the interpretations with respect to both of those types of surveys?

A. Correct.

Q. Okay. Let's see, is the last page of this exhibit page 0093?

A. It is.

Q. Okay. And the first page is 0070?

A. Correct.

Q. Okay. Then we're all set.

I think you have a couple of pages that don't go with that exhibit, but you're welcome to them anyway.

MS. LYNCH: Okay.

Q. (By Mr. Stevens) Okay. Should we take a little break right now?

A. That's fine.

(Recess: 10:30 to 10:48 AM.)

Q. (By Mr. Stevens) The next document will be Exhibit 35. It begins on page 102 and runs to page

105. The first page is a memorandum from you, again, to the ONRC Action coordinators.

A. M-hm.

Q. You've told us who that would be before.

A. Correct.

Q. All right. And in the second paragraph of your memo you write "However, as you will note the DOJ has promised certain sales will not be awarded until after November 23, 1998." So am I correct this was your understanding of what was going on in the settlement discussions?

A. It was due to that, correct.

Q. So this would be another reason for the department of justice not allowing sales to be awarded, that they had made an agreement with the ONRC Action plaintiffs?

A. Well, I don't know if ONRC counsel and my counsel, the department of justice, in fact agreed to these sales 'cause I -- because I wouldn't know that. But I do know that Ted Boling, DOJ, and plaintiffs' counsel were meeting through these -- or, you know, having conversation through that period of time in the request. And they thought they could get their deal cut by around the end of November. So then the requests came from department of justice can you delay

105. The first page is a memorandum from you, again, to the ONRC Action coordinators.

A. M-hm.

Q. You've told us who that would be before.

A. Correct.

Q. All right. And in the second paragraph of your memo you write "However, as you will note the DOJ has promised certain sales will not be awarded until after November 23, 1998." So am I correct this was your understanding of what was going on in the settlement discussions?

A. It was due to that, correct.

Q. So this would be another reason for the department of justice not allowing sales to be awarded, that they had made an agreement with the ONRC Action plaintiffs?

A. Well, I don't know if ONRC counsel and my counsel, the department of justice, in fact agreed to these sales 'cause I -- because I wouldn't know that. But I do know that Ted Boling, DOJ, and plaintiffs' counsel were meeting through these -- or, you know, having conversation through that period of time in the request. And they thought they could get their deal cut by around the end of November. So then the requests came from department of justice can you delay

these certain sales until that 23rd date. So I don't know that I would represent it as -- as an agreement between plaintiffs and defendants that these sales would not be awarded.

Q. Okay. The reason I ask that is because you say here that "DOJ has promised certain sales will not be awarded." I assume you promised that to the ONRC Action plaintiffs?

A. Correct.

Q. So that part you do know?

A. Right.

Q. And that's consistent with the statement further down in the same paragraph where you say "I need to remind you of Bob Devlin's message to the forest supervisors October 16 asking that you not award any of the listed sales until I can get an okay from DOJ, period."

A. Correct.

Q. And you say "I've inserted Bob's message below," and that's on page 103, and I think we've seen that in another context already.

A. Correct. However, again what's not attached to this briefing memo is the October 23, '98, counteroffer.

Q. I understand that.

A. Okay.
Q. And in the last paragraph of your memo on page 102, the first sentence, you say that, in part, "The DOJ is likely to encourage us to delay the upcoming awards of any sale on the chart, unless we can show good reasons (resource reasons) why the sale needs to be awarded within the next month." Why did you think that was true?
A. It was my observation that until an agreement got reached between plaintiffs and defendants, that these controversial sales, controversial to the plaintiffs, we would be asked to delay those. That was just my -- my reading of the way Ted Boling managed the case so far.
Q. And did Mr. Boling make it clear to you that in terms of good reasons he meant resource reasons, protection of natural resources?
A. Correct.
Q. As opposed to purchasers desires to have sales awarded?
A. Correct. Or targets. You know, if the -- if the region was not going to meet their timber targets, that was not important enough to the department of justice to move forward with these sales that are likely to prompt the injunction.

Q. Timber targets meaning the projected target for volume of sales of timber?

A. Just volume.

Q. Volume.

A. Timber volume.

Q. So that each forest had a certain target in terms of the volume of sales it was hoping to sell that year?

A. Correct. That's what we get financed for by Congress.

Q. So it's important?

A. They're very important targets, but we were -- and that's why we needed Devlin's understanding and agreeing with delaying these, because that all meant targets were not going to be met.

Q. Okay. And what did you mean by the last couple of sentences in this last paragraph where you write "DOJ is aware that the timber market in the Portland area is not strong, so we have a bit of an uphill struggle to move ahead. But" we will -- "but try we will. And we do have some good reasons for many of these sales"?

A. Right. Well, as we had looked in the earlier exhibit, Lois Shiffer and Peter Coppelman were

of the opinion -- they're in Washington, DC, were of the opinion that the timber market in Oregon was soft and so that's what the first part of that sentence means. Ted's bosses realize it's a soft timber market.

But that doesn't mean that the forest service does not advertise and award sales. I mean, we have advertised and awarded sales -- it's a purchaser's -- I mean, that's the market is whether the purchasers wanted to buy the stuff or not. So you put the -- you put the timber sales out there. If they believe they can make money by buying that sale, they buy it. And it isn't for us to slow down the offering of timber sales because of soft market. Just makes a difference on whether we'll sell them or not.

Q. Okay. The next document will be Exhibit 38.

A. Thank you.

Q. Okay. Well, the first page is another copy of the memo we were just talking about, but the attachments is what I'm really interested in, pages 92940 and 92941. This document is addressed, on page 1, to ONRC Action coordinators, and I'm just asking you if you can verify that the -- the list on page 92940, which is produced in more readable form on 92941, these are the individuals to whom you sent

documents that are addressed, in general, to ONRC Action coordinators?

A. Correct. And what I note here I guess to correct what I had said earlier is Owen Schmidt, as general counsel's office, is on this coordinator list.

Q. Okay.

A. So he would have been receiving these as well.

Q. And so is Mr. Devlin, if I read this correctly?

A. Yeah. Yeah, you're right.

Q. And Brian Stone who was in region 5?

A. Correct. And he was my contact there.

Q. And he was the ONRC Action litigation coordinator for region 5 for a while?

A. Sure. I think that's close enough. Certainly he was -- he was intended to be my contact for region 5.

Q. And Ed Matthews for region 5 on the Klamath is also on this list?

A. Right. What happened was that Brian Stone had other job demands so I ended up coordinating with some region 5 people independent, you know, of -- or in addition, I guess I should say, to Jerry Jensen was region 5.

Q. Would it be fair to say that you were the principal litigation coordinator for the ONRC Action litigation for both region 5 and region 6, in general?

A. That would be correct.

Q. And so if Mr. Matthews had some sales on the Klamath and he wanted to award, he would get in touch with you --

A. Correct.

Q. -- and provide you with the information and the process would proceed as you have previously described it?

A. That is correct.

Q. Okay. The -- this list for the Umpqua identifies Michael Hupp but does not identify Brenda Woodard.

A. That's right.

Q. You would have sent some -- some of these to Miss Woodard and some to Mr. Hupp and you would expect Mr. Hupp would pass them on to --

(Mr. Wah left the room.)

THE WITNESS: I expected -- because Mike Hupp was the environmental coordinator and their forest planner, and in some cases that's who the forest supervisor wanted me to go through so that's who I used. I know I had, from time to time,

independent discussions/E-mails with Brenda on particular sales.

Q. (By Mr. Stevens) Okay. Taking you back down memory lane, the next exhibit is 40, plaintiffs' Exhibit 40.

(Mr. Wah entered the room.)

Q. (By Mr. Stevens) And this is an E-mail -- at least part of this is an E-mail from you to various other individuals.

A. Correct.

Q. And under part 2 that's your E-mail?

A. It is.

Q. The bottom of the paragraph under part 2 you say "DOJ is willing to consider the merits of each sale that we want to award, so the door isn't shut."

A. Correct.

Q. Meaning at this point it was still possible for sales to be awarded but DOJ had to be convinced?

A. Correct.

Q. And then when you say "Please put your rationale for need to award in the far right column," you're talking about your chart?

A. A chart.

Q. Okay. And all of that was standard procedure at this point in time?

A. It was.

Q. Okay. The next exhibit is Exhibit 42.

And this is another one of your E-mails. You can't read the date very clearly on the first page, but I've deciphered it as November 6, 1998, and you could just take that as representation.

A. Okay.

Q. And the text which is more readable is on the second page, page 1844. On page 1844 the paragraph under part 2 and at the end of the second sentence you say "Encourage the rest of --" starting in the middle of the sentence, "Encourage the rest of you to" make -- "to review the sales in the sideways chart I sent out yesterday to see if you want to make a concerted effort to discuss the award likelihood with DOJ slash OGC." Now, why, at this point, are you talking about a concerted effort? Were you suggesting to them that unless they had a very strong reason for going forward, that they shouldn't urge you to do that or --

A. Because there was this delay period that plaintiffs -- as I recall, plaintiffs had a list of sales that they didn't want to go forward while they were negotiating with Ted Boling and that we were assured by -- I recall being assured by Mr. Boling

that after the 23rd of November we could move forward to award sales. And so what this was -- and you said the date on this was November something?

Q. November 6 as best I can make out.

A. 6.

Okay. So we had, what, two and a half weeks until this delay period would be over, and so in preparation for that I'm asking my case coordinators to get their thoughts together and put it in this chart if they wanted to move forward with the award of some sales. So that was the purpose of this E-mail was to get our thoughts together and our rationales together to award sales that we had agreed to delay up until the 23rd of November.

Q. And why did you say here in this paragraph to the Umpqua National Forest "I did not bring to DOJ's attention the sales like Whitebird, Jigsaw, or Prairie Thin, that came under a, quote, project name, end quote. Some of them have November auction dates, so let me know what you'd like to do"?

A. Right. I can't --

MS. LYNCH: I'd like to object to that question just being irrelevant to the Blue Lake/CLR/ Timber Products cases. But you can go ahead and answer.

THE WITNESS: I don't know why I would not have brought those to DOJ's attention. And most likely because they had November auction dates it would have been after the 23rd, that's how I would have read that. Because if they had had auction dates prior to the 23rd we would have had to have talked to DOJ about delaying them or not.

But without trying to find one of those charts that had the proposed auction dates, the -- the project name, quote, unquote, often camouflaged individual sale's names because the plaintiffs would say we don't want the X, Y, Z project NEPA to go forward. Well, under that X, Y, Z project would be individual timber sales with names. So that's what that project name piece means. But -- but as to why I didn't include the Umpqua sales in these charts that I sent out I can't tell you, other than they most likely had auction dates after the 23rd of November.

Q. (By Mr. Stevens) Okay. And so your -- your parting comment to "Let me know what you'd like to do," do you recall any response on that?

A. Oh, I -- not particularly, but I certainly know Brenda -- Brenda wanted very much to get her sales awarded.

Q. Why was that?

A. 'Cause she was a doer and an accomplisher and she was going to meet her targets, you know, as her boss expected her to do so --

Q. That's Brenda Woodard on the Umpqua?

A. Correct.

Q. Okay. Bear with me here for just a moment.

(Discussion off the record.)

Q. (By Mr. Stevens) The next document is Exhibit 56.

MS. LYNCH: Can I ask just one quick question for my information?

MR. STEVENS: Sure.

MS. LYNCH: On these E-mails, where are you finding the dates?

MR. STEVENS: In the upper right-hand corner. If you look very carefully you'll see a date.

MS. LYNCH: Okay.

MR. STEVENS: And it is legible, but I'm --

MS. LYNCH: Barely.

MR. STEVENS: Right, barely. And with a magnifying glass you can actually read it, but it's just because of the nature of the photocopy.

MS. LYNCH: Of course. Thank you.

MR. STEVENS: And if I'm wrong about these dates, I'll stand corrected by the record, but I

verified them and they should be right.

MS. LYNCH: Okay.

Q. (By Mr. Stevens) Okay. This is a -- Exhibit 56 is page 1745 through 1746. It's another one of these E-mails or perhaps E-mail exchanges. And let me ask you to turn to the second page, though I'll note, for the record, my reading of the date is November 8th, 1998. And if you turn to page 2 under part 4.2, three short paragraphs, that's your E-mail I take it?

A. That's correct.

Q. Let me draw your attention to the last paragraph and the first sentence where you say "Please keep in mind (as COs always do) the liability that may come to the USFS if the sale is awarded and enjoined." What were you referring to there?

A. Well, I'm -- I'm certainly not a contract lawyer for the government, but it was just a reminder to perhaps my case coordinators who were not contracting officers that if we have to award and then we are enjoined, that we then would have to use one of the clauses in the contract to suspend the sales. So it was just a -- just a reminder.

Q. And COs refers to contracting officers?

A. Officers, correct.

Q. And were you asking them not to press for

the award if they thought there would be liability to the government?

A. Yes.

Q. In the second sentence in that same paragraph you say "Is there a need for a regional conference call re the award question?" What kind of regional conference call were you talking about?

A. With our -- with Jerry Hofer, the regional contracting officer, and Peggy Kain to see if we needed to talk through collectively the sales that the forest wanted to award.

Q. Now, you're asking your -- your folks on distribution list if you think there is a need for a regional conference call. What would determine whether there would be a need or not be a need?

A. E-mails back or phone calls back to me from those case coordinators if they wanted to talk it through.

Q. And the nature of the conference call would be to, as you put it, air the needs and risks of going forward?

A. Correct.

Q. So would Owen Schmidt be involved in that at all?

A. He would.

Q. Who was that?
A. He was the other deputy regional forester in region 6. He was the deputy regional forester for administration and she was deputy regional forester for national resources.
Q. Okay.
A. So it was her colleague.
Q. And the next document is Exhibit 52. Are these your notes --
A. They are.
Q. -- on page 92339 and 92340 of Exhibit 52; right?
A. It is, I'm sorry.
Q. That's okay.
And at the very top on the left it says "TB," that's Ted Boling?
A. Correct.
Q. And "11-25-98." Are these notes of a telephone conversation you probably had with Mr. Boling?
A. That would be my -- yes, that would -- this is how --
Q. That's your interpretation?
A. Yeah, these are my notes from a call with him.

Q. And then you have paragraph No. 3 "Shiffer issues" looks like "w Coppelman."

A. With.

Q. With Coppelman.

A. M-hm.

Q. And 1 is the "Implement definition is nonsense." That's what you --

A. We've heard that before. This was him telling me, right.

Q. This is the moment in time when you first --

A. This is, exactly.

Q. Okay.

A. He called after his meeting that morning.

Q. Okay. So do you recall him using that exact word now?

A. Yes. I wouldn't have written it if he hadn't used it.

Q. Okay. And "Timber market dash" does that say success rate?

A. Success rate, m-hm.

Q. Do you know what that refers to?

A. Well, what I recall, if you look down in the lower -- lower sticky note on the left it says Shiffer's opinion, I don't recall that she was on the phone.

Q. Okay.

A. I don't -- I don't recall. But that the timber market was flat and how many sales are you really selling.

Q. Okay.

A. And, you know, she had -- she had these concepts of how the timber world worked out here, and --

Q. She thought -- she thought there was enough timber already available?

A. No. She thought nobody was buying it.

Q. I see, okay.

A. And so -- so she was going to explain that the timber industry, there was just no harm to them, that there's enough already available so they don't need these sales, yeah.

Q. And this Post-It note which I assume it says that's what Ted Boling is telling you Lois Shiffer said?

A. Yes, yes. Yeah.

Q. Okay. And the other note, the No. 3 note to the right of it?

A. That's her third point that you see paraphrased up above, that the availability of personnel to do the survey --

Q. Okay.
A. -- and how many private biologists could we hire.
Q. Okay. Let's go to the next page --
A. Okay.
Q. -- 92340. And Judy Nelson is referenced there. What's that about?
A. Well, this is a different phone call.
Q. Okay.
A. I mean, this is dated 12-4-98 so we're talking a week later.
Q. Okay.
A. Judy Nelson was with the bureau of land management. She's the head of their timber shop here in Portland.
Q. M-hm.
A. And I'm just -- we must have been on another call with Ted Boling. You see in the upper right-hand corner we have a TB and we have Brouha, his name is Paul Brouha.
Q. He was in the Washington office?
A. He's in the Washington office.
Q. And did he have some special office for the ONRC Action litigation at this point?
A. I think he had responsibilities for the