THE UNITED STATES COURT OF FEDERAL CLAIMS

BLUE LAKE FOREST PRODUCTS, INC., Plaintiff,
v.
THE UNITED STATES, Defendant.
No. 01-570C (Judge Williams)

ORIGINAL

TIMBER PRODUCTS COMPANY, Plaintiff,
v.
THE UNITED STATES, Defendant.
No. 01-627C (Judge Williams)

CLR TIMBER HOLDINGS, INC., Plaintiff,
v.
THE UNITED STATES, Defendant.
No. 04-501C

DEPOSITION OF

SUSAN M. ZIKE

Taken in behalf of Plaintiffs

* * *

August 21, 2007

United States Forest Service, Region 6

333 S.W. First, Suite 717

Portland, Oregon

EXHIBIT
tabbies
Plaintiff's Trial Exhibit No. 175

Shannon K. Krska, CSR

Court Reporter

400 Columbia, Suite 140
Vancouver, WA 98660
(360) 695-5554
Fax (360) 695-1737

Schmitt & Lehmann, Inc.
COURT REPORTERS
www.slreporting.com

121 SW Morrison St., Suite 850
Portland, OR 97204
(503) 223-4040
slinc@qwest.net

**Designated Excerpts from the Sue Zike Deposition Transcript in Blue Lake, August 21, 2007:**

Page/Line
143: 14 – 150: 7
152: 3 – 158: 19
200: 4 – 202: 3
219: 23 – 228: 23
230: 10 – 234: 9
234: 10 – 235: 5
244: 25 – 245: 19
262: 23 – 265: 1
265: 2 – 23
266: 12 – 268:14

A. Any input from -- about the forest service contracts?

Q. Yeah.

A. No.

Q. On this point.

A. No.

Q. Okay. And was it your intention, in writing this on this page, that this -- this point should be added to the BLM memorandum?

A. No, no. My point would have been that when we got -- my thinking is when I got the final briefing attachment done, that it should say that somewhere in the forest service part.

Q. Okay. Now, let's go to page 93353. That's a memorandum from you to the regional forester and the BLM state director; correct?

A. Correct.

Q. And what caused you to write this memorandum?

A. Well, my recollection is that we needed to -- I needed to have an executive decision on whether or not we were going to award sales after 11-23-98 which was the end of our agreed delay period, and we needed to take that question to -- to executives for the forest service and the BLM.

Q. Did someone ask you to write this memorandum?

A. Well, no one usually asks me to write a memorandum. If anything, Ted Boling would ask me what does the agency want to do, and then in order for me to figure out what the agency wants to do I have to go to my line officers, and this is how we did it.

Q. Okay. And under "Issue" you write "Is there litigation advantage to awarding sales named by plaintiffs in the ONRC Action as examples of violating the Northwest Forest Plan?" What did you mean by litigation advantage?

A. I don't know, I don't know.

Q. I mean, did you mean -- I'll just suggest to you, and you can tell me whether this is true or not. Did you mean it would be advantageous to pick particularly strong sales in order to present that legal issue to the court?

MS. LYNCH: I'll object, the question has already been asked and answered.

MR. STEVENS: Well, I'm just trying to refresh her recollection.

THE WITNESS: Let me read the situations here and see if the --

Q. (By Mr. Stevens) Sure.

A. -- gray matter will come around.

Q. Okay.

A. Well, I think in the analysis part of this memo it probably explains what we were trying to think is what would be the benefit to our litigation posture if -- in awarding them, and I recall that one of the important things was that we could in fact focus on individual sales.

Q. Okay.

A. So if we could focus the case on individual sales, then we could in fact show that the soil issue was -- was -- was winnable, we weren't harvesting and repairing reserves in the violation of the Northwest Forest Plan, we had implemented the protocols that we had available to us and were required to do. I mean, you know, so that would be one of the advantages to awarding the sales sort of in the face of this lawsuit. And then of course the -- the cons are shown here as well.

So to me the issue was - and maybe this is what you were suggesting earlier - is there an advantage to awarding the sales? And it shouldn't be as an example of violating, it should have been as examples of complying with the Northwest Forest Plan from our perspective.

Q. Okay. Under "Analysis: Pro in awarding sales," those are a list of five benefits in shorthand form?

A. Correct.

Q. One is "Complete the sale process." And that means you sell the sales for the forest service?

A. Get the sales awarded, right.

Q. Get the sales awarded.

Secondly, "Puts MMBF in purchasers' hand." That means get the timber volume to the purchasers?

A. Correct.

Q. Third, "Meets Northwest Forest Plan commitment." You means in terms of selling?

A. Volume of timber sales.

Q. Volume sold.

A. Right.

Q. Four, "Focuses the case, initially, on individual sales." I think you've just explained that.

A. Correct.

Q. And fifth, "Puts purchasers squarely at the table." What does that mean?

A. That means, in my view, that we have much better litigation arguments. We have better defense arguments when we let the purchasers be the ones who

talk about harm and what happens to their company and their employees if in fact an injunction were to lie.

Q. Okay.

A. The forest service is not able to make economic harm arguments in defense to a PI because no one quite cares if it causes economic harm to the government, but judges do seem to care that if it's economic harm to an operator and his employees and -- you know, so that -- that has helped us in the past and continues to help us today when we have full-fledged awarded purchasers at the table with us.

Q. Okay. Let's now go over to the other side --

A. M-hm.

Q. -- the con in awarding sales.

The first one is "Forces ONRC hand to file TRO slash PI."

A. M-hm.

Q. Why is that a con?

A. Why is that a con?

Q. Yes.

A. Well, because we believe that it can be -- it's harmful to the purchasers which we are concerned about, but we can't argue that. And that it's also been our traditional litigation understanding is that

really once you lose the first motion you're going to pretty much lose the case. And so when the standard for an injunction is likelihood of success on the merits, if the judge in the -- in the initial motion before it rules for plaintiffs, it sort of colors the rest of your case.

Q. I see.

A. So we don't like to have TROs or PIs in the front end of a case like this.

Q. And I guess what you just said would also cover point 2?

A. Correct.

Q. "Force government to make entire case in PI setting."

A. Right. And it's always fast. The briefing is quick. You know, sometimes we -- rather than three briefs like we would have on a summary judgment motion, we each get one and then the plaintiffs can often sneak in a second and we don't have a chance to rebut that before the hearing. And you have to -- yeah, you have to make your entire case in your only 30 pages in a brief so -- we don't like to have that happen.

Q. Okay. And No. 3, "PI," meaning preliminary injunction, "likely to be issued and applied to arrow

BLM sales"?

A. Well, that would mean more than, more than. I mean, that's a more than in algebra. Remember greater than or more than.

Q. Now you're bringing back painful memories.

A. But -- and I don't know what that means today because we certainly had more at issue, the forest service had more sales at issue in here than the BLM. But what it might mean is that if we were to lose the PI on the sales that the forest service awarded, that could easily then be applied over to the BLM sales. So we weren't just taking our stuff down, we would be taking the BLM's down, too.

Q. And then No. 4, "Government not ready to defend PI in short time frame." Why wasn't the government ready?

A. Well, you'd have to ask Ted Boling. My guess is it was December and it's a very tough time of year to get people up and going and -- and briefs written and working over the holidays and family obligations. And all that would -- would play in to that. It also means that probably me and my people did not have our administrative records ready and we like to have all of those put together so that we can make the strongest showing at a PI hearing so --

Q. Okay. And No. 5, "May create dollar liability to government if lose case." It says lose case I guess, but --

A. If -- yeah, if we were to lose the PI which we thought was likely, then we would have, most likely, contractual damages to the purchasers that we awarded them to.

Q. Okay. Let's see, turn to the next page, 93354.

A. M-hm.

Q. That's just a copy of the one we just looked at.

A. It appears to be.

Q. Somehow it just got stuck in there. And 93355 looks, again, exactly the same. 93356, this is an annotated version. Is that your handwriting?

A. It is my handwriting.

Q. Okay. And what's going on here? Why have you written on this one?

A. My style tends to be to have this briefing paper with me when we actually have the meeting with the regional forester and Elaine, and I keep my notes on the briefing paper of that meeting.

Q. Okay.

A. So when you see down below you have TB in

Q. Okay. Okay, thank you.

A. M-hm.

Q. The next document is Exhibit 65. Take a look at it. It runs from page 205 to, at least in my version, page 208. The first page is a memorandum to the ONRC Action coordinators from you and it's dated December 11, 1998.

A. Okay.

Q. Okay. And what caused you to write this memorandum?

A. This was the promised chart in an earlier exhibit that we looked at here.

Q. Okay.

A. I said I would get a chart out to the coordinators to compare the issues in their -- in the plaintiffs' administrative appeal, if there was one, with the issues in the lawsuit. So this is what I sent out to do that.

Q. Okay. And in paragraph No. 1 on this page you talk about conferring with the office of general counsel, Owen Schmidt, about the litigation risks and the strengths of the sales analysis and decision. Is that a process that actually took place? I think you've testified that it was, but --

A. Well, certainly Owen was at our side through

all these. But whether or not any individual forest or forest coordinator called Owen and they went through this together I don't know.

Q. Are you aware of any written assessment of litigation risks and strengths by Mr. Schmidt?

A. I'm not aware of any being written.

Q. Was it his practice to normally do that orally or do you know?

A. With me it was mostly oral. When I would seek counsel from Owen it was oral.

Q. And paragraph No. 2 says "Communicate to DOJ our determination that the award is worth the risk of ONRC Action using it as a basis of a TRO or preliminary injunction." And I take it that the chart that you prepared here was the means by which you could reach such a determination?

A. We certainly used these charts to -- to -- to analyze what the forest thought were projects that needed to go forward.

Q. And when you decided to go forward with the project, did you provide certain documentation of that determination to Mr. Boling?

A. You know, I -- well, I don't recall if these charts went to Ted Boling.

Q. What I'm really asking you is did something

go to Mr. Boling -- when the forest service decided to go forward and award a sale, was that decision simply made known orally to Mr. Boling or was he given something in writing to indicate that was the determination and would that writing include reasons?

A. I certainly know it was oral because I would talk with him about it. But whether or not we would purposefully follow up with an E-mail to Ted saying we're going to do this I don't recall.

Q. All right. And when you talked to Mr. -- Mr. Boling about going forward with these sales, would I be correct that you would give him the reasoning of the forest service in deciding to go forward with that particular --

A. Yes, we would.

Q. And all that would have been oral?

A. That's what I recall, that it was oral. I don't recall creating more paper at that juncture.

Q. Okay. And the reasons would be the reasons that you'd derive from meetings with Mr. Schmidt and Mr. Devlin?

A. And Peggy Kain.

Q. And Peggy Kain?

A. Yes.

Q. Okay. That was the group --

A. Right.

Q. -- consolidated --

A. Well, and Jerry Hofer because he was our contract officer in here.

Q. Okay.

A. So it was important that he take a look at if there's anything unique about that contract that we needed to consider --

Q. Okay.

A. -- or not.

Q. So the process was you would get a -- a request from the forest to award a sale, they would fill out this chart and provide you with whatever other information you asked for --

A. M-hm.

Q. -- and then this information would be provided to the group that you've just described --

A. M-hm.

Q. -- and then collectively you would discuss it --

A. M-hm.

Q. -- and then a decision to recommend award to DOJ --

A. Well, we would -- it wasn't to recommend. I think that's the wrong verb.

Q. Okay.

A. Ted Boling would ask us to give him five days notice before we award.

Q. Okay.

A. So that was what -- that's what we would do if we had decided to go -- to actually award, then we -- we were asked to give Ted five days advance notice.

Q. Okay, okay.

A. Then that hopefully would give him five days to get a brief together opposing an expected injunction motion.

Q. All right. So at this point, and we're talking about as of December 11, 1998, was it the case that Mr. Boling could say no, you can't award that sale?

A. I don't think so. I think what -- my recollection is it was past that. And the -- if you look at step 2 and what we talked about on page 0208 where we talk about what our -- what our process here is, it says that if we determine that the sale is worth the PI risk, we being the forest service, and it's highly defendable on the issues, we'll coordinate a call with the forest, OGC, the regional office, and DOJ. So it wasn't like we were asking DOJ. We were

going to inform the department of justice that we were going to do something.

Q. Okay. And what was the exhibit number of the page that you just --

A. 65.

Q. That was page 65 of that -- Exhibit 65 with that page number --

A. Correct.

Q. -- that you were referencing?

A. M-hm, sorry.

Q. Okay, that's clear. Thank you.

On page 208 of Exhibit 65 in that step 2 paragraph at the top you also say "We may need to involve the Washington office at this point." How was it determined when the Washington office needed to be involved?

A. Well, I didn't make that -- that decision whether to involve the Washington office. It would have been Peggy Kain or most likely Bob Devlin at what he -- at what point he believed that the chief's office needed to weigh in on a decision to go forward.

Q. In the last paragraph on page 208 you write "We need to be absolutely sure that we are on the cusp of awarding the sale which I think is sending the award letter to the purchaser before we tell DOJ we

are going to award." Why did you write that?

A. Because our contracting officers when they're asked -- this is just a very general statement about forest service contracting officers.

Q. Okay.

A. They are can do people. And if you ask them when are you going to award this sale, they will give you a date. And it may be three weeks from now or four weeks from now. I mean, they -- they'll project that. And they may not have all -- everything done in order to really award. And so my point here was don't be raising any red flags here that you're going to award before you're really ready to award.

And I wanted them to be on that ready to put that award letter in the mail. Don't -- we're not going to get DOJ all in a stir here when you project you're going to award the sale in three weeks or four weeks or five weeks. It needs to be when you're ready to put the stamp on the letter.

Q. Okay.

All right. Why don't we take a quick break here.

(Recess: 10:17 to 10:29 AM.)

Q. (By Mr. Stevens) All right. The next document is Exhibit 66. And it is -- I believe that

Q. So this was part of the further effort to keep the awards quiet?
A. I don't know that. I don't know that.
Q. The next document is Exhibit 83.
(Mr. Wah left the room.)
Q. (By Mr. Stevens) It's another E-mail exchange. You are identified as a sender at the top with the creation date of June 7, 1999.
A. Yes.
Q. And you sent that to the part 1 recipients, Devlin, Kain, etcetera?
A. Correct.
Q. Do you remember we had that earlier draft E-mail that talked about urging the quiet award --
A. Yes.
Q. -- and we couldn't quite I think at that point in time put a date to it, but here's the date and here's the -- I guess the actual E-mail in a more complete form. And so under part 2 that's your -- your message?
A. It is.
Q. Okay. After No. 18 in your message referring I guess to Spencer on the Wenatchee National Forest --
A. M-hm.

Q. -- you say "May not be able to be quiet with this one; local ONRC member is watching it closely." And you were saying that just to put the recipients on notice that it may be difficult to -- to do this without a lot of publicity?

A. That's right.

Q. Okay. And then below that you write "DOJ is likely to request that we wait until we have our ONRC Action hearing with Judge Dwyer, but there is no date set yet." Was that your assessment of DOJ's likely response to notice from the forest service that it planned to go ahead with all of these awards?

A. I think we had seen that concern in an earlier E-mail exchange between Bob Devlin and I, that -- that they wanted to get the summary judgment briefing done before any dogs got out in the yard.

Q. Okay.

A. And I think that's what this Exhibit 83 reflects is DOJ's concern about that.

Q. Okay. But at this time, DOJ did not have a -- a veto over whether a sale was awarded so the forest service could go ahead anyway; is that right?

MS. LYNCH: Object to the form of the question.

THE WITNESS: That's my recollection, that

we could move ahead with -- with respectful notice to our justice attorneys so no one gets caught off guard, yeah.

Q. (By Mr. Stevens) Okay. And your reference there to the lesser of two evils between Happy Thin and Lower Hayfork, what did you mean by that?

A. I don't -- I can't find it.

Q. It's right after the DOJ --

A. Okay.

Q. -- reference that I just read to you and below No. 18.

A. Okay.

Well, what I recall was that there was a lot of local -- and these are region 5 sales so it was only through my information from Brian Stone and Ed Matthews, that there was a lot of outcry against those two particular sales, and so the question was if there's one to award, is there one that is going to be less controversial than the other.

Q. I see.

A. That being the lesser of two evils.

Q. I see, okay.

There's a reference right under part 2 to the conference call tomorrow.

A. M-hm.

counsel is understood and that these had happened, so I would -- that would lead me to conclude that there had been an agreement between the two parties that the award of these sales would not prompt an injunction.

Q. Okay. And then you say later on in the E-mail, you note that the promise by the government to give ten days notice to the ONRC Action plaintiffs of the award of sales, that promise expires on June 16th, and then you say I expect a hearing on the merits of the case on the week of June 21st, and then you say "I'm working with the forest and DOJ to assess the best strategic time to move ahead with the award of these sales." Meaning what?

A. Well, these sales would be the 30 that we still had -- 30 plus I say that we are holding up on.

Q. Okay.

A. And because we know that it takes some time between a hearing and a ruling, then it would be prudent for the forest service to confer with their trial attorney as to whether or not awarding any sales in that meantime would -- would affect our winning chances.

Q. Okay. And so did that discussion take place, to your knowledge?

A. Well, I think -- I thought we had already

looked at an exhibit that followed June 15th in that letter that I drafted and signed --

Q. Okay.

A. -- to Ted --

Q. Okay.

A. -- Boling.

Q. Pardon me, yes.

A. Okay.

Q. So was that the instance where Mr. Boling gave notice to Mr. Axline that certain sales were going to be awarded and you sent --

A. Well, I don't know that he gave him notice, but he was intending to give him notice in about a week.

Q. And you sent him back an E-mail and kind of told him what for?

A. Well, it was a -- it was a fax cover that said I'm -- I'm surprised to hear you're going to do this, yes.

Q. Right. Meaning don't do it if you --

A. Don't do it, it was implied. But we were surprised by that.

Q. Okay, all right. The next document is Exhibit 90.

A. Okay.

Q. The first two pages are two pages of E-mail, and although it says on the second page "CC: Susan Zike," it looks to me, if I look on the first page of this exhibit, that you're just CCing yourself, it is actually from you to a group of people. Is that correct?

A. It is.

Q. Okay. And with my magnifying glass under the most glaring light I can find I perceived a date of July 6th, 1999, in the upper right-hand corner.

A. July 6, '99, okay.

Q. And I will stand corrected on that if I'm wrong, but I -- that's what I think.

And so this -- this E-mail goes out to, among other people, Dick Fitzgerald in the Washington office?

A. Yes.

Q. And Ron Sallee in the Washington office?

A. Yes.

Q. And Kathryn Toffenetti who was with OGC in Washington?

A. Correct.

Q. Bob Devlin and a host of others down here.

Now, you mentioned that you've attached a briefing paper and a chart. And under part 2, which

is your E-mail text, the line begins "R5 slash R6" you say "are ready to award seven sales and approve plan of operations on one. The draft Bartuska letter would appear to limit our ability to move forward with these sales until the court rules. However, given the history (shown in the attached chart) of our willingness to delay (nearly a year) and the reticence of ONRC Action to get serious about naming sales in their lawsuit, we want to consider moving ahead with this meaning this sale and future sales, notwithstanding the draft Bartuska letter." And this was on July 6th so there must have been some other draft version of that letter out prior to July 8th which was the date we had before.

A. Was that the date of the signed one?

Q. That was the date of the one in the exhibit that I showed you on the 8th and then we had Mr. Furnish -- or rather had Miss Bartuska's follow-up on the 10th where she said I'm rescinding/withdrawing the letter.

A. Okay.

Q. And then Furnish issues a document much later on --

A. Correct.

Q. -- much later on.

A. I believe that helps.

Q. So can you help me out with what this draft March Bartuska letter is that I keep reading about and I can't find copies of?

A. I can't. I know, yeah. We must have got a draft of it is what I would take from this because this was just a few days before the signed one came out, if your -- if your memory is accurate.

Q. I believe I'm right about that date, the July 8th date.

Okay. You said "The draft Bartuska letter would appear to limit our ability to move forward."

A. Yeah.

Q. Can you throw any more light on that?

A. Well --

Q. Why would this draft have had that affect?

A. It's not unusual before a policy letter comes out, usually from the chief -- and that's one thing that made this particular letter from Bartuska odd is that we typically get direction from the line officer. We don't -- which is the chief or a deputy chief or -- yeah, or a deputy chief. We don't often get direction from a director of which Ann was the director of timber management so -- so -- but notwithstanding that, it's not unusual that if a new

policy letter is going to come out it is sometimes circulated in draft form to get feedback from the different regions and regional foresters as to how that letter sets with you.

Q. And so that's probably what happened here?

A. That's probably what happened here. And to the extent we would have assumed that it was going to be final in its -- in the form that it came out, and I honest -- I cannot honestly remember working on the draft or looking at the draft or interpreting, but obviously I did --

Q. Okay.

A. -- that it would have not allowed us to award a timber sale during a lawsuit.

Q. Okay.

A. That would be how I'd read it.

Q. All right, thank you very much.

If you look at page 530, which I believe is the next page of this exhibit, and I -- it goes on over, it looks like it carries all the way to the end 539. That's a memorandum that you prepared for Bob Devlin and Kathryn Toffenetti?

A. Yes.

Q. And what was the purpose of this memorandum?

A. Well, according to the subject line, it says

we need to talk about whether or not we will join BLM in awarding timber sales during this lawsuit.

Q. And how was it learned by you that BLM intended to award timber sales?

A. Well, Alan Wood and I managed this ONRC Action case together, and he was the BLM contact for ONRC Action.

Q. I see.

A. So we were very close at hand.

Q. And I take it he told you that BLM was not going to wait any longer, they were going to award sales?

A. I got that understanding, either from him or -- we also had a lot of joint meetings with Elaine Zielinski and Bob Williams and -- so I can't remember particularly where I learned that.

Q. But in any case, here on July 7th, 1999, you were briefing Mr. Devlin and whoever the acting deputy regional forester was, Miss Graybeal perhaps?

A. That was Bob. That's his title.

Q. Oh, excuse me.

A. Yes.

Q. Excuse me.

A. Yep.

Q. That's right.

And Miss Toffenetti. So Mr. Devlin and Miss Toffenetti, you were briefing them on the pertinent facts to making a decision as to whether the forest service would go ahead and award sales?

A. Correct.

Q. And under number -- on page 530, it would B6 at the very bottom -- let's make it B5, you refer to "DOJ and ONRC action negotiated the award of ten projects from the problem list," that included among the ten Jack Heli in this lawsuit and, let's see, I guess that's all I see in this lawsuit in this list. But I'm reading that correctly, am I?

A. You are.

Q. Okay. This is something of a chronology of events, isn't it?

A. Yes, it is.

Q. It's very handy, thank you.

Okay. Now, looking on the next page under Roman numeral II "Current situation" it says "Oral argument held in Seattle, July 1," 1999. So there had already been an oral argument on the merits?

A. It was a summary judgment.

Q. Summary judgment in ONRC Action?

A. Correct.

Q. Okay. "July 6: DOJ asks forest service/BLM

what it is willing to do about the TRO threat." Can you give me some more detail on that? What -- what was DOJ asking there?

A. Well, let me read this a minute.

Q. I think the next sentence, in part, answers that, but I'm not sure.

A. Your question was what was DOJ asking of us?

Q. Yeah, right.

A. DOJ would have been asking the forest service and BLM what would we do if ONRC keeps threatening temporary restraining orders on these temporary sales.

Q. Okay.

A. And what item 3 tells me is that we said we would do the minimum, and I'm not sure what that would be, "But since briefing and hearing completed, continued delay" of award, right, that's implied, "delay of award seems unreasonable."

Q. Okay.

A. And that -- and I attributed that to Devlin.

Q. Okay. And you sent this to Mr. Devlin --

A. I did.

Q. -- this memo?

A. I did.

Q. And you have the BLM's position?

A. M-hm.

Q. Then point II-E, the forest service position, and you say "Can we join in BLM position? R5 slash R6 equals preferably yes, but the draft Bartuska letter re timber sale activity in litigation would prevent the award of sales." You've already explained what you know about the Bartuska letter --

A. Right.

Q. -- so I understand that.

A. Okay.

Q. Okay. And then in -- continuing on down under E, USFS position, you mention that there are six sales on the Umpqua ready to award. Jigsaw, Prairie Thin, Whitebird, and Pigout, which are involved in this lawsuit, were on that list.

MS. LYNCH: Objection. I'd just like to clarify, those aren't involved in this lawsuit.

MR. STEVENS: No, involved in a lawsuit, different lawsuit of the same nature. That's a good point, thank you.

Q. (By Mr. Stevens) Okay. I'm just looking to make sure I understand what you've said here.

A. That's fine.

Q. No. 2, "R5 has two sales ready to act upon." Happy Thin, okay, and that is in this lawsuit. And

A. -- you know, peaceful consideration of argument so we -- you know, we knew -- we didn't think plaintiffs would hesitate to run in the middle of his deliberation time with a PI. So I don't know what we did. I don't recall what we did.

Q. All right. This next exhibit is numbered 91.

Let's go off the record for a minute.

(Discussion off the record.)

Q. (By Mr. Stevens) All right. Exhibit 91 is another one of those two-page versions of your E-mails. This one my magnifying glass tells me is dated July 9, 1999, and, as indicated on the first page, it's from you and it's to various folks listed below in that -- below from Susan Zike. And then turning to page 2 where you can read the text a little more clearly, okay, and here you -- you say, under part 2, "I will be faxing to R5 RO and R6 forests ONRC's 7 slash 6 slash 99, open quotes, at risk, close quotes, list of 76 BLM slash FS sales which requests ten day notice before approving a plan of operations and DOJ's 7-8-99 reply, which does not," not is in capitalized letters, "agree to a ten day notice regime, period."

All right. What can you tell me about the

decision at this point by DOJ to refuse to agree to hold off on the award of timber sales, excuse me, and not give ten-day notice?

A. Well, I think department of justice was respecting the BLM and forest service's position that we had held off long enough. I would not call it a DOJ decision. I think he was representing his client's position.

Q. Okay. Was it Mr. Boling's position that the government should continue to hold off?

A. I don't know what -- I don't know what Ted felt about that. We were -- we were pleased that he was willing to represent what we wanted to do.

Q. That is always good between a client and a lawyer.

A. It is good, it is good. We were pleased.

Q. Okay. Moving down in the E-mail, it says "What the letter --" I suppose meaning DOJ letter, "What the letter doesn't say is that the UMP," meaning Umpqua, "can proceed with awarding Jigsaw, Prairie Thin, Whitebird, and Pigout, but if plans of operations are submitted that indicate operations in July, RO slash DOJ slash OGC need to know ASAP, exclamation point. The same is true for Jack Heli." So at this point, was the forest service committed to

going forward with the award of those sales and/or operations of those sales?

A. That's hard to answer. Of the sales listed above, for instance, Beegum Rock was already awarded, so we were -- the Shasta-Trinity was waiting for the plan of operations to operate it. It appeared that T-Line Salvage and Chapter Four Salvage would be awarded on the 19th. Now, whether or not they really were I don't know today. I mean, we'd have to -- you know, we'd have to look back at those.

Q. Okay. I'm really just concerned about Jigsaw, Prairie Thin, Whitebird, and Pigout.

A. Okay.

Q. Does this mean that the forest service had made the decision to go ahead and award those sales at this point and not inform the plaintiffs that they were planning to do so?

A. I don't know if that's what that means.

Q. Okay. Further down in this E-mail you say "On July 8th, 1999, I spoke with Dick Fitzgerald, Rod Sallee and Kathryn Toffenetti, along with Owen Schmidt and Ted Boling about the Washington office concurrence with R5 and R6 position on awarding the UMP," the Umpqua, "sales and approving Beegum Rock plan of operations. After reviewing the briefing paper and

sale info, Dick F.," meaning --

A. Correct.

Q. -- Dick Fitzgerald, "said he agreed with the regional position and he concurred with us moving forward." Was that the final okay from the Washington office that the region 6 could go ahead and award Jigsaw, Prairie Thin, Whitebird, and Pigout?

A. I would take it that way, yes.

While -- while Dick Fitzgerald is not a line officer, you know, he was fairly well placed in the timber management department in the chief's office and he's our contracting officer expert fellow, so I would -- I would say that the forest service felt that they had the Washington office concurrence to award the sales.

Q. And then after what's next in the next part of your message you indicate that DOJ believes it is likely that ONRC will seek a TRO or a PI on these July sales.

A. I'm sure that he did.

Q. And that's what you were told by Boling?

A. Correct.

Q. But the forest service went ahead anyway?

A. I don't know at what point we awarded those sales.

Q. Okay.

A. That's what -- that's what I can't tell you. Even though we felt that we had the Washington office behind us, we would have to look at those contracts for these name sales to see when they were awarded in light of this E-mail which we thought was, what, July 11, July --

Q. July 9th.

A. July 9th, okay. So --

Q. Okay. The next exhibit will be 91A.

All right. Now, this is dated July 20th and it's your E-mail and it goes to your distribution list.

A. Correct.

Q. And I note here that as of this date, July 20th, ONRC Action has requested an injunction against certain sales that were at issue in the lawsuit. And you write that you cannot tell how many sales in R5 dash R6 might be included in such an injunction. You offer a guess that it's well over 200. And in the second to last paragraph you say "DOJ will be constructing our defense to the injunction over the next few days. In the meantime, USFS and BLM have proceeded with awarding certain timber sales for which we have no reason to continue to delay." And I take

it from that that this is a reaffirmation of the forest service's position that it will not delay the award of timber sales pending a final decision on the cross motions for summary judgment from Judge Dwyer?

A. That's true.

Q. The next exhibit is 92.

All right. This is a fax cover sheet from Kathryn Toffenetti to you and to John Watts at DOJ. And the second page is an E-mail from Toffenetti to you and Mr. Watts, and it relates to various contract clauses which it says "We (OGC) were talking about yesterday," and then attached to that at least it's one contract clause C6.01 here. What gave rise to Miss Toffenetti's sending you and Mr. Watts this E-mail with this attachment? Or I guess it's the E-mail with the following fax and its attachment.

A. Well, you know, it's August 4th and --

Q. Right.

A. -- I'm thinking Judge Dwyer had ruled on our summary judgment motions --

Q. Correct.

A. -- by that time.

Q. Correct.

A. Is that correct, in your memory?

Q. I believe that's correct.

A. Well, the subject of the memo says it's the volume of 17 sales before the court on 8-25-99, so I'm -- I'm assuming that these are the sales that the plaintiffs named that they wanted enjoined and so --

Q. You got the volumes from the forest service records?

A. I did -- well, from forest service people. I didn't -- I didn't have the records.

Q. Okay.

A. But I would have asked my case coordinators for that information.

Q. Okay. And conveyed that to Mr. Boling?

A. Correct.

Q. All right.

Okay. I'm going to -- let me see if we have this. I have a document that I want to insert in the process here which I'm going to call Exhibit 98C. If we take just a very short break and make a photocopy so we all know we have exactly the same document

MS. LYNCH: Sure.

MR. STEVENS: Could you do that for me.

(Recess: 4:11 to 4:19 PM.)

Q. (By Mr. Stevens) Let's go back on the record now.

All right, okay. Miss Zike, you have in

front of you Exhibit 98C.

A. Yes.

Q. It looks like a document prepared by you?

A. Yes.

Q. For Miss Graybeal?

A. Yes.

Q. And why did you prepare this document?

A. We had had an adverse ruling from Judge Dwyer on the -- another adverse ruling on our ONRC Action case on August 26th and I was briefing her on the -- on the details of that ruling.

Q. Okay. And so the information contained in this -- this briefing paper was information which you obtained from the forest service records or personnel who had access to those records?

A. Yes.

Q. Okay. You have no reason for thinking it's not accurate?

A. No, not when my name's on it.

Q. Good. That's always good.

A. Yeah.

Q. Let's go next to Exhibit 101.

Okay. Just for the record, this I understand to be the memorandum issued by James Furnish, deputy chief of the National Forest System,

subcommittee.

A. Whatever.

Q. Yeah.

A. Okay, okay.

Q. But -- thank you for correcting me. It's late in the day and now you're exactly right.

A. And what are we doing here for --

Q. Well, I'm just trying to see if this further information -- I've got three or four E-mails that all went to you on this concept of some kind of a compensation to purchasers, and I'm just trying to find out who knows what about it. Do you -- does this spark any further recollection of any consideration?

A. No, it doesn't. You know -- no, it does not. And clearly I was on the call 'cause these are my notes, my handwritten notes. But it was elevated above me. When it's Devlin and Bartuska and Brouha and Birmingham, those are folks I don't -- I mean, we're not staff peers.

Q. M-hm, okay.

All right. Well, just doing what I can here.

The next document is Exhibit 115, unless you have more to add on this subject.

A. I don't, I don't.

Q. Okay.
A. It just isn't ringing a bell.
Q. I'd just like for you to identify this document. It starts with a fax cover sheet and then there's data attached to the cover sheet. And it says it's from you to Doug McDonald who works for a company called Timber Data.
A. It does. And I think this is a report printed off one of our timber sale data bases. Is it? Let me look.
Q. You were referring to the tables that are attached to the --
A. Well, yeah.
Q. -- cover sheet?
A. But I don't -- yeah, but I don't remember me or Stacey preparing these, but it's certainly the information that we had been keeping. H-m-m.
Q. So just going across to make sure I can read this, it's got the region, the national forest, the sale name or the EA name?
A. Correct.
Q. Whether it was enjoined, meaning by Dwyer?
A. By Judge Dwyer, m-hm.
Q. Whether the plaintiffs appealed it administratively?

A. Correct.

Q. And this is -- I guess that's at any point.
And then the next column is red tree vole point, appealed on that point?

A. Correct. It'd be the red tree vole memo.

Q. Right.
Next is the implementation memo?

A. Memo.

Q. And then the NEPA decision date?

A. Correct.

Q. Okay. And this is the -- the original volume which would be reflected in the A section of the contract?

A. I don't know about A section on the contract so --

Q. Original meaning the volume when the sale was awarded?

A. Correct.

Q. Okay. And since that came from you I assume this is all from forest service records?

A. Yes, it would be, m-hm.

Q. Do you remember why you were sending it to --

A. I don't. It's -- it's just not -- you know, it's not a format that Stacey or I had used. But I

think it's forest service prepared, though.

Q. Do you remember, I asked you a series of questions about Lois Shiffer and Peter Coppelman saying that the interpretation NEPA decision equals implementation was nonsense?

A. I do.

Q. Did you ever tell Bob Devlin about that?

A. Oh, I think we had -- I think the exhibits we looked at were briefing pieces. I think I wrote that in a briefing memo which would have -- which would have gone to the executives.

Q. So you --

A. I would have to look that up.

Q. So Devlin would have known about that; is that right?

A. To the best of my recollection, he would have known that we had -- we had some tension between our position and where the DOJ folks were.

Q. Okay. Based on your working relationship with him as opposed to any specific memory?

A. Right, I don't have any -- I don't -- I don't recall that he and I had a facial -- you know, a one to one or said -- no, I don't recall that.

Q. Okay. Miss Zike, that's all I have for you today. Thank you.

A. Okay.

Q. In fact, that's all I have for you for this deposition.

A. Oh, good.

Q. So you won't be needed tomorrow, for me anyway.

A. Thank you.

MS. LYNCH: Can we take a five-minute break?

MR. STEVENS: Of course you can.

(Recess: 4:59 to 5:12 PM.)

EXAMINATION

BY MS. LYNCH:

Q. Okay. We just have one clarifying question. Exhibit 117, now, Miss Zike, could you just clarify where your E-mail begins and where Mr. Devlin's E-mail ends --

A. On page --

Q. -- for the record?

A. Yeah. On Exhibit 117 it says TAB 8 0184 I believe my E-mail reply to Mr. Devlin starts.

MR. STEVENS: Excuse me, could you point that?

THE WITNESS: 117, right. My -- right.

MR. STEVENS: Oh, I see, yes. You were giving the page number.

THE WITNESS: The TAB number.

MR. STEVENS: 8 0184.

THE WITNESS: Yes.

MR. STEVENS: Please go ahead.

THE WITNESS: You on that page?

Okay. I believe my reply to Bob Devlin starts with the words "Talk to me," right.

MR. STEVENS: All right.

THE WITNESS: I think.

No, I think it starts at "Looked." "Looked like you really wanted out."

MR. STEVENS: All right.

THE WITNESS: I think it's here.

MS. LYNCH: That was the only clarification we had.

FURTHER EXAMINATION

BY MR. STEVENS:

Q. All right. Just to follow up slightly. So when it says, further down there, "You're gone! Rats . . . Here the's scoop --" right?

A. That's Sue Zike talking.

Q. That's you?

A. M-hm.

Q. Okay. So is that you continuing also on the next page?

A. Yes.

Q. All the way to the end?

A. Yes.

Q. And Mr. Devlin then begins with "Well, first of all" on page 0184?

A. Yes.

Q. And "Phone next week --" no, no, no, sorry. "Come get me out," that would be the end of his?

A. Yes. And he wanted out of a meeting and --

Q. And it was too late?

A. It was too late.

Q. All right. Thank you very much. No more questions. Thank you, Sue.

A. M-hm.

(The deposition concluded at 5:15 PM.)