UNITED STATES COURT OF FEDERAL CLAIMS

SCOTT TIMBER CO., Plaintiff,

vs. No. 05-708C

THE UNITED STATES, Defendant.

DEPOSITION OF
SUE ZIKE
Taken in behalf of Plaintiff
* * *
January 4, 2007
333 S.W. First Avenue
Portland, Oregon

Teresa L. Dunn, CSR, RPR
Court Reporter



APPEARANCES:

For the Plaintiff: MR. GARY G. STEVENS
Attorney at Law
Suite M-110
1801 K Street
Washington, DC 20006

For the Defendant: MS. JOAN M. STENTIFORD
Attorney at Law
Room 12038
1100 K Street
Washington, DC 90005

Also Present: (None)

INDEX


| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Stevens | 4 - 58 |
| Ms. Stentiford | 59 - 63 |




EXHIBITS

(Exhibits marked prior to deposition.)

No. 35 E-Mail dated 9-4-98
No. 35A Fax dated 8-8-98
No. 35B Fax dated 8-27-98
No. 37C Letter dated 10-26-98
No. 38 Handwritten Note dated 11-30-98
No. 40 Memorandum dated 2-22-99
No. 41A E-Mail from Sue Zike
No. 41B Letter dated 4-12-99
No. 41D Letter dated 4-23-99
No. 43 Handwritten Note dated 7-2-99
No. 44 Letter dated 7-6-99
No. 45 Timber Sales List
No. 46 Handwritten Note dated 7-8-99
No. 51 Memorandum dated 10-5-99



PORTLAND, OREGON; THURSDAY, JANUARY 4, 2007
3:50 p.m.
* * *
SUE ZIKE
called as a witness in behalf of the Plaintiff,
having first been sworn by the Reporter,
testifies as follows:
EXAMINATION

BY MR. STEVENS:
Q. Ms. Zike, have you ever been deposed before?
**A. Yes.**
Q. Could you tell me when and where?
**A. I was deposed in Portland in 1990.**
Q. In connection with what?
**A. It was a private land developer issue.**
Q. Was there a court action? I assume there was?
**A. There was.**
Q. What was it?
**A. It was an issue about the division of subdivision lots between the land developer and the developer.**
Q. Did you win?
**A. Well, I wasn't on either side. I had just been an employee of one company and they went into a fight and they needed my testimony.**

Q. Okay. In that last paragraph the first part reads, Should you proceed with the auction of these sales you should notify all purchasers prior to the opening of the bids that the plaintiffs in this lawsuit have identified the sale and have contended that the Forest Service has violated the Northwest Forest Plan in preparing the sale. You should also notify the bidders that you will be including language in the contract limiting the government's liability in case of cancellation to the holding costs and that if this is not acceptable to the bidders they should withdraw their bid at that time.

Do you know if that warning was conveyed to the purchasers, rather the high bidders on all of the sales?

**A. Yeah, I would have no way of knowing that.**

Q. Do you know if that warning was supposed to be in writing or oral?

**A. What I recall is that we had, meaning Jerry Hofer and Bob Devlin and I and with probably general counsel's help had determined that if it had not been in the advertisement for the sale and, of course, it would not have, but for the sales that we had bid openings that we would make an oral announcement.**

**When we would have time to get the warning put**



**in the advertisement that this sale is the subject matter of litigation, then we would put it in the advertisement.**

Q. Was it put in the instructions to bidders?

**A. I have no idea.**

Q. That wasn't the direction?

**A. You know, all of the terms of contract administration isn't my deal, but --**

Q. Okay. On page two of this memo at the top the paragraph there begins, As indicated in the new case memo from Katherine Toffenetti, Owen Schmidt is the lead attorney for OGC. Owen has been working with Sue Zike with regard to the sales in Region 6.

What were you doing with Owen and the sales in Region 6?

**A. We were determining the status of the sales that plaintiffs sent to us in these series of lists.**

Q. And the status as to what?

**A. Well, there was a number of pieces of information. One was whether or not the NEPA was done, what the date of the NEPA was, had it had been appealed, who had appealed, what were the issues raised in the appeal, and then if it had been awarded and when it had been awarded and to whom it had been awarded and if it was awarded, what was the status of the sale in**



**terms of operations, had it had been operating or not yet happening.**

Q. And what was done with this information?

**A. It provided information to our managers, both Bob Devlin and on up to the Regional Forester to help us determine our settlement position.**

Q. Okay. If you turn further to the page that starts with 00033 in the lower right-hand corner about three pages in it is on Western Environmental Law Center letterhead?

**A. Yes.**

Q. Now, Western Environmental Law Center, that was Mr. Axline and the attorneys representing the ONRC Action plaintiffs?

**A. Correct.**

Q. Now, what's your understanding of why the ONRC Action plaintiffs identified this list of sales in this letter as sales that have problems with the Northwest Forest Plan compliance?

**A. I can't tell you. This was -- this is dated July 28th, 1998, which means we hadn't even defended the case yet because it was filed July 7th or something, 1998.**

**So plaintiffs are just asserting that these timber sales are not in compliance with the plan.**



Q. Okay. On page 00036, a fax message from Ted Boling to Mike Gippert, do you see that?

**A. No, no, oh, six, I'm sorry, I'm looking at five.**

Q. 00036.

**A. From Ted to -- correct.**

Q. Mr. Boling was the attorney representing the government in the ONRC Action case, right?

**A. Yes.**

Q. And he is asking for certain information ASAP. Do you know why he needed it no later than close of business Thursday?

**A. No, I don't, but that's often the way the requests for information came. No, I don't.**

Q. Okay. Let's look at 35B. Do you see the handwriting at the bottom of this page?

**A. I do.**

Q. Is it yours?

**A. No.**

Q. Can you read it?

**A. No, I can't other than, Have you something anything on something, oh, Parkaboo, that was a timber sale, Parkaboo.**

Q. Parkaboo?

**A. Parkaboo. I think it is, Have you sent us**

**anything on Parkaboo. That would be my guess. That's Ted's writing so he would have scratched that on there before he faxed it.**

Q. Next page is another letter from the ONRC Action plaintiffs to the government's attorneys.

**A. Yes.**

Q. And two pages after that there's a list of timber sales entitled Category 1 Unsold Problem Sales With Calendar Year 1998 Auction Dates.

Is that something to your knowledge the Forest Service produced or is that something from the plaintiffs, the ONRC Action?

**A. I don't know. I don't recall. I don't think I have seen it. It certainly doesn't ring a bell and it doesn't look familiar.**

Q. Would you understand by the adjective "problem" as in problem sales that these were sales that the ONRC Action plaintiffs were also threatening to challenge?

**A. I would and I would also assume Category 1 is from page one of their memo.**

Q. Category 2, that would be the same and that would refer to the second category mentioned later on?

**A. Sales with proposed action dates, auction dates, yes, calendar year 1998, right.**



Q. And we can make the same inference with respect to Category 3?

**A. Yes. The "problem" word is plaintiff's characterization.**

Q. Yes, I understand.

**A. Okay.**

Q. What about the last page PT 0049, does that look familiar to you?

**A. It does not.**

Q. This says Category 4 up in the left-hand corner and it is kind of hard to read?

**A. It does.**

Q. Let's see --

**A. That aligns with Category 4 on page one, PT 0040, sales on Gifford Pinchot.**

Q. So it would be your testimony that you don't believe these are lists that were produced by the Forest Service?

**A. That would be my testimony.**

Q. Were these lists ever disclosed to the high bidders on these sales?

**A. I would have no knowledge of that.**

Q. You never disclosed it?

**A. To bidders?**

Q. This information.



**A. I would have no way to do that.**

Q. Was it your understanding that these lists were to be kept confidential and not disclosed --

**A. That was my understanding, yes.**

Q. -- and not disclosed to anyone outside of the agency?

**A. Other than to DOJ, correct.**

Q. As far as you know that's what happened?

**A. As far as I know that's correct.**

Q. Take a look at 37C, Exhibit 37C. If you look at the very top of this letter which has apparently been faxed there are some fax numbers in area code 503.

Are any of those Forest Service numbers?

**A. Well, the 808 number is for our building.**

Q. That's the Region 6 office?

**A. Correct. The 326 number is the Federal building which is Office of General Counsel.**

Q. OGC?

**A. Right.**

Q. Okay. Was a copy of this letter provided to you?

**A. I would have to assume that it was. It doesn't look familiar particularly.**

Q. If you turn to page five of this letter, the five is on the bottom, it says page nine in the upper



right-hand corner.

**A. I'm with you.**

Q. The letter reads, Also we are prepared to not award the Forest Service timber sales listed below until November 23, 1998. And there's a list that follows.

Did you help put that list together?

**A. Did I help put the list together, well, yes, I would have.**

Q. How did you go about doing that?

**A. As we looked in the earlier fax, I don't remember the exhibit number, but it was through those faxes out to my forests that plaintiff's list that we developed charts of the status of the sales that plaintiffs were interested in.**

**So that compendium of data then would tell us status of those sales and choices would then be made on whether to advertise an award or hold the award.**

Q. So you have three columns here, Forest Service, Sale, and that's the name of the sale?

**A. Correct.**

Q. The forest is the National Forest it is on and Status is either awarded or no award, although, all of these but it looks like two, all of them are no award.

What does it mean to say, Award by agreement

with purchaser in settlement of NFRC vs. Glickman?
A. **That was the National Forest Research Council's lawsuit against USDA on the Forest Service under the Recisions Act that we were not prosecuting our duties under the Recisions Act which was primarily to provide replacement volume for the sales that had nesting birds, you know, the Rescissions Act has lots of funky details like that.**
**So we did have a court overseeing mediation with Judge Hogan on NFRC vs. Glickman and as part of that we agreed and then the court ordered us to award certain sales.**
Q. Okay. Take a look at what's been previously marked plaintiff's Exhibit 38. Have you seen that before?
A. **No.**
Q. Do you know what Allen Apliss (phonetic) is?
A. **I do know who Ellen Apliss was, yes.**
Q. Is she no longer with us?
A. **She's not in Department of Justice anymore I don't believe.**
Q. Sorry. And have you not seen this cover sheet or the pages attached to it previously?
A. **No, I haven't.**
Q. Okay. Do you see on the first page of this



document where it says, As I promised here is the list of Forest Service and Bureau of Land Management timber sales rushed through to avoid the Survey and Manage requirements?
Do you see that?
A. **I do.**
Q. Do you have any knowledge of environmental groups providing such a list to the government other than in the ONRC Action litigation?
A. **I do not.**
Q. Did you hear from anyone in the course of your duties that an allegation had been made that the Forest Service and the Bureau of Land Management had rushed through the decision documents on sales in order to avoid Survey and Manage requirements?
A. **We had heard that from plaintiffs in the ONRC Action case as well as they did public press releases and those sorts of things.**
**It was fairly general knowledge to those of us who follow such things that plaintiffs believed we had rushed through to make decisions to avoid the oncoming Survey and Manage requirement.**
Q. Did the Forest Service do that?
A. **No.**
Q. What's your basis for that answer?



A. **My answer is as far as I know we observed every law that we needed to do in terms of NEPA and NFMA and Endangered Species Act for all of the sales that we did NEPA decisions for.**
**I don't think anything was rushed necessarily.**
Q. Did you ever hear there had been instructions or directions to forests to hurry up and finish Decision Notices in order to beat the October 1, 1996, deadline?
A. **Yes, I had heard that.**
Q. From whom?
A. **I'm aware there's an e-mail from Bob Devlin out to the forests where he urges them to appreciate that the October 1 deadline was coming.**
Q. And your understanding is that he urged them to finish up the Decision Notices rather than wait until after the deadline?
A. **Well, we knew as did -- Bob knew and our forests knew that as of October 1 the survey obligations were greatly increased.**
**So I think his e-mail stands for itself. I mean, he said what he said and if you need to interpret that as plaintiffs did that that was a rush, to rush, you know, the public is entitled to so many days of review on NEPA documents anyway and that was short-cut**



**so rush what, you know. I'm not sure.**
**Legally we couldn't rush anything. You had to meet your statutory time frame.**
Q. Did you discuss this e-mail you are talking about with Mr. Devlin?
A. **No.**
Q. Did you discuss the Devlin e-mail with anyone else?
A. **At the time?**
Q. At any time.
A. **Only through the discovery of Blue Lake case, your Blue Lake case. When we ran across it during that discovery I discussed it then.**
Q. With whom?
A. **I would have discussed it with, who was our counsel, Jack Groat I believe.**
Q. So you didn't talk to anyone else about it like Jerry Jensen, he was in Region 5, but anyone else from Region 6 did you talk to?
A. **I didn't know Devlin sent it out. I didn't know. I wouldn't have any reason to know that. It wasn't a litigation matter and Bob would do his director job, you know, with his timber people and I would have no reason to know what he was directing them to do or not do until it became a matter of litigation**

**and then when it did in your Blue Lake case is when I saw it.**
Q. When you saw this e-mail you were surprised?
**A. Was I surprised?**
Q. Yes.
**A. I don't know I would use the word surprised. I found it interesting he would send that out.**
Q. Why was it of interest?
**A. Well, because, and I'm thinking and trying to get the dates right, because I wouldn't have known about it until when was Blue Lake? What was the year of your Blue Lake case? It was certainly not '98 or '99. It had been in the 2000s.**
Q. I presume the e-mail you are referring to was written sometime prior to October 1, 1996, or '98, one of those two?
**A. It must have been, but I didn't see it and I wasn't aware of it until we did the discovery in Blue Lake.**
Q. After you became aware of it did you discuss it with anyone other than Mr. Groat?
**A. No.**
Q. No discussion at all?
**A. No, it is like water over the dam. No, I didn't discuss it with anybody and it wouldn't be my**



**position to do that anymore.**
Q. I meant informally as well as formally. You said it was of interest so I thought perhaps you talked to somebody else about it, one of your colleagues, for example?
**A. Not other than Jack, no.**
Q. Take a look at plaintiff's Exhibit 40. Can you identify the document?
**A. It is a letter from Diana Bus, who was the contracting officer on the Willamette National Forest, to me.**
Q. You say the contracting officer. There was just one for the whole forest?
**A. I believe that's right.**
Q. She writes to you and says, Here is some information on sales we would like to move forward with award on?
**A. Correct.**
Q. Do you know why they wanted to move forward on award?
**A. Well, because that's what the Forest Service does, when they get sales prepared they advertise them and try to sell them and then award them.**
**And we had been -- this was February of 1999 so we had been held up since the filing of the ONRC**



**lawsuit. That was July of '98 so we had been through all of the machinations of do we award, don't we award, do we delay, what's the deal.**
**So by February we solicited forests as she mentions here about my call -- about the call we had in the lawsuit that we believed there was an opening to award some sales. And if you check the docket for the ONRC Action case you will find that Judge Dwyer actually dismissed the case in the end of 1998.**
**And then the plaintiffs erroneously did a second amended complaint and then a third amended complaint and the case started all over. And I recall that was sometime in February or March. And they asked -- they asked leave to file their amended complaint, but I think we believe there was an opening of time for us to get sales awarded there in January and February.**
Q. Why do you characterize that as an opening of time?
**A. Because the lawsuit was temporarily gone.**
Q. So the lawsuit was not formally in existence, but they had been given leave to amend?
**A. They had not been given leave. They requested leave.**
Q. There had been no action taken on that. Judge



Dwyer didn't deny them leave?
**A. Ultimately, no.**
Q. Was there initial denial?
**A. I don't recall.**
Q. So who made the decision that this was an opening within which sales could be awarded?
**A. I don't know who made that decision.**
Q. Someone above your level?
**A. Yes. I make no decisions. I'm a staff person. I recommend, but I don't make decision.**
Q. Would such a decision have required Mr. Devlin's concurrence?
**A. It would have required Bob's concurrence and the Regional Forester. We didn't do much in this case without Bob Williams in the know.**
Q. Was there any discussion at the time of the risk that the government might be assuming in awarding these sales?
**A. I don't know if there was. Not with me.**
Q. No e-mails or other conversations with you about that?
**A. See, that wouldn't fall in my world. That would be a Jerry Hofer, contracting officer for the region, forest contracting officers and Bob's discussion of risk about that.**

**That might be what we're talking about.**
Q. Okay. Let's turn over to the next page that's attached. We're looking at 00104 and this is 00105 and they're stapled together and I assume that's the way we got them for some reason or another. I'm not representing they are otherwise related.
This is an electronic message that you sent?
**A. It is.**
Q. Is that your handwriting on the document?
**A. No.**
Q. Do you know whose handwriting it is?
**A. I don't recognize that, I don't.**
Q. Do you know why the sale names of Whitebird, Pigout, and Jigsaw are included on this document?
**A. I do not.**
Q. And the other information at the bottom, that's not your handwriting either?
**A. It is not my handwriting.**
Q. Okay. It looks like the categories of information you were just describing before, Plaintiff Appealed, yes or no, Auction Date, et cetera, et cetera, Award Date, Advertise Date?
**A. Correct.**
Q. That's the kind of information that you gathered?



**A. Yes, I agree we did gather that.**
Q. You sent this to Ted/Owen, right, Ted Boling and Owen Schmidt?
**A. They were -- I would assume that I sent this to my standard forest mailing list and that included Ted Boling and Owen Schmidt.**
Q. You say, Can you fill out chart and return to me by tomorrow. So you were asking the forest to fill out a chart and am I correct that it was a chart that would have columns on it very similar to the ones that are handwritten?
**A. Yes.**
Q. Okay. Do you know if the Forest Service was considering awarding Whitebird, Pigout, and Jigsaw among others and that's why?
**A. You know, I don't know who wrote this and so I don't know what the forest's intent was on that.**
Q. In your e-mail you say, The immediate job is to identify the sales that have been awarded or that you intend to award by mid-June.
Why was the date of mid-June significant?
**A. My guess is that's the briefing schedule because the sentence before says they would like to get the briefing done without the interruption of a TRO or PI.**



Q. Okay.
**A. So given the earlier e-mail in March we agreed to a briefing schedule that would make sense that the briefing schedule would run through June.**
Q. So this document which judging by the handwritten notation in the upper right-hand corner 4-5-99 was an attempt to among other things scrutinize the sales that the Forest Service intended to award by mid-June so it wouldn't interfere with the briefing schedule?
**A. I would characterize it differently.**
Q. How would you characterize it?
**A. I would characterize it as we wanted to know if any sales were going to be awarded during the briefing schedule because we had reason to believe that ONRC would not hesitate to file for a TRO or PI in the middle of our summary judgment briefing schedule and that buggers up -- it just messes up the briefing schedule when you are interrupted with injunctive requests.**
Q. Okay. Take a look at 41B. Now, if am I reading this right if I look at the fax line at the very top of this document, that means it was faxed to Region 6?
**A. The 808-2255 number is my fax which is here in**



**the Regional Office.**
Q. So in the ONRC Action the plaintiffs faxed this to you?
**A. I would not think so. I would have gotten it from Ted Boling.**
Q. Okay. Well, he writes here, We have been using, and this is the very bottom paragraph on the first page, We have been using June 11, 1999, as a cut-off date for determining whether to include sales in the at-risk category, but of course that is simply when summary judgment will be fully briefed and not when summary judgment will be decided.
What's he talking about, the at-risk category?
**A. Well, you would have to ask plaintiffs. When you read the paragraph above it says the sales are not -- not all sales are equally at risk and I believe Mr. Axline -- we're missing a page here.**
Q. Yes, we are. Sorry.
**A. I'm sorry, it is from Axline.**
Q. It is not that I have it and you don't. It is not in my copy either.
**A. They believe awarding the sales put them at risk, that it put old growth at risk and it put the earth at risk.**
Q. So it was not too veiled a threat, they might

**telling us, number one, the stipulation has expired, therefore, delta, no more notice due. And whoever took these notes my read is writing down what Ted is telling us.**

Q. Okay.

**A. So he must have mentioned Prairie Thin and Pigout and that Ted would be talking to Axline on Tuesday.**

Q. Okay.

**A. That would be my read of it, but I don't recognize the handwriting or the topic.**

Q. And you don't have independent recollection?

**A. I don't.**

Q. Okay. Plaintiff's Exhibit 44, was a copy of this letter from the ONRC Action plaintiffs made available to you?

**A. Well, I would assume that I received it. I was the keeper of the sale list so I would assume that Ted would have got it to me.**

Q. By that you mean you were the keeper of the various sale lists provided by the ONRC Action plaintiffs to the government?

**A. Correct.**

Q. So if anybody needed to know what was on that list or which list, you were the authoritative source



to call?

**A. I had files.**

Q. And you could read them what was on the document?

**A. I could.**

Q. Okay. And if I'm reading, just to summarize, the first page of this document correctly, Mr. Axline has attached a revised list in some respects?

**A. Yes, they believed that they have more sales at risk of being awarded or operated because Judge Dwyer had not yet ruled.**

Q. Okay. This letter is dated July 6th, 1999. Do you know if any of these sales were, in fact, awarded in July, 1999?

**A. I don't know.**

Q. This is plaintiff's Exhibit 45. Take a look at that for me, please. Do you recognize this chart of sales?

**A. I do.**

Q. Can you identify it then for the record?

**A. It put into chart form what plaintiffs were characterizing as at-risk timber sales.**

Q. As of July 6th?

**A. As of that -- it was their July 6th letter which I believe we just looked at.**



Q. Okay. Did you prepare this chart?

**A. I think someone on my staff prepared it.**

Q. Okay. What was the purpose in preparing it?

**A. The purpose to prepare it was to assess whether or not plaintiffs knew what they were talking about as to award date and to status.**

Q. So the information contained under each column here is the best information that the Forest Service could provide according to each status point?

**A. On July 7th, right, that appears to be when we printed this off.**

Q. And you can tell that from the date on the lower left?

**A. Yes.**

Q. Was this chart used in any decision-making process that you are aware of?

**A. Not that I'm aware of. It would have been provided to Bob Devlin and the forest staffs and Ted Boling, trial counsel, so that we could get an idea of the threat from ONRC Action for an injunction.**

Q. Okay. Under the Status column I notice for several of the sales it says, Award delayed until after ONRC hearing 7-1-99.

What hearing is that a reference to?

**A. Well, we would have to check the docket for**



**this case.**

Q. When it says "Award Delayed," does it mean the Forest Service agreed to delay of this sale until that hearing? Is that what that means?

**A. That would be my interpretation of it.**

Q. Now, was this chart or the information on this chart made available to your knowledge to anyone outside the Forest Service other than the Justice Department?

**A. Not to my knowledge.**

Q. Was it made available to Mr. Axline?

**A. I do not know. We did not have, you know, the Forest Service did not have direct communications with opposing counsel.**

Q. Okay. Take a look at plaintiff's Exhibit 46, please. Can you identify the first page of that document for me?

**A. Well, it looks to me like it is an e-mail again from me out to my forest contacts.**

Q. Who would be on that -- is that your distribution list you are talking about?

**A. Yes.**

Q. Who would be on that list?

**A. It would be my case coordinators on these west-side national forests.**

THE UNITED STATES COURT OF FEDERAL CLAIMS

BLUE LAKE FOREST PRODUCTS, INC., Plaintiff,
v.
THE UNITED STATES, Defendant.
No. 01-570C (Judge Williams)

COPY

TIMBER PRODUCTS COMPANY, Plaintiff,
v.
THE UNITED STATES, Defendant.
No. 01-627C (Judge Williams)

CLR TIMBER HOLDINGS, INC., Plaintiff,
v.
THE UNITED STATES, Defendant.
No. 04-501C

# DEPOSITION OF SUSAN M. ZIKE

Taken in behalf of Plaintiffs

* * *

August 20, 2007

United States Forest Service, Region 6

333 S.W. First, Suite 717

Portland, Oregon

Shannon K. Krska, CSR

Court Reporter

400 Columbia, Suite 140
Vancouver, WA 98660
(360) 695-5554
Fax (360) 695-1737

Schmitt & Lehmann, Inc.
COURT REPORTERS
www.slreporting.com

121 SW Morrison St., Suite 850
Portland, OR 97204
(503) 223-4040
slinc@qwest.net

A. My responsibilities at that time was -- were that I was the region 6 litigation coordinator. And when a new complaint comes in that names the forest service, it's my job to coordinate the preparation of the case defense with general counsel department of justice and the forest service entity that's named in the complaint.

Q. All right. If you look at the first page of Exhibit 24A, the very first sentence says "This is a request for expedited information regarding the allegations in the above dash captioned matter." Then if you turn over to paragraph No. 4 on page 2, paragraph No. 4 on page 2 asks "Was any public notice and opportunity to comment provided before the November 1, 1996, directive cited in paragraph 31 was issued? Was a draft provided to the IAC? What are your plans for addressing the 9-30-98 expiration of this memo?" Do you recall providing any information in response to that paragraph 4?

A. I did not.

Q. And how about paragraph 5, do you recall providing any information in response to that?

A. I would not have the knowledge to do that.

Q. Okay. Do you know who, at that time, would have been most likely to provide information in

A. Boy, I don't know. I -- I don't know.
Q. So do you recall what you meant by the initial briefing?
A. Well, if -- if in fact this was -- I don't know the date of this E-mail. But if it was in the first, you know, three or four weeks after the lawsuit was filed, you know, if it was in the first -- in July of '98, then it would be the very first one, the very first initial -- it would be the first briefing.
Q. This E-mail is addressed to Nancy Graybeal.
A. M-hm.
Q. Do you recall her response to it, if any?
A. I don't recall her response. It was more FYI.
Q. And others. Who were the others you sent it to, do you remember?
A. You know, typically I would send it to the directors and the deputy regional foresters, so that would have been Devlin and Peggy probably.
Q. Do you remember Devlin's response, if any?
A. No. He typically didn't respond unless I asked him to respond because I was more of a purveyor of information rather than asking questions so --
Q. I take it in this case you don't recall asking him?

subcommittee.

A. Whatever.

Q. Yeah.

A. Okay, okay.

Q. But -- thank you for correcting me. It's late in the day and now you're exactly right.

A. And what are we doing here for --

Q. Well, I'm just trying to see if this further information -- I've got three or four E-mails that all went to you on this concept of some kind of a compensation to purchasers, and I'm just trying to find out who knows what about it. Do you -- does this spark any further recollection of any consideration?

A. No, it doesn't. You know -- no, it does not. And clearly I was on the call 'cause these are my notes, my handwritten notes. But it was elevated above me. When it's Devlin and Bartuska and Brouha and Birmingham, those are folks I don't -- I mean, we're not staff peers.

Q. M-hm, okay.

All right. Well, just doing what I can here.

The next document is Exhibit 115, unless you have more to add on this subject.

A. I don't, I don't.