IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SCOTT TIMBER CO.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 05-708C<br>(Judge Lettow) |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR AN ORDER AUTHORIZING TRIAL SUBPOENAS**

Defendant appears only to oppose trial subpoenas for three witnesses who are retired government employees and who live more than 100 miles from either Washington, D.C. or Portland, Oregon, the two locations where the trial is scheduled to take place.[1] However, defendant's position on the remaining witnesses for whom plaintiff Scott Timber Company ("Scott Timber") seeks subpoenas is not clearly stated, but defendant does not deny that these witnesses are all also on defendant's witness list. These witnesses are John Hickenbottom, who lives in Colorado, and the following witnesses who live in Oregon – Neal Forrester, Brenda

[1]Those witnesses are Michael Gippert who lives in Florida, Richard Holthausen who lives in Arizona and Paul Brouha who lives in Vermont. Plaintiff has determined that it will not be necessary to call Don Knowles who lives in North Carolina and does not seek a subpoena for him.

Woodard, Steven Nelson, Robert Devlin, Larry Larsen, Cheryl McCaffrey and Thomas Hussey.[2] Defendant cannot in good faith object to the issuance of subpoenas for witnesses it says it intends to call. Accordingly, plaintiff respectfully requests that the Court issue an order as soon as possible authorizing subpoenas for Messrs. Hickenbottom, Forrester, Hussey, Nelson, Devlin, Larsen and Mses. Woodard and McCaffrey. Defendant's counsel has previously agreed to accept service for all of these witnesses who were previously deposed and are represented by defendant's counsel.

As to Messrs. Gippert, Holthausen and Brouha, plaintiff proposes the following resolution: In lieu of trial testimony plaintiff will designate a portion of Mr. Gippert's and Mr. Holthausen's depositions including any exhibits which were discussed in the designated excerpts and offer these deposition excerpts and exhibits in lieu of live testimony. This was the approach taken in the cases relied upon by defendant in its opposition. See Perera v. U.S. Fidelity & Guar. Co., No. 8:02-cv-688, 2007 WL 4247699, at *1 (M.D. Fla. Dec. 3, 2007); Mendez v. UnitrinDirectProperty & Cas. Ins. Co., No. 8:06-cv-563, 2007 WL 2726900, at *1 (M.D. Fla. Sept. 14, 2007). Proceeding in this manner will eliminate any inconvenience to Messrs. Gippert and Holthausen. If this is not acceptable to defendant, then plaintiff respectfully requests that subpoenas be authorized for these two witnesses.

---

[2]Plaintiff has just learned that Ms. McCaffrey and Messrs. Hussey and Devlin live close to Portland and therefore may reside within 100 miles of the Portland trial location. Plaintiff nevertheless, out of an abundance of caution, seeks an order authorizing their subpoenas. Plaintiff also notes that Messrs. Forrester and Larsen live in Eugene, Oregon, approximately 110 miles away from the Portland trial location.

Plaintiff has already proposed to defendant that Mr. Brouha be deposed as soon as possible over the telephone and that his deposition testimony and any exhibits that are the subject of his testimony be submitted in lieu of live testimony at trial. Plaintiff estimates that Mr. Brouha's deposition will take about two hours or less. This procedure would minimize any inconvenience to Mr. Brouha. In the alternative, if the Court so desires, Mr. Brouha's testimony can be taken before the Court over the telephone as soon as possible on any reasonable available date prior to June 27, 2008.

Although plaintiff does not foresee Mr. Brouha's testimony as being lengthy, it is critical to plaintiff's case because Mr. Brouha is the author of part of the "Brouha Memorandum." Plaintiff's Trial Ex. 109 (attached hereto). This memorandum is addressed to high level Department of Agriculture officials and makes important admissions regarding the Forest Service's responsibility and liability for not conducting Category 2 surveys properly.[3] As indicated on the face of the memorandum, part of it was prepared by Forest Service and BLM officials within the Northwest Forest Plan area prior to the award of Scott Timber's sales at issue in this action and for the purpose of providing advice and guidance to high level government officials on how to proceed with Category 2 surveys. Mr. Brouha is necessary to authenticate the Brouha Memorandum and explain portions of it to the Court. Without Mr. Brouha's testimony plaintiff likely would not have another witness through whom it can authenticate and gain

---

[3]Defendant has waived any claim of attorney-client privilege or work product protection for the Brouha Memorandum and related testimony and documents. Blue Lake Forest Products, Inc. v. United States, 75 Fed. Cl. 779, 793 (2007).

admission of this important piece of evidence. Defendant, of course, knows this very well and desires to keep the Brouha Memorandum out of evidence in this case.

Plaintiff's counsel located Mr. Brouha and spoke directly with him shortly after defendant's counsel represented to plaintiff's counsel that the government was unable to locate him. Mr. Brouha explained his health situation and his desire not to have to testify after June 27, 2008, when he expects to undergo treatment. Mr. Brouha indicated at that time that he would be willing to testify via telephone prior to June 27, 2008. I told him that this procedure was acceptable to plaintiff and that I would take up that possibility with defendant's counsel. I did so, but defendant's counsel declined to take a position on my proposal at that time. Plaintiff's counsel does not anticipate in any way that Mr. Brouha's deposition or trial testimony would be stressful or lengthy.[4]

Defendant's claim that plaintiff's counsel has misrepresented prior discussions regarding former government employees is without merit. As indicated in plaintiff's motion, the issue of having to subpoena witnesses who reside more than 100 miles away from both locations for the trial was raised directly with the Court during the pre-trial conference on March 14, 2008. At that time plaintiff's counsel understood the Court to indicate that given the fact that several witnesses may reside more than 100 miles from either place of trial, the Court would issue orders for subpoenas expeditiously. Defendant's counsel did not object or raise any concerns at that

[4]Plaintiff notes that defendant has made no representation on behalf of Mr. Brouha that it would be injurious to his health to testify in a short telephonic deposition or trial testimony prior to June 27, 2008, and there is no declaration from Mr. Brouha or his physician to that effect.

time. Defendant's counsel's letter of May 22, 2008 informed plaintiff that Messrs. Holthausen and Knowles objected to appearing for trial and that Mr. Gippert agreed to testify but only via telephone. There was no indication in defendant's counsel's letter of May 22nd that defendant would simply oppose any motion by plaintiff for an order authorizing subpoenas for all witnesses who reside more than 100 miles from the place of testimony. It was only in the course of a recent telephone call with defendant's counsel on June 6, 2008 that plaintiff was told of this broad opposition. Plaintiff's counsel suggested at that time to defendant's counsel that the parties contact the Court for a status conference that very day in order to resolve the matter expeditiously but defendant's counsel refused to agree to such a conference and insisted that plaintiff file the instant motion instead.

Plaintiff has taken the depositions of all of the witnesses who are the subject of its motion with the exception of Mr. Brouha. Plaintiff did not know of Mr. Brouha's health condition and had not been able to locate Mr. Brouha until just recently. Plaintiff's counsel anticipates that Mr. Brouha's testimony will be brief, factual and without any undue stress or burden. Mr. Brouha served as Associate Deputy Chief of the Forest Service at the time of the "Brouha Memorandum" and was a sophisticated, high level public servant who should have little difficulty responding to a few questions over the telephone.

Defendant repeatedly argues that plaintiff has not shown a substantial need[5] for the witnesses for whom it requests subpoenas because virtually all of those witnesses are "expected to testify concerning the Forest Service's interpretation 'NEPA decision equals implementation.'" While it is true that plaintiff anticipates that these witnesses will address that subject and the red tree vole directive which are at the heart of this case, they will also discuss substantial risks which the Forest Service knowingly undertook in failing to conduct Category 2 surveys prior to ground-disturbing activities on plaintiff's sales. The witnesses also will authenticate and explain important documents which will provide the Court with contemporaneous statements by government officials that bear directly on what the Forest Service knew and when it knew it as the Forest Service decided to authorize ground-disturbing activities on plaintiff's sales without conducting Category 2 surveys. Although the topics in many instances broadly will be the same, the witnesses' testimony will address different pertinent facts and details of the key issues in this case much of which only each individual has personal knowledge of. Presumably, defendant does not disagree with this because all of the witnesses identified in plaintiff's motion save Messrs. Gippert, Holthausen and Brouha are also on defendant's trial witness list.

---

[5]The requirement that Scott Timber show a "substantial need" for the witnesses subpoenaed only arises upon a motion to quash. See RCFC 45(c)(3)(A). Neither the witnesses nor defendant have filed any such motion. Before the Court is Scott Timber's application for a court order requiring the witnesses to give testimony at a place more than 100 miles from their residences. Such a motion requires only that Scott Timber show good cause for the subpoenas to issue. RCFC 45(b)(2). In any event, Scott Timber satisfies both the "good cause" and "substantial need" tests.

Plaintiff's proposal to substitute deposition testimony of Messrs. Gippert, Holthausen and Brouha in lieu of live trial testimony eliminates any necessity for them to travel to the site of trial.[6] Defendant apparently does not oppose an order authorizing subpoenas for the other witnesses discussed above.

For each of the foregoing reasons, plaintiff respectfully requests the Court grant its motion for an order authorizing trial subpoenas for the witnesses identified in its motion.

Respectfully submitted,

s/Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

[6]In order to make maximum use of the three trial days scheduled by the Court in Washington, D.C. and in light of the fact that most of the witnesses in this case live in Oregon or other areas west of the Mississippi, plaintiff proposes to schedule Mr. Gippert and Mr. Holthausen for trial testimony in Washington, D.C. if their deposition testimony and the exhibits they discussed cannot be used in lieu of live testimony. Both of these witnesses will have to travel to one of the two trial locations, and the Court has set aside three days for trial in Washington, D.C. which may be difficult to fill. For that reason, we will ask Mr. Holthausen as well as Mr. Gippert to come to Washington, D.C. Plaintiff notes that defendant's counsel has agreed that defendant's witness, Richard Fitzgerald, will testify in Washington, D.C., close to where he resides, in order to minimize any inconvenience to Mr. Fitzgerald and to use the trial time in Washington, D.C. more expeditiously. It is the parties' intention under this proposal to complete all direct and cross-examination of Mr. Fitzgerald at that time.

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: June 12, 2008

# MEMORANDUM

To: Anne Kennedy, Barbara Weber, Al Ferlo

From: Paul Brouha [signature]

Date: January 22, 1999

**Subject: Working Document concerning "Survey and Manage" Lawsuit for CEQ.**

The enclosed brief, requested by CEQ during our December 2, 1998, meeting was hand delivered to CEQ Acting Chair, George Frampton on January 19, 1999. Prepared by Forest Service employees in Regions 5 & 6 and by Oregon BLM's Judy Nelson, it offers a good overview of the current situation surrounding the lawsuit.

In addition to providing this brief, I have discussed with several people the need for a status review of the "Survey and Manage" program as it has evolved since its inception as a result of the Northwest Forest Plan. There is concurrence on the need to rapidly convene a small group of knowledgeable Forest Service, BLM, and disinterested subject matter scientists to assess whether the implementation is in fact yielding the result originally envisioned.

Specifically, are we progressing rationally toward describing, defining the distribution of, and assessing population status and vulnerability of species to Forest Service and BLM activities. Does the program make the most effective use of limited available funds to ensure the future viability of all species in the Northwest Forest Plan area?

I have asked Nancy Green to set up this status review as expeditiously as possible and to work with the group to ensure that the planned EIS will yield the desired results.

Enclosure

cc: Nancy Green

Peggy Kain

Arnie Holden

Chris Jauhola

EXHIBIT
tabbies
Plaintiff's Trial 109

1795

*Working document, litigation sensitive, not subject to FOIA* *Jan.*

Subject: Lawsuit on Northwest Forest Plan and Implementation of Survey and Manage

Issue: The Oregon/Washington Office of BLM and Region 5 and 6 of the Forest Service have been asked by the Council of Environmental Quality (CEQ) to provide information to evaluate a strategy to reduce litigation risks from an ongoing lawsuit on the Northwest Forest Plan. The strategy offers to survey some portion of the timber sales "implemented" in FY 1998 for twelve species which are identified as "high risk" species. These species were identified as "high risk" should the required survey date be moved from FY 1999 to FY 2000 in the "Environmental Assessment to Change the Implementation Schedule for Survey and Manage and Protection Buffer Species", October 7, 1998. Surveying for the 12 species could have substantial impacts to the FY 1999 program of work.

Background: The Northwest Forest Plan seeks to create a balance between environmental goals and commodity outputs. The Bureau of Land Management (BLM) and Forest Service (FS) were sued on the implementation of the Northwest Forest Plan (NFP) in July, 1998 by 13 local and regional environmental groups. The lawsuit claims that the agencies have failed to follow the NFP for a variety of reasons, many related to the implementation of the survey and manage standards and guidelines. Four timber companies have joined the lawsuit as interveners because of concern over award of timber sales that they have purchased.

Survey and manage standards and guidelines are mitigation measures, developed as part of the Record of Decision (ROD) on the NFP, for approximately 400 old-growth related species where there was concern for the continued persistence of these species across the landscape, but where little knowledge existed on the species themselves. The NFP identified four survey strategies for these species: 1) manage known sites; 2) survey prior to ground disturbing activities; 3) conduct extensive surveys to find high priority sites for management; and 4) conduct general regional surveys to acquire additional information to determine necessary levels of protection. Survey and manage species fall in one or more of these categories. In addition to the survey and manage standard and guideline, additional protection was identified for 17 species under the protection buffer standards and guidelines. The protection buffer species also require surveys prior to ground disturbing activities similar to the requirements under survey and manage. Thirteen of the 17 protection buffer species are also on the survey and manage species lists, sometimes with conflicting protection strategies. None of the survey and manage or protection buffer species are listed under the Endangered Species Act.

Since 1994, the agencies have learned a considerable amount about the species by collecting site data, preparing management recommendations and survey protocols, and surveying for these species. However, the agencies have encountered problems in developing appropriate survey protocols for some of the 80 survey strategy 2 and protection buffer species which require surveys prior to ground disturbing activities in FY 1999. Examples of problems include 26 species that can only be identified by one or a few experts, 20 species that require laboratory work for identification, and nine species that require five years of survey.

The (Regional Interagency Executive Committee (RIEC) has worked closely with the Interagency Steering Committee ( ISC) and CEQ to develop a strategy to update the survey and manage guideline, based on language in the ROD which gives the RIEC authority to make changes in the guideline including changing the schedule and changing the level of species protection based on new information. This strategy is underway and includes:

An Environmental Assessment (EA) to change the survey implementation schedule for 32 species where surveys were evaluated to be not-technically-feasible and where this one year delay in survey did not substantially increase risk to the species.

An Environmental Impact Statement (EIS) to strengthen the adaptive management provisions of the ROD by providing a detailed process and clearer criteria for making changes to species' status in response to new information, and re-categorize some survey and manage species through use of this process.

The completion of survey protocols and management recommendations for field use by January.

A full time oversight team of managers assigned with expediting these tasks. The oversight team reports directly to the Director, Natural Resources, Region 6, Forest Service; the Deputy State Director for Resources for Oregon and Washington BLM; and the Assistant Regional Director for Ecological Services, Region 1, Fish and Wildlife Service. Region 5 of the Forest Service and the Pacific Northwest and Southwest Research Stations are also actively involved in the oversight role.

Several policy questions are under discussion at this time:

**1. Should the agencies survey for FY 1998 projects for the 12 "high risk" species?**

The EA proposes to change the survey implementation schedule for 32 species where surveys were evaluated to be not-technically-feasible and where this one year delay in survey did not substantially increase risk to the species. The analysis also identified 12 species which were estimated to be at a "substantially increased risk" if surveys were delayed from FY 1999 to FY 2000. Under the NFP ROD, the requirement to survey for these 12 species is to begin in FY 1999. The NFP developers did not believe that ground disturbing activities prior to FY 1999 posed an imminent threat to these species. We have no new information to indicate that this belief was in error.[1] Surveys for these 12 species will be conducted prior to the implementation of any ground disturbing activity in FY 1999.

The agencies are committing considerable resources to meeting the strategy outlined above. Adding the requirement to survey timber sales implemented in FY 1998 detracts from the FY 1999 efforts since many of the same experts are needed for these efforts. In addition, surveying for these species would have significant impacts, including limiting the agencies ability to

---

[1]The 12 high risk species were identified by the agency taxa experts based on questions about delaying the surveys for FY 1999 (EA, Appendix D). The analysis in this EA did not consider these species as high risk in terms of long-term viability. The assessment of risk was based on the potential for substantially increased risk to species if surveys were delayed from FY 1999 to FY 2000, as perceived by agency professionals familiar with the species groups at a regional scale. The conclusion of the assessment was that these 12 species were at higher risk in relation to all 80 species analyzed if surveys were not completed for FY 1999 projects. The results of this assessment did not indicate any greater risk for these species than was assumed by the Northwest Forest Plan. This EA does not propose to delay the surveys for these 12 species.

complete the FY 1999 timber sale program.

2. **What would be the cost of surveying FY 1998 timber sales for the 12 species?**

Based only on surveying the approximately 100 timber sales identified by the plaintiffs in the settlement talks; preliminary estimates of costs of doing surveys is $863,000 ($663,000 Forest Service and $200,000 BLM).. Survey costs would be greater if all timber sales implemented in the last quarter of FY 1998.

Forest Service projects are implemented when the EA or Decision Notice is signed. Much of their planned FY 1999 timber sales are from decisions implemented in FY 1998. Implementation for the BLM is when the sale is advertised. BLM has no unsold sales that would consider to be implemented.

Work foregone in FY 1999 may be a more realistic measure of impacts for the agencies because employees would be redirected from work on FY 1999 sales to survey for the FY 1998 sales. BLM is estimating that 30-50 MMBF (15-25%) of FY 1999 timber sales would be foregone by redirecting employees to this workload. The Forest Service is estimating that 320 MMBF (45%) of FY 1999 timber sales would be foregone. The Forest Service has more impacts from surveying FY 1998 projects because of the different agency definitions of implemented, much of their planned FY 1999 timber sales are from decisions implemented in FY 1998.

3. **What are the contracting implications of surveying awarded sales?**

The agencies would argue vigorously against surveying sales that have been awarded. The Forest Service has no provisions in its timber sale contracts that specifically allow for suspension for survey and/or discovery of survey and manage species. The "Protection of Habitat of Endangered, Threatened, and Sensitive Species" clause (C6.25#) only includes those species listed as Threatened, Endangered, or Sensitive (Regional Forester's list). None of the survey and manage species are on the Threatened & Endangered list and many are not on the Sensitive List. A contract modification under this subsection would require reimbursement to the purchaser.

BLM timber sales contain contract language that permits the suspension of sale operations when species have been discovered that were "identified for protection through Survey and Manage and/or Protection Buffer standards and guidelines." However, in the event a change to the sale area is deemed appropriate, it must be effected through negotiation and a bilateral contract modification with the purchaser. The purchaser is unlikely to agree to bilateral contract modifications. The nature of survey protocols and the BLM interpretation of when a project is implemented relies on the logic and efficiency of completing the surveys prior to award, or the point at which the Government loses the discretion to make unilateral changes.

4. **What impacts would a significant decrease in the planned federal timber sale offering for the region have?**

Timber companies work to secure a steady supply of timber for their mills and purchase sales during "bad" markets with the expectations that the market will be improved by the time that they log and mill the timber (typically 2-3 years). Delaying federal timber sale offerings, during

times of depressed timber markets, still has regional impacts. The table provided below shows the bidding history on federal timber sales for the region by year and by unit. Based on the table, it would appear that there is a steady demand for federal timber across the region. Notice that for 1995-1998, only 6% of the timber sales went no bid.

| Year or Unit | Target (MMBF*) | Advertised Sale Volume (MMBF) | BLM Sold, FS Bids Opened (MMBF) | Awarded (MMBF) | No Bids** (MMBF) | % No Bid |
|---|---|---|---|---|---|---|
| 1995 | 585.4 | 605.4 | 592.4 | 567.0 | 35.5 | 8.4% |
| 1996 | 831.5 | 854.2 | 853.7 | 832.0 | 22.2 | 2.6% |
| 1997 | 989.8 | 906.9 | 894.4 | 835.3 | 35.4 | 3.9% |
| 1998 | 936.1 | 814.5 | 750.7 | 508.4 | 91.1 | 12.0% |
| Total | 3342.8 | 3181.0 | 3091.4 | 2742.7 | 184.2 | 5.9% |
| | | | | | | |
| FS-Region 5 | 576.9 | 535.5 | 464.6 | 444.9 | 19.7 | 4.1% |
| FS-Region 6 | 2051.9 | 1859.1 | 1859.1 | 1713.3 | 145.8 | 7.8% |
| BLM | 714.0 | 786.4 | 767.7 | 584.5 | 18.7 | 2.4% |

* MMBF - Million Board Feet.

** Tables are included as Appendix A which shows the information by unit with additional explanation. Care should be taken in interpreting this table because of variation in the way the agencies record this information. No bid column is advertised sale volume minus sold volume for BLM and bids opened minus awarded column for the Forest Service.

5. **What progress is being made to complete the survey requirements for these species?**

A great deal of progress has been made in the development, review, and revision of regional survey protocols and management recommendations for over 275 survey and manage species as described in the NFP under Standards and Guidelines Common to All Land Allocations. Over the past three years, agency staff have prepared guidance for most species. This guidance is currently being used and tested by field staff. The agencies are currently accelerating the effort to complete protocols and management recommendations. This is a significant undertaking involving complicated issues, tasks, and personnel from the BLM, Forest Service, and Fish and Wildlife Service. In addition, contracted work is ongoing to find ways to make surveys feasible for the species who surveys are currently infeasible.

Management recommendations for most species will be completed by mid-January, except for a group of fungi which requires five years of surveys to clear a project. Completion of survey protocols for these fungi will be scheduled after the ongoing EIS provides clarity to appropriate survey strategies for these species and competition of an analysis of species security to determine

if this level of survey is actually needed.

Agency staff have been trained and are surveying for and finding new sites for many of the survey and manage and protection buffer species. The increase in sites and associated information is contributing greatly to our ability to evaluate the security of these species.

6. **What other steps is the region taking to correct any problems with implementing these Standards and Guidelines?**

In order to increase the efficiency and consistency of the survey and manage and protection buffer provisions in the ROD the Agencies are preparing an EIS. The goal is to continue the current survey and manage strategy including a combination of managing known sites and increasing our information base through surveys. At this initial stage the Agencies proposed action is to make the standards and guidelines clearer and more easily understood; discontinue the protection buffer standards and guidelines and cover those species under the survey and manage standards and guidelines; provide a detailed process and clearer criteria for making changes to species' status in response to new information; and, re-categorize some survey and manage species through use of this process. This proposed action may be redefined or modified based on response from the public and analysis of a range of alternatives.

Appendices: I - Programmatic Overview
II - Summary of 12 Species; Species by Species Survey Requirements

| I. Programmatic Overview - as of December 7, 1998<br>Western Oregon BLM/Northwest Forest Plan Timber Program - Volume in MMBF | | | | | | |
|---|---|---|---|---|---|---|
| Fiscal Year | Financed Program (Target) | Sale Volume Advertised | Unadvertised sale volume | Sale Volume Sold | Sale Award Completed | Sale Volume w/ No Bid |
| 1995 | 112.0 | 127.3 | 0.0 | 117.4 | 117.4 | 9.9 |
| 1996 | 180.0 | 189.6 | 0.0 | 189.1 | 189.1 | 0.5 |
| 1997 | 211.0 | 212.0 | 0.0 | 211.7 | 187.7 | 0.3 |
| 1998 | 211.0 | 257.5 | 0.0 | 249.5 | 90.3 | 8.0 |
| 1999 | 211.0 | 41.5 | 169.5 | 41.2 | 4.0 | 0.3 |
| Totals | 925.0 | 827.9 | 169.5 | 808.9 | 588.5 | 19.0 |

- Steps in BLM timber sale process:
  - Advertise: Decision notice is published in local newspaper four weeks prior to the sale date, i.e., the auction.
  - Offering: Oral auction proceeds on sale date to solicit bids.
  - Sold: Qualified high bid is accepted by BLM and bid bond retained.
  - Awarded: Contract issued to high bidder; on award date contract is entered into.
  - Acceptance: Contract signed by purchaser.
  - Approval: Contract signed by BLM contracting officer.

- So far under the Northwest Forest Plan BLM has sold 97.7 percent of the timber offered. BLM's western Oregon annual Allowable Sale Quantity (ASQ) is 211 million board feet (MMBF). The volume offered in excess of the ASQ in FY 1998 is reflective of BLM's commitment to achieve offering of the average annual ASQ on a decadal basis.

- The difference in volume awarded versus volume sold is due to delays presented by the settlement negotiation with the plaintiffs; a stay has been issued by the Interior Board of Land Appeals (IBLA) or an appeal is pending, and/or Endangered Species Act consultation on listed fish species has not been completed. Consultation has been initiated. Biological Assessments have been submitted to the National Marine Fisheries Service (NMFS). Delays in the issuance of Biological Opinions (BO) stem from the Rothstein Decision in the Pacific Coast Federation of Fisheries Associations, et al., v. NMFS suit, which set a higher standard for analysis and documentation to demonstrate compliance with the Aquatic Conservation Strategy and related Standards and Guidelines of the Northwest Forest Plan. BLM expects that the pending BOs will not make jeopardy determinations nor prescribe any terms and conditions that are not already part of the sale design and mitigation. One BO has been issued that confirms this expectation.

- The reasons for the no-bid sale volume is market related (either the small log or chip markets were depressed) and/or prospective purchaser dissatisfaction with the complexities of the sale design in relation to the appraised value of the sale and/or their available harvest technology.

*NOT FOR RELEASE UNDER FOIA - PREPARED IN RESPONSE TO LITIGATION*

I. Programmatic Overview - as of December 7, 1998
R6 Forest Service Northwest Forest Plan Timber Program - Volume in MMBF

| Fiscal Year | Financed program (Target) | Sale volume advertised | Unadvertised Sale Volume | Sale volume with Bids Opened | Sale Award Complete | Sale volume - No Bid |
|---|---|---|---|---|---|---|
| 1995 | 367.8 | 393.4 | 0.0 | 393.4 | 369.4 | 24.0 |
| 1996 | 507.5 | 510.0 | 0.0 | 510.0 | 499.9 | 10.1 |
| 1997 | 612.3 | 538.6 | 73.7 | 538.6 | 507.4 | 31.2 |
| 1998 | 564.3 | 417.1 | 147.2 | 417.1 | 139.6<br>140<br>57 | 80.5 |
| 1999 | 558.6 | 15.2 | 543.4 | 15.2 | 1.7 | N/A |

CHART NOTES

Financed Program: The 1999 Financed Program(558.6) is the initial distribution to the forests and will be slightly adjusted when the final budget is distributed.

Unadvertised Sale Volume: The difference between financed program and volume advertised in 1997 resulted from delays due to appeal remands, loss of work resulting from the arson fire of the Oakridge Ranger Station, delays due to ongoing negotiations with the City of Salem concerning protection of the city water source, and agreed to changes in targets for 2 forests. The difference between the financed program and volume advertised in 1998 results from delays in receiving Biological Opinions from NMFS, or additional work required to complete consultation of newly listed species, rework following appeal remands, and delays in completion of NEPA.

Sale Award Complete: The volume shown for 1998 as Sale Award Complete includes all sales for which we currently have high bidders. The breakdown of this volume is 139.6MMBF awarded prior to 10/1/98, approximately 140MMBF on sales named by the plaintiffs with awards being held, and approximately 57MMBF awarded since 10/1/98 or moving to award at this time.

Sale Volume-No Bid: Reasons for no bid sales are, in some cases market related (low small sawlog or chip markets), prospective purchaser dissatisfaction with the sale design in relation to the appraised value of the sale, operating restrictions and limited operating seasons, short contract lengths, large amounts of volume advertised in the 4th quarter, and large sales containing predominantly small diameter material. Approximately 66MMBF (80%) of the no bid volume in 1998 occurred on the Gifford Pinchot, the Mt Hood and the Willamette forests, with small amounts on 6 other NWFP forests.

So far under the Northwest Forest Plan R6 has award or has high bidders on 92 percent of the timber offered.

*NOT FOR RELEASE UNDER FOIA - PREPARED IN RESPONSE TO LITIGATION*

I. Programmatic Overview - as of December 7, 1998
R5 Forest Service Northwest Forest Plan Timber Program - Volume in MMBF

| Fiscal Year | Financed program (Target) | Sale volume advertised | Unadvertised Sale Volume | Sale volume with Bids Opened | Sale Award Complete | Sale volume - No Bid |
|---|---|---|---|---|---|---|
| 1995 | 105.6 | 84.7 | 35.9 | 81.8 | 80.2 | 1.6 |
| 1996 | 144.0 | 154.6 | 22.8 | 154.6 | 143.0 | 11.6 |
| 1997 | 166.5 | 156.3 | 11.1 | 144.1 | 140.2 | 3.9 |
| 1998 | 160.8 | 139.9 | 29.4 | 84.1 | 81.5 | 2.6 |
| 199 | 154.0 | 0 | 0 | 0 | 0.0 | N/A |

CHART NOTES

*Note - Unadvertised sale volume totals include permits sold, add-on volume and program short-falls. Unadvertised sale volume total is "Target" column minus "Sale Volume Advertised" column.

III. C. SPECIES BY SPECIES SURVEY REQUIREMENTS TABLE

| SPECIES | HABITAT | RANGE | NO. FIELD UNITS | METHOD | SEASON | NO. VISITS | RATE OF SURVEY |
|---|---|---|---|---|---|---|---|
| FUNGUS | | | | | | | |
| *Bridgeoporus nobillisimus* | Any age stand of Pacific and noble fir on live tree base, or large dead material, stumps, snags | Olympic Peninsula OR-WA Cascades; possibly CA | 10 | Walk through all potential habitat searching microsites | snow-free | 1 | 10-20 ac./da + 1 office da/field da |
| LICHENS | | | | | | | |
| *Hypogymnia duplicata* | Epiphyte on trunks, branches, mossy outcrops, and ridges in old-growth mountain hemlock, Pacific fir, and western hemlock forests | OR Coast Range and western North Cascades from WA to northern OR | 9 | Walk through all potential habitat searching ground, litterfall, trunks, branches, and canopy (with binoculars) | snow-free | 1 | 10-20 ac./da + 1 office da/field da |
| *Lobaria linita* | Foliose lichen of old-growth Pacific silver fir and mountain hemlock zones on trunks, branches, and mossy rocks in cool, shaded, humid microsites. 2300-3600 ft. elevation | Range of NFP: North Cascades and Olympic Mts. of nw WA primarily. Few sites in nw OR and nw CA | 8 | Walk through all potential habitat searching ground, litterfall, trunks, branches, and canopy (with binoculars) | snow-free | 1 | 10-20 ac./da + 1 office da/field da |
| *Pseudocyphellaria rainierensis* | Epiphyte in cool humid western hemlock and lower silver fir zones with old growth structure. 330 - 4000 ft. | WA and OR west of Cascade Mt. crest | 11 | Walk through all potential habitat searching litterfall and upper canopy with binoculars. | snow-free | 1 | 10-20 ac./da + 1 office da/field da |

| SPECIES | HABITAT | RANGE | NO. FIELD UNITS | METHOD | SEASON | NO. VISITS | RATE OF SURVEY |
|---|---|---|---|---|---|---|---|
| BRYOPHYTE | | | | | | | |
| *Ptilidium californicum* | Epiphyte on tree trunks, decaying logs, stumps, and humus in silver fir and white fir zones on west slopes and central portion of Cascades in northern CA | Protocol requires surveys only in CA | 6 | Walk through all potential habitat searching tree trunks, decaying logs, stumps, and humus | snow-free | 1 | 10-20 ac./da + 1 office da/field da |
| MOLLUSKS | | | | | | | |
| *Deroceras hesperium* | Forests below 2000 ft. in low vegetation, leaf litter, on debris and rocks | West of Cascade Mts. From western WA to nw OR | 7 | Meander entire project area through key habitat types. Per 10 acres of suitable habitat: 1) several 5 min. searches of low vegetation, litter, debris, and rocks; 2) intensive search in two 270 sq.ft. plots. | Early spring and late spring,<br><br>or (preferred) spring and fall rainy season<br><br>(Wet; 40-80 deg.F) | 2 at least 3 wk apart | 30 ac/da/ person + 1 office da/field da.<br>( 1 hr. search per 10 acres of habitat exclusive of travel, time walking, identifying specimens or recording data.) |



1805

| SPECIES | HABITAT | RANGE | NO. FIELD UNITS | METHOD | SEASON | NO. VISITS | RATE OF SURVEY |
|---|---|---|---|---|---|---|---|
| *Hemphilla pantherina* | Deep forest floor litter | One known site. Suspected in Cascade Mts. of sw WA | 1 | Meander entire project area through key habitat types. Per 10 acres of suitable habitat: 1) several 5 min. searches in deep litter; 2) intensive search in two 270 sq.ft. plots. | Early spring and late spring, or (preferred) spring and fall rainy season (Wet; 40-80 deg.F) | 2 at least 3 wk apart | 30 ac/da/ person + 1 office da/field da. (1 hr. search per 10 acres of habitat exclusive of travel, time walking, identifying specimens or recording data.) |
| *Oreohelix* n.sp. | Edge of ponderosa pine forest with elk sedge/pine grass. Near ridgetops in small draws, depressions, benches and in schist talus. | Northern WA Cascades | 2 | Meander entire project area through key habitat types. Per 10 acres of suitable habitat: 1) several 5 min. searches of grass and talus; 2) intensive search in two 270 sq.ft. plots. | Early spring and late spring, or (preferred) spring and fall rainy season (Wet; 40-80 deg.F) | 2 at least 3 wk apart | 30 ac/da/ person + 1 office da/field da. (1 hr. search per 10 acres of habitat exclusive of travel, time walking, identifying specimens or recording data.) |

| SPECIES | HABITAT | RANGE | NO. FIELD UNITS | METHOD | SEASON | NO. VISITS | RATE OF SURVEY |
|---|---|---|---|---|---|---|---|
| *Pristiloma articum crateris* | Moist conifer forests in litter and among vegetation near wetlands, seeps,springs and riparian areas above 2000 ft. | Cascades in Central-southern OR | 11 | Meander entire project area through key habitat types. Per 10 acres of suitable habitat use 10-15 x hand lens to search for 2 mm shells : 1) several 5 min. searches of leaves, rotten wood, mosses; 2) intensive search in two 270 sq.ft. plots. | Early spring and late spring, or (preferred) spring and fall rainy season (Wet; 40-80 deg.F) | 2 at least 3 wk apart | 15-30 ac/da/ + 1-2 office da/field da. (1-2 hr. search per 10 acres of habitat exclusive of travel, time walking, identifying specimens or recording data.) |
| VASCULAR PLANTS | | | | | | | |
| *Coptis trifolia* | Boggy, wet seepage areas and mossy places in western hemlock and silver fir zones between 3280-3800 ft. elevation. | WA and northern OR Cascades | 7 | Meander through and around project area doing 100% visual survey of known sites and likely habitats | June-Sept. | 1-2 | 40 ac./da + 1 office da/field da |
| *Cypripedium montanum* (west Cascades) | Mixed conifer and mixed evergreen/oak woodland communities in a range of habitats where its symbiotic fungus occurs. 1,500-6,500 ft. elevation | West Cascades from Columbia R. Gorge in WA south into northern CA | 15 | Meander through and around project area doing 100% visual survey of known sites and likely habitats | May - August | 1-2 | 40 ac./da + 1 office da/field da |
| *Habenaria (Platanthera) orbiculata* | Dry to swampy habitats in mature to old-growth western hemlock and silver fir zones to 3000 ft. elevation | Northern Cascades of WA and possibly Olympic Peninsula | 3 | Meander through and around project area doing 100% visual survey of known sites and likely habitats | June - Sept. | 1-2 | 40 ac./da + 1office da/field da |



1807