**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SCOTT TIMBER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 05-708C<br>(Judge Lettow) |

**PLAINTIFF'S POST-TRIAL BRIEF**

Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: August 29, 2008

# TABLE OF CONTENTS

**PAGE**


Table of Authorities ........ ii

Table of Acronyms ........ v

INTRODUCTION ........ 1

QUESTIONS PRESENTED ........ 1

STATEMENT OF THE CASE ........ 2

ARGUMENT ........ 4

I. The FS Failed To Include An Adequate Exculpatory Provision Or Disclaimer In The Contracts Or Require Scott To Execute A Release Of Liability ........ 4

II. The FS Breached Its Implied Warranty Of Specifications ........ 9

III. The FS Breached The Contracts Because It Failed To Disclose To Scott That Its Sales Were On ONRC Action's "At-Risk" Lists And That The FS Had Secret Agreements With ONRC Action And Because The FS Misled Scott Into Believing That The Sales Were Not Threatened By ONRC Action ........ 16

IV. The FS Breached Its Duties To Cooperate And Not To Hinder Scott's Operations ........ 19

A. "NEPA Decision Equals Implementation" And The Red Tree Vole Directive Are Unreasonable Interpretations of the ROD ........ 19

B. The FS Rushed To Award The Contracts Before The Final Decision In ONRC Action Despite Being On Notice That Its Legal Rationale For Not Conducting Surveys Was Deficient ........ 27

C. The Forest Service Unreasonably Prolonged The Suspensions ........ 36

CONCLUSION ........ 40

# TABLE OF AUTHORITIES

**CASES** **PAGE**

Beauchamp Construction Co., Inc. v. United States,
14 Cl. Ct. 430 (1988) ....................................................................................14

Blake Construction Co. v. United States,
987 F.2d 743 (Fed. Cir. 1993)........................................................................12

Bloedel Donovan Lumber Mills v. United States,
74 F. Supp. 470 (Ct. Cl. 1947)........................................................................15

Cedar Lumber, Inc. v. United States,
5 Cl. Ct. 539 (1984) ........................................................................................5

Chaney and James Construction Co. v. United States,
421 F.2d 728 (Ct. Cl. 1970) ............................................................................14

C.J. Betters Corp. v. United States,
25 Cl. Ct. 674 (1992) ......................................................................................5

Department of Natural Resources and Conservation of Montana v. United States,
1 Cl. Ct. 727 (1983) ........................................................................................5

Everett Plywood Corp. v. United States,
651 F.2d 723 (Ct. Cl. 1981) ......................................................................5, 9, 14

GAF Corp. v. United States,
932 F.2d 947 (Fed. Cir. 1991), cert. denied, 502 U.S. 1071 (1992) ................................18

Heartwood, Inc. v. United States Forest Service,
73 F. Supp. 2d 962 (S.D. Ill. 1999)..................................................................39

Helene Curtis Industries, Inc. v. United States,
312 F.2d 774 (Ct. Cl. 1963) ........................................................................16, 19

Hercules, Inc. v. United States,
516 U.S. 417 (1996)........................................................................................12

H.N. Wood Prods., Inc. v. United States,
59 Fed. Cl. 479 (2003) ..................................................................................8, 27

In re Gartside,
203 F.3d 1305 (Fed. Cir. 2000)....19

J.A. Jones Construction C. v. United States,
390 F.2d 886 (Ct. Cl. 1968)....19

J.L. Simmons Co. v. United States,
412 F.2d 1360 (Ct. Cl. 1969)....13

Laburnum Construction Co. v. United States,
325 F.2d 451 (Ct. Cl. 1963)....14

Luria Bros. & Co., Inc. v. United States,
369 F.2d 701 (Ct. Cl. 1966)....14

Miller Elevator Co. v. United States,
30 Fed. Cl. 662 (1994)....18

Munn v. Secretary of Department of Health and Human Services.,
970 F.2d 863 (Fed. Cir. 1992)....19

Northcoast Environmental Center v. Glickman,
136 F.3d 660 (9th Cir. 1998)....19

Oregon Natural Resources Council Action v. United States Forest Service,
59 F. Supp. 2d 1085 (W.D. Wash. 1999)....3

Ozark Dam Constructors v. United States,
127 F. Supp. 187 (Ct. Cl. 1955)....5

Pacific Rivers Council v. Thomas,
30 F.3d 1050 (9th Cir. 1994)....25, 26

Petrochem Services, Inc. v. United States,
837 F.2d 1076 (Fed. Cir. 1988)....18

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001).... *passim*

Pyramid Lake Paiute Tribe of Indians v. U.S. Department of Navy,
898 F.2d 1410 (9th Cir. 1990)....19

Seaboard Lumber Co. v. United States,
41 Fed. Cl. 401 (1998)....5, 10

Seaboard Lumber Co. v. United States,
48 Fed. Cl. 814 (2001) ........................................................................................9

Sergent Mechanical Systems, Inc. v. United States,
34 Fed. Cl. 505 (1995) ......................................................................................14

Shawn Montee, Inc.,
AGBCA Nos. 2003-132-1 through 2003-136-1, 04-1 BCA ¶ 32,564 (2004) ...............9, 27

Silver v. Babbitt,
924 F. Supp. 976 (D. Ariz. 1995) ......................................................................26

S. California Edison v. United States,
58 Fed. Cl. 313 (2003) ......................................................................................16

Southwest Forest Industries,
AGBCA No. 79-178-3, 81-1 BCA ¶ 14,877 (1981) .................................................14

Spearin v. United States,
248 U.S. 132 (1918)...................................................................................13, 15

Tamarack Mills, LLC,
AGBCA Nos. 2003-151-1 and 2003-116-1, 04-1 BCA ¶ 32,591 (2004).....................8, 27

Trinity River Lumber Co. v. United States,
66 Fed. Cl. 98 (2005) ......................................................................................8, 27

United States v. Seckinger,
397 U.S. 203 (1970)..............................................................................................5

**STATUTES AND REGULATIONS**

16 U.S.C. § 4321 et seq. .......................................................................................2

16 U.S.C. § 472a ....................................................................................................14

36 C.F.R. Part 223...................................................................................................14

**MISCELLANEOUS**

2 Childress and Davis, STANDARDS OF REVIEW (1986)...............................................19

# TABLE OF ACRONYMS

| | |
|---|---|
| BLM | Bureau of Land Management |
| CCF | Hundred Cubic Feet |
| CE | Categorical Exclusion |
| CO | Contracting Officer |
| ESA | Endangered Species Act |
| FS or USFS | Forest Service |
| F&WS | Fish & Wildlife Service |
| FY | Fiscal Year |
| IRT | Issue Resolution Team |
| LRMP | Land and Resource Management Plan |
| MMBF | Million Board Feet |
| NEPA | National Environmental Policy Act |
| NFP | Northwest Forest Plan |
| ROD | Record of Decision |
| RTV | Red Tree Vole |
| RTV Directive | Red Tree Vole Directive |
| S&G | Standards and Guidelines |
| S&M | Survey and Manage |

## INTRODUCTION

Plaintiff Scott Timber Company ("Scott") alleges that the Forest Service ("FS") breached the Pigout, Whitebird and Jigsaw timber sale contracts ("Scott's sales"). Sections I-III of this brief are premised on legal theories that require proof of the FS's erroneous acts or omissions but do not require inquiry into whether these acts or omissions were unreasonable. In Section IV Scott contends that the FS breached the contracts by violating its implied duties to cooperate and not to hinder.

## QUESTIONS PRESENTED

1. Did the FS assume the risk of liability by awarding the contracts without Category 2 surveys and then having to suspend operations to perform those surveys without having included valid exculpatory provisions or disclaimers or requiring Scott to execute waivers of liability excusing FS fault?

2. Did the FS breach its implied warranty of specifications when it had to suspend operations in order to reevaluate whether the specifications governing ground-disturbing activities were adequate to protect Category 2 species?

3. Did the FS breach its obligation to disclose its superior knowledge that (a) the sales were on ONRC Action's "at-risk" lists and (b) the FS had secret agreements with ONRC Action, and because the FS misrepresented to Scott that the sales were not threatened by <u>ONRC Action</u>?

4. Did the FS breach its duties to cooperate and not to hinder by suspending operations because it failed to conduct Category 2 surveys prior to contract award and by unreasonably prolonging the suspensions?

## STATEMENT OF THE CASE

In April 1994, the Secretaries of the Department of Agriculture and Department of the Interior issued the Record of Decision ("ROD") for what is commonly known as the Northwest Forest Plan ("NFP"). JX 14. The NFP amended Land and Resource Management Plans ("LRMPs") governing the operation of the National Forests and Bureau of Land Management ("BLM") lands in Washington, Oregon and northern California, including the Umpqua National Forest where Scott's sales are located. JX 14 at 11-12; Stip. 1. Under the NFP various surveys were promulgated as mitigation measures for certain old-growth-related species for which there was concern about continued persistence but for which little knowledge existed. JX 14 at C-5; Tr. 343:11-34:8.

At issue in this case are Category 2 surveys which were required for 77 species on projects such as timber sales. Id. at C-5. The first group of Category 2 species included the Red Tree Vole ("RTV") and five species of salamanders for which surveys were required on projects on which ground-disturbing activities were to be implemented in fiscal year ("FY") 1997 or later (after October 1, 1996). Id. The second group of Category 2 surveys included 71 species for which surveys were required for projects on which ground-disturbing activities were to be implemented in FY 1999 or later (after October 1, 1998). Id.; Tr. 1592:10-1593:2.

In a November 1, 1996 memorandum, which did not comply with National Environmental Policy Act ("NEPA"), 16 U.S.C. § 4321 et seq., or land management plan amendment procedures, PX 154 at 4), the FS and BLM adopted a joint interpretation of "implemented" for purposes of determining when Category 2 surveys were required. PX 41. Under this interpretation timber sales were exempted from the surveys if the NEPA decision

document signifying approval of the environmental analyses preparatory to offering the sales to the public was signed before October 1, 1996. PX 41; Tr. 47:20-25. This interpretation became known as "NEPA decision equals implementation." The memorandum was to expire on September 30, 1998 (PX 41) but was extended and readopted by the FS and BLM for application to the FY 1999 species. PX 60; Tr. 1054:2-25. The FS relied upon "NEPA decision equals implementation" in deciding not to conduct any Category 2 species on Scott's sales prior to the award of those sales. Tr. 1452:16-1453:5; see DX 49.

On November 4, 1996, the FS and BLM also issued "Interim Guidance for Survey and Manage Component 2 Species; Red Tree Vole" (the "RTV Directive"). DX 109. The RTV Directive employed various parameters (screens) exempting much RTV habitat, including all of the RTV habitat on Scott's sales, from the Category 2 surveys. PX 154 at 4, PX 172 (Interrog. 6). The FS relied upon the RTV Directive in deciding not to conduct RTV surveys on Scott's sales. PX 172 (Interrog. 6).

On July 8, 1998, several environmental organizations filed suit challenging "NEPA decision equals implementation" and the RTV Directive. PX 143; Stip. 5; Oregon Natural Res. Council Action v. United States Forest Serv. ("ONRC Action"), 59 F. Supp. 2d 1085 (W.D. Wash. 1999). At the same time, they began providing the FS with lists of "at-risk" or "problem" sales that were targeted but not named in the complaint. PX 55, 128; Tr. 1340:8-24. The FS secretly agreed to hold off awarding the targeted sales, including Scott's sales, in conjunction with efforts to resolve the suit. On July 8, 1999, when Scott's sales were awarded, Scott did not know that its sales were specific targets of the lawsuit. Settlement efforts were unsuccessful and, on August 2, 1999, the district court held that "NEPA decision equals implementation" and the

RTV Directive were arbitrary, capricious and contrary to law and enjoined the FS from approving operations on nine named sales until the appropriate Category 2 surveys had been performed. PX 143. On August 26, 1999, the district court expanded the injunction to preclude the FS from approving operations on Scott's sales and others until the surveys had been performed. Stip. 6. The FS suspended Scott's sales on or about August 31, 1999 in order to perform the required surveys. Stip. 7. The suspension of Pigout lasted until June 11, 2002 and the suspensions of Whitebird and Jigsaw lasted until June 9, 2003. PX 41, 74, 93; Stip. 8-10. As a result of the suspensions Scott incurred substantial damages and on November 9, 2004, Scott timely submitted certified Contract Disputes Act claims. Stip. 11. Except for minor amounts such as interest on deposits and the cost of maintaining performance bonds, the contracting officer denied all of Scott's claims. JX 11, 12, 13. Scott timely filed suit in this Court.

## ARGUMENT

### I. The FS Failed To Include An Adequate Exculpatory Provision Or Disclaimer In The Contracts Or Require Scott To Execute A Release Of Liability

The FS breached each of the contracts because it failed to fulfill its fundamental obligation to make the timber available to Scott to harvest in a timely manner, and the FS was not excused from doing so by any valid exculpatory clause or waiver. See JX 4, 5, 15. Before auctioning Scott's sales the FS knew that these sales were explicit targets of the ONRC Action litigation. PX 172 (Interrog. 12); Tr. 869:18-24. The FS could have included any exculpatory provision it wished or required Scott to execute a waiver of liability to protect itself should it have to suspend the sales to conduct Category 2 surveys. See PX 176A, 176B; Tr. 406:13-408:2, 409:20-410:23, 601:21-603:3. Instead, the FS chose to rely exclusively on clause CT6.01, which

both this Court and the Board of Contract Appeals have found does not excuse FS fault for causing a contract to be suspended.

"'[W]here the government intends to exculpate itself from liability for its breach of contract, it must manifest that intent in direct and express language.'" Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 58 (2001) (quoting Dep't of Natural Res. and Conservation of Mont. v. United States, 1 Cl. Ct. 727, 734 (1983)); accord United States v. Seckinger, 397 U.S. 203, 212 (1970) ("[I]f the United States expects to shift the ultimate responsibility for its negligence to its various contractors, the mutual intentions of the parties to this effect should appear with clarity from the face of the contract"); Cedar Lumber, Inc. v. United States, 5 Cl. Ct. 539, 552 (1984) ("when the government intends to disclaim liability for breach of contract, it must employ clear and express language to effectuate its intent"). Even then, "the efficacy of a limitation of liability clause does not extend to those situations where the breach arises out of events within the Government's control." C.J. Betters Corp. v. United States, 25 Cl. Ct. 674, 677 (1992) (citing Ozark Dam Constructors v. United States, 127 F. Supp. 187 (Ct. Cl. 1955)). Timber sale contracts are take-it-or-leave-it contracts of adhesion. E.g., Everett Plywood Corp. v. United States, 651 F.2d 723, 726 (Ct. Cl. 1981); Precision Pine, 50 Fed. Cl. at 66; Seaboard Lumber Co. v. United States, 41 Fed. Cl. 401, 408 (1998). The FS is liable to the purchaser when it fails to include explicit language necessary to insulate itself from liability for an event which it clearly foresaw and which it caused, e.g., the failure to survey. See Ozark Dam, 127 F. Supp. at 191.

On July 29, 1998, Regional Attorney Robert Simmons advised the FS that if timber sales threatened by ONRC Action were to be offered to the public, the FS should include language in

the contracts limiting the government's liability for cancellation to holding costs. PX 53. Although Mr. Simmons only advised the FS to include language limiting the government's liability for cancellation and not for suspension, his advice demonstrates that the FS was well aware of its potential liability and the need to include appropriate language in the contracts. Nevertheless, the FS did not do so.

Other evidence in the record demonstrates that the FS was not only aware of its potential liability but also that the language in its standard contract was insufficient. In a memorandum signed by FS Associate Deputy Chief Paul Brouha which was provided to Department of Agriculture Deputy Under Secretary for Natural Resources and Environment Anne Kennedy, FS Associate Deputy Chief for Research and Development Barbara Weber, and Counsel to the FS Chief Al Ferlo, and produced at the request of the Acting Chair of the President's Council on Environmental Quality ("CEQ"), the FS and CEQ were advised that the FS "would argue vigorously against surveying sales that have been awarded" and that "[t]he Forest Service has no provisions in its timber sale contracts that specifically allow for suspension for survey and/or discovery of survey and manage species." PX 109 at 1798, 188; Tr. 316:16-317:3. In addition, just before December 3, 1998, when settlement did not appear likely, FS ONRC Action Litigation Coordinator Sue Zike emailed her distribution list (which included a litigation coordinator on the Umpqua National Forest, and high level FS officials such as Region 6 Director of Natural Resources Robert Devlin), the following warning: "Please keep in mind (as CO's always do) the liability that may come to the USFS if the sales are awarded and then enjoined." PX 95; Tr. 473:19-474:20, 1309:7-14.

As early as August 26, 1998, the FS knew that Scott's sales were explicit targets of ONRC Action because they were named on one of ONRC Action's earliest lists of "at-risk" sales provided to the government. PX 172 (Interrog. 12). Just two days before the award of Scott's sales on July 8, 1999, ONRC Action sent the FS a list of "at-risk" sales that continued to include Scott's sales. PX 128, 129; Tr. 915:3-923:15. The FS understood when it awarded these contracts that harvesting or ground-disturbing operations would likely prompt a motion for injunctive relief. PX 141; Tr. 99:7-100:1, 1370:7-1371:1. Nevertheless, the FS did not include adequate language in Scott's contracts to shield the FS from liability for suspensions which it caused by failing to perform Category 2 surveys.

The FS certainly knew how to draft language advising purchasers that it was disclaiming liability. For example, in its instructions to bidders, the FS included a provision that "expressly disclaims any warranty as to the quantity or quality of timber sold." This provision requires that the purchaser hold the FS "harmless for any error, mistake, or negligence regarding estimates except as expressly warranted" and directs the purchaser to rely only on its own estimates. JX 1 at SCOTTII 03846; JX 2 at SCOTTII 09306; JX 3 at SCOTTII 11153. Scott was aware of this disclaimer language, understood its clear meaning, and relied only on its own cruise estimates. Tr. 627:4-630:7. In contrast, there is no explicit disclaimer for error, mistake or negligence much less for arbitrary and capricious behavior set forth in clause CT6.01 which is relied on by defendant as a purportedly valid exculpatory clause. See JX 4 at SCOTTII 10011; JX 5 at SCOTTII 03935-36; JX 15 at SCOTTII 09488. In bidding on these sales Scott was reasonable in not interpreting CT6.01 as a provision exculpating the FS from any significant damages caused

by the FS's own error, mistake, negligence or arbitrary and capricious conduct. Tr. 652:16-656:16.

The FS could have required Scott to execute an explicit release and waiver of all claims as a condition of receiving contract award. For example, the FS has required purchasers in Region 5 and elsewhere to execute a pre-award waiver, release, and limitation of liability as a condition to being awarded a timber sale contract. PX 176A, 176B; Tr. 407:12-408:2, 409:20-411:4, 417:13-15, 601:21-603:3. This waiver explicitly states that the purchaser waives and releases all claims arising from the FS's failure to comply with environmental laws or its breach of the duties to cooperate and not to hinder. PX 176A. Moreover, use of this release and waiver shows that the FS regards CT6.01 as insufficient to protect itself from interruptions and delays caused by its own fault. Yet language equivalent to that found in the release and waiver was neither included in Scott's contracts nor in any pre-award waiver that Scott was asked to sign.

This Court has previously considered whether clause CT6.01 directly and expressly exculpates the FS from liability and found that it does not: "If the Forest Service sought to exculpate itself from delays . . . caused by conduct within the Government's own control, there would need to be a clear expression of that intent in [clause CT6.01]. . . . However, nowhere in [clause CT6.01] is such language to be found." 50 Fed. Cl. at 58. Precision Pine and all the cases subsequently dealing with allegations that the FS breached a timber sale contract by suspending operations under clause CT6.01 to satisfy pre-award environmental obligations have held that this clause is not a valid exculpatory clause. Trinity River Lumber Co. v. United States, 66 Fed. Cl. 98, 108 (2005); H.N. Wood Prods., Inc. v. United States, 59 Fed. Cl. 479, 487 (2003); Precision Pine, 50 Fed. Cl. at 59, 64; Tamarack Mills, LLC, AGBCA Nos. 2003-115-1

and 2003-116-1, 04-1 BCA ¶ 32,591 (2004), at 161,228; Shawn Montee, Inc., AGBCA Nos. 2003-132-1 through 2003-136-1, 04-1 BCA ¶ 32,564 (2004), at 161,073-74.

The FS had a fundamental obligation under the contracts to make timber available to Scott for harvesting within the normal operating season as set forth in each contract. JX 4 at SCOTTII 09949; JX 5 at SCOTTII 03877; JX 15 at SCOTTII 04927. When it failed to do so due to its own fault, regardless of whether it acted unreasonably, the FS breached the contracts and is liable to Scott unless it included a clear and explicit exculpatory provision. Clause CT6.01 is not such a provision.

**II. The FS Breached Its Implied Warranty Of Specifications**

Using its standard 2400-6T form as the template, the FS prepared the requirements applicable to Pigout, Whitebird and Jigsaw and specified in detail the manner in which each contract was to be performed. E.g., Tr. 559:4-560:20, 562:4-18, 582:23-590:20, 1422:22-1426:22; see JX 4, 5, 15. The particular terms included by the FS in each contract were not open to negotiation. Tr. 585:7-588:16, 1425:8-22. Bidders had to accept all of the terms included in the contracts or their bids would have been rejected as nonresponsive. Tr. 591:4-22, 592:12-15. Scott submitted the highest responsive bids and was awarded each contract. JX 6, 7, 8; Stip. 2-4.

Like all FS timber sale contracts, Scott's sales were take-it-or-leave-it contracts of adhesion drafted by the government. E.g., Everett Plywood, 651 F.2d at 730 ("bidders had to accept the contract terms the government wrote into the invitation [for bids], only the price being open for the bidder to specify"); Seaboard Lumber Co. v. United States, 48 Fed. Cl. 814, 816 (2001) ("Interested parties are invited to bid based on the information provided in the prospectus and the bidder's own examination of the site. The terms laid out in the prospectus are not open

to negotiations"); Seaboard Lumber, 41 Fed. Cl. at 408 ("contract terms laid out in the prospectus and those in the final contract are not open to negotiation"); Precision Pine, 50 Fed. Cl. at 66.[1]

The specifications drafted by the FS detailed exactly where and how ground-disturbing activities authorized by the contracts could be performed, such as identifying which particular trees could be harvested; specifying methods of logging in each unit; designating the precise manner in which timber could be harvested, and the time of year during which operations could be conducted; restricting the timing and locations where logging could take place; specifying the locations where roads and landings necessary for operations could be built; and specifying the timing and manner of road construction and the time of year during which logging operations could be conducted. E.g., JX 4 at SCOTTII 09951, 09964, 09970, 09974-75, 09981, 09983-84, 09995-10003, 10020-27; JX 5 at SCOTTII 03879, 03891, 03897, 03901, 03908, 03910, 03920-24, 03945-47; JX15 at SCOTTII 09429, 09442, 09448, 09452, 09459, 09461, 09473-76, 09496-98. A visible representation of some of the specifications detailed in the contracts is found in the sale area and slash (logging debris) disposal maps. E.g., JX 4 at SCOTTII 09981-82; JX 5 at SCOTTII 03908-09; JX 15 at SCOTTII 09459-60. Scott was not free to ignore the specifications or to perform contract operations in a manner that was not in complete accord with them. Tr. 591:9-592:15.

For example, in the standard "BT" clauses in each contract (BT6.1-BT6.9), the FS dictates many fundamental aspects of when and how the contractor must conduct its harvesting

[1]Although the FS periodically accepted comment on its standard form contracts and contract clauses from members of the timber industry, generally to provide notice to the industry that it was making changes to the contracts, it was within the FS's sole discretion to accept or reject any comments it received. Tr. 577:2-578:13, 1150:25-1151:10.

operations. This includes specifying the equipment that can be used to fell timber, JX 4 at SCOTTII 09974; JX 5 at SCOTTII 03901; JX 15 at SCOTTII 09452 (BT6.41); the manner in which the fallen timber is "bucked" or cut to size, id.; the height of the stumps remaining after the timber has been felled, id. (BT6.412); the methods of skidding and yarding the felled timber to the landing and the equipment that may be used for skidding and yarding, id. (BT6.42); and the size and location of landings, id. (BT6.422).

Corresponding "CT" clauses (CT6.0-CT6.84) contain even more detailed requirements with which harvesting and other operations under the contract must comply. E.g., JX 4 at SCOTTII 10010-28; JX 5 at SCOTTII 03935-54; JX 15 at SCOTTII 09458-09504 (CT6.315#) (specifying additional restrictions on the timing of certain contract operations and the equipment that can be used); (CT6.41#) (specifying, unit-by-unit, the methods and equipment the contractor can use when felling timber; FS approval required for any deviation from the methods and equipment specified); see (CT6.42#) (specifying the methods and equipment the contractor can use when yarding and skidding timber in the various units of the sale area; FS approval required for any deviation from the yarding and skidding equipment and methods specified).

The FS also controls restoration of the sale area following harvest. In clause CT6.6# the FS specifies the means by which the contractor is to prevent erosion and restore the sale area, identifies the areas where mechanized equipment may be used for these tasks, and even provides a detailed description of the type and quality of grass seed, fertilizer, mulch and straw to be used. JX 4 at SCOTTII 10020-22; JX 5 at SCOTTII 03945-47; JX 15 at SCOTTII 09497-98. In the same way the FS controls the disposal of "slash," i.e., "cull logs, blasted or pushed out stumps, chunks, broken tops, limbs, branches, rotten wood, damaged brush, damaged or destroyed

reproduction, saplings or poles," remaining upon the completion of harvesting in a given area of the sale. JX 4 at SCOTTII 10022-27; JX 5 at SCOTTII 03947-53; JX 15 at SCOTTII 09498-09503 (CT6.7 and CT6.74).

Additional specifications included in the contracts (BT5.1-BT5.5 and CT5.1-CT5.254) dictate the manner in which ground-disturbing road construction activities are to be conducted on the timber sale area. JX 4 at SCOTTII 09970-72, 09991-98; JX 5 at SCOTTII 03897-99, 03918-20; JX 15 at SCOTTII 09448-50, 09469-76. Among other things, these include specifications dictating in detail exactly where and what kind of road is to be constructed as part of the timber sale contract. Finally, two of Scott's contracts contain Limited Operating Periods specifically to restrict the times during which Scott could operate on the sales. See JX 5 at SCOTTII 03939; JX 15 at SCOTTII 09490 (CT6.313#). These specifications are for the protection of various species of wildlife and plants for whom active operations during certain times of the year (typically breeding seasons) may be harmful.

All of these contract specifications governing ground-disturbing activities are design specifications not performance specifications.

> Performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." Design specifications, on the other hand, describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications, but is "required to follow them as one would a road map." "Detailed design specifications contain an implied warranty that if they are followed, an acceptable result will be produced."

Blake Constr. Co. v. United States, 987 F.2d 743, 745 (Fed. Cir. 1993) (citations omitted); accord Hercules, Inc. v. United States, 516 U.S. 417, 425 (1996) ("When the Government

provides specifications directing how a contract is to be performed, the Government warrants that the contractor will be able to perform the contract satisfactorily if it follows the specifications"); Spearin v. United States, 248 U.S. 132 (1918). The FS impliedly warranted that Scott would be able to complete each contract satisfactorily by following the specifications it drafted.[2]

The FS provided Scott with design specifications that could not be followed because the FS failed to conduct Category 2 surveys before contract award and was forced to re-examine the specifications after award to determine whether they provided adequate protection for Category 2 species. The FS suspended sale operations for substantial periods of time in order to perform the Category 2 surveys so that if Category 2 species were discovered, it could revise the specifications governing ground-disturbing activities, if necessary.[3] By failing to conduct the surveys before preparing the specifications, the FS breached its implied warranty that Scott's compliance with the specifications would produce an acceptable result.

The Court need not find that the FS was at fault or negligent in order to conclude that the FS is liable for failing to prepare adequate specifications. E.g., J.L. Simmons Co. v. United States, 412 F.2d 1360, 1383 (Ct. Cl. 1969). Where the government's defective specifications cause delay in performance, the contractor is entitled to recover the costs it has incurred as a

[2] That Scott was required to submit plans of operations which specified when it planned to conduct operations in accordance with the parameters set forth in the contracts does not convert the design specifications into performance specifications. See JX 4 at SCOTTII 10014; JX 5 at SCOTTII 03939; JX 15 at SCOTTII 09489-90.

[3] As a result of conducting surveys, the FS discovered an active RTV nest in Unit 40 on Whitebird. Before it would allow operations in that unit the FS modified the sale to preclude the harvest of trees within an approximate five-acre area around the nest. DX 93; Tr. 982:5-14, 1572:12-25.

result of that delay. E.g., Laburnum Constr. Co. v. United States, 325 F.2d 451, 457 (Ct. Cl. 1963); Luria Bros. & Co., Inc. v. United States, 369 F.2d 701, 707-08 (Ct. Cl. 1966). Delay caused by deficient specifications is per se unreasonable for purposes of the standard suspension of work clause.[4] Sergent Mech. Sys., Inc. v. United States, 34 Fed. Cl. 505, 526 (1995) (citing Chaney and James Constr. Co. v. United States, 421 F.2d 728, 731 (Ct. Cl. 1970)); see Luria Bros., 369 F.2d at 707-08; Laburnum Constr., 325 F.2d at 453-54; Beauchamp Constr. Co., Inc. v. United States, 14 Cl. Ct. 430, 438 (1988).

The FS prepared the specifications pertaining to ground-disturbing activities, and was not only in the best position to determine whether or not those specifications conformed with its obligations under the NFP so that they could be carried out as written but it was the only one that could make such a determination. See Everett Plywood, 651 F.3d at 731. Nevertheless, at the time of award the FS had no idea whether or not the contracts could be performed as written because it had not conducted the requisite Category 2 surveys. As in Everett Plywood, the risk is on the government that its specifications governing ground-disturbing activities cannot be followed. See id.

A Spearin-type warranty analysis was applied to FS timber sale road specifications in Southwest Forest Industries, AGBCA No. 79-178-3, 81-1 BCA ¶ 14,877 (1981). A specification required the contractor to use "grid rolling" to remove rock from a designated pit. The contractor believed this specification was defective and the FS permitted the contractor to use crushed rock in lieu of grid-rolled rock, a more expensive manner of performance, but declined

[4]General principles of federal government contract law are routinely applied to timber sale contract disputes even though the FS enters into timber sale contracts pursuant to 16 U.S.C. § 472a and its implementing regulations, 36 C.F.R. Part 223, rather than pursuant to the federal procurement statutes and regulations.

to agree to a design change to increase the rock cost as requested by the contractor. In examining the question, the Board used a Spearin analysis and stated: "Where the Government dictates a particular method of contractor performance, it implies the method will produce satisfactory results." Id. at 73,568. The Board, however, was not persuaded that grid-rolling would produce unsatisfactory results and concluded that the contractor had not proved that the specification was defective.

That the logic and reasoning of Spearin applies to design specifications included in FS timber sale contracts in the same manner that it applies to design specifications included in all government contracts can be seen in other cases. See Bloedel Donovan Lumber Mills v. United States, 74 F. Supp. 470 (Ct. Cl. 1947) (timber sale contract gave FS the right to specify the time and manner for burning slash; FS liable because compliance by contractor with specified time and manner resulted in wildfire that destroyed logs and equipment of contractor); Precision Pine, 50 Fed. Cl. at 67 ("The Defendant's contention that its interpretation of the contract should prevail because courts generally uphold the autonomous rights of parties to contract rings hollow in the face of precedent in which the Government is liable for cases where a contractor cannot perform according to government-drafted specifications because the specifications themselves are defective").

The Spearin doctrine applies to FS timber sale contracts. By preparing defective design specifications governing the ground-disturbing activities authorized by the contracts, the FS breached its implied warranty that Scott's sales could be operated in accordance with those specifications.

### III. The FS Breached The Contracts Because It Failed To Disclose To Scott That Its Sales Were On ONRC Action's "At-Risk" Lists And That The FS Had Secret Agreements With ONRC Action And Because The FS Misled Scott Into Believing That The Sales Were Not Threatened By ONRC Action

The facts established at trial demonstrate that the FS breached its implied affirmative duty "to disclose superior knowledge that is required for the performance of a contract to which it is a party" by failing to disclose to Scott the vital knowledge it possessed that the sales were explicit targets of the pending ONRC Action litigation and misleading Scott to the contrary. S. California Edison v. United States, 58 Fed. Cl. 313, 325 (2003). A government agency cannot remain silent where, as here, it has a duty to share information. See Helene Curtis Indus., Inc. v. United States, 312 F.2d 774, 778 (Ct. Cl. 1963). The FS never disclosed to Scott the FS's secret internal communications, assessments of the risk of going forward with contract award, and secret agreements with ONRC Action about Scott's sales.

When it awarded the contracts on July 8, 1999, the FS knew that Scott's sales were explicitly at risk of being suspended after award due to the ONRC Action litigation. PX 121A, 128, 129 at A-993 to -994; Tr. 880:23-25, 911:14-912:11, 1361:18-1364:17, 1365:21-1366:11. Scott did not. Tr. 656:17-657:2, 658:1-10, 881:20-23, 935:12-937:12, 1516:2-16. The lengthy suspensions affected Scott's performance of the contracts by delaying the time during which Scott could harvest the timber and remove it from the sale areas.[5] The FS knew that Scott was unaware of the explicit risk of the sales being suspended due to the ONRC Action litigation because the FS intentionally kept secret from Scott that the sales were on the "at-risk" lists exchanged between the FS and ONRC Action. PX 59, 65; Tr. 102:2-105:19, 177:3-7, 874:15-

[5]The delay resulted in significant increased costs and substantial lost profits. JX 9, 10, 16; Tr. 662:13-23.

880:25, 1207:15-1208:14. The FS also kept secret from Scott that it had agreed with ONRC Action that Scott's sales could be awarded without provoking requests for injunctive relief so long as the FS gave ONRC Action advance notice of any ground-disturbing activities on the sales. PX 59, 115, 119, 128, 154; Tr. 229:21-231:25, 456:24-458:15, 886:6-18. The FS also failed to inform Scott that before deciding to make contract award it had weighed the risk of likely injunctive action against these sales by ONRC Action and evaluated the strength of the government's case on the merits as to each. PX 92, 96, 101, 116, 125; Tr. 107:2-112:21, 1010:8-1012:1, 1021:5-1022:19, 1318:13-1320:23.[6]

Scott did not know and could not have known that the sales were subject to the secret agreements between the FS and ONRC Action based on the FS's generic pre-bid announcement that award (as opposed to performance after award) of the contracts might be delayed by litigation.[7] JX 1, 2, 3; PX 71; Tr. 650:16-651:19, 870:14-872:18, 1082:1-17, 1083:22-1084:12. Subsequently, Scott repeatedly asked the contracting officer if the sales were on any secret lists or for any information that might reveal that the sales were threatened by ONRC Action. Believing that the information was confidential, the contracting officer refused to provide the requested information to Scott. Tr. 877:15-880:22. Of course, as the FS knew and Scott did not, the sales remained directly at risk, and that risk became a virtual certainty once the FS decided to make contract award.

[6]The FS actively hid the secret information it possessed for its own purposes so that Scott would be placed "squarely at the table" to Scott's detriment and the government's assumed benefit. PX 99 at A-1754; Tr. 495:2-498:12.

[7]Had Scott known the true facts, Scott could have avoided or mitigated its damages. Tr. 650:16-651:19.

In the award letters, the FS represented to Scott that the sales were no longer at risk. After Scott had bid on the sales and prior to award, the contracting officer informed Scott that the sales had been appealed and that "[a]ward will be delayed or denied pending outcome of such appeal." PX 84; Tr. 874:13-877:14. Then in the award letters the contracting officer explained that award had been delayed pending resolution of a lawsuit. JX 6, 7, 8; Tr. 938:22-941:24. The clear implication of the award letters was that Scott's sales were no longer involved in the lawsuit or appeal that had delayed award. Tr. 1517:15-1519:12.

Additionally, based on its past dealings with the FS and because the FS was the most accurate source of information about its sales, Scott reasonably expected that the FS would inform it if there were specific threats to the sales. Tr. 658:25-659:10, 1545:8-1546:6. Scott relied on the FS's conduct in making contract award without indicating that the sales were still at risk of being delayed as a result of ONRC Action, and by its silence on the subject effectively representing to Scott that the sales were not at risk.

Scott relied on the FS's silence and its letters and suffered injury as a result of the FS's failure to disclose. Scott accepted contract award at the prices it bid with the expectation that its operations would not be suspended based on ONRC Action. Cf. DX 55 (extending bid only for a limited time); Tr. 651:8-19, 1535:1-20 (stating Scott would not have waited indefinitely for award). Because the suspension caused Scott to incur significant damages, the nondisclosure by the FS resulted in direct injury to Scott. See Miller Elevator Co. v. United States, 30 Fed. Cl. 662, 674-75 (1994). Scott has proven that the FS breached the contracts by failing to disclose its superior knowledge. See GAF Corp. v. United States, 932 F.2d 947, 949 (Fed. Cir. 1991), cert. denied, 502 U.S. 1071 (1992); Petrochem Servs., Inc. v. United States, 837 F.2d 1076, 1078-79

(Fed. Cir. 1988); J.A. Jones Constr. Co. v. United States, 390 F.2d 886 (Ct. Cl. 1968); Helene Curtis, 312 F.2d at 774.

## IV. The FS Breached Its Duties To Cooperate And Not To Hinder Scott's Operations

### A. "NEPA Decision Equals Implementation" And The Red Tree Vole Directive Are Unreasonable Interpretations of the ROD

"NEPA decision equals implementation" and the RTV Directive are unreasonable interpretations of the ROD. The FS knew or should have known that its environmental analyses were inadequate when it awarded Scott's sales because of its decision not to perform Category 2 surveys. As the ONRC Action district court found, "NEPA decision equals implementation" and the RTV Directive were "arbitrary and contrary to the plain language of the ROD." PX 143 at 1093.[8] Because these interpretations do not comport with the plain language of the Category 2 survey requirements or the purpose of the Category 2 surveys,[9] see PX 143 at 1093; Tr. 357:4-

[8]The arbitrary and capricious test "is a standard well understood to be the most deferential possible" to the government. Munn v. Sec'y of Dep't of Health and Human Servs., 970 F.2d 863 (Fed. Cir. 1992); 2 Childress and Davis, STANDARDS OF REVIEW § 15.7 (1986)); accord In re Gartside, 203 F.3d 1305, 1312 (Fed. Cir. 2000). Agency action can be overturned under this standard only if that action is not just unreasonable but irrational. This rule is the same in the Ninth Circuit, under whose law ONRC Action was decided. E.g., Northcoast Envtl. Ctr. v. Glickman, 136 F.3d 660, 666 (9th Cir. 1998); Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy, 898 F.2d 1410, 1414 (9th Cir. 1990). The Ninth Circuit recognizes that when a court reviews agency action for reasonableness, the court is less deferential than when it applies the arbitrary and capricious test. Northcoast Envtl. Ctr., 136 F.3d at 666-67. When the district court held that the FS was arbitrary and capricious for adopting "NEPA decision equals implementation" and the RTV Directive, that court ipso jure concluded that the FS had no reasonable basis for its actions. This Court should reach the same conclusion.

[9]The clear intent of the Category 2 surveys was to gather vital data on species for which there was little information and a serious concern about their persistence before timber harvesting and other ground-disturbing activities took place. JX 14; Tr. 346:4-21, 383:3-384:7.

358:2, the interpretations were unreasonable and the FS's reliance on them as justification for not performing Category 2 surveys resulted in the suspensions.

The FS and BLM initially developed "NEPA decision equals implementation" purportedly because they believed that page C-5 of the S&G ("Surveys must precede the design of all ground-disturbing activities that will be implemented in [FY] 1997 or later") was in conflict with page 37 of the ROD itself ("surveys [must be] conducted prior to ground-disturbing activities"). See PX 41 at A-279. Both the S&G and the ROD obviously require that Category 2 surveys be conducted prior to "ground-disturbing activities." Nonetheless, the FS and BLM chose to adopt what they described as the "specific direction" on page C-5 of the S&G, which they construed as directing that Category 2 surveys were not required on projects for which NEPA decision documents approving the "design" of the project had been signed (PX 26, PX 41 at A-279), even though no ground-disturbing activities were anticipated for months or even years later on those sales. See PX 41; Tr. 47:20-25.

"NEPA decision equals implementation" was arbitrary and irrational because in both the ROD and the S&G "implemented" clearly refers to ground-disturbing activities and not to NEPA documents. Even the title of the Category 2 survey requirements is "Survey prior to ground-disturbing activities." JX 14 at C-5. Also, there is no mention of NEPA decisions in either the S&G or the ROD itself. JX 14. Further, as the FS well knew, NEPA decision documents often precede ground-disturbing activities by a number of years. Tr. 166:21-167:15, 171:18-23, 1065:8-1066:6, 1492:13-15, 1592:5-7. "To equate a NEPA decision with the implementation of ground-disturbing activities would arbitrarily exempt a large number of timber sales from the [NFP's] survey requirements" and "create an incentive to rush NEPA decisions to avoid

conducting surveys." PX 143 at 1093. And that is precisely what occurred. PX 86, 182; Tr. 1071:12-1074:21.

Assuming arguendo that the intent of the ROD was to require Category 2 surveys prior to the signing of a NEPA decision document, because "the presence or absence of [S&M] species is a significant piece of information and should be available prior to the signing" of the NEPA decision document (PX 41 at A-279), the obviously correct approach, which the FS intentionally did not follow, would have been to postpone execution of NEPA decision documents for sales on which ground-disturbing activities were anticipated to begin in FY 1997 or FY 1999 or later, so that the appropriate Category 2 surveys could be performed and included in the pre-award environmental analyses. Only then would it have been appropriate to sign decision documents and thereafter offer and award the contracts.[10] Indeed, the original intent of "NEPA equals implementation" was to require surveys for the greatest number of sales, not to exclude the greatest number of sales from the survey requirements. Tr. 799:24-800:14. By applying this interpretation to exclude rather than to include planned sales in the survey requirements, the FS relied on an interpretation ostensibly developed for the purpose of being the most conservative

[10] Apparently out of a concern that too many sales would be exempted from surveys, the November 1, 1996 guidance memorandum provided for a "'transition period' (October 1, 1996 to May 31, 1997)" during which Category 2 surveys would be required even though no surveys had been performed and decision notices had been signed. PX 35 at 2-3, PX 41 at A-279 to -80; Tr. 774:6-776:18. There is no basis in the language of the ROD for such a "transition period." Tr. 776:19-777:14. This blatant inconsistency underscores the arbitrary, capricious and unreasonable application of "NEPA decision equals implementation." It also demonstrates the obvious concern the FS and BLM had about exempting sales from surveys when ground-disturbing activities were anticipated to occur after the survey trigger date. When "NEPA decision equals implementation" was extended to apply to the FY 1999 surveys, the "transition period" was dropped from the guidance memorandum without explanation even though 221 awarded timber sales (574 MMBF) were exempted from surveys. PX 60, PX 154 at 6.

(i.e., protective of habitat) in a manner that had completely the opposite effect with respect to sales in the pipeline. Tr. 800:15-801:10.

The November 1, 1996 guidance memorandum which formally adopted "NEPA decision equals implementation" was scheduled to expire on September 30, 1998. PX 41; Tr. 850:25-851:10. The FS and BLM chose to extend this interpretation to cover the Category 2 surveys required to commence as of October 1, 1998. PX 60. It is this extension of "NEPA decision equals implementation" and the RTV Directive (DX 109) which are directly at issue in this action because the NEPA decision documents for Scott's sales were signed after October 1, 1996 but before October 1, 1998. PX 46, PX 129 at A-993 to -94, PX 172 (Interrog. 4).

The FS and BLM engaged in no new analysis of the ROD to justify this extension and instead relied only upon the earlier analysis used to justify adoption of "NEPA decision equals implementation" with respect to the October 1, 1996 trigger date. PX 41, 60. With regard to the Category 2 surveys required after October 1, 1998, the ROD states, "In all cases, these surveys must be completed prior to ground-disturbing activities that will be authorized or implemented in FY 1999 or later," and the S&G states, "these surveys must be completed prior to ground-disturbing activities that will be implemented in FY 1999 or later." JX 14 at 37, C-5. There is no reference in either the ROD or the S&G to any alleged requirement that surveys must precede the "design of all ground-disturbing activities." In short, with respect to the FY 1999 surveys which are at issue in this case, any argument based upon use of the term "design" on page C-5 of the S&G has no application and there is no purported ambiguity.[11]

[11]Use of the term "authorized" in the ROD at 37 does not introduce ambiguity. Ground-disturbing activities are authorized only after the purchaser has submitted and the FS has approved a plan of operations that complies with all contract requirements. JX 4 at SCOTTII

The record is replete with instances in which knowledgeable government personnel, including Edward (Ted) Boling, the government's chief trial lawyer in ONRC Action, and Assistant Attorney General for the Environment and Natural Resources Lois Schiffer advised the FS that "NEPA decision equals implementation" did not comport with the ordinary understanding of the term "implement," was not consistent with the intent and direction in the ROD and was nothing more than nonsense. For example, in a fax message dated November 25, 1998, Mr. Boling sent an email to CEQ General Counsel Dinah Bear which analyzed the "implementation" issue in ONRC Action entitled "Failure to Survey Projects Authorized in FY 98 for Invertebrates – High Litigation Risk, Major Program Impact." PX 90. The analysis states, "The agency's interpretation of the ROD is difficult to square with the common meaning of the term 'implemented.'" Id. at 501; Tr. 127:10-129:13.

On the same day Mr. Boling sent this fax, he advised Ms. Schiffer and her immediate subordinate Peter Coppleman about "NEPA decision equals implementation." PX 89; Tr. 1269:10-1271:17. During that briefing Ms. Schiffer said that the interpretation was nonsense. PX 91; Tr. 134:23-135:20, 474:23-475:21, 1276:21-25. Mr. Coppleman shared Ms. Schiffer's concerns. Tr. 117:15-118:8. Later, in his memorandum to Ms. Schiffer recommending settlement and no appeal of the ONRC Action decision, Mr. Boling advised, "our likelihood of

10014; JX 5 at SCOTTII 03939; JX 15 at SCOTTII 09489-90; Tr. 959:7-22. Moreover, having relied on the "specific direction" on page C-5 of the S&G for the FY 1997 species because the ROD states that its directions are "spelled out" and are to be "applied" as contained in the S&G, JX 14 at 4, logic dictates that the FS should also have relied on the S&G direction for FY 1999 species. There is no reference in this S&G direction to "design" or "authorized." Finally, the S&G at C-5 refers to ground-disturbing activities that will be authorized or "implemented" in FY 1999. Ground-disturbing activities were not implemented on Scott's sales until after October 1, 1998; therefore, surveys were required. These logical inconsistencies underscore the unreasonableness of the FS's interpretation for the FY 1999 species.

success on appeal is not great because the agencies' interpretations are clearly in tension with the text of the ROD and the common meaning of the words 'implement' and 'survey.'" PX 154 at 7.[12] Earlier, a draft guidance memorandum dated August 28, 1996 stated that "NEPA decision equals implementation"

> will also result in projects being operated on in fiscal years 1997, 1998 and possibly even 1999 without surveys having been done. We have been unable to determine how many projects this might be, nor have we been able to get an estimate of the possible resource damage that could occur. However, there is strong concern on the part of FS, BLM and USF&WS biologists that allowing any operations to proceed after 9/30/96 without surveys is unacceptable because it does not meet the intent of the ROD.

PX 27 at 2; Tr. 1621:14-1623:16; see PX 25 at A-209. Ultimately, the government agreed to settle ONRC Action and pay attorneys' fees and expenses in accordance with the Equal Access to Justice Act, effectively conceding that the government's position was not substantially justified. PX 155; Tr. 250:19-251:22, 254:8-255:25.

The RTV Directive was also arbitrary, capricious and contrary to law. It unreasonably and without any amendment of the ROD reversed the explicit direction for Category 2 surveys for the RTV. PX 143 at 1094-95. Under the RTV Directive no surveys were required where it was believed that there was a substantial amount of RTV habitat. DX 109. This interpretation was ostensibly based upon the agencies' belief developed after the ROD issued that field surveys were not needed in these areas. Cf. DX 109 at SCOTTII 03291 ("Attachment 1 provides . . . rationale for this guidance"), id. at SCOTTII 03293, 03294 (Attachment 1 dated 09/05/96).

---

[12] Mr. Boling had concerns about the defensibility of "NEPA decision equals implementation" (Tr. 247:17-248:20), and Owen Schmidt, chief FS lawyer for ONRC Action, understood that Mr. Boling was leery of this interpretation. Tr. 1014:13-1017:21.

The clear direction in the ROD was that surveys must be conducted for the RTV within its "known or suspected ranges and within the habitat types or vegetation communities associated with" it. JX 14 at C-5 (emphasis added). "The [NFP's] requirement that surveys be conducted cannot be dropped simply by the issuance of memoranda concluding that 'field surveys were not needed.'" PX 143 at 1095. Any such change in the requirements for RTV surveys would have required an amendment to the ROD and could not be based solely on agency interpretation of the ROD. See id. at 1088, 1094. However, the FS did not attempt to amend the ROD even though the RTV Directive exempted "about ninety percent of the red tree voles' habitat." Id. at 1094.[13] In fact, Mr. Boling advised his superiors that the RTV Directive "effectively excluded much of the red tree vole's habitat from survey, which is inconsistent with the ROD requirement to survey 'all' ground-disturbing activities 'within the known or suspected ranges and within the habitat type or vegetation communications associated with the species.' ROD C-5." PX 154 at 4.

In Precision Pine, the court granted the plaintiff summary judgment on liability where the FS unreasonably failed to submit LRMPs for consultation to the Fish & Wildlife Service ("F&WS") in the face of the Ninth Circuit's "clear ruling" in Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1051-52 (9th Cir. 1994), that the FS was required to do so under the Endangered Species Act ("ESA"). 50 Fed. Cl. at 68-69. The FS tried to avoid these requirements by issuing amendments to its LRMPs and submitting the amendments, but not the underlying LRMPs, for consultation. An environmental organization sued to enforce the consultation requirements and,

---

[13]Because the district court held that the RTV Directive was arbitrary, capricious and contrary to law (id. at 1096-97), it also held, ipso jure, that the RTV Directive was unreasonable. See supra note 8.

citing Pacific Rivers, the district court found that the FS's actions were "contrary to the ESA and clear Ninth Circuit law." Silver v. Babbitt, 924 F. Supp. 976, 985 (D. Ariz. 1995).

The district court issued an injunction that caused the FS to suspend Precision Pine's timber sales until the required consultations were completed. 50 Fed. Cl. at 38. Precision Pine then filed suit in this Court alleging that the suspensions breached the implied duties to cooperate and not to hinder. The Court in Precision Pine found that for some of the suspensions prior to Pacific Rivers, there was a reasonable legal argument for not submitting LRMPs for consultation because there was "an open . . . legal question" on the matter up to that point, but afterwards the FS was unreasonable for trying "to avoid the clear mandate of Pacific Rivers." Id. at 68, 70.

In the instant case, there is no need for a Pacific Rivers-type court decision because the intent and direction of the NFP Category 2 surveys is "clear, plain and unmistakable." PX 143 at 1094. There was never any genuine "open legal question" before the FS regarding the unreasonableness of "NEPA decision equals implementation" or the RTV Directive and the use of these interpretations to exempt 221 awarded timber sales (574 MMBF), including Scott's sales, from surveys. PX 154 at 6. Moreover, as in Precision Pine, there is uncontroverted evidence that the Department of Justice ("DOJ") expressed deep concerns about the defensibility of the FS's actions prior to the award of Scott's sales. See 50 Fed Cl. at 45, 68-69; PX 90; Tr. 247:17-248:20.

The theory of liability on which Precision Pine prevailed was that the FS breached its duties to cooperate and not to hinder. 50 Fed. Cl. at 70, 72. Since the Precision Pine decision, several tribunals have agreed that the FS's unreasonable failure to comply with critical underlying environmental requirements prior to contract award may constitute a breach of the

duties to cooperate and not to hinder. E.g., Trinity River, 66 Fed. Cl. at 112; H.N. Wood Products, 59 Fed. Cl. at 490-91; Tamarack Mills, 04-1 BCA at 161,228; Shawn Montee, 04-1 BCA at 161,077. The plain language of the ROD, plus the holding of ONRC Action and the supporting facts established at trial demonstrate that it was not reasonable for the FS to have adopted "NEPA decision equals implementation" or the RTV Directive.

### B. The FS Rushed To Award The Contracts Before The Final Decision In ONRC Action Despite Being On Notice That Its Legal Rationale For Not Conducting Surveys Was Deficient

Before the award of Scott's contracts, the FS was repeatedly put on notice that "NEPA decision equals implementation" and the RTV Directive were without any reasonable basis. Warnings piled upon warnings from the FS, other agency personnel and high level officials of DOJ that were repeatedly ignored by FS management. The FS either knew or should have known that it was not reasonable to award Scott's sales in these circumstances.

At least as early as 1995, an Issue Resolution Team ("IRT") was established as an interagency workgroup for the FS and BLM to provide recommendations to higher level management and to give guidance to field personnel on interpretations of the ROD's requirements. Tr. 696:15-697:22, 699:15-703:14. Key members of the IRT included Tom Hussey of the FS and Larry Larsen of the BLM. Tr. 698:8-21. Beginning at least in the summer of 1996 when the IRT began to address the question of when Category 2 surveys were required, other agency personnel became involved including Randy Hickenbottom of the FS, Cheryl McCaffrey of the BLM and Robin Bown of the F&WS. Tr. 705:19-707:11, 835:11-836:18, 1588:4-1591:8. Hickenbottom and McCaffrey were at various times lead members of the S&M workgroup which helped implement the ROD's S&M program. Tr. 824:3-825:2, 834:25-835:10.

As these individuals worked to produce guidance that ultimately became the joint FS/BLM memorandum adopting "NEPA decision equals implementation" (PX 41), serious doubts arose among them and among agency field personnel about whether this interpretation correctly reflected the direction in the ROD. These doubts were made known to FS and BLM members of the IRT and other agency personnel. Tr. 748:19-749:24, 756:8-757:11, 1617:11-1621:13.

Around January 1996, the IRT was called upon to provide guidance at workshops to FS field personnel charged with implementing the ROD. Tr. 704:13-705:8. At one workshop for Willamette National Forest personnel, the IRT provided the following guidance in response to the question, "When is a project [timber sale] implemented [for purposes of requiring Category 2 surveys]?": a project (or timber sale) is implemented "when the Forest Service has committed to a project to the point where it would be unreasonable (cost or resource impacts) to delay or cancel the project. When FS has entered into legal contractual agreement, the project is considered implemented (IRT Response)." PX 13 at A-90.[14] Had the FS continued to follow this early IRT interpretation of "implementation," there would have been no need to suspend Scott's sales to survey for the RTV or the 71 FY 1999 species.

By early fall of 1996, the IRT began producing and circulating drafts of guidance memoranda addressing, among other things, the question of when Category 2 surveys were required. <u>Compare</u> PX 41 <u>with</u> PX 27-31, 35, 38. One interpretation was that implementation occurs some time after the NEPA decision had issued but before the agency makes a relatively irreversible commitment to act. PX 24 at A-205. This was essentially the same interpretation

[14]Although Tom Hussey recalled attending the Willamette workshop, he had no specific recollection about providing this guidance, but stated that it would not have been unusual for him to have made that kind of presentation and had no reason to believe that the guidance provided did not accurately reflect what was presented at the Willamette meeting. Tr. 710:19-713:8.

offered by the IRT at the January 1996 Willamette workshop. PX 13 at A-90. This interpretation was considered "a more conservative approach in that it would require more of our projects to have the surveys prior to project operations." PX 24 at A-205, PX 179 at A-244; Tr. 741:23-742:16. The drafts frequently reflected serious concerns about the adoption of "NEPA decision equals implementation" because it would exempt many timber sales from Category 2 surveys and was inconsistent with the ROD. PX 25 at A-209, 27, 28, 29 at A-217, 30 at A-223. Draft guidance memoranda dated August 28, 1996 circulated among the IRT and others warned against unquantifiable damage to species habitat, and that proceeding with unsurveyed timber sales after October 1, 1996 "does not meet the intent of the ROD." Id. Agency field personnel also expressed doubts about "NEPA decision equals implementation." Tr. 748:19-749:24, 756:8-757:11, 1617:11-1621:13.

Another draft memorandum likely from Randy Hickenbottom of the FS specifically warned that "the 'banking' of NEPA decisions prior to FY 97 for projects [timber sales] that will not begin for several years is inappropriate," if "NEPA decision equals implementation" is adopted. PX 179 at A-244, 180 at A-257; Tr. 1648:14-1652:2. This comment referred to the FS practice of completing and signing NEPA decision documents months or even years before actually offering timber sales to the public. Tr. 771:9-772:14.

Cheryl McCaffrey of the BLM and Robin Bown of the F&WS were two individuals who vigorously pressed their concerns before the IRT and argued for interpretations that would allow more timber sales which were planned to have operations after October 1, 1996 and October 1, 1998 to be surveyed. Tr. 1598:20-1603:6, 1621:14-1622:24. Tom Hussey was aware of these concerns. Tr. 771:9-772:18, 1603:9-13, 1651:15-19. Larry Larsen was not only aware of these

concerns but shared them to a degree. Tr. 1600:5-6. Mr. Larsen personally favored either holding off on the award of timber sales and doing surveys before award or holding off on the signing of NEPA decisions until Category 2 surveys had been performed for timber sales for which operations were planned after the survey trigger date. Tr. 1612:15-1613:3.

Ultimately, even though the final guidance memorandum adopted "NEPA decision equals implementation," that memorandum incorporated a concept of "transition periods" under which Category 2 surveys would be required even after NEPA decision documents had been signed for timber sales with decision documents relatively close to the trigger date of October 1, 1996. PX 41. Larry Larsen prepared a graphic chart used in the memorandum that identified at least three circumstances in which such surveys were required. PX 30, 31, 35; Tr. 772:24-780:16, 1630:11-1631:2. There is no language in the ROD authorizing any such "transition periods," and these "transition periods" were not based on the language in the ROD but rather were a post-ROD policy determination. Tr. 775:25-777:2, 786:19-788:19.[15]

By 1998 the FS was well aware of the controversy surrounding its interpretations "NEPA decision equals implementation" and the RTV Directive. Prior to the filing of the complaint, ONRC Action and member organizations had administratively appealed approximately 154 FS and 67 BLM timber sales challenging these two ROD interpretations. PX 154 at 6. Shortly after

[15]There was so much concern about the possible adverse consequences of exempting timber sales from Category 2 surveys that Regional Ecosystem Office director Donald Knowles asked Richard Holthausen, the former head of the Species Analysis Team and knowledgeable about various aspects of the Category 2 survey requirements, whether it was possible to do an assessment of the potential impact of the different implementation dates for surveys required under the NFP. Tr. 356:19-357:17. Mr. Holthausen responded that there was no way of knowing whether delaying the Category 2 surveys would or would not cause the extirpation of a species, but that delaying the Category 2 surveys would undoubtedly have some level of adverse affect on their habitat. Tr. 357:18-358:2.

the complaint was filed, at the request of Ted Boling, the ONRC Action plaintiffs submitted a 25-page letter to the government addressing in detail, among other issues, their arguments against these two ROD interpretations, with specific examples. PX 65.

On November 24, 1998, Ted Boling briefed Lois Schiffer and Peter Coppleman on the ONRC Action litigation. Tr. 113:2-114:1. Ms. Schiffer and Mr. Coppleman expressed serious concern regarding whether the government could successfully defend "NEPA decision equals implementation." PX 89, 91, 92; Tr. 117:15-118:8, 134:23-135:20, 474:23-475:21, 482:6-486:18, 1273:10-1275:9, 1276:16-25. These concerns of high level DOJ officials were well-known to the FS months before the FS awarded Scott's sales. Id.; PX 88 at A-295; Tr. 535:2-20, 1085:25-1090:1, 1091:14-1092:2, 1105:3-1107:15, 1267:7-21.

From approximately September 17, 1998 to at least June 15, 1999, the FS delayed the auction, award or approval of operations on timber sales as part of explicit or implicit agreements with ONRC Action. PX 129 at A-986; Tr. 97:13-98:10, 1299:17-1300:24; see PX 65, 95, 172 (Interrog. 12). This included the delay of the award of Scott's sales, PX 119, PX 129 at A-993 to -994, PX 172 (Interrog. 20), for which bid opening and oral auctions took place in October 1998. JX 6, 7, 8. On December 4, 1998, after settlement talks with ONRC Action collapsed, Mr. Boling advised the FS that it could award timber sales that had been delayed but cautioned that it was essential that he be kept informed of the status of pending awards and asked that the FS have its own lawyers review any sales proposed for award and communicate their judgment to him that "the award of the sale is worth the risk that the sale will be used by plaintiffs as an example in an emergency motion to enjoin all sales in the area of the [NFP]." PX 96 at A-519. Region 5 ONRC Action Litigation Coordinator Brian Stone boiled down the advice from Mr. Boling as

follows: "The question needs to be answered for each sale that would go forward: Why do we need to go forward with this particular sale NOW, instead of waiting for conclusion of the ONRC litigation??" PX 110 at A-577; Tr. 1325:7-1328:24.

Before the award of Scott's sales, the FS was aware that purchasers, like Scott, would likely suffer damages and the FS could be found liable to the purchasers for those damages. Tr. 505:10-16, 527:5-528:9, 462:20-463:6. On December 9, 1998, FS ONRC Action Litigation Coordinator Sue Zike sent a memorandum to the Regional Forester for Region 6 and the BLM State Director in which she analyzed the question, "Is there litigation advantage to awarding sales named by plaintiffs in ONRC Action as examples violating the [NFP]?" PX 99 at A-1754; Tr. 494:7-496:21. In a listing of "Pros" and "Cons," Ms. Zike concluded that awarding such sales (which would include Scott's sales) would be an advantage to the FS because it would "put purchasers squarely at the table," meaning that it would be more effective for the purchasers rather than the FS to complain about the harm or damages purchasers might suffer. Id.; Tr. 496:22-498:12. One of the "Cons" listed by Ms. Zike was "may create $$ liability to govt if lose [sic] case." PX 99 at A-1754; Tr. 505:10-16.

In an email dated March 19, 1999 to Region 6 Director of Natural Resources Robert Devlin, Ms. Zike described DOJ's position regarding the award of the previously delayed timber sales as follows: "DOJ wants out of the 'concurrence' but wants to be assured that 'no dogs are let out in the street' while [Boling] is preparing our motion for summary judgment to the amended complaint and while the judge is considering the case, estimated to be May 15." PX

113A at TAB 80184-85; Tr. 513:21-514:19, 1335:19-1337:8.[16] The FS continued to delay the award of Scott's sales.

By letter dated April 6, 1999, Mr. Boling advised the FS that under a stipulated scheduling order the government would give ONRC Action 10 days notice before the award of any timber sales until at least June 15, 1999, the then-anticipated date for a hearing on the parties' cross-motions for summary judgment. PX 116; Tr. 202:20-209:12. Once again Mr. Boling reiterated his request that the FS and BLM and their agency counsel reach a judgment that the award of a sale was worth the risk that the sale might trigger an emergency motion for injunctive relief and that that judgment be communicated to him prior to any award. Id. at A-755; Tr. 209:25-214:10. The April 6, 1999 list included Scott's sales.

Notwithstanding the foregoing, Contracting Officer Brenda Woodard gave formal notification to Sue Zike and through her to DOJ that she wished to push forward with the award of Scott's sales "as soon as possible, but not later than May 5, 1999." PX 118, 119. In response Ms. Zike advised that these sales remained on ONRC Action's "at-risk" list and that it would be best to wait until a hearing which Ms. Zike anticipated would be on June 11, 1999 and for the court's ruling on cross-motions for summary judgment which Ms. Zike anticipated would occur "shortly thereafter." PX 119; Tr. 456:24-458:22, 908:6-909:15. The FS was now willing to continue to delay the award of Scott's sales until at least after June 11, 1999 in order to obtain a decision on the merits in ONRC Action. Tr. 909:9-15.

---

[16]By March 19, 1999, the court had granted the government's motion to dismiss. The court allowed ONRC Action to file an amended complaint which for the first time identified nine timber sales as examples and continued to assert that the interpretation "NEPA decision equals implementation" and the RTV Directive were clear violations of the ROD. Tr. 1340:13-20.

An email from Sue Zike to Robert Devlin, Owen Schmidt and other FS personnel dated June 7, 1999 indicates that Ms. Zike had learned that the hearing on the parties' cross-motions for summary judgment would now take place later, during the "week of 6/21." PX 121. Ms. Zike also noted "DOJ is likely to request that we wait until we have our ONRC Action hearing with J. Dwyer, but there is no date set yet." Id. However, Ms. Zike added that she "would like to suggest that we urge the quiet award" of Scott's sales and others after June 15, 1999. Id.; Tr. 1346:7-24.

In an email dated June 11, 1999, Brenda Woodard sent formal notification to Ms. Zike that she was prepared to award Scott's sales on June 16, 1999. PX 121A; Tr. 909:22-915:2. However, the award of Scott's sales continued to be delayed. By letter dated June 23, 1999, signed by Mr. Devlin for the Acting Regional Forester, the FS gave formal notice to Mr. Boling of the FS's intention to award Scott's sales after July 1, 1999, the rescheduled date for a hearing on the parties' cross-motions for summary judgment. PX 125 at A-972 to -74; Tr. 1109:18-1112:21.

On July 6, 1999, ONRC Action provided the FS with a revised list of "at-risk" sales which continued to include Scott's sales. PX 128. This letter stated, "Consistent with our prior agreements and stipulations, plaintiffs offer to hold off seeking preliminary injunctive relief with respect to these sales until at least July 31, 1999, if the [FS] and BLM agreed to provide plaintiffs with at least ten (10) days advance notice prior to approving any plan of operations for the sales." Id. A copy of this letter was provided to Owen Schmidt, the FS attorney who provided advice and assessed the risk of awarding sales for the FS. Tr. 259:9-23; see id. at A-980. In a memorandum dated July 7, 1999, Sue Zike advised Robert Devlin, then the Acting Deputy

Regional Forester, and Kathryn Toffenetti, a lawyer in the FS's Washington, D.C. Office, of the status of various sales, including Scott's sales, and, in Ms. Zike's view, the points to consider in deciding whether the FS should agree to ONRC Action's 10-day notice proposal. PX 129; Tr. 1361:18-1362:11. Ms. Zike noted that Scott's sales were on ONRC Action's "at-risk" list but were ready to be awarded and that although the FS had authority to approve any general plan of operations before a sale is operated, the FS had no provision to require that the purchaser delay operations after a plan of operations was approved unless there were "resource reasons." PX 129 at A-987 to -88.

In an email dated July 7, 1999 to her distribution list, Ms. Zike wrote "we want to consider moving ahead with this [sic] sales and further sales, notwithstanding the draft Bartuska letter."[17] PX 129 at A-985. Presumably for this reason, as reflected in Ms. Zike's email of July 8, 1999, Ms. Zike conferred with Dick Fitzgerald and Rod Sallee (officials in FS Timber Management in Washington, D.C.), Kathryn Toffenetti (FS attorney), Owen Schmidt (FS attorney) and Edward Boling and received their concurrence in the Region 6 decision to award Scott's sales among others. PX 141; Tr. 527:5-528:1, 1371:12-1372:16. The FS approved the decision to award Scott's sales on July 8, 1999 even though the FS believed that DOJ thought it likely that the award of Scott's sales and other sales in July would trigger a motion for injunctive relief from ONRC Action. Id. On July 8, 1999, Scott's sales were awarded. Stip. 2-4.

The foregoing demonstrates that the FS repeatedly delayed the award of Scott's sales first to facilitate settlement discussions, next to avoid a premature motion for injunctive relief, next to

[17] Ann Bartuska, Director of the FS Timber Management Office in Washington, D.C., had recommended that timber sales in litigation not be awarded without the concurrence of the Washington Office. Tr. 1361:18-1362:25.

await an anticipated hearing on the government's motion to dismiss and finally to wait for the hearing on the parties' cross-motions for summary judgment. After delaying the award of these sales for months for these reasons, the FS inexplicably decided it could wait no longer and rushed forward with award one week after the hearing in ONRC Action and less than one month before the final decision in ONRC Action on August 2, 1999. The FS knew that an adverse decision on the merits in ONRC Action could lead to the suspension of Scott's sales and cause Scott to incur substantial damages. In these circumstances, there is no rational basis for the FS to have rushed to award these sales and not to have waited at least a reasonable time for the court to issue its decision. In choosing to award Scott's sales prior to the final decision in ONRC Action, the FS knowingly incurred substantial risks and imposed substantial risks on Scott without informing Scott of this danger. This unreasonable and risky behavior is a sufficient basis in itself to support a finding that the FS is liable to Scott.

**C. The FS Unreasonably Prolonged The Suspensions**

Had the FS made a reasonable effort to complete the Category 2 surveys of Scott's sales, the FS should have completed them by spring 2000. It was on track to do so even as late as January 2000. Instead, the FS did not complete the surveys until sometime in October-December 2000 (with the exception of Unit 10 on Pigout, discussed below). Tr. 1447:8-1448:11. Even then, the FS did not lift the suspension of Pigout until June 21, 2002 and the suspensions of Whitebird and Jigsaw until June 9, 2003. PX 172 (Interrog. 20); Stip. 8-10; Tr. 1447:24-1448:8. At trial, the FS provided no reasonable excuse for this delay. The FS was unreasonable for maintaining the suspensions of Scott's sales past spring 2000 and is liable for all damages caused by Scott's inability to operate the sales after that time.

Surveys were required for Scott's sales for lichens, bryophytes, vascular plants, fungi, mollusks, and the RTV. See DX 104; PX 172 (Interrog. 20). By October 13, 1999, the surveys had been completed for lichens, bryophytes, and vascular plants. DX 104 at SCOTTII 00520-21. For fungi and mollusks, surveys were required during two different seasons, at least one of which had to be in the fall. Id.; Tr. 1449:8-14. The FS began the fungi and mollusk surveys on November 4, 1999. PX 172 (Interrog. 20). Less than two weeks later, the FS completed the fall fungi surveys. DX 104 at SCOTTII 00520-21. As late as January 2000, the FS expected to complete the fungi surveys by the spring of that same year. Id. at 00518. There was no reasonable basis for the FS not doing the same for the mollusk surveys.

As for the RTV, only one survey was required, with a group of 2 to 5 surveyors being able to survey an entire cutting unit in a single day. If a potential RTV nest was found in a tree then a subsequent survey would be conducted, either by climbing the tree or viewing the nest from the ground, to verify the nest. Tr. 1432:13-1433:4, 1433:15-20, 1457:9-1458:2. Such verifications occurred at most two to three weeks after the initial survey. Tr. 1434:21-1435:8. The FS began the RTV surveys on September 22, 1999. PX 172 (Interrog. 20). Even assuming the FS used a single crew of surveyors, all 27 units[18] in the three sales should have been surveyed by the beginning of November 1999, plus an added two to three weeks to verify the potential nests found in Unit 10 of Pigout and Unit 40 of Whitebird. There was no reason why the FS could not have completed all RTV surveys by the end of November 1999.

Even assuming arguendo that it was reasonable for the FS to have taken until October-December 2000 to complete the surveys, it was unreasonable for not lifting the suspension of

[18]There are 10 units in Pigout, 8 units in Whitebird and 9 units in Jigsaw. PX 4 at SCOTTII 09953; PX 5 at SCOTTII 03881; PX 15 at SCOTTII 09431.

Pigout until June 21, 2002. By October-December 2000 the only survey work remaining on Pigout was one suspected RTV nest in Unit 10 that required verification, and even during the busiest time it took only about two to three weeks from the original sighting to verify a potential RTV nest. Tr. 1434:21-1435:9. The FS first identified this potential Pigout nest on September 25, 1999, Tr. 1446:4-9, so the FS ought to have been able to verify it by the middle of October 1999. Instead, the FS waited nearly two years – until August 8, 2001 – to verify that the nest in Unit 10 did not even belong to a RTV. DX 130 at 11; Tr. 1457:9-22. Steve Nelson, the FS official responsible for overseeing surveys on Scott's sales, could not explain this two-year delay. Tr. 1446:4-25.

Also, the FS could have lifted, but did not lift, the suspension on Pigout on all units but Unit 10 in the October-December 2000 timeframe, thereby allowing Scott to begin operations on Pigout while the FS completed the remaining single nest verification. This is exactly what the FS did for Whitebird. When an active RTV nest was located in Unit 40 of Whitebird, the FS suspended that unit until the contract was modified to preclude operations within about five acres of the nest but lifted the suspension on all other units. Stip. 10. The FS never approached Scott with the option of doing the same thing for Unit 10 in Pigout. Instead, the FS maintained its suspension on the entire Pigout sale while it unreasonably waited for nearly two years to verify a single RTV nest.

The FS similarly was unreasonable in maintaining the suspension of the entire Pigout timber sale while it prepared an EA for Unit 28.[19] Unit 28 was authorized under a Categorical

[19]Unit 28 was the third smallest unit in Pigout – comprising just 4.7 acres and 197 CCF of sawtimber of the sale's total 144.1 acres and 6,801 CCF or less than 3% of the total Pigout volume. JX 5 at 3881.

Exclusion ("CE") that the district court overturned on September 28, 1999 in Heartwood, Inc. v. United States Forest Service, 73 F. Supp. 2d 962 (S.D. Ill. 1999).[20] PX 149. In response, the FS conducted an EA for the area covered by the invalidated CE. The FS did not complete this EA until October 23, 2001. PX 172 (Interrog. 3). Although all other units on Pigout had satisfied the Category 2 survey requirements by October-December 2000 (with the exception of Unit 10, which remained in limbo while the FS waited to verify a single potential RTV nest), rather than allowing Scott to proceed with operations on those units, the FS instead chose to keep the entire sale suspended for another two years while it completed the EA for Unit 28. Mr. Nelson offered no explanation for why the FS chose this course of action. Tr. 1481:8-25. The FS suspension of Pigout from at least October-December 2000 to June 11, 2002 was unreasonable.

For Jigsaw and Whitebird, there was no contractual authority for the FS to continue the suspensions long after the Category 2 surveys were completed in October-December 2000. Under the ONRC Action settlement agreement upon the completion of the surveys for a sale, the FS was required to provide ONRC Action with a Supplemental Information Report describing the survey results. If ONRC Action did not object to the Report the suspension could be lifted within 60 days. PX 155 at A-1833 to -34 (¶¶ 3, 4). ONRC Action raised no objections to the surveys on Whitebird and Jigsaw. At a minimum, within 60 days of December 2000 the suspension of Whitebird and Jigsaw should have been lifted. However, the FS kept both sales suspended for about another 2½ years, until June 9, 2003. Mr. Nelson attempted to explain that the FS waited to release the sales from the suspension because the EA authorizing the sales was

---

[20] Scott relies on the holding of the district court in Heartwood as an additional ground to support its contention that the FS breached its duties to cooperate and not to hinder Scott's operations in Unit 28.

implicated in another lawsuit, Umpqua Watersheds v. United States Forest Service, No. 01-399 (D. Or. Apr. 2, 2002). Tr. 1483:17-1484:24. However, under clause CT6.01, the FS must act pursuant to a court order for a suspension to be contractually authorized,[21] and there was no court order in Umpqua Watersheds. Tr. 1496:2-4.[22] Therefore, the suspensions of Whitebird and Jigsaw from at least March 2001 (60 days after December 2000) to June 9, 2003 breached Scott's contracts.

According to the survey protocols and the record at trial, the FS should have been able to complete all of the surveys of Scott's sales by the spring of 2000, which would have allowed Scott to begin operations on the sales that year. Alternatively, even if the FS was reasonable for taking until October-December 2000 to complete the surveys (except for Unit 10 in Pigout), as of that date, the FS's contractual authority to suspend the sales to comply with the ONRC Action court order expired. The FS decision to keep Pigout suspended until June 11, 2002 and Whitebird and Jigsaw suspended until June 9, 2003 was a further breach of the implied duties to cooperate and not to hinder Scott's performance.

**CONCLUSION**

For all of the reasons set forth herein and based on the facts adduced at trial, Scott respectfully requests that the Court rule that the FS breached Scott's contracts.

[21] CT6.01 also authorized suspensions in two circumstances not applicable here.

[22] Because the court order approving the settlement agreement in ONRC Action also dismissed the case, there also was no court-ordered injunction after December 17, 1999 and therefore no contractual basis for continuing the suspension of any of Scott's sales after that date. PX 155.

Respectfully submitted,

s/Gary G. Stevens

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Ruth G. Tiger
Eric J. Pohlner
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: August 29, 2008