# In the United States Court of Federal Claims

No.  05-708C

(Filed Under Seal: March 31, 2011)
(Reissued: April 5, 2011)

|  |  |  |
|---|---|---|
| **SCOTT TIMBER COMPANY,** | ) | Post-trial decision on damages in a |
|  | ) | timber-sale case; unreasonable actions by |
| **Plaintiff,** | ) | the Forest Service leading to suspensions |
|  | ) | of the sales; undue delay in lifting the |
| **v.** | ) | suspensions; foreseeability; mitigation; |
|  | ) | viability of pass-through claim; lost |
| **UNITED STATES,** | ) | profits; claim preparation costs; interest |
|  | ) |  |
| **Defendant.** | ) |  |
|  | ) |  |

Alan I. Saltman, Saltman & Stevens, P.C., Washington, D.C., for plaintiff. With him at trial and on the briefs were Ruth G. Tiger and Aron C. Beezley, Saltman & Stevens, P.C., Washington, D.C.  With him at closing argument was James J. White of Ann Arbor, Michigan.

Ellen M. Lynch, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant.  With her at trial and on the briefs was Anuj Vohra, Trial Attorney, Commercial Litigation Branch, and with her on the briefs were Gregory G. Katsas, Acting Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Bryant G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C.  Of counsel was Rebecca Harrison, Office of the General Counsel, U.S. Department of Agriculture, Washington, D.C.

## OPINION AND ORDER[1]

Lettow, Judge.

This is a post-trial decision on damages in a timber-sale case.  The relevant timber-sale contracts pertain to the "Jigsaw," "Whitebird," and "Pigout" timber areas located in the Umpqua National Forest in Southern Oregon, within Region 6 of the National Forest System.  *See Scott Timber Co. v. United States*, 86 Fed. Cl. 102, 103 (2009).  Scott Timber Company ("Scott

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal.  The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before April 6, 2011.  The parties have notified the court that no redactions were necessary.

Timber" or "Scott") filed suit in this court seeking damages based upon allegations that the United States Forest Service ("Forest Service") had wrongfully suspended and breached these three timber-sale contracts. At the behest of the parties, trial proceedings were bifurcated into separate phases, respectively, liability and damages. *See id.* at 103 n.1. Following an eight-day trial held in Portland, Oregon, from June 30 through July 11, 2008, the court found the government liable to Scott Timber. *See id.* at 120-21. Thereafter, a seven-day trial on damages was held from August 16 through August 24, 2010. Upon the completion of post-trial briefing and closing argument, the claim for damages is ready for disposition.

## FACTS[2]

At oral auctions held on October 21 and 28, 1998, Scott Timber was the high bidder on timber-sale contracts for the Pigout, Jigsaw, and Whitebird tracts, and, eventually, eight and one-half months later, on July 8, 1999, Scott was awarded those contracts. *Scott Timber*, 86 Fed. Cl. at 104. Each of the three contracts contained a standard clause, Section CT6.01, providing for the interruption or delay of operations to prevent environmental damage or to comply with a court order. *Id.* at 104-105. Each contract also contained a clause, Section BT8-21, permitting a Contract Term Adjustment if Scott Timber experienced an interruption or delay in operations or if the Forest Service requested an interruption or delay of more than ten days. *Id.* at 105.

The three contracts were suspended before performance began due to an injunction issued by the United States District Court for the Western District of Washington in a litigation styled *Oregon Natural Res. Council Action v. United States Forest Serv.*, 59 F. Supp. 2d 1085 (W.D. Wash. 1999) ("ONRC Action"). *See Scott Timber*, 86 Fed. Cl. at 105. In *ONRC Action*, plaintiffs challenged the Forest Service's and the Bureau of Land Management's compliance with survey requirements contained in the Northwest Forest Plan. *Id.* at 106 (citing *ONRC Action*, 59 F. Supp. 2d at 1091-92). The Jigsaw, Whitebird, and Pigout timber sales had not been identified as being at risk in the complaint or amended complaint filed in *ONRC Action*, or in any public filings in that case, but the environmental organizations who brought suit had informed the Justice Department during confidential settlement negotiations that they believed the three sales, among others, had been made in contravention of the Northwest Forest Plan. *See Scott Timber*, 86 Fed. Cl. at 106. Officials with the Forest Service had specifically withheld this information from Scott Timber, acting on the basis that they were obliged by the attorney-client privilege *not* to disclose the inclusion of the tracts on the list of "at risk" sales. *Id.* at 116.

The Northwest Forest Plan amended Land and Resource Management Plans governing the operation of nineteen National Forests and seven Bureau of Land Management districts in the Pacific Northwest, including the Umpqua National Forest where the tracts pertinent to Scott Timber's sales were located. *Scott Timber*, 86 Fed. Cl. at 109. The Plan required surveys to be performed before ground-disturbing activities could be implemented in forest areas, to avoid harming species of concern that might be present in the forest. *Id.*

---

[2]This recitation of facts, taken together with those contained in the earlier opinion on liability, constitutes the court's principal findings of fact in accord with RCFC 52(a). Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

The Northwest Forest Plan was developed after a series of injunctions barring timber sales had been entered by federal district courts in the early 1990s.  *See Scott Timber*, 86 Fed. Cl. at 109 & n.9.  Representatives of the Forest Service, Bureau of Land Management, Environmental Protection Agency, and other federal agencies undertook a study and drafted a report suggesting "patterns of protection, investment, and use that will provide the greatest possible economic and social contribution from the nation's forests."  *Id.* at 109 (citing DX 2 at 5 Forest Ecosystem Management Team ("FEMAT") Report (July 1999)) (internal quotations omitted).[3]  The FEMAT report and further environmental impact assessments were used to formulate the Plan.

In *ONRC Action*, the district court for the Western District of Washington on August 2, 1999, acting upon cross-motions for summary judgment, concluded that the Forest Service had failed to comply with survey requirements outlined in the Northwest Forest Plan and precluded the Forest Service from approving operations on the sales listed in the amended complaint until the required surveys had been performed.  *ONRC Action*, 59 F. Supp. 2d at 1093, 1097.  Twenty-four days later, on August 26, 1999, the district court expanded its injunction to include twenty-five other timber-sales contracts not identified in the *ONRC Action* pleadings or other publicly available filings in the case; this subsequently enjoined group included the Pigout, Jigsaw, and Whitebird sales.  *Scott Timber*, 86 Fed. Cl. at 107.  The Forest Service suspended the timber sales that had been enjoined, including the three timber sales at issue here, and it began to undertake the requisite surveys of the sale areas.

All surveys on the Pigout, Jigsaw, and Whitebird properties were completed by August 7, 2001.  *Scott Timber*, 86 Fed. Cl. at 111.  Nonetheless, the Pigout contract remained suspended until June 11, 2002, and the Jigsaw and Whitebird contracts remained suspended until June 9, 2003.  *Id.* at 105-106.  Once the suspensions were lifted, Scott Timber began harvesting the timber covered by the sales.  Scott Timber completed performance of the Pigout contract in 2005, and of the Jigsaw and Whitebird contracts in 2008.  *See* PX 244B (Attachments A-C: Timber Sales Statements of Account).

In November 2004, Scott Timber filed three claims under the Contract Disputes Act with Ms. Brenda L. Woodard, the Forest Service's contracting officer for the Pigout, Jigsaw, and Whitebird contracts.  *Scott Timber*, 86 Fed. Cl. at 106.  She issued a decision granting Scott Timber interest on its deposits in the three sales but denied Scott's claims for lost market opportunity and other costs and losses.  *Id.*

On June 30, 2005, Scott Timber filed suit in this court alleging that the Forest Service had wrongfully suspended and breached the Pigout, Jigsaw, and Whitebird timber-sale contracts and seeking damages.  *See* Compl. at 17-18.  Following the initial trial, the court found the

---

[3]Plaintiff and defendant identified their exhibits in sequence for the liability and damages trials, and exhibits and testimony from the liability phase carried over into the damages phase.  Plaintiff's exhibits are denoted as "PX __," defendant's exhibits are identified as "DX __," and Joint Exhibits are represented as "JX __."  Citations to the transcript of the trial on damages are to "Tr. __."

government liable for damages to Scott Timber on three separate and independent grounds. First, the Forest Service unreasonably awarded the Pigout, Jigsaw, and Whitebird contracts to Scott Timber without informing Scott of the risks to the contracts posed by the *ONRC Action* litigation, which risks were known to the Forest Service but not to Scott Timber and which knowledge had been specifically and intentionally withheld from Scott Timber.[4]   These actions breached the Forest Service's covenant of good faith and fair dealing and duty to cooperate. *Scott Timber*, 86 Fed. Cl. at 117-18 (citing *Scott Timber Co. v. United States*, 333 F.3d 1358, 1369 (Fed. Cir. 2003); *H.N. Wood Prods., Inc. v. United States*, 59 Fed. Cl. 479, 487 (2003); *Shawn Montee, Inc.*, AGBCA Nos. 2003-132-1 through 2003-136-1, 2004 WL 473250, at *17 (Dept. Agric. B.C.A. Mar. 10, 2004)).  Second, the Forest Service unreasonably delayed completing the surveys of the Pigout, Jigsaw, and Whitebird timber areas, as required by the *ONRC Action* injunction and the Northwest Forest Plan, unduly lengthening the contract suspension periods.  *Scott Timber*, 86 Fed. Cl. at 119-20.  And third, the Forest Service further acted unreasonably by continuing the suspensions of two of the contracts even after the requisite surveys had been completed, because of the existence of a different lawsuit in which no injunction was ever issued.  *Id*. at 120.[5]

At the trial on damages, Scott Timber endeavored to prove that lost profits from the suspension of the timber sales contracts were required to make whole Scott Timber and its sister-corporation, Roseburg Forest Products ("Roseburg").  Pl.'s Post-Trial Br. at 1.  Scott adduced evidence that an implied subcontract existed between Scott Timber and Roseburg that contemplated that Scott Timber would buy and harvest the timber and that Roseburg would process the harvested timber into finished products primarily consisting of plywood, although some dimension lumber was also produced.  *See* Tr. 58:18 to 60:8, 61:2 to 62:15 (Test. of Allyn C. Ford, president of Scott Timber, Roseburg, and their parent company, RLC Industries).[6]

---

[4]At the trial on liability, detailed evidence was received regarding the government's legal posture in the *ONRC Action* proceedings leading up to the issuance of the injunctions, as well as relating to the deliberations among governmental officials that led to the award of the timber-sales contracts approximately one month before the first injunction was issued.  This evidence was received because the government had waived the attorney-client privilege and the protection accorded work product for communications related to matters at issue in this case and others arising out of the same events.  *See Scott Timber*, 86 Fed. Cl. at 106 n.6 (citing *Blue Lake Forest Prods., Inc. v. United States*, 75 Fed. Cl. 779 (2007)).

[5]The government claimed that the suspensions of the Jigsaw and Whitebird contracts could not have been lifted because another environmental lawsuit had been filed concerning a set of contracts that included those two sales.  *See Scott Timber*, 86 Fed. Cl. at 120 (referring to *Umpqua Watersheds v. United States Forest Serv.*, No. 01-399 (D. Or. Apr. 2, 2002)).  However, no injunctive order was ever issued in the *Umpqua Watersheds* case, and therefore the government did not have the necessary cause under CT6.01 to continue the suspensions.  *Scott Timber*, 86 Fed. Cl. at 120.

[6]Mr. Ford described the process of turning timber into a finished plywood product. Timber is cut and then peeled, which results in "a continuous strip of ribbon of veneer."  Tr. 43:5-19 (Ford).  That veneer is then cut into sheets and sorted according to whether it is "core"

Mr. Ford testified that an "implicit" agreement existed between Scott Timber and Roseburg that Scott Timber would use its "best efforts" to purchase and harvest logs for use in Roseburg's mills and that Roseburg was required to process all of the timber received from Scott that was suitable for use in Roseburg's mills, in accord with the Forest Service's domestic processing regulations. *Id.* Alternatively, Scott Timber claimed that it and Roseburg were one and the same company because Scott Timber had no independent existence from Roseburg. Mr. Ford testified that Scott and Roseburg were technically different companies but that Scott had no employees of its own, Tr. 31:2-5 (Ford), and that all of Scott's functions were performed by Roseburg's employees. Tr. 275:21-24 (Ford).

Mr. Ford explained that the timber in the Pigout, Jigsaw, and Whitebird areas largely consisted of old-growth Douglas fir, which was in high demand during the suspension period because of its suitability for use in premium plywood products. *See* Tr. 153:17 to 155:18.[7] Roseburg had scheduled that timber for inclusion in its mill runs beginning in 2000, Tr. 119:15 to 124:2 (Ford); the delay meant that Roseburg suffered a gap in its supply of logs used to manufacture premium plywood products. Because of the high demand for, and environmental concerns surrounding harvesting of, old-growth timber, which decreased the harvestable volume "dramatically," there was a "shortage" of old-growth timber available on the open market during the 2000 and 2001 harvest years. Tr. 102:16 to 103:7 (Ford). Consequently, Mr. Ford testified that Scott Timber had significant difficulty in acquiring enough old-growth timber while its contracts were suspended to meet market demand for premium plywood products that could be

---

or "face" material, "core" material being "solid" material that "make[s] up the balance of [a] panel," and "face" material being that material which will ultimately comprise the side of plywood on display upon use. Tr. 39:15 to 40:2, 43:20-24, 47:14-22 (Ford). The veneer is then classified within a grading system according to the quality of the veneer (the quality of the veneer being determined by the degree of "big knobs or splits," among other things, on the veneer); the top grade of veneer is A grade veneer, while the lowest grade of veneer is D grade. Tr. 37:19 to 38:7, 43:22-24 (Ford). Layers of sheets are then stacked upon one another at a 90 degree angle to create plywood products. Tr. 41:2 to 42:18 (Ford). Premium plywood products use veneer from the upper tiers of the grading system, while commodity-grade products use veneer primarily starting at grade C. Tr. 37:19-21, 38:5-7 (Ford).

[7]Timber west of the Cascade Range in Oregon is primarily Douglas fir and western hemlock, while that east of the mountains is largely Ponderosa pine. Tr. 1204:6-8 (Test. of Ronald D. Lewis, a retired former official with the Forest Service, who had worked in both areas.). Both Douglas fir and western hemlock are used in producing plywood, with Douglas fir used for face and core material and western hemlock used primarily for core material and dimension lumber. Tr. 222:15 to 225:7 (Ford) (explaining the nomenclature used in PX 219, reporting the species and grade of logs harvested from the Pigout sale); Tr. 546:5 to 548:13 (Test. of Marc A. Mendenhall, who had worked for Roseburg first as a "sawyer scaler" and then in various portions of increasing responsibility until he became the "lumber operations manager" at Roseburg's Dillard facility).

Mr. Mendenhall impressed the court with his extensive knowledge of the allocation of raw timber to mills in the forest products industry, including his detailed experience in developing, adjusting, and implementing log grading systems to aid that allocation.

processed from such old-growth Douglas fir.  Tr. 154:24 to 155:4, 157:1-7 (Ford).  Indeed, Mr. Ford testified that Scott had "practically zero opportunity to find additional" old-growth logs.  Tr. 158:10-21; *see also* 159:23 to 160:11 (Ford) (explaining that Scott was unable to acquire old-growth logs from its own timberlands, which consisted primarily of "second-growth stands").

Mr. Ford also testified about how the contract suspensions affected Roseburg's ability to produce premium and commodity plywood products.  If the contracts had originally been harvested in 2000 and 2001, Mr. Ford averred that Roseburg still would have been able to produce the same amount of commodity plywood products in the post-suspension period of 2004 to 2008.  Tr. 208:4-9, 210:9 to 212:10.  In those circumstances, Mr. Ford testified, Roseburg would have bought the additional timber "on the open market" or extracted such timber from second-growth timberlands owned and operated by yet another sister company, Roseburg Resources Company ("Roseburg Resources").  Tr. 210:9 to 212:10.  In contrast to old-growth timber, second-growth timber produces a much reduced proportion of high-grade veneers suitable for use in premium products.  Tr. 53:23 to 55:20 (Ford).  Correspondingly, Mr. Ford acknowledged that Roseburg "would have struggled" to make the same amount of premium plywood products in 2005 and 2006 if the Pigout, Jigsaw, and Whitebird areas had been harvested as originally planned.  Tr. 200:8-16.  Mr. Ford testified that, if Roseburg had manufactured premium plywood products from that timber in 2000 and 2001, it would have had difficulty acquiring enough old-growth timber to make the same premium products in the post-suspension period.  Tr. 200:1-21 (Ford).

Scott Timber began harvesting timber from each of the three tracts in 2004, and it completed harvesting the Pigout tract in 2005, but did not complete work on the Jigsaw and Whitebird tracts until 2008.  Mr. Ford testified that Scott Timber could not have started harvesting the three areas immediately following the lifting of the suspensions, due to various preparatory measures that were required for harvesting, including the enlistment of numerous subcontractors, construction of roads, and retention of firms to remove logs by helicopters (required by the contracts for specific areas).  *See* Tr. 162:12 to 163:8, 163:14-18, 164:8-17, 165:4-10 (Ford).  Mr. Ford testified also as to the reasoning behind Scott Timber's slowed harvest of the timber particularly from the Jigsaw and Whitebird tracts following the lifting of the suspensions from those tracts in 2003 (the suspension of the Pigout contract had been lifted in 2002).  Primarily, this delay was due to Scott Timber's decision to focus upon acquiring logs for the commodity plywood market rather than the premium plywood market because the commodity market "more than doubled in price," Tr. 165:25 to 166:4 (Ford), while at the same time, the premium plywood market was beginning to drop off.  Tr. 168:4-11 (Ford).  Because the Jigsaw and Whitebird tracts consisted of timber best used in premium plywood products, Scott Timber elected to slow its harvesting of the areas.  Scott nonetheless completed harvesting all the tracts within the suspension-extended time for performance.

In support of its damages claim, Scott submitted expert testimony and a report by Michael L. Wildey, which calculated what Scott and Roseburg's expected revenues and costs from the Pigout, Jigsaw, and Whitebird sales would have been (the "but for" case), presuming the suspensions had not occurred.  Tr. 633:2-7, 658:21-24 (Wildey).  Mr. Wildey is a Certified Management Account who worked at Roseburg for thirty years, in roles such as Acting

Controller and Director of Planning and Forecasting.  Tr. 611:5-25, 617:5-12, 619:1-25, 621:9-23 (Wildey).  While at Roseburg, Mr. Wildey made "hundreds" of forecasts concerning cash flow and profitability for the company.  Tr. 625:9 to 627:4 (Wildey).  At trial, he summarized his expert report and conclusions.  Mr. Wildey concluded that Roseburg had lost $3,665,256 from the Jigsaw suspensions, $960,121 from Pigout, and $2,253,598 from Whitebird.  Tr. 804:3-805:25 (Wildey).[8]  Scott lost $19,959 in log sales from the Pigout sale and $13,529 from the Whitebird sale, but benefitted by $4,746 from the Jigsaw suspension because the company would have lost money on log sales from that area.  Tr. 696:10 to 697:20 (Wildey).  Scott also had to expend an additional $129,599 to purchase timber for core material it would have acquired from the three timber sales.  Tr. 673:24 to 679:7 (Wildey).

A second expert, Robert A. Ness, offered testimony detailing actual revenue and costs derived from harvesting and processing the timber after the suspensions were lifted.  Tr. 1010:1 to 1012:13 (Ness).  Mr. Ness is a Certified Public Accountant who has approximately 32 years of public and private accounting experience, including eleven years as a Chief Financial Officer or Controller of forest products companies.  *See* PX 244A (Ness' Expert Report) (Curriculum Vitae Tab).

The court also heard testimony from former Roseburg employees Steve W. Reister and Marc A. Mendenhall, who had helped Mr. Wildey compile and analyze data for his expert report.  *See* Tr. 463:9 to 464:2, 465:14-19 (Reister); Tr. 500:1 to 505:7 (Mendenhall).  Mr. Reister had been the general foreman at Roseburg's Dillard plywood plant and then became a plywood salesman for Roseburg.  Tr. 463:1-19 (Reister).  As noted previously, Mr. Mendenhall initially had worked as a sawyer scaler but then became the lumber operations manager at the Dillard plant.  Tr. 500:1 to 505:5 (Mendenhall).

The government maintained that any losses suffered by Roseburg should not be recoverable, because no written subcontract existed between Scott Timber and Roseburg and no implied-in-fact contract could be derived from the arrangements made by and between Scott and Roseburg.  Def.'s Post-Trial Br. at 4.  The government also urged the court to find that the timber-sales contracts precluded Scott from recovering damages for lost profits if the contracts were suspended.  *Id*. at 16-17.

Alternatively, relying upon the testimony of its expert, Derk G. Rasmussen, the government contended that Scott had to reduce any claims for lost profits by the actual profit it

---

[8]Mr. Wildey testified that he made a clerical error in his original expert report and that Roseburg's lost profits for Whitebird were actually $5,738 less than originally stated.  *See* Tr. 660:11 to 661:2 ("On going back and reviewing the calculation on damages I discovered . . . I picked up the wrong line for the [G]reen plant on the Whitebird sale. . . .  I used a volume of 187,000 board feet which was one line above the correct volume of 144,000 board feet . . . . [T]hat would have made a difference of $5,738 less damages."); *see* PX 239 at 5 n.2 (Wildey's Rebuttal Report).

made on the timber-sales contracts post-suspension. Tr. 1287:13 to 1289:8 (Rasmussen).[9]
Mr. Rasmussen is a Certified Public Accountant and holds numerous other certifications
concerning accounting and business practices. Tr. 1178:15 to 1179:2 (Rasmussen). He has been
a forensic accountant since 1983, Tr. 1184:19-23, and has led his own forensic accounting firm,
Sage Forensic Accounting, for the past several years. Tr. 1187:3-12 (Rasmussen).

　　　Mr. Rasmussen criticized Mr. Wildey for "assum[ing]" the contracts would be harvested
in 2000 and 2001, DX 444 at 7 (Expert Report of Derk G. Rasmussen); DX 445 at 18 (Rebuttal
Report of Derk G. Rasmussen), for "assum[ing]" that there was no other source of old-growth
timber available for acquisition by Scott Timber in 2000 and 2001 after the contracts were
suspended, Tr. 1264:9-23, for relying on data presented to him by Roseburg employees, DX 445
at 26, and for some differences between Mr. Wildey's report and the one completed by Mr. Ness.
DX 444 at 7-13. Mr. Rasmussen additionally contested Scott's experts' conclusion that there
was "sufficient demand for the products in question to actually result in a lost sale." Tr.
1265:11-14 (Rasmussen); *see also* Tr. 1270:6-13 (Rasmussen) (questioning whether there was
indeed a shortage of high-grade veneer during the suspension period).

　　　Mr. Rasmussen testified that Scott and Roseburg had incurred no damages because he
believed they had earned more in the post-suspension period than they would have if the timber
sales were harvested as planned. Tr. 1282:12-24, 1283:19 to 1284:5. To evaluate the financial
impact of the suspension on Scott Timber, Mr. Rasmussen chose 2003 as the year in which the
logs could have been harvested and plywood made. Tr. 1416:4-11 (Rasmussen).
Mr. Rasmussen indicated, however, that despite his use of 2003 — the harvesting period
immediately following the lifting of the suspensions for Jigsaw and Whitebird — as the essential
baseline for his calculations, he was "not saying" that Scott Timber could have actually
harvested the timber at that time, Tr. 1415:5-12 (Rasmussen),[10] nor could he testify as to how

---

[9]This was so, according to Mr. Rasmussen, because actual profits must always be
deducted from but-for profits in determining damages when "there's a delay and you're able to
make up for those sales in a subsequent period." Tr. 1288:6-11 (Rasmussen). The only
exception to this rule would be "in a situation where . . . demand is so high that every possible
product you produce can sell" — an exception which Mr. Rasmussen testified he did not believe
applied to Scott Timber. Tr. 1288:22-25 (Rasmussen).

　　　[10]The pertinent exchange was as follows:
　　　　　Q: But you have no reason to believe that harvesting the sales
　　　　　in 2003 was practical?
　　　　　A: I have no analysis of when it was actually practical to
　　　　　harvest any of this stuff based on supply and demand. That
　　　　　would be the overriding driver of when things were harvested
　　　　　or should have been harvested.
　　　　　Q: Maybe I don't understand what you mean by should have
　　　　　been harvested.
　　　　　A: Should have been harvested to maximize the supply, the
　　　　　harvest that was available from the Forest Service.

long such harvesting in reality would have taken, Tr. 1415:21-24 (Rasmussen). Mr. Rasmussen likewise testified that he had "no way of knowing" the reasonableness of Scott Timber's decision to harvest the timber in 2004 through 2008. Tr. 1412:2 to 1413:2 (Rasmussen). When pressed by Scott Timber's counsel as to how "the sensitivity of pricing relate[s] if [Scott Timber] couldn't have harvested the sales at the time [the suspensions were lifted]," Mr. Rasmussen responded that he was just "showing that the prices were higher post[-]suspension than they were pre[-]suspension." Tr. 1416:1-5.[11]

Mr. Rasmussen concluded that Scott Timber actually benefitted from the suspension, profiting by $423,397.48 based on the changes in log prices, Tr. 1283:19 to 1284:5, and that Roseburg obtained a profit of $8,569.77 related to plywood products, Tr. 1282:8-24.

### STANDARDS FOR DECISION

"The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997)) (internal quotations omitted). "'[T]he general principle is that all losses, however described, are recoverable.'" *Indiana Mich.*, 422 F.3d at 1373 (quoting *Restatement (Second) of Contracts* § 347 cmt. c (1981)).

To recover damages, Scott Timber bears the burden of proof to show that (1) the damages were reasonably foreseeable by the breaching party at the time of contracting, (2) the breach is a substantial causal factor in the damages, and (3) the damages are shown with reasonable certainty. *Indiana Mich.*, 422 F.3d at 1373 (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)). Damages must also be directly caused by defendant's breach and not be too remote. *See Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1021 (Fed.

---

Q:  And wouldn't it have to have been practical to actually conduct the harvest?
A:  That would be an input into the analysis.
Q:  So you didn't input into your analysis whether or not it was practical to harvest in 2003?
A:  I didn't do a supply and demand analysis because I don't have the data to do a supply and demand analysis.
Q:  So that was a no?
A:  No. I didn't do it because I couldn't.

Tr. 1417:25 to 1418:21.

[11]Mr. Rasmussen dismissed the importance of the selection of his harvest date for his calculations, arguing that "[t]he whole point of the exercise is not to pinpoint the exact moment when they should have harvested the logs. The point of the exercise is to demonstrate that when they actually do harvest the logs it's very sensitive based on the pricing issues that are occurring within the market, and without a supply and demand analysis it's impossible to be able to determine whether they acted prudently." 1415:13-20 (Rasmussen).

Cir. 1996) ("'[R]emote and consequential damages are not recoverable in a common-law suit for breach of contract . . . especially . . . in suits against the United States for the recovery of common-law damages.'") (quoting *Northern Helex Co. v. United States*, 524 F.2d 707, 720 (Ct. Cl. 1975)). Although causation must be directly established, the breach need not be the sole cause of the damages. *California Fed. Bank v. United States*, 395 F.3d 1263, 1267-68 (Fed. Cir. 2005). Additionally, while speculative damages are not recoverable, "'where responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision.'" *San Carlos Irrigation & Drainage Dist.*, 111 F.3d at 1563 (quoting *Electronic & Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358 (Ct. Cl. 1969)).

If a party to a contract provides notice that it does not intend to perform under the contract, the other, non-breaching party acquires an obligation to mitigate its losses or damages: "'[O]nce a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.'" *Indiana Mich.*, 422 F.3d at 1375 (quoting *Restatement (Second) of Contracts* § 350 cmt. b); *see also Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1320 (Fed. Cir. 2007) (same); *Boston Edison Co. v. United States*, 93 Fed. Cl. 105, 115 (2010) (same). Typically, a mitigating, non-breaching party is entitled to recover its expenses of mitigating the breach, specifically its costs of arranging alternatives to the breaching party's required performance. *Boston Edison*, 93 Fed. Cl. at 115.

The non-breaching party obligated to mitigate may recover as damages its reasonable costs incurred in doing so. However, the government may seek to eliminate or reduce mitigation-related damages by making a showing that the claimant's mitigation efforts were unreasonable. *See Indiana Mich.*, 422 F.3d at 1375. A non-breaching party is "'not precluded from recovery . . . to the extent that [it] has made reasonable but unsuccessful efforts to avoid loss.'" *Id.* (quoting *Restatement (Second) of Contracts* § 350(2)); *see also First Heights Bank, FSB v. United States*, 422 F.3d 1311, 1316-17 (Fed. Cir. 2005).

## ANALYSIS

### I. *RECOVERY FOR ROSEBURG'S LOSSES*

A preliminary question is whether Scott Timber can put forward a claim that, among other things, encompasses losses suffered by Roseburg. Scott has proffered two theories for recovery: that Roseburg was Scott's subcontractor and Scott may prosecute a pass-through claim against the government on Roseburg's behalf, and alternatively, that Roseburg and Scott are, for all practical and legal purposes, a single entity.

### A. Scott's Relationship to Roseburg

Scott Timber and Roseburg Forest Products, as well as Roseburg Resources, are wholly-owned subsidiaries of their parent company, RLC Industries. Tr. 26:5-14 (Ford). Scott Timber was created for the purpose of obtaining and providing raw timber to Roseburg for processing, manufacture, and sale. Tr. 27:19-24 (Ford). The arrangement between Scott and Roseburg

reportedly is common in the timber industry in the Northwestern United States; in an effort to protect the assets of a timber company's mill, sister companies, like Scott, are frequently created to serve as the timber-sale-contract holder.  Tr. 394:11-16 (Woodard).  Although Scott and Roseburg are technically different companies, Scott has no employees of its own.  Tr. 31:2-5 (Ford).  Scott's officers are also Roseburg's officers, and all of Scott's functions are performed by Roseburg's employees.  Tr. 274:8 to 276:1 (Ford).  However, Scott and Roseburg do have separate balance sheets, income statements, and general ledgers.  Tr. 849:22 to 850:16 (Wildey).

The court is bound by precedent, *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303 (Fed. Cir. 2004), to treat Scott Timber and Roseburg as separate entities, despite the fact that Scott appears to have an independent existence only as a technical corporate matter, and not on a functional basis.  In *Poly-America*, a patent case, the plaintiff tried to collect damages suffered by its sister company, Poly-Flex, with which it shared the same parent.  The court held that Poly-America could not recover Poly-Flex's damages, explaining, "Their parent [company] has arranged their corporate identities and functions to suit its own goals and purposes, but it must take the benefits with the burdens. . . . [Sister companies] may not enjoy the advantages of their separate corporate structure and, at the same time, avoid the consequential limitations of that structure."  *Id.* at 1311.  Accordingly, despite the reality that Scott Timber exists independently of Roseburg only on paper, the court is bound to treat Scott and Roseburg as separate entities.  Therefore, for Scott to be able to recover for Roseburg's losses, it must establish that Roseburg was its subcontractor and make a valid pass-through claim.

## B. A Pass-Through Claim

"A pass-through claim allows a prime contractor to assert against the government a claim for harm caused by the government to a subcontractor where the subcontractor could hold the prime contractor liable for that harm."  *International Tech. Corp. v. Winter*, 523 F.3d 1341, 1347 (Fed. Cir. 2008).  Scott Timber claims that it is liable to Roseburg, the domestic log processor, for harms caused by the Forest Service's breach, and can therefore put forward Roseburg's losses as well as its own in seeking damages from the government for the breach.  The government has objected to Scott's pass-through claim on the grounds that there was no subcontracting relationship between Scott and Roseburg, and that Scott is not liable to Roseburg.  Def.'s Pre-Trial Br. at 7.

The issue of recovery by a prime contractor on behalf of a subcontractor was addressed comprehensively in *E.R. Mitchell Constr. Co. v. Danzig*, 175 F.3d 1369 (Fed. Cir. 1999), where the court of appeals considered the exception to the privity-of-contract doctrine, which allows "a prime contractor in certain circumstances to sue the government on behalf of its subcontractor, in the nature of a pass-through suit, for costs incurred by the subcontractor."  175 F.3d at 1370 (citing *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984)).  This exception is commonly referred to as the *Severin* doctrine based upon the precedent established in *Severin v. United States*, 99 Ct. Cl. 435 (1943), *cert denied*, 322 U.S. 733 (1944).  Under the original *Severin* doctrine, if the prime contractor could prove its liability to the subcontractor for the damages sustained by the subcontractor, then the prime contractor itself could show injury from the government's action.  Such a showing would overcome an objection based upon the lack of privity between the government and the subcontractor.  *See E.R. Mitchell*,

175 F.3d at 1370.  Initially, the burden of proving the prime contractor's "responsibility to a subcontractor, to avoid the defense of sovereign immunity, rested on the prime contractor."  *Id.*  Subsequently, however, the burden of proof was shifted from the prime contractor to the government.  *Id.*  "Thus, it became, and still is, the burden of the government to prove that the prime contractor is *not* responsible for the costs incurred by the subcontractor that are at issue in the pass-through suit."  *Id.*  (emphasis in original) (citing *John McShain, Inc. v. United States*, 412 F.2d 1281, 1283 (Ct. Cl. 1969); *Blount Bros. Constr. Co. v. United States*, 346 F.2d 962, 964-65 (Ct. Cl. 1965)).  "The *Severin* doctrine can only bar the prime contractor's pass-through suit against the government if the government first asserts at trial, and then proves, that the prime contractor is not liable to the subcontractor for the costs in suit."  *E.R. Mitchell*, 175 F.3d at 1371 (citing *George Hyman Constr. Co. v. United States*, 30 Fed. Cl. 170, 177 (1993), *aff'd*, 39 F.3d 1197 (Fed. Cir. 1994) (table)).

> 1.  *Roseburg's arrangement with Scott Timber*.

The government argues there was no contract between Scott and Roseburg, and therefore Roseburg could not be a subcontractor to Scott.  No expressly written contract existed between Scott and Roseburg.  Although Scott and Roseburg's relationship was not committed to writing, Scott contends that it had an implied-in-fact contract with Roseburg.  An implied-in-fact contract requires a "meeting of the minds, which . . . is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding."  *Bank of Guam v. United States*, 578 F.3d 1318 (Fed. Cir. 2009) (internal quotations omitted).  Acceptance of an offer can be manifested by parties' conduct, and conduct alone can create an implied-in-fact contract.  *Restatement Second of Contracts* § 19; *Williston on Contracts* § 1:5 at 35-38; *id.* § 4:2 at 340-43.

Mr. Ford described the existence of an "implicit" agreement between Scott Timber and Roseburg.  Tr. 58:18 to 60:8; 61:2 to 62:15.  Scott was required to use "best efforts" to purchase, harvest, and provide Roseburg with logs that were needed for use in Roseburg's plants, and Roseburg was required to process the logs that met its quality specifications, in accordance with the domestic processing requirements of Scott's Forest Service timber-sales contracts.  Tr. 62:25 to 64:8, 115:14-19, 126:25 to 127:10, 239:25 to 240:24, 280:5-18 (Ford).  Roseburg itself appears to have no forest resources but rather uses timber obtained by Scott and timber grown and harvested by its sister company, Roseburg Resources, to manufacture lumber products such as plywood and dimension lumber for sale.  Tr. 27:19-24 (Ford).  Mr. Wildey testified that the ledgers for Scott and Roseburg recorded the transfer of timber and that a transfer-pricing regime was used to make payment.  Tr. 689:12 to 690:11.  In light of this evidence, the court finds an implied-in-fact contract existed between Scott and Roseburg, which required Roseburg to identify its needs for timber and to domestically process timber suitable for its plants that then was acquired through Scott's timber contracts to meet those needs.

> 2.  *The relevance of domestic processing requirements*.

The government argues Roseburg could not have been a subcontractor for Scott because the domestic processing completed by Roseburg was not required by the primary contract between Scott and the Forest Service.  However, evidence from the Pigout, Jigsaw, and

Whitebird contracts and numerous witnesses' testimony indicates that domestic processing was a requirement of Scott's performance.  The Pigout, Jigsaw, and Whitebird contracts were expressly subject to the Forest Resources Conservation and Shortage Relief Act of 1990, 16 U.S.C. §§ 620-620j, which makes it illegal to export unprocessed timber from federal lands.  *See* JX 4 at 185 (Whitebird Timber Sale Contract (July 8, 1999)) (§ CT 8.641); JX 5 at 184 (Pigout Timber Sale Contract (July 8, 1999)) (§ CT 8.641); JX 15 at 183 (Jigsaw Timber Sale Contract (July 8, 1999)) (§ CT 8.641).[12]  Each of the contracts required that "[u]nless otherwise agreed in writing, unprocessed Included Timber [must] be delivered to a domestic processing facility and . . . not be mixed with logs intended for export."  JX 4 at 185 (§ CT 8.641); JX 5 at 184 (§ CT 8.641); JX 15 at 183 (§ CT 8.641).  Mr. Lewis, a retired former official with the Forest Service, testified at trial that the Forest Service not only "knew" that timber harvested pursuant to federal timber-sales contracts would be domestically processed, but that it was also "[p]art of [the Forest Service's] job . . . to make sure" the timber was processed domestically because "[i]t was illegal to export unprocessed logs."  Tr. 1217:5-16 (Lewis).  The contracting officer for the Pigout, Jigsaw, and Whitebird contracts, Ms. Woodard, acknowledged that part of the Forest Service's duty was "monitoring delivery" of the logs to prevent the export of unprocessed timber.  Tr. 308:18 to 309:1.  Scott was required to report the location where logs from Forest Service timber sales were processed.  *See, e.g.*, PX 207 (Scott's Log Disposition Forms for the Umpqua National Forest (1998)); *see also* Tr. 309:2 to 310:22 (Woodard).  The government maintains that, while the contracts forbade the export of unprocessed logs, the contracts did not require the timber to be domestically processed.  However, Ms. Woodard acknowledged that, as a practical matter, there was nothing that could be realistically done with logs harvested from a Forest Service sale other than processing them.  Tr. 343:15-21 (Woodard).  She was not aware of a single instance where a federal timber processor had paid for an old-growth Douglas fir log that was not processed into finished products.  Tr. 330:11-17 (Woodard).

Other reported decisions have considered whether timber sales contracts included a domestic processing requirement.  *See Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460 (2006).[13]  In *Precision Pine*, the government argued that "the manufacture and sale of

---

[12]The prohibition on export of unprocessed timber originating from federal lands is stated in statutorily explicit terms:

> No person who acquires unprocessed timber originating from Federal lands west of the 100th meridian in the contiguous 48 States may export such timber from the United States, or sell, trade, exchange, or otherwise convey such timber to any other person for the purpose of exporting such timber from the United States, unless such timber has been determined under subsection (b) of this section to be surplus to the needs of timber manufacturing facilities in the United States.

16 U.S.C. § 620a(a).

[13]In the *Precision Pine* case, the trial court ultimately awarded the plaintiff damages for the Forest Service's suspension of fourteen sales contracts in Arizona pending compliance with Section 7 of the Endangered Species Act, 16 U.S.C. § 1536.  *See Precision Pine & Timber, Inc. v. United States*, 81 Fed. Cl. 733 (2008), *aff'd in part, rev'd in part, and remanded*, 596 F.3d 817

lumber . . . is not inherent in timber sale contracts themselves, even if the Forest Service knew that [a contractor] intended to manufacture and sell lumber, such activity constituted independent and collateral undertakings." *Id*. at 475.  The court rejected the government's argument, holding that it was "obvious to the Forest Service" that the timber purchaser "did not intend to cut the sawlogs on the timber contracts at issue and use them as firewood or stack them and leave them unused." *Id*.  The same is true here.  The government attempts to distinguish *Precision Pine* by noting that, unlike Precision Pine & Timber, Scott Timber did not own sawmills or plywood plants.  Def.'s Post-Trial Br. at 20 (citing Tr. 27:19-21, 28:25 to 29:2 (Ford)).  The government thus maintains that "lost profits related to the sale of manufactured products" were not "in any way foreseeable to the Forest Service."  Def.'s Post-Trial Br. at 20.  However, the testimony of Mr. Lewis and Ms. Woodard establishes that, just as in *Precision Pine*, it was "obvious to the Forest Service" that Scott Timber was acquiring timber for domestic processing and did not intend to use the logs "as firewood or . . . leave them unused."  *Precision Pine*, 72 Fed Cl. at 475.  Ms. Woodard also was well aware that logs harvested by Scott Timber were ordinarily processed by Roseburg, *see* PX 207 (Scott's Log Disposition Forms for the Umpqua National Forest (1998)), and, indeed, she had previously made a personal visit to at least one of Roseburg's mills.  Tr. 307:4 to 309:22 (Woodard).[14]

"[W]hen the lost profits directly relate to the subject of the contract, they are recoverable, even if they would have required a transaction with a third party."  *Mann v. United States*, 68

---

(Fed. Cir. 2010).  The awards of damages for thirteen of the contracts were reversed on the ground that the timber-sales contracts had not been breached.  596 F.3d at 834-35.

[14]Ms. Woodard stated that she had knowledge of the relationship between Scott Timber and Roseburg at the time the sales occurred:

> Q:  . . . [A]t the time that Scott bid on these three sales in the fall of 1998, you were aware of the relationship between Scott and Roseburg, correct?
>
> A:  The relationship, meaning that they were separate corporations, but Scott Timber served as a log procurement, yes.
>
> Q: Okay.  You understood that Scott was acquiring timber from the Forest Service to be used as raw material in Roseburg Forest Products' mills, right?
>
> A:  That was one of the places that I was aware that some of the logs would go, probably would go, just based on their pattern of delivery.
>
> Q:  And what pattern of delivery – what is the basis for your understanding of the pattern of delivery?
>
> A:  At the end of each year, as a contracting officer, there would be forms that each purchaser would have to fill out letting us know – letting the Forest Service know where they had delivered the logs.  That's part of the so-called export law that you referred to, monitoring delivery.

Tr. 308:4 to 309:1 (Woodard).

Fed. Cl. 666, 670 (2005). Roseburg's manufacturing activities directly related to the Pigout, Jigsaw, and Whitebird contracts and support rather than pose a barrier to Scott's pass-through claim.

      3. *Liability to Roseburg*.

      To forestall Scott's pursuit of a pass-through claim for Roseburg's losses, the government bears the burden of proving that, despite the subcontracting arrangement, Scott is not liable to Roseburg. To meet this burden, the government must show there was "an iron-bound release or contract provision immunizing the prime contractor completely from any liability to the sub[contractor]." *E. R. Mitchell Constr.*, 175 F.3d at 1371. "If the contract is silent as to the prime[ contractor]'s ultimate liability to the sub[contractor], suit by the former [for the subcontractor's damages] will generally be permitted." *Id.* (citing *Blount Bros.*, 346 F.2d at 964-65).

      None of the government's evidence establishes the absence of legal liability. The government points to the fact that Roseburg has not sued Scott, that the six-year statute of limitations for bringing a breach of contract claim has run vis-à-vis Scott and Roseburg, and that Scott and Roseburg did not enter into an agreement tolling the statute of limitations for the duration of the present lawsuit. Def.'s Post-Trial Br. at 9 (citing Tr. 260:21, 261:11 (Ford); *Prichard v. Regence Bluecross Blueshield of Or.*, 201 P.3d 290, 291-92 (Or. App. 2009) (identifying a six-year statute of limitations for breach of contract claims in Oregon)).

      Invoking a statute of limitations is an affirmative defense. The fact that Roseburg has not actually sued Scott says nothing about whether, as a legal matter, Scott would be liable to Roseburg for failing in a timely way to provide timber from the Pigout, Jigsaw, and Whitebird contracts if a suit were filed. Were Roseburg to sue Scott, and Scott not to invoke the statute of limitations, Scott would be found liable to Roseburg. As between Scott and Roseburg, Scott is responsible for the delay in harvesting and delivery of timber from the three sales to Roseburg. The government has presented no affirmative evidence to the contrary. *See ACE Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 289 (2006) (finding that the government had not satisfied its burden of proof that the prime contractor had no responsibility for the losses incurred by the subcontractor), *aff'd*, 499 F.3d 1357 (Fed. Cir. 2007). Scott's pass-through claim is therefore permitted.

## II. *MITIGATION OF DAMAGES*

      Scott Timber began and completed its harvesting of the timber sold by the Forest Service via the Pigout, Jigsaw, and Whitebird contracts within the time specified in the contracts as extended because of the suspensions. The government nonetheless argues that Scott and Roseburg's damages should be decreased because their damages were "directly and primarily" caused by Scott's failure to harvest the Pigout, Jigsaw, and Whitebird areas immediately after the contract suspensions were lifted. *See* Def.'s Post-Trial Br. at 24-25. The Pigout sale suspension was lifted in June 2002, and the Whitebird and Jigsaw sales were lifted in June 2003. Mr. Ford explained at trial that, after the suspensions were lifted, Scott began harvesting in 2004. Scott completed the Pigout harvest in 2005, but did not finish the Jigsaw and Whitebird harvesting

until 2008.  Specifically, the Pigout area was harvested in 2004 and 2005.  *See* PX 244B (Attachment B: Timber Sale Statements of Account — Pigout).  The Jigsaw and Whitebird areas were harvested in 2004, 2007, and 2008.  *See* PX 244B (Attachment A: Timber Sale Statements of Account — Jigsaw); *id.* (Attachment C: Timber Sale Statements of Account — Whitebird).

Because the timber from the Pigout, Jigsaw, and Whitebird areas was best suited for making premium plywood products, the government claims Scott should have harvested those sales immediately after the suspensions were lifted.  The government points to Mr. Ford's testimony that during 2004 and 2005, Scott was focused on acquiring logs for the commodity plywood market, rather than the premium plywood market, because the commodity market had "rocketed" and "more than doubled in price."  Tr. 165:25-166:4.  Around that same period, the price of premium plywood products "was slowly dropping off."  Tr. 168:9-11 (Ford).  The government contends that Scott should have harvested the three tracts before the premium market declined further.  The government's arguments amount to a claim that Scott failed to mitigate damages.

The government bears the burden of showing that Scott's mitigation efforts were unreasonable.  *See Old Stone Corp. v. United States*, 450 F.3d at 1360, 1370 (Fed. Cir. 2006); *Consolidated Edison Co. of NY, Inc. v. United States*, 92 Fed. Cl. 466, 488 (2010); *Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515, 528 (2006).  Scott is "'not precluded from recovery . . . to the extent that [it] has made reasonable but unsuccessful efforts to avoid loss.'"  *Indiana Mich.*, 422 F.3d at 1375 (quoting *Restatement (Second) of Contracts* § 350(2)); *see also First Heights Bank*, 422 F.3d at 1316-17.

The government has not shown that Scott's post-suspension harvesting was commercially unreasonable.  First, a set of practical considerations prevented Scott Timber from beginning immediately to harvest the Pigout, Jigsaw, and Whitebird sales.  *See* Tr. 162:12-14, 164:8-14, 165:4-10 (Ford).  Harvesting involves working with logging contractors, trucking contractors, and other parties. Tr. 162:16 to 163:4 (Ford).  Because of the time required to organize a harvest, Scott typically makes plans in November and December for harvests the following year.  Tr. 162:16-23, 163:14-18 (Ford).  The suspensions were lifted in June when the harvest season had already begun and resources had already been committed to other harvests.  Additionally, the Pigout sale required "helicopter logging," which only a few contractors were available to do in Oregon, and the Jigsaw area required significant preparatory work to construct roads. Tr. 163:4-8, 165:4-10 (Ford).  Scott had to arrange for road construction and helicopter logging in the Whitebird area as well. Tr. 164:8-17 (Ford).  Because of the planning required, Scott could not realistically have commenced harvesting the Pigout sale earlier than the year following the government's decision to lift the contract suspensions, and the harvesting for Jigsaw and Whitebird contracts would have required at least as much preparatory time and probably more.

Second, the Pigout, Jigsaw, and Whitebird areas included timber best suited for making premium plywood products.  But, in the third quarter of 2003, the market for commodity plywood products "took off" and "more than doubled in price."  Tr. 165:22-166:4 (Ford).  The commodity plywood market stayed strong through 2006. Tr. 166:8-18 (Ford).  The years the commodity market was booming were some of the most profitable years Scott Timber and Roseburg ever had. Tr. 166:14-20 (Ford).  Again, Scott Timber began harvesting for each of the

three contracts in 2004, and while it completed the Pigout work in 2005, that for Jigsaw and Whitebird lasted until 2008.  In effect, Scott Timber finished harvesting the Jigsaw and Whitebird areas when the prices of commodity plywood started to abate.  *See* Tr. 166:21 to 167:1 (Ford).  At that time, the market in premium plywood products was also declining, in part due to changing customer preferences and competition from producers in Chile.  Tr. 167:9 to 168:19 (Ford).

The government's expert, Derk G. Rasmussen, asserted in his expert report that "if [Scott Timber Company] had harvested in 2004, 2005, or 2006, the average selling price [of the logs] would have exceeded that of . . . 2001 and no loss would have occurred."  DX 445 at 32. Mr. Rasmussen seems focused on the harvests of the Jigsaw and Whitebird tracts.  However, Mr. Rasmussen did not address in his expert report whether Scott Timber's choice of harvest time was reasonable given the booming commodity plywood market in those years. Mr. Rasmussen also admitted that it was impossible to know the optimal time for harvesting timber until after the fact, and that he did "not know if it was unreasonable or not" for Scott to have harvested the Jigsaw and Whitebird sales when it did.  Tr. 1411:16-20, 1412:2 to 1413:2 (Rasmussen).

Plaintiff's expert Robert Ness criticized Mr. Rasmussen's decision to use the Oregon Department of Forestry's data on log sale prices to render his opinion on Scott's optimal harvest time.  In his testimony, Mr. Ness offered several examples from actual log sales Scott Timber made that were up to three times the sales prices estimated by the Oregon Department.  *See* Tr. 1481:6 to 1483:19 (Ness).  This testimony undermines the reliability of Mr. Rasmussen's conclusion.

Ultimately, the government abandoned its contention that Scott acted unreasonably. Tr. 1627:15-18 (Def.'s closing argument).  Yet, the government reinstitutes the same type of argument by contending that Scott's reasonable business decision to delay harvesting the Jigsaw and Whitebird timber sales caused Scott to make less profit on those sales than it could have otherwise.  Under the government's theory, Scott had an obligation to anticipate a decline in the premium plywood market and to give priority to acquiring timber from the Jigsaw and Whitebird sales rather than maximizing its profits by taking advantage of the high demand for commodity plywood products.

Scott's obligation was to make reasonable efforts to mitigate its losses.  The government has presented no credible evidence that Scott should have known the premium plywood market would suffer in 2007 and 2008.  Accordingly, the court finds that, by taking advantage of the demand for commodity plywood, Scott's delay in harvesting the Jigsaw and Whitebird tracts was reasonable, and damages should not be decreased.

## III. *MEASURE OF DAMAGES*

### A.  Contractual Limitations on Damages

The government contends that Clause CT6.01 of the timber contracts unambiguously bars the recovery of lost profits in the event of a breach.  *See* Def.'s Pre-Trial Br. at 10.  This clause

provides that the "sole and exclusive remedy" "in [the] event of interruption or delay of operations under this provision" is limited to "a Contract Term Adjustment pursuant to [Clause] BT8.21" and "out-of-pocket expenses." *See* JX 4 at 157 (Whitebird Timber Sale Contract (July 8, 1999)); JX 5 at 154 (Pigout Timber Sale Contract (July 8, 1999)); JX 15 at 155 (Jigsaw Timber Sale Contract (July 8, 1999)). Out-of-pocket expenses explicitly do not include "lost profits." JX 4 at 157 (Whitebird Timber Sale Contract (July 8, 1999)); JX 5 at 154 (Pigout Timber Sale Contract (July 8, 1999)); JX 15 at 155 (Jigsaw Timber Sale Contract (July 8, 1999)). Even though the government breached the timber-sales contracts, it argues that the limitations in Clause CT6.01 on remedies should still apply because "the breach[es] found by the [c]ourt w[ere] only . . . partial breach[es]," and consequently, "the parties continue to be bound by the terms of the contract as written." Def.'s Pre-Trial Br. at 17 (citing *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1280 (Fed. Cir. 2008)).

For the limitations on remedies in Clause CT6.01 to apply, however, the contract must have been "interrupt[ed] or delay[ed] . . . under [the CT6.01] provision." JX at 157 (Whitebird Timber Sale Contract (July 8, 1999)). Clause CT6.01 governs interruption or delay of operations in three circumstances:

> (a) To prevent serious environmental degradation or resource damage that may require contract modification under CT8.3 or termination pursuant to CT8.2;
> (b) To comply with a court order, issued by a court of competent jurisdiction; or
> (c) Upon determination of the appropriate Regional Forester, Forest Service, that conditions existing on this sale are the same as, or nearly the name as, conditions existing on sale(s) named in such an order as described in (b).

*Id.* Scott Timber's contracts were initially suspended under Clause CT6.01(b), due to a court order in *ONRC Action*. *See Scott Timber*, 86 Fed. Cl. at 107. The Forest Service, in turn, adjusted the terms of each of the three contracts and paid some of Scott's claimed out-of-pocket costs. *See* Tr. 163:19-25, 164:18-24, 165:11-14 (Ford) (discussing contract term adjustments); JX 11 at 6-9 (Contracting Officer's Findings and Decision – Jigsaw Sale) (awarding interest on deposits and costs of maintaining bonds during the suspension); JX 12 at 6-9 (Contracting Officer's Findings and Decision – Whitebird Sale) (same); JX 13 at 6-9 (Contracting Officer's Findings and Decision – Pigout Sale) (same).

Although the suspensions initially occurred under Clause CT6.01(b), the court found in the trial on liability that the government breached the contracts in three ways, existing apart from that Clause, although related to it. By awarding the contracts without informing Scott Timber of the risks to the contracts posed by the *ONRC Action* litigation, the Forest Service breached its covenant of good faith and fair dealing and its duty to cooperate. *Scott Timber*, 86 Fed. Cl. at 117-18. The Forest Service also unreasonably delayed completing the surveys of the Pigout, Jigsaw, and Whitebird timber areas, unduly lengthening the contract suspension periods. *Id.* at

119. And finally, the Forest Service continued the suspensions of two of the contracts even after the requisite surveys had been completed because of litigation in which no injunction was ever entered. *Id*. at 120. These breaches do not fall under the circumstances outlined in Clause CT6.01; the award of the contracts in the face of an imminent threat of an injunction, knowledge of which was intentionally kept from Scott Timber, and delays in completing the environmental surveys and lifting the suspensions are not matters subject to Clause CT6.01.[15]

Consequently, because these breaches resulted in the contracts being "interrupt[ed] or delay[ed]" for reasons other than those listed in Clause CT6.01, the contractual limitations in that Clause on remedies are not triggered, and Scott Timber may pursue lost profits in its claim.

### B. Post-Suspension Profits

Scott Timber and Roseburg produced plywood and dimension lumber and sold logs between 2004 and 2008 using material from the Pigout, Jigsaw, and Whitebird sales. Scott argues the profits from these transactions should not be subtracted from its damages because it and Roseburg are "lost volume sellers." In other words, Scott argues that, had the timber sales contracts been harvested as planned in 2000 and 2001, it and Roseburg still would have engaged in substantially the same business transactions in 2004 through 2008; they just would have acquired the timber they used from another source. *See* Pl.'s Post-Trial Br. at 37-39.

Scott Timber's theory is encapsulated in the *Restatement (Second) of Contracts*. "If the injured party could and would have entered into the subsequent [transaction], even if the contract had not been broken, and could have the benefit of both, he can be said to have 'lost volume' and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the net profit that he has lost as a result of the broken contract." *Restatement (Second) of Contracts* § 347 cmt. f; *see also Precision Pine*, 72 Fed. Cl. at 496. Whether a party is a lost-volume seller is a question of fact. *Precision Pine*, 72 Fed. Cl. at 496; *see also Restatement (Second) of Contracts* § 347 cmt. f.

Scott Timber comments that analytically "the situation is really one dealing with the application of [Sections] 2-708(2) and 2-714(1) of the Uniform Commercial Code." Pl.'s Post-Trial Br. at 38. Although the Uniform Commercial Code does not directly apply to government contracts, the Federal Circuit has noted that the Code provides "useful guidance in applying general contract principles" to government contracts. *Hughes Comm. Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2001); *see also Citizens Fed. Bank, FSB v. United States*, 59 Fed. Cl. 507, 513 n. 6 (2004).

Factually, however, Scott is not a "lost volume seller" as explained in the *Restatement* or in Section 2-708 of the Uniform Commercial Code. The "lost volume seller" doctrine is

---

[15]Despite the fact that surveys on the Pigout, Jigsaw, and Whitebird properties were completed by August 7, 2001, the Pigout contract remained suspended until June 11, 2002, and the Jigsaw and Whitebird contracts remained suspended until June 9, 2003. *Scott Timber*, 86 Fed. Cl. at 105-106, 111.

generally applied to a seller whose *buyer* breaches a contract.  The *Restatement* clarifies with an example:

> A contracts to pave B's parking lot for $10,000.  B repudiates the contract and A subsequently makes a contract to pave a similar parking lot for $10,000.  A's business could have been expanded to do both jobs.  Unless it is proved that he would not have undertaken both, A's damages are based on the net profit he would have made on the contract with B, without regard to the subsequent transaction.

*Restatement (Second) of Contracts* § 347 cmt. f (Illustration).  The buyers of Roseburg's plywood products did not breach a contract; the Forest Service, which was selling to Scott Timber, did.  Scott Timber is arguing that if the Forest Service had not breached, it could have earned the profits from selling products from the Pigout, Jigsaw, and Whitebird timber sales in 2000 and 2001, and then also could have acquired other timber to make the same sales it did make between 2004 and 2008.

Although Scott Timber's position does not fit within the factual pattern of a "lost volume seller," its argument is reflected in other general contract principles.  Damages should put a non-breaching party "in as good a position as he would have been in had the contract been performed."  *Restatement (Second) of Contracts* § 347 cmt. a.  "The relevant inquiry is whether requiring [a] plaintiff to offset damages earned in the post-suspension period would give [the] plaintiff the benefit of its bargain by awarding plaintiff damages that w[ould] put [the plaintiff] in as good a position as it would have been in had the contract been performed."  *Precision Pine*, 72 Fed. Cl. at 493.  So, if Scott and Roseburg could have made their 2004 through 2008 sales regardless of whether the contract suspensions occurred, the profits from those sales would not need to be subtracted from Scott and Roseburg's damages because the "benefit of the bargain" would have been simply the profits on timber products that could have been sold in 2000 and 2001.

Whether Scott Timber and Roseburg could have engaged in the 2004 through 2008 transactions if the Pigout, Jigsaw, and Whitebird contracts had not been suspended depends on whether Scott could then have acquired appropriate timber from other sources.  There is undisputed evidence that many of the transactions Scott Timber and Roseburg made in 2004 through 2008 could and would have been made even if the timber from the Pigout, Jigsaw, and Whitebird sales had been unavailable during that period.  Commodity-grade logs, used to make commodity plywood products, were available on the open market and from Roseburg Resources' timberlands.  Tr. 208:4-9, 208:20 to 209:4 (Ford).  If timber from the Pigout, Jigsaw, and Whitebird sales had not been available in 2004 to 2008, Roseburg would have been able to produce the same quantity of commodity plywood by acquiring commodity-grade logs from these other sources.  *See* Tr. 208:4-9 (Ford).  The evidence at trial also showed that logs suitable for commodity plywood could have generated enough high-quality veneer to produce some products classified as premium plywood, *viz.*, sanded plywood and some sound siding.  Tr. 200:8-16 (Ford).  Roseburg also would have been able to acquire core material by having Scott buy wood from industrial landowners or by harvesting wood from Roseburg Resources' land.

Tr. 211:11 to 212:10 (Ford).  And, in those years, Scott would have likely acquired from other timber purchases a similar number of logs of non-preferred species, such as western white cedar, incense cedar, and certain types of pine, that were unsuitable for use by Roseburg but could be sold on the open market.  *See* Tr. 210:3 to 211:10 (Ford); Tr. 1167:18 to 1168:7 (Ness).  However, Roseburg would not have been able to make and sell most of its premium plywood products in 2004 through 2008 if the timber from the Pigout, Jigsaw, and Whitebird sales had been harvested earlier and not thereafter been available.  Tr. 200:1-21 (Ford); Tr. 1168:13-21, 1514:1-5 (Ness).

The "benefit of the bargain" is the profit Scott and Roseburg would have made from the Pigout, Jigsaw, and Whitebird timber sales in 2000 and 2001. The profit on top-end premium plywood products that were eventually made from these sales could only have been obtained once, so the profit on those products obtained in 2004-2008 should be subtracted from the profits Scott and Roseburg would have made in 2000 and 2001.  The profit earned in the post-suspension period on other products derived from the timber sales, however, including commodity plywood products, core material, and logs, should not be subtracted.  These products would have been made or sold whether or not the contracts had been breached. Therefore, Scott Timber and Roseburg's lost profits on non-premium plywood products are the full amount Scott Timber and Roseburg would have earned had they been able to harvest the Pigout, Jigsaw, and Whitebird areas in 2000 and 2001.  There is no offset for those products.

IV. *QUANTUM OF DAMAGES*

A.  Lost Profits

1.  *Scott Timber's claimed damages.*

Scott Timber regularly sold logs it acquired in timber sales which were not useable by Roseburg, such as Lodgepole pine, western white pine, and incense cedar.  Tr. 688:6 to 689:11 (Wildey).  But, due to the contract suspensions, Scott Timber did not enjoy the benefit of those sales in 2000 and 2001.  Mr. Wildey calculated Scott Timber's damages from lost log sales by first determining the volume of these species from the Pigout, Jigsaw, and Whitebird sales using Scott Timber's and Roseburg's LIMS system.  *See* Tr. 715:23 to 716:9 (Wildey); PX 224 at 15, 26, 37 (Wildey Expert Report) (showing lost market opportunity for log sales), PX 218 (Actual Volume of Timber: Jigsaw); PX 219 (Actual Volume of Timber: Pigout); PX 220 (Actual Volume of Timber: Whitebird).[16]  He estimated the open market value of those logs during the originally planned harvesting period using intercompany transfer prices, which approximated market prices.  *See* Tr. 130:7-17 (Ford), Tr. 689:12 to 690:11 (Wildey).  Mr. Wildey then subtracted the total cost of delivering the logs to the buyer — encompassing stumpage, logging, and hauling costs — from the market value of the logs to estimate the profit or loss Scott Timber would have incurred.  *See* Tr. 671:15 to 672:24, 695:2 to 697:20 (Wildey); PX 224 at 14-15, 25-26, 36-37.  Mr. Wildey concluded that Scott Timber would have lost $4,746 on the sale of logs from Jigsaw, made a profit of $19,959 on the sale of logs from Pigout, and made a profit of

---

[16]The LIMS system employed by Scott Timber, Roseburg, and Roseburg Resources "keeps track of all . . . timber purchases and sales of logs."  Tr. 687:1-2 (Wildey).

$13,529 on the sale of logs from Whitebird.  Tr. 696:10-697:20, 904:11-905:4 (Wildey); PX 224 at 15, 26, 37.  In total, Scott's but-for lost profits from log sales totaled $28,742.

Due to the contract suspensions in 2000 and 2001, Scott also needed to purchase commodity-quality hem-fir (*i.e.*, hemlock and white fir) logs on the open market that it would have otherwise acquired by harvesting the Jigsaw, Pigout, and Whitebird areas.  Tr. 667:9-24 (Wildey).  Mr. Wildey determined the purchase prices and delivered log cost of those logs and concluded that Scott Timber suffered additional expenses of $174,916 to replace hem-fir it could not harvest from Jigsaw.  Tr. 679:1-7 (Wildey); PX 224 at 19; *see also* Tr. 669:19 to 674:3 (describing in detail Mr. Wildey's calculations concerning the replacement of core material).  Mr. Wildey also concluded that Scott Timber saved $6,776 by replacing the hem-fir logs from Pigout with open market purchases and $38,541 by replacing hem-fir logs from Whitebird with open market purchases.  Tr. 679:1-7 (Wildey); PX 224 at 30, 41.  In total, purchasing logs for core material in 2000-2001 would have cost Scott $129,599.  *See* Tr. 679:1-7 (Wildey).

2.  *Roseburg's claimed damages.*

Mr. Wildey calculated Roseburg's lost market opportunity for selling plywood products from the Pigout, Jigsaw, and Whitebird timber sales using a contribution-margin approach.  Tr. 637:10 to 638:13, 772:2 to 773:19 (describing the contribution-margin approach).

Mr. Wildey first determined the profit Roseburg would have earned per unit of sale of different types of plywood.  He acquired Roseburg's financial statements for its actual sales for the year in which each of the three contracts would have been harvested but for the suspension.  Looking at each plywood product group, he subtracted from the actual sale prices the raw material costs and the incremental costs of processing the products at the mills to determine lost profits.[17]  He finally added the by-product income that would have been generated from the logs on these sales.  Tr. 698:4-18 (Wildey); PX 224 at 3-5 (describing how Mr. Wildey performed his calculations).

In making his calculations, Mr. Wildey used the actual harvest volumes from the three sales.  He determined the volume of veneer that likely would have been produced from each of the logs and the products to which the veneer would have been allocated.  Tr. 698:19 to 699:5.  In total, Mr. Wildey calculated Roseburg's lost profits to be $6,878,975, including $3,665,256 from the Jigsaw sale, $960,121 from the Pigout sale, and $2,253,598 from the Whitebird sale.  PX 224 at 2, 11, 22, 33; PX 239 at 5 n.2.

---

[17]At the time the contracts were harvested, Roseburg only tracked profit by plant, not by product or product group.  *See* Tr. 724:5 to 726:14 (Wildey).  As a result, Mr. Wildey had to develop an estimate of what the raw material cost would have been had the harvests taken place.  He did so by calculating the percentage that the raw material for each product group represented in Roseburg's total raw material cost in March 2003 and applying those percentages to Roseburg's actual audited raw material cost for the year of anticipated harvest.

3.   *The government's objections.*

The government's expert, Mr. Rasmussen, criticized Scott Timber's damages calculations on several grounds, although the only one of Mr. Rasmussen's objections that was addressed in the government's post-trial brief was his questioning whether Scott Timber actually would have harvested the Pigout, Jigsaw, and Whitebird sales in 2000 and 2001, but for the suspensions.  *See* Def.'s Post-Trial Br. at 22-24.  The court will consider each of Mr. Rasmussen's contentions despite the omission of most of them from the government's post-trial brief.

As noted earlier, Mr. Rasmussen criticized Mr. Wildey for "assum[ing]" the contracts would be harvested in 2000 and 2001, for "assum[ing]" that there was no other source of old-growth timber for Scott Timber to acquire in 2000 and 2001 after the contracts were suspended, for relying on data presented to him by Roseburg employees, and for some differences between his report and the one completed by plaintiff's other expert, Robert Ness.  DX 444 at 7-13 (Rasmussen Expert Report), DX 445 at 18 (Rasmussen Rebuttal Report).  These critiques of Mr. Wildey's calculations are unavailing.

a.   *Harvesting schedule and other sources of timber.*

Mr. Ford and Mr. Wildey testified that, because of the strong demand for high-quality veneer in 2000 and 2001, the Pigout and Whitebird contracts would have been harvested in 2000 and, due to road construction requirements, the Jigsaw contract would have been harvested in 2001.  Tr. 119:15 to 124:2 (Ford); Tr. 702:22 to 704:7 (Wildey).  There is no evidence, merely Mr. Rasmussen's bare contentions, to undermine this testimony.

Mr. Ford specifically stated that Scott Timber's and Roseburg's efforts to find replacement old-growth timber was unsuccessful and that other available timber from Oregon state sources and Roseburg Resources would not have yielded comparable quantities of premium-quality veneer.  Tr. 65:11-22, 158:7 to 160:11.  Scott Timber had "practically zero opportunity to find additional [old-growth] logs" because it was "not the only company to see a restriction in these [old-growth timber] sales."  Tr. 158:15-21 (Ford).  That Roseburg could not generate enough premium-quality veneer to meet its sales demand in 2000 and 2001 is corroborated by the testimonial evidence provided by Mr. Reister, Mr. Mendenhall, and Mr. Wildey, each of whom was employed at Roseburg during the 2000-2001 time period.  Tr. 466:3-10 (Reister); Tr. 520:6-9 (Mendenhall); Tr. 702:2 to 704:17 (Wildey).  The Forest Services' contracting officer, Brenda Woodard, also confirmed that, because of the designation of the spotted owl as a threatened species in 1990, the Forest Service's target volume of old-growth timber sales in the Umpqua National Forest had declined from 300 million board feet (MBF) to 40 MBF annually.  Tr. 301:8 to 302:22 (Woodard).

Demand for premium plywood products was sufficiently high in 2000 and 2001 that Mr. Ford testified that Roseburg was regularly turning away orders for premium plywood products from such large and valued customers as Home Depot and Lowe's.  Tr. 155:5 to 158:6 (Ford); Tr. 466:11 to 467:1 (Reister); *see also* Tr. 87:2-12 (Ford) (explaining that Home Depot and Lowe's typically purchased high-quality plywood products from Roseburg).

b. *Mr. Wildey's reliance on information provided by Mr. Reister and Mr. Mendenhall.*

Mr. Rasmussen contended that Mr. Wildey should not have "assumed" which of Roseburg's plants would have been used to process the timber-sale logs. *See* DX 444 at 7-10. However, Mr. Wildey determined the destination of the logs using a report generated by the very person at Roseburg in charge of allocating logs among the company's plants, Mr. Mendenhall. Tr. 713:1 to 715:18 (Wildey); PX 255 (Cruise Volumes from Appraisal). Mr. Mendenhall's assessments were corroborated by Mr. Ford's testimony about the general destinations of different types of logs. Tr. 90:15 to 91:19, 141:1 to 142:13.[18]

Mr. Rasmussen also contended that there was not sufficient evidence to determine the amount and grade of veneer that would be produced from the logs. DX 444 at 12-13. This contention is not justified. Mr. Wildey calculated the amount of veneer that would be produced from the harvested logs using log test data compiled by Mr. Mendenhall, which data had been generated by recording the veneer actually produced from logs processed in Roseburg's plants. *See* Tr. 554:3 to 559:6 (Reister) (describing how he determined the average grade of veneer yielded from particular log grades); Tr. 781:22-23 (Wildey), PX 224 at 77 (Standard Grade Yield of Veneer per New Log Grade Tests); PX 238 (Standard Grade Yield per New Log Grade Tests for Douglas Fir, Hemlock, Spruce, Bull Pine, and Alder). The log test data indicated that one MBF of logs would yield 4.2 MBF of veneer. Tr. 527:2-16 (Mendenhall); Tr. 779:16 to 781:6 (Wildey). The data indicated, based on graded quality of log, what percentage of various grades of veneer would be produced from those logs. *See* Tr. 529:5 to 530:11 (Mendenhall). Mr. Mendenhall testified in detail at trial about his method for determining veneer yield. Mr. Rasmussen's only criticism of Mr. Mendenhall's analysis was that he "d[id]n't have any ability to verify" Mr. Mendenhall's work directly, Tr. 1358:19; and that Mr. Wildey "ha[d] not tested Mr. Mendenhall's work nor has he provided supporting documentation to duplicate the process Mr. Mendenhall used to determine what veneer grade percentages [came] from the different grades of logs." DX 445 at 23-24.

The analysis of veneer yield required looking at "hundreds and hundreds of log tests." Tr. 646:25 to 647:7 (Wildey); *see also* Tr. 554:13 to 555:5 (Reister). The data were generated by looking at actual logs going through Roseburg's plants at the relevant time period and compiling the veneer yields of those logs. Those data were compiled for use by Roseburg during the daily operation of the plants, to ensure that each log was sent to the optimum plant for processing. The derivation of the data and the ensuing use in everyday operations of Roseburg's sophisticated processing plants supply adequate indicia of credibility and negate Mr. Rasmussen's critiques.

Mr. Rasmussen similarly criticized Mr. Wildey's reliance on Mr. Reister's analysis of what plywood products would have been produced from the high-quality A and B grade veneer,

---

[18]For timber harvested east of I-5, which included the Pigout, Jigsaw, and Whitebird timber sales, high-quality logs went to Roseburg's Riddle plant, commodity-quality logs went to Roseburg's Green plant to produce sheathing and underlayment, and moderate-quality logs went to both the Riddle and Dillard plants. Tr. 90:15 to 91:19, 141:1 to 142:13 (Ford); Tr. 519:1-12 (Mendenhall).

claiming that Mr. Wildey "just accepted" Mr. Reister's calculations.  Tr. 1295:20 to 1297:8.
However, Mr. Reister provided Mr. Wildey with both his summary memorandum and
calculations of the percentage of A and better faces that were used in different Roseburg
plywood products.  Tr. 573:13 to 574:12, 604:2-9 (Reister).  Mr. Wildey testified that he
assessed the reliability of Mr. Reister's calculations and "verified" some of Mr. Reister's
mathematics.  Tr. 635:19 to 636:7, 641:7-17, 646:16 to 647:25 (Wildey).

     In each of these instances, Mr. Rasmussen challenged Mr. Wildey's reliance on the work
of Roseburg employees in creating his expert report.  In preparing his analysis, however,
Mr. Wildey is entitled to rely on data and information created and provided by others.  The
Federal Circuit has held that "an expert need not have obtained the basis for his opinion from
personal perception."  *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (2008) (citing, *e.g.*, *Data
Line Corp. v. Micro Techs., Inc.*, 813 F.2d 1196, 1200-01 (Fed. Cir. 1987)).  This court also has
allowed experts to testify based on data prepared by other persons.  *See, e.g.*, *Banks v. United
States*, 75 Fed. Cl. 294, 304 (2007) (expert could rely on geological tests and reports conducted
by others); *Weyerhaeuser Co. v. United States*, 32 Fed. Cl. 80, 125-126 (1994) (timber valuation
expert could rely on information from plaintiff's personnel in making calculation), *aff'd in part
and rev'd in part on other grounds*, 92 F.3d 1148 (Fed. Cir. 1996).  Mr. Wildey's use of data
gathered and analyzed by other parties was eminently reasonable and does not detract from the
reliability of his findings and conclusions.

     c.  *Comparison between expert reports.*

     Mr. Rasmussen also compared the volume of veneer Mr. Wildey claimed would have
been produced (64,029 MBF) and the volume of veneer Mr. Ness determined was actually
produced when the sales were harvested (39,391 MBF).  *See* Tr. 1266:14 to 1267:3 (Rasmussen);
DX 445 at 23.  However, this discrepancy is attributable to a change in usage patterns, not to
logs harvested.  Mr. Wildey's but-for calculations were premised on all of the logs being made
into plywood in 2000 and 2001.  In 2007 and 2008, Roseburg actually sold some of the high-
grade Douglas fir logs on the open market and sent other logs to a new stud mill in operation at
its Dillard plant.  Tr. 1487:7 to 1489:25 (Ness); *see also* Tr. 161:7 to 162:5 (Ford) (describing the
opening of the Dillard stud mill in 2004).  Mr. Ness estimated that if all of the logs that were sold
or sent to the stud mill had been used for veneer, almost 61,000 MBF would have been produced
from the Pigout, Jigsaw, and Whitebird timber sales.  Tr. 1489:3-20 (Ness).  Mr. Ness believed
this figure was not "significant[ly] differen[t]" from Mr. Wildey's calculation of 64,029 MBF.
Tr. 1489:21-25 (Ness).

     There was also a difference between Mr. Wildey's and Mr. Ness' calculations of the
percentage yield of particular grades of veneer from the timber sales.  For example, Mr. Wildey
calculated that 17.05% of the veneer that would have been produced would be A grade veneer,
and Mr. Ness calculated that only 8.79% of the veneer actually produced was A grade veneer.
*See* DX 445 at 23.  Mr. Rasmussen's analysis of this difference contained errors because he
lumped sound-grade and B grade veneer into the same category.  *See* Tr. 1485:10-1486:15.
Correcting for this error narrows the difference between Mr. Wildey's and Mr. Ness' calculation
significantly.  *See* 1486:6-15 (Ness).  In addition, the Douglas fir logs sold by Roseburg during
2007 and 2008 were very high-quality logs that typically yielded high percentages of A grade

veneer.  *See* PX 244A (Ex. 6a at 1) (showing high-quality logs from the Jigsaw timber sale sold in 2007 and 2008).  The difference noted by Mr. Rasmussen thus has a satisfactory explanation.

d.  *Other challenges.*

Variable manufacturing costs for plywood production at Roseburg's plants were also addressed by expert testimony.  Mr. Wildey looked at data from the Coquille plywood plant and estimated that variable manufacturing costs for additional plywood production increased at a per-unit rate of 75% of the manufacturing costs for the original volume of plywood.  Tr. 733:17 to 735:12 (Wildey); PX 245 (Coquille, OR, Plywood Plant Variable Manufacturing Costs (Dec. 31, 2001)).  Mr. Wildey used this figure to calculate the additional manufacturing costs for processing timber from the Pigout, Jigsaw, and Whitebird sales in 2000 and 2001.
Mr. Rasmussen claimed the supporting analysis for the 75% figure was "virtually nonexistent."
Tr. 1267:4-8 (Rasmussen).  Mr. Wildey arrived at his figure using data from the Coquille plant, even though none of the logs from the Pigout, Jigsaw, and Whitebird sales were processed there, because he had calculated the variable manufacturing costs for Coquille at previous times and thus had a basis for comparison.  Tr. 738:18-23 (Wildey).  The use of Coquille to determine variable manufacturing costs was not ideal.  However, Mr. Wildey's analysis of those costs at the Coquille plant was, on balance, a reasonable means of estimating the variable manufacturing costs for plywood production in the other plants.

4.  *Lost profits.*

Damages are proved with sufficient certainty "if the evidence adduced enables the court to make a fair and reasonable approximation of the damages. . . . [The court] may act upon probable and inferential as well as direct and positive proof."  *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960) (cited in *Energy Capital*, 302 F.3d at 1329).  Damages need not be proven with absolute certainty; "[t]he risk of uncertainty must fall on the defendant whose conduct caused the damages."  *Energy Capital*, 302 F.3d at 1327 (quoting *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1366 (7th Cir. 1996)).

The court finds that Scott has presented ample evidence to establish its and Roseburg's actual losses with sufficient certainty.  Mr. Rasmussen's criticism of Mr. Wildey's expert report does not significantly undermine its conclusions.  Mr. Wildey's beliefs that the Jigsaw, Pigout, and Whitebird sales would have been harvested in 2000 and 2001, that similar-quality old-growth timber was not available from other sources, and that high demand existed for premium plywood products are supported by testimony the validity of which has not been refuted in any way.  In his analysis, Mr. Wildey reasonably relied on voluminous amounts of information generated by Mr. Reister and Mr. Mendenhall for Roseburg's business purposes independent of the litigation.  The discrepancies between veneer yield in Mr. Wildey's and Mr. Ness' reports are explained by the sale of Douglas fir logs in 2007 and 2008 and the opening of the Dillard stud mill in 2004.  And finally, Mr. Wildey's estimation of variable manufacturing costs was, on balance, a reasonable approximation.  *See Precision Pine*, 596 F.3d at 832-34.

In total, Mr. Wildey concluded that Scott lost $28,742 in log sales and $129,599 in costs of purchasing logs suitable for core material.  Roseburg lost $6,878,975 in lost market

opportunities.  In total, Scott and Roseburg's anticipated profits on the timber sales in 2000 and 2001 were $7,037,316.

Properly discounted, Scott earned a profit of $62,638 from the sale of high-quality logs in 2007 and 2008, and Roseburg earned a profit of $107,578 on premium siding in the same period. Tr. 1509:9 to 1512:10, 1514:1 to 1516:3 (Ness).  Subtracting these amounts from Scott's and Roseburg's anticipated profits in 2000 and 2001, the court determines that Scott's actual damages were $95,703 and Roseburg's actual damages were $6,771,397, for a total of $6,867,100.

## B.  Claim-Preparation Costs

Scott argues that it is entitled to claim-preparation costs pursuant to Clause CT6.01 or, alternatively, as general breach damages.  In its post-trial brief, the government raises no objection to the inclusion of these costs in Scott's damages.  Applicable precedent, however, provides claim-preparation costs are not generally recoverable by a plaintiff.  *See, e.g.*, *Singer Co. v. United States*, 568 F.2d 695, 721 (Ct. Cl. 1977) ("[C]laim[-]preparation costs . . . are not allowable [because] they bear no relation to contract performance."); *Gulf Contracting, Inc. v. United States*, 23 Cl. Ct. 525, 532 (1991) (Claim-preparation costs "are related to contract performance only if they benefit contract production or contract administration related to ongoing productive work.").  Scott's request for claim-preparation costs is therefore denied.

## C.  Interest

The Contract Disputes Act provides that "[i]nterest on amounts found due contractors on claims shall be paid to the contractor from the date the contracting officer receives the claim pursuant to [41 U.S.C. § 605(a)] of this title from the contractor until payment thereof."  41 U.S.C. § 611.  Section 605(a) states that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision."  41 U.S.C. § 605(a).  Scott Timber's claims regarding the Pigout, Jigsaw, and Whitebird tracts were received by the Forest Service on November 10, 2004.  *See* JX 11 at 1 (acknowledging receipt of Scott's Jigsaw claim on November 10, 2004); JX 12 at 1 (acknowledging same for Whitebird); JX 13 at 1 (acknowledging same for Pigout).  The court finds that Scott Timber is entitled to interest on its claim from that date.  *See, e.g.*, *Pinckney v. United States*, 88 Fed. Cl. 490, 516 (2009); *ACE Constructors*, 70 Fed. Cl. at 295.

## CONCLUSION

For the reasons stated, Scott Timber is awarded $6,867,100 as damages for the Forest Service's breaches of the timber-sale contracts for the Pigout, Jigsaw, and Whitebird tracts in the Umpqua National Forest in Oregon.  Interest on this amount is awarded pursuant to, and at the rate specified in, 41 U.S.C. § 611 from November 10, 2004 until payment is made.  The clerk shall enter judgment in accord with this disposition.

No costs.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge